EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA BROWN, M.D., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-32E |
| | ) | |
| HAMOT MEDICAL CENTER, | ) | |
| | ) | |
| Defendant | ) | |

### RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Defendant Hamot Medical Center ("Hamot"), by and through its counsel, hereby responds to plaintiff Lisa Brown's ("plaintiff") First Request for Production of Documents and states as follows:

### PRELIMINARY STATEMENT

Hamot has not completed its investigation of the facts related to this case, has not completed discovery, and has not completed preparation for trial. All of the Responses contained herein are based only upon such information and documents that are presently known to Hamot. Further discovery and analysis may supply additional facts and establish new factual or legal contentions that Hamot may assert.

These Responses are made solely for the purpose of and in relation to this action. Each response is given subject to all appropriate objections, including without limitation, objections concerning competency, relevancy, materiality, propriety and admissibility. All such objections and grounds thereof are reserved and may be raised in subsequent proceedings.

The following responses include, as requested, documents and information not only of Hamot but of Hamot's agents, representatives, and, unless privileged, Hamot's attorneys.

The phrasing of the following responses is not necessarily that of Hamot, but is, in some cases, the phrasing of the persons mentioned in preceding paragraph.

The following responses are given without prejudice to Hamot's right to produce evidence of any subsequently discovered fact or contention that Hamot may later develop. These Responses furnish knowledge, facts and information presently available and, as requested, if subsequent or different information is obtained before trial, these responses will be appropriately supplemented, either formally or informally by communicating the information to all parties. No duty to supplement these answers is undertaken except as provided in the Federal Rules of Civil Procedure.

## GENERAL OBJECTIONS

1.      Defendant objects to the requests to the extent they are unreasonably repetitive and cumulative in nature, thereby effectively harassing defendant.

2.      Defendant objects to the requests to the extent that they seek information and documents that are neither relevant nor likely to lead to the discovery of admissible evidence.

3.      Defendant objects to the requests to the extent that they seek information or documents that constitute attorney-work product, contain privileged attorney-client communications, or are otherwise privileged from disclosure under the Pennsylvania Peer Review Act or otherwise.

4.    Defendant objects to the requests to the extent that they seek disclosure of and information about documents and other tangible materials that have been prepared in anticipation of litigation or for trial.

5.    Defendant objects to the document requests to the extent they seek documentation or information primarily or exclusively within the possession, custody, or control of plaintiff, or available from a source other than defendant that is more convenient, less burdensome or less expensive.

6.    Defendant objects to the document requests to the extent that they seek confidential, proprietary or commercially sensitive information, without the entry of an appropriate protective order.

7.    Defendant objects to the requests to the extent that they seek to impose obligations that are beyond the scope permitted by the Local and Federal Rules of Civil Procedure.

8.    Defendant objects to the requests to the extent that they are not limited in time or scope, and/or to the extent they seek documents relating to a time period prior to plaintiff's entry into Defendant's Orthopaedic Surgery Residency Training Program on July 1, 2001, on the grounds that they are not relevant, nor reasonably calculated to lead to the discovery of admissible evidence, and on the further grounds that they are overly broad and unduly burdensome.

9.    Defendant's failure to object to any of the requests on a particular ground or grounds shall not be construed as a waiver of its right to object on such ground or grounds at any time.

3

## RESPONSES TO DOCUMENT REQUESTS

1.    Produce a copy of all documents which refer or relate to the selection process for candidates for Hamot's Orthopaedic Residency Program.

Response:  Defendant objects to this request to the extent it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence.

2.    Produce a copy of Hamot's affirmative action plans or policy statements from 1995 to the present.

Response:  Defendant objects to this request to the extent it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence, and further objects to this request to the extent it seeks documents that relate to a time period prior to July 2001.  Notwithstanding these objections, but without waiving them, any affirmative action plans or policy statements in effect from 2001 to the present will be produced as requested.

3.    Produce a copy of Hamot's EEO-1 reports for the period 1995 to the present.

Response:  Defendant objects to this request because it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence, and further objects to the request to the extent it seeks discovery of documents related to a time period prior to July 2001.

4.    Produce a copy of any form of outreach or recruitment by Hamot to attract female residents to the Orthopaedic Residency Program.

Response:  Defendant objects to this request because it is vague, ambiguous and confusing.  Defendant further objects to this request because it purportedly seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence.

4

5.     Produce a copy of any form of outreach or recruitment by Hamot to attract female residents to any of its residency programs.

Response: Defendant objects to this request because it is vague, ambiguous and confusing.   Defendant further objects to this request because it purportedly seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence.

6.     Produce a copy of any surveys, research reports, or summaries thereof, or any other data, that show the utilization of females in all job categories at Hamot in comparison to the utilization of females in the same or similar job categories in other organizations in Hamot's industry.

Response: Defendant objects to this request because it is vague, ambiguous and confusing.   Defendant further objects to this request because it purportedly seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence.  Finally, defendant objects to the request to the extent that it is not limited in time to the period arising on or after July 1, 2001.  Subject to, and without waiving these objections, defendant will produce responsive documents in its possession, custody or control.

7.     Produce a copy of all personnel files, permanent files, or their equivalent which includes information about the resident's history, qualifications, evaluations, or performance, for all residents in the Orthopaedic Residency Program from July 1995 to the present.

Response: Defendant objects to this request because it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence, and in particular to the extent that is seeks documents from a period prior to July 1, 2001. Defendant further objects to this request because disclosure of the requested documents would violate the privacy interests of current and former residents in the Orthopaedic Surgery Residency Program.  Notwithstanding these objections, but without waiving

5

them, defendant will produce Plaintiff's personnel file, as well as those for other residents

in the Orthopaedic Surgery Residency Program during Plaintiff's term of enrollment.

8.    Produce a copy of all personnel files, permanent files, or their equivalent, for any female who was ever admitted to the Orthopaedic Residency Program at any time.

Response:  Defendant objects to this request because it seeks documents that are

neither relevant nor likely to lead to the discovery of admissible evidence.  Defendant

further objects to the extent that the request seeks documents related to a period prior to

July 1, 2001, on the grounds that it  is overly broad and unduly burdensome, as well as

not relevant, nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant further objects to this request because disclosure of the requested documents

would violate the privacy interests of current and former residents in the Orthopaedic

Surgery Residency Program.  Notwithstanding these objections, but without waiving

them, defendant will produce responsive documents in its possession.

9.    Produce a copy of all application documents from females who were not admitted to the Orthopaedic Surgery Residency Program from 1995 to the present.

Response:  Defendant objects to this request because it seeks documents that are

neither relevant nor likely to lead to the discovery of admissible evidence, and further

because the request seeks document related to a period prior to July 1, 2001.  Defendant

further objects to this request because disclosure of the requested documents would

violate the privacy interests of the applicants to the Orthopaedic Surgery Residency

Program.

6

10.    Produce a copy of all personnel files for any resident admitted to the Orthopaedic Residency Program who was terminated from the Program.

Response: Defendant objects to this request because it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence, and further objects to the extent it seeks documents relating to the time period prior to July 1, 2001. Defendant further objects to this request because disclosure of the requested documents would violate the privacy interests of the former residents in the Orthopaedic Surgery Residency Program. Notwithstanding these objections, but without waiving them, defendant will produce responsive documents in its possession, custody and control.

11.    Produce a copy of all personnel files for any resident admitted to the Orthopaedic Residency Program whose contract was not renewed.

Response: Defendant objects to this request because it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence, and further objects to the extent it seeks documents relating to the time period prior to July 1, 2001. Defendant further objects to this request because disclosure of the requested documents would violate the privacy interests of the former residents in the Orthopaedic Surgery Residency Program. Notwithstanding these objections, but without waiving them, defendant will produce responsive documents in its possession, custody and control.

12.    Produce a copy of all personnel files for any resident admitted to the Orthopaedic Residency Program who resigned from the Program.

Response: Defendant objects to this request because it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence, and further objects to the extent it seeks documents relating to the time period prior to July 1, 2001. Defendant further objects to this request because disclosure of the requested documents would violate the privacy interests of the former residents in the Orthopaedic Surgery

7

Residency Program.    Notwithstanding these objections, but without waiving them, defendant will produce responsive documents in its possession, custody and control.

13.    Produce a copy of any notes, memorandums, recordings of conversations, or documents recorded or received regarding plaintiff's performance.

Response:  Defendant objects to this request on the ground that it is overly broad and unduly burdensome, and to the further extent that is seeks documents protected from discovery by the attorney-client privilege, work-product privilege and/or Pennsylvania Peer Review Act.    Notwithstanding these objections, but without waiving them, responsive documents in defendant's possession, custody or control will be produced as requested.

14.    Produce a copy of all records referring or relating to disciplinary action taken against residents of Hamot's Orthopaedic Residency Program from July 1995 to the present.

Response:  Defendant objects to this request because it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence, and further objects to the extent it seeks documents related to a time period prior to July 1, 2001. Defendant further objects to this request because disclosure of the requested documents would violate the privacy interests of its current and former residents in the Orthopaedic Surgery Residency Program.  Defendant also objects to the extent information sought by this request is protected from disclosure by the Pennsylvania Peer Review Act. Notwithstanding these objections, but without waiving them, defendant will produce responsive documents in its possession, custody or control.

8

15.    Produce a copy of all records referring or relating to academic probation imposed on residents of Hamot's Orthopaedic Residency Program from July 1995 to the present.

Response:  Defendant objects to this request because it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence, and further objects to the extent it seeks documents related to a time period prior to July 1, 2001. Defendant further objects to this request because disclosure of the requested documents would violate the privacy interests of its current and former residents in the Orthopaedic Surgery Residency Program.  Defendant also objects to the extent information sought by this request is protected from disclosure by the Pennsylvania Peer Review Act. Notwithstanding these objections, but without waiving them, defendant will produce responsive documents in its possession, custody or control.

16.    Produce a copy of all records referring or relating to the failure of any resident to meet the advancement criteria in the Advancement and Dismissal Policy of Hamot's Orthopaedic Residency Program from July 1995 to the present.

Response:  Defendant objects to this request because it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence, and further objects to the extent it seeks documents related to a time period prior to July 1, 2001. Defendant further objects to this request because disclosure of the requested documents would violate the privacy interests of its current and former residents in the Orthopaedic Surgery Residency Program.  Defendant also objects to the extent information sought by this request is protected from disclosure by the Pennsylvania Peer Review Act. Notwithstanding these objections, but without waiving them, defendant will produce responsive documents in its possession, custody or control.

9

17.    Produce a copy of all records referring or relating to the failure of plaintiff to meet the advancement criteria in the Advancement and Dismissal Policy of Hamot's Orthopaedic Residency Program.

Response:  Responsive documents in defendant's possession, custody or control

will be produced as requested.

18.    Produce a copy of all letters or written communications placing Lisa Brown on academic probation status at any time.

Response:  Responsive documents in defendant's possession, custody or control

will be produced as requested.

19.    Produce a copy of all policy statements about work assignments, educational requirements, program expectations, and job duties of all residents in Hamot's Orthopaedic Residency Program.

Response:  Defendant objects to this request because it is vague, ambiguous,

overly broad and unduly burdensome.  Notwithstanding this objection, but without

waiving it, defendant will produce responsive documents setting forth policies that were

in effect during plaintiff's participation in Hamot's Orthopaedic Surgery Residency

Program.

20.    Produce a copy of all performance evaluations for all residents in Hamot's Orthopaedic Residency Program from July 1995 to the present.

Response:  Defendant objects to this request because it seeks documents that are

neither relevant nor likely to lead to the discovery of admissible evidence, and further

objects to the extent it seeks documents related to a time period prior to July 1, 2001.

Defendant further objects to this request because disclosure of the requested documents

would violate the privacy interests of its current and former residents in the Orthopaedic

Surgery Residency Program.  Defendant also objects to the extent information sought by

this request is protected from disclosure by the Pennsylvania Peer Review Act.

10

Notwithstanding these objections, but without waiving them, defendant will produce responsive documents in its possession, custody or control.

      21.    Produce a copy of all e-mails and electronic documents which refer or relate to Brown's performance in Hamot's Orthopaedic Residency Program.

    <u>Response</u>: Defendant objects to this request because it is overly broad and unduly burdensome, and further objects to the extent it seeks documents protected from discovery by the attorney-client and/or work product privilege. Notwithstanding these objections, but without waiving them, responsive documents in defendant's possession, custody or control will be produced as requested.

      22.    Produce a copy of all documents referring or relating to the modification or elimination of any Orthopaedic Residency Program advancement criteria for plaintiff.

    <u>Response</u>:  Responsive documents in defendant's possession, custody or control will be produced as requested.

      23.    Produce a copy of all documents referring or relating to plaintiff's absence from residency assignments.

    <u>Response</u>:  Responsive documents in defendant's possession, custody or control will be produced as requested.

      24.    Produce a copy of all documents referring or relating to other residents' lack of confidence in plaintiff's ability.

    <u>Response</u>:  Responsive documents in defendant's possession, custody or control will be produced as requested.

      25.    Produce a copy of all documents referring or relating to the assignment of Mary Beth Cermak as plaintiff's preceptor.

    <u>Response</u>:  Responsive documents in defendant's possession, custody or control will be produced as requested.

26.    Produce a copy of all documents referring or relating to the February 2004 meeting among plaintiff, Jim Seeds, and Jeff Nechleba.

Response:  Responsive documents in defendant's possession, custody or control will be produced as requested.

27.    Produce a copy of all documents interpreting the phrase "proper cause" as used in Section 3, Paragraph 1 of Hamot's Resident Agreement of Appointment in the Graduate Program in Medical Education between Brown and Hamot for the period of July 1, 2003 to June 30, 2004, or in any other Resident Agreement of Appointment.

Response:  Defendant objects to this request to the extent it seeks documents or information subject to the attorney-client and/or work product privilege.  Subject to and without waiving this objection, responsive documents in defendant's possession, custody or control will be produced as requested.

28.    Produce a copy of all Orthopaedic In-Training Examination (OITE) test results for all residents in Hamot's Orthopaedic Residency Program from July 1995 to the present.

Response:  Defendant objects to this request because it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence, and further objects to the extent it seeks documents related to a time period prior to July 1, 2001. Defendant further objects to this request because disclosure of the requested documents would violate the privacy interests of its current and former residents in the Orthopaedic Surgery Residency Program.  Defendant also objects to the extent information sought by this request is protected from disclosure by the Pennsylvania Peer Review Act. Notwithstanding these objections, but without waiving them, defendant will produce responsive documents in its possession, custody or control.

12

29.     Produce a copy of all documents which refer or relate to how Hamot considers or evaluates resident performance on the OITE.

Response:  Responsive documents in defendant's possession, custody or control

will be produced as requested.

30.     Produce a copy of all documents created or reviewed by the Grievance Committee regarding Brown's grievance relating to the non-renewal of her contract with Hamot's Orthopaedic Residency Program.

Response:  Defendant objects to the request to the extent it seeks documents

protected from discovery by the Pennsylvania Peer Review Act.  Subject to and without

waiving this objective, responsive documents in defendant's possession, custody or

control will be produced as requested.

31.     Produce a copy of all documents created or reviewed by the Medical Education Committee, Medical Staff Executive Committee, or Board of Directors regarding Brown's grievance relating to her termination from Hamot's Orthopaedic Residency Program.

Response:  Defendant objects to the request to the extent it seeks documents

protected from discovery by the Pennsylvania Peer Review Act.  Subject to and without

waiving this objective, responsive documents in defendant's possession, custody or

control will be produced as requested.

32.     Produce a copy of all documents, including notes and e-mails, presented to the Medical Education Committee, Medical Staff Executive Committee, or Board of Directors regarding the non-renewal of plaintiff's contract or the consideration of her grievance.

Response:  Defendant objects to the request to the extent it seeks documents

protected from discovery by the Pennsylvania Peer Review Act.  Subject to and without

waiving this objective, responsive documents in defendant's possession, custody or

control will be produced as requested.

33.    Produce a copy of all documents, including notes and e-mails, reviewed by the Medical Education Committee, Medical Staff Executive Committee, or Board of Directors regarding the non-renewal of plaintiff's contract or the consideration of her grievance.

Response:  Defendant objects to the request to the extent it seeks documents

protected from discovery by the Pennsylvania Peer Review Act.  Subject to and without

waiving this objective, responsive documents in defendant's possession, custody or

control will be produced as requested.

34.    Produce a copy of all documents, including notes and e-mails, that were created as a result of the review by the Medical Education Committee, Medical Staff Executive Committee, or Board of Directors of the non-renewal of plaintiff's contract or the consideration of her grievance.

Response:  Defendant objects to the request to the extent it seeks documents

protected from discovery by the Pennsylvania Peer Review Act.  Subject to and without

waiving this objective, responsive documents in defendant's possession, custody or

control will be produced as requested.

35.    Produce a copy of all documents created or stored by the Department of Human Resources or its equivalent regarding Brown's performance, performance evaluations, non-renewal of contract, and grievance.

Response:  Defendant objects to the request to the extent it seeks documents

protected from discovery by the Pennsylvania Peer Review Act.  Subject to and without

waiving this objective, responsive documents in defendant's possession, custody or

control will be produced as requested.

36.     Produce a copy of all documents that refer or relate to any training provided to, or attended by, the faculty of resident programs regarding equal employment opportunity (such as the Civil Rights Act of 1964; the Age Discrimination in Employment Act; the Americans with Disabilities Act; or the Pennsylvania Human Relations Act), or Hamot personnel rules.

Response:  Defendant objects to this requests because it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence.  Subject to and without waiving this objection, defendant will produce responsive documents in its possession, custody or control.

37.     Produce a copy of all documents referring or relating to any production or exchange of information about plaintiff's performance by, between, or among the following persons:  John D. Lubahn; John T. Malone; James A. Pepicello; Donald K. Inderlied; John D. Albert, II; or Pat Rogers.

Response:  Responsive documents in defendant's possession, custody or control will be produced as requested.

38.     Produce a copy of all performance valuations, or their equivalent, for attending physicians and faculty in the Orthopaedic Residency Program.

Response:  Defendant objects to this request because it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence, and further objects to the extent it seeks documents related to a time period prior to July 1, 2001. Defendant further objects to this request because disclosure of the requested documents would violate the privacy interests of its current and former residents in the Orthopaedic Surgery Residency Program.  Defendant also objects to the extent information sought by this request is protected from disclosure by the Pennsylvania Peer Review Act.

39.     Produce a copy of all personnel files of attending physicians and faculty of the Orthopaedic Residency Program from July 1995 to the present.

Response:  Defendant objects to this request because it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence, and further

15

objects to the extent it seeks documents related to a time period prior to July 1, 2001. Defendant further objects to this request because disclosure of the requested documents would violate the privacy interests of its current and former residents in the Orthopaedic Surgery Residency Program. Defendant also objects to the extent information sought by this request is protected from disclosure by the Pennsylvania Peer Review Act. Notwithstanding these objections, but without waiving them, defendant will produce responsive documents in its possession, custody or control.

40.    Produce copies of all diaries, calendars, telephone logs, appointment books, and e-mail from the following persons with entries that refer or relate to Lisa Brown: John D. Lubahn; John T. Malone; James A. Pepicello; Donald K. Inderlied; John D. Albert, II; and Pat Rogers.

Response: Defendant objects to this request because it is overbroad and unduly burdensome and because it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence. Notwithstanding this objection, but without waiving, defendant will produce responsive documents in its possession, custody or control.

41.    Produce a copy of all written complaints made or filed against Hamot for employment discrimination from July 1995 to the present.

Response: Defendant objects to this request because it is overbroad and unduly burdensome and because it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence. Defendant further objects to the request to the extent it seeks documents related to the time period prior to July 1, 2001.

42.    Produce a copy of all documents which refer to breach of employment contracts involving Hamot from 1995 to the present.

Response: Defendant objects to this request because it is overbroad and unduly burdensome and because it seeks documents that are neither relevant nor likely to lead to

16

the discovery of admissible evidence. Defendant further objects to the request to the extent it seeks documents related to the time period prior to July 1, 2001.

43.     Produce a copy of all complaints, derogatory information, or its equivalent about the performance of attending physicians in the Orthopaedic Residency Program from any source, including patients, residents, staff, or colleagues, from 1995 to the present.

Response: Defendant objects to this request because it is overbroad and unduly burdensome and because it seeks documents that are neither relevant nor likely to lead to the discovery of admissible evidence. Defendant further objects to the request because it seeks information and/or documents protected from discovery by Pennsylvania Peer Review Act.

44.     Produce a copy of all documents that support your defenses to the Complaint filed by Brown against Hamot in the United States District Court for the Western District of Pennsylvania.

Response: Responsive documents in defendant's possession, custody or control will be produced as requested.

45.     Produce a copy of all statements, interviews, or reports which Hamot has obtained from any individuals regarding the claims in plaintiff's Complaint.

Response: Defendant objects to this request to the extent it seeks disclosure of information that is protected by the attorney-client privilege or the work product doctrine and/or the Pennsylvania Peer Review Act.

17

Respectfully submitted,

TOBIN, O'CONNOR, EWING & RICHARD

By_____

     Kerry M. Richard, Esq.
     Ziad P. Haddad, Esq.
     Forrest G. Read, IV, Esq.
     5335 Wisconsin Ave., N.W. Suite 700
     Washington, DC 20015
     (202) 362-5900

     Counsel for Defendant
     Hamot Medical Center

Local Counsel:

KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.
Mark J. Kuhar, Esq.
120 West Tenth Street
Erie, Pennsylvania 16501-1461
(814) 459-2800

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of June, 2005, a true and correct copy of the foregoing was served by telecopy and by federal express to:

Patrick Sorek, Esq.
Leech Tishman Fuscaldo & Lampl, LLC
Citizens Bank Building, 30th Flr.
525 William Penn Place
Pittsburgh, PA 15219
Tel:    (412) 261-1600
Fax:   (412) 227-5551

Kerry M. Richard

EXHIBIT 2

# Tobin
# O'Connor
# Ewing &
# Richard

|| Attorneys at Law
*A Partnership of Professional Corporations*

---

*Practicality in Practice*

Ziad P. Haddad
Direct Dial (202) 362-5900 ext. 210
zphaddad@tobinoconnor.com

June 3, 2005

**By Federal Express**

Patrick Sorek, Esq.
Leech Tishman Fuscaldo & Lampl, LLC
Citizens Bank Building, 30th Flr.
525 William Penn Place
Pittsburgh, PA  15219

> Re:   **Brown v. Hamot Medical Center**

Dear Mr. Sorek:

    I am enclosing defendant's responses to Ms. Brown's document requests as well as the responsive documents.  As you will note, we withheld some confidential documents pending the parties' execution of a confidentiality agreement.  Please provide us with a proposed confidentially agreement at your earliest convenience.  If you have any questions, please call me.

            Sincerely,

            Ziad Haddad

cc:    Mark J. Kuhar, Esq.

# Tobin
# O'Connor
# Ewing &
# Richard

Attorneys at Law
*A Partnership of Professional Corporations*

*Practicality in Practice*

Ziad P. Haddad
Direct Dial (202) 362-5900 ext. 210
zphaddad@tobinoconnor.com

August 1, 2005

**By Federal Express**

Patrick Sorek, Esq.
Leech Tishman Fuscaldo & Lampl, LLC
Citizens Bank Building, 30th Flr.
525 William Penn Place
Pittsburgh, PA 15219

RECEIVED

AUG 0 2 2005

LEECH TISHMAN FUSCALDO LAMPL

      **Re:    Brown v. Hamot Medical Center**

Dear Mr. Sorek:

     I am enclosing documents bearing Bates nos. HMC-00240 through 00897. If you have any questions, please call me.

                Sincerely,

                Ziad Haddad

5335 Wisconsin Avenue, NW    Phone  202-362-5900
Suite 700    Fax  202-362-5901
Washington, DC 20015    www.tobinoconnor.com

# Tobin
# O'Connor
# Ewing &
# Richard

Attorneys at Law
*A Partnership of Professional Corporations*

*Practicality in Practice*

Ziad P. Haddad
Direct Dial (202) 362-5900 ext. 210
zphaddad@tobinoconnor.com

August 10, 2005

**By Telecopy and First Class Mail**

Patrick Sorek, Esq.
Leech Tishman Fuscaldo & Lampl, LLC
Citizens Bank Building, 30th Flr.
525 William Penn Place
Pittsburgh, PA 15219

RECEIVED AUG 15 2005

   Re:   **Brown v. Hamot Medical Center**

Dear Mr. Sorek:

   I am writing to follow up on my letter dated August 8, 2005 and our telephone conversation today regarding discovery matters in the above-referenced case.

   Since my August 8 letter, I have re-confirmed that we have produced everything that our client has regarding residents who did not complete the program (Requests 10-12), any disciplinary or remedial action against residents (Requests 14-16), how Hamot considers the OITE (Request 29), plaintiff's discharge (Requests 30-34), any exchange of information among supervisors and reviewers about plaintiff's performance (Request 37), any diaries, calendars, appointment books with entries relating to Dr. Brown (Request 40), and any e-mail correspondence regarding plaintiff's performance and/or discharge.

   As for plaintiff's request for the personnel files of orthopedic attending physicians (Request 39), we have confirmed that Hamot Medical Center does not generally maintain personnel files for attending physicians because they are not Hamot employees. Hamot does have written contracts with six of the sixteen orthopedic attending physicians that allow them to receive compensation on a per diem basis for certain services rendered on Hamot's behalf. We have asked Hamot to forward those contracts to us so we can determine whether they are in any way relevant to this case. After we review the contracts, we will decide whether to produce them. Given the likelihood that such records would be of no value to you in this case, we ask that you refrain from filing any motion to compel their production at least until we inform you of our decision as to whether they will be produced.

   Hamot also has located some anonymous evaluations of attending physicians that were submitted by various residents of Hamot in addition to those that already have been produced. We will produce these evaluations to you as soon as possible.

5335 Wisconsin Avenue, NW
Suite 700
Washington, DC 20015

Phone  202-362-5900
Fax  202-362-5901
www.tobinoconnor.com

Patrick Sorek, Esq.
August 10, 2005
Page 2


    Finally, we are still checking on the availability of the individuals you would like to depose and will provide you with available dates when we have them.

                                        Sincerely,

                                        Ziad Haddad

5335 Wisconsin Avenue, NW    Phone  202-362-5900
Suite 700    Fax  202-362-5901
Washington, DC 20015    www.tobinoconnor.com

# Tobin
# O'Connor
# Ewing &
# Richard

Attorneys at Law
*A Partnership of Professional Corporations*

*Practicality in Practice*

Ziad P. Haddad
Direct Dial (202) 362-5900 ext. 210
zphaddad@tobinoconnor.com

August 17, 2005

**By Federal Express**

Patrick Sorek, Esq.
Leech Tishman Fuscaldo & Lampl, LLC
Citizens Bank Building, 30th Flr.
525 William Penn Place
Pittsburgh, PA  15219

   **Re: Brown v. Hamot Medical Center**

Dear Mr. Sorek:

   I am enclosing documents bearing Bates nos. Confidential HMC-00898 through 00966.  These documents include the evaluations of attending physicians referred to in my August 10, 2005 letter as well as Don Inderlied's notes from the Medical Education Committee meetings concerning Lisa Brown's termination that we recently obtained.  If you have any questions, please call me.

       Sincerely,

       Ziad Haddad

5335 Wisconsin Avenue, NW
Suite 700
Washington, DC 20015

Phone  202-362-5900
Fax  202-362-5901
www.tobinoconnor.com

# Tobin
# O'Connor
# Ewing &
# Richard

Attorneys at Law
*A Partnership of Professional Corporations*

*Practicality in Practice*

Ziad P. Haddad
Direct Dial (202) 362-5900 ext. 210
zphaddad@tobinoconnor.com

August 22, 2005

**By Federal Express**

Patrick Sorek, Esq.
Leech Tishman Fuscaldo & Lampl, LLC
Citizens Bank Building, 30th Flr.
525 William Penn Place
Pittsburgh, PA 15219

Re:    **Brown v. Hamot Medical Center**

Dear Mr. Sorek:

I am enclosing documents bearing Bates nos. Confidential HMC-00967 through 01026 that were recently located.  If you have any questions, please call me.

Sincerely,

Ziad Haddad

Enclosures

# Tobin
# O'Connor
# Ewing &
# Richard

Attorneys at Law
*A Partnership of Professional Corporations*

*Practicality in Practice*

Ziad P. Haddad
Direct Dial (202) 362-5900 ext. 210
zphaddad@tobinoconnor.com

September 7, 2005

**By Federal Express**

Patrick Sorek, Esq.
Leech Tishman Fuscaldo & Lampl, LLC
Citizens Bank Building, 30th Flr.
525 William Penn Place
Pittsburgh, PA  15219

Re:    **Brown v. Hamot Medical Center**

Dear Mr. Sorek:

I am enclosing documents bearing Bates nos. Confidential HMC-01161 through 01165 which we previously produced during the depositions this past week.  If you have any questions, please call me.

Sincerely,

Ziad Haddad

Enclosures

5335 Wisconsin Avenue, NW
Suite 700
Washington, DC 20015

Phone  202-362-5900
Fax  202-362-5901
www.tobinoconnor.com

EXHIBIT 3



# LEECH TISHMAN FUSCALDO & LAMPL

ATTORNEYS AT LAW

**LEECH TISHMAN**
**FUSCALDO & LAMPL, LLC**

**CITIZENS BANK BUILDING**
**30ᵀᴴ FLOOR**
**525 WILLIAM PENN PLACE**
**PITTSBURGH, PA 15219**

412-261-1600
412-227-5551 FAX
www.leechtishman.com

July 29, 2004

Melissa M. Sekerchak
msekerchak@leechtishman.com

**VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED**

Donald K. Inderlied
Senior VP Human Resources & Chief Compliance Officer
Hamot Health Foundation
201 State Street
Erie, Pennsylvania 16550

Re:     *Lisa Brown, M.D.*
        *Notice to Preserve Documents*

Dear Mr. Inderlied:

As you may know, on July 16, 2004, Dr. Brown filed a Charge of Discrimination
with the Equal Employment Opportunity Commission regarding her termination.

We write to place Hamot Medical Center on notice that the Code of Federal
Regulations, 29 C.F.R. § 1602.14, requires that the Medical Center preserve all
records relevant to the Charge. These materials include, but are not limited to,
records having to do with hiring, promotion, demotion, transfer, lay-off or
termination, rates of pay or other terms of compensation, and selection for training, of
the Medical Center's residents. The personnel files of current and former residents
are included as relevant documents, as they will be used for comparative information.
In addition, the Medical Center should take care to preserve all electronic
communications related to Dr. Brown's termination. Such electronic records can be
easily lost or destroyed if not affirmatively safeguarded.

You should also know that should the EEOC process, which requires preservation of
these records, prove unsuccessful, they will be requested as part of discovery in a
lawsuit. While your own counsel can advise you about this issue, the loss or
destruction of records that are relevant to a legal action can have serious adverse
consequences for the party that fails to preserve them. You should also be advised
that witnesses will be asked about their preservation of relevant records in any
lawsuit.

We ask that you take whatever steps are necessary to make the persons at the Medical
Center responsible for record keeping aware of these obligations.



July 29, 2004
Page 2

Thank you for your cooperation.

Very truly yours,

LEECH TISHMAN FUSCALDO & LAMPL, LLC

Melissa M. Sekerchak
U:\PSorek\Cases\Brown\Correspondence\7 27 04 Ltr Hamot Medical Center_PS.doc

EXHIBIT 4

**Page 2**

1              I N D E X

2

3    DONALD INDERLIED

4        Direct Examination by Mr. Sorek . . . . .    3

5

6

7

8    EXHIBITS:

9        Inderlied Deposition Exhibit 1 . . . . .   13

10       Inderlied Deposition Exhibit 2 . . . . . 120

11       Inderlied Deposition Exhibit 3 . . . . . 123

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 3**

1          D O N A L D   I N D E R L I E D, first having

2    been duly sworn, testified as follows:

3

4                 DIRECT EXAMINATION

5    BY MR. SOREK:

6

7        Q.  Good morning, Mr. Inderlied.

8        A.  Good morning, sir.

9        Q.  You have sat through a number of depositions so

10   far; Dr. Rogers, Dr. Galey, and Ms. Patricia Rogers,

11   correct?

12       A.  Yes, sir.

13       Q.  And you've heard the introductory statements that

14   I've made about the purpose of depositions, I take it.

15       A.  Yes, sir.

16       Q.  And so at least to that extent, you're familiar

17   with the deposition process, right?

18       A.  Yes, I am.

19       Q.  All right.  Is there anything about the process

20   that you have any questions about or you want to go over

21   before we begin?

22       A.  No, sir.

23       Q.  All right.  We have Ms. Dana Ashley also in the

24   room with us today?

25       A.  Yes, sir.

**Page 4**

1        Q.  All right.  And did you ask her to come with you?

2    Did you ask her to appear at the deposition?

3        A.  Did I ask her to?

4        Q.  Yeah.

5        A.  Yes.

6        Q.  Okay.  What is your education, beginning with high

7    school?

8        A.  I graduated in 1960 from West Geauga High School

9    in Chesterland, Ohio.  Attended the University of Arizona

10   for two years.  Transferred from that to John Carroll

11   University in Cleveland, Ohio.  Graduated from John Carroll

12   with a bachelor's degree in psychology in 1965.  Completed

13   an Executive Management Course in 1978 from the Graduate

14   School of Industrial Administration from Carnegie Mellon

15   University.

16       Q.  The graduate program, what was the name of it

17   again?  Executive --

18       A.  It was the Executive Management Graduate Program

19   of the Graduate Institute of -- wait a minute.  GS --

20   Graduate School of Industrial Administration, at Carnegie

21   Mellon in Pittsburgh.

22       Q.  What were the subjects of study in that program?

23       A.  They're general management, finance, accounting,

24   human behavioral sciences, human relations, economics.  I

25   can't remember them all at the moment, but a comprehensive

**Page 5**

1    course.

2        Q.  One year, two years?

3        A.  No, it was about a little less than a year course.

4        Q.  All right.  Have you ever given a deposition

5    before?

6        A.  No, sir.

7        Q.  Have you ever been to any other depositions other

8    than the ones this week?

9        A.  I have in the past.  It's been 20 years, probably.

10       Q.  What kind of matter was that?

11       A.  It was a human resource matter.

12       Q.  What is your employment history?

13       A.  When I graduated from -- oh, I'm sorry.  I did

14   leave out one part of an education.  I did take, upon

15   completion of my undergraduate work, a 12-month internship

16   in Hospital Personnel Administration at Saint Luke's

17   Hospital in Cleveland, Ohio.

18           At the completion of that program, I was recruited

19   to an industrial chemical company.  And went to work for an

20   industrial chemical company in 19, oh boy, 60 -- 66.

21       Q.  What company was that?

22       A.  It was -- at that time, it was the Diamond

23   Alkaline Company, and then Diamond Shamrock.  I think it

24   still exists, but I don't know.  In 1966, I entered the

25   United States Army.  Spent just under four years in the

FERGUSON & HOLDNACK REPORTING, INC.
814-452-4556

44d5579d-4ea0-4f27-aee7-29dd845c6666

Brown v. Hamot Medical Center                                     Donald Inderlied

**Page 18**

1  Q. Okay.
2  A. By virtue of being the Human Resource Department.
3  Q. And what, generally, are in the human resource
4  files; personnel files?
5  A. Yes.
6  Q. Okay. Compensation? Discipline? Promotions?
7  A. Yes, sir. I also have -- would have oversight, I
8  guess, of the employee health records. Those are maintained
9  separate from the personnel files, in the Employee Health
10  Department.
11  Q. If there is any disciplinary action against an
12  employee, is that something that would be in a file that's
13  accessible to you, or is that somewhere else?
14  A. That would be in a file that would be accessible
15  to me. Can I clarify that it depends on what disciplinary
16  action you're talking about.
17  Q. Of course, you can clarify. And so you're
18  thinking of some distinction. And what is the distinction
19  that you're thinking in terms of access to records that you
20  have?
21  A. If it was involved in, for example, some other
22  area, wasn't specifically with an employee of Hamot, I would
23  not have access to that.
24  Q. What do you mean by that; not an employee of
25  Hamot?

**Page 19**

1  A. (No response.)
2  Q. You just said that if it was involved, for
3  example, in some area that wasn't specifically an employee
4  of Hamot, I would not have access to that. What do you mean
5  by wasn't specifically an employee of Hamot?
6  A. It might be a contractor that we have.
7  Q. I'm going to ask you to take a look at the next --
8  it's the fourth and fifth pages in the exhibit that you
9  have.
10  MS. RICHARD: Can you refer to them by Bates
11  numbers, or is that the one that's not Bates?
12  MR. SOREK: This is the one that's not Bates
13  numbered.
14  MS. RICHARD: Okay. Can we identify it for the
15  record, then, as a letter dated July 29th, 2004 on
16  Leech Tishman letterhead?
17  MR. SOREK: Absolutely.
18  Q. Ask you to take a look at that document,
19  Mr. Inderlied.
20  A. (Witness complies.)
21  Q. Have you ever seen that July 29th, 2004 letter
22  from my office before?
23  A. Yes, sir.
24  Q. All right. And this is a letter from my office
25  discussing preservation of records and preservation of

**Page 20**

1  e-mail. Do you agree with that?
2  A. Yes, sir.
3  Q. And what did you do in response to this letter?
4  A. I informed the individuals involved that they
5  should save all records pertaining to this case.
6  Q. And who did you inform?
7  A. I believe I drafted a memo or sent a memo to --
8  I'm not positive -- to Dr. Albert, I believe Dr. Lubahn,
9  Dr. Pepicello. And I'm not sure if there -- there may have
10  been another individual.
11  Q. Do you know whether you produced that memo to us
12  pursuant to our requests for production of documents?
13  A. If it was in my -- if it was in my file, we did,
14  yes, sir.
15  MR. SOREK: I don't think I've seen it yet, but
16  we'll have to talk about that later.
17  MS. RICHARD: All right. I'll look for it, if we
18  have not produced it.
19  MR. SOREK: Okay.
20  Q. How did you decide who to send your memo to?
21  A. They were the individuals that were involved with
22  Lisa Brown.
23  Q. But Dr. Pepicello wouldn't have records about Lisa
24  Brown, would you?
25  A. But he was the chief medical officer.

**Page 21**

1  Q. But this is about preserving records. I mean, you
2  were advising him to preserve any records, right?
3  A. Yes, sir.
4  Q. But you weren't sure what he had, I guess. Did
5  you know what kind of records he had?
6  A. No, I did not.
7  Q. Pat Rogers didn't get a copy of your memo, did
8  she?
9  A. I don't believe she did.
10  Q. Does your memo also talk about preserving e-mails?
11  A. I would have to refer back to it, if it did
12  specifically.
13  Q. Now, you're aware of requests for production of
14  documents that Dr. Brown served in this case, aren't you?
15  A. Yes, sir.
16  Q. Did you have any role in responding to those
17  requests for production?
18  A. Any role?
19  Q. We asked for documents through this formal request
20  with all the questions.
21  A. Right.
22  Q. You saw it, right?
23  A. Yes, sir.
24  Q. And were you one of the people who were part of
25  the process of finding documents in response to the

6 (Pages 18 to 21)

FERGUSON & HOLDNACK REPORTING, INC.
814-452-4556

44d5579d-4ea0-4f27-aee7-29dd845c6666

**Page 26**

1 have any more; is that right? You said to Counsel, I don't
2 have any more documents, I've looked. Did you ever say that
3 to Counsel?
4    A. I don't believe I ever said that.
5    MS. RICHARD: I'm going to --
6    MR. SOREK: All right.
7    MS. RICHARD: -- object only because we're getting
8 into the realm of attorney/client privilege here.
9    MR. SOREK: Okay.
10    Q. All right. I guess what I'm getting at is, you
11 said that you were asked to look for documents, and that you
12 didn't find documents each time. I'm assuming that at some
13 point you exhausted your search and couldn't find any more
14 because there was nothing new to find; is that right?
15    A. I presume that's true, yes, sir.
16    Q. I mean, I'm asking you what you did. So are you
17 presuming?
18    A. I looked for documents. When I was asked to look
19 for documents, I looked for documents. If I didn't find
20 documents, I said there are no documents.
21    Q. Okay.
22    A. It didn't mean I didn't go back and look.
23    Q. I understand. And I'm trying to distinguish that.
24    A. Right.
25    Q. Counsel has produced documents pursuant to our

**Page 27**

1 first request four separate times. Do you know why the
2 production has come in kind of sequence or increments?
3    A. No, sir.
4    Q. Did you have any role in supervising the
5 production of documents?
6    A. No, sir.
7    Q. Did you ever instruct Ms. Ashley or anybody else
8 where to find documents?
9    A. No, sir.
10    Q. Are you able to say whether you've produced all of
11 the documents that are responsive to these requests in Pat
12 Rogers Exhibit 8?
13    A. All of those have been produced, to the best of my
14 knowledge.
15    Q. You're aware of the term equal employment
16 opportunity, right?
17    A. Yes, sir.
18    Q. And how would you define it?
19    A. Equal opportunity is providing opportunity without
20 discrimination to individuals, regardless of race, creed,
21 religion, sex, or sexual orientation, including Vietnam-era
22 veterans.
23    Q. By the way, where were you posted in the Army?
24    A. I was in Fort Bragg -- or Fort Dix, New Jersey.
25 Fort Benning, Georgia; Fort Carson, Colorado; Fort Bragg,

**Page 28**

1 North Carolina; Fort Bliss, Texas; and the Republic of South
2 Vietnam.
3    Q. What were your duties?
4    A. I was a rifle infantry platoon leader. When I was
5 in Vietnam, I was a member of a five-man advisory team that
6 lived with the North Vietnamese along the Kuvia River in
7 North Vietnam, just south of North Vietnam.
8    Q. When you say you lived with them, you were --
9    A. Lived with them.
10    Q. They were --
11    A. We were military advisers to the South Vietnamese
12 Army.
13    Q. What rank did you eventually hold?
14    A. First lieutenant.
15    Q. Have you ever heard the phrase Title VII? Do you
16 know what Title VII means?
17    A. I'm sure I've heard of it. I don't --
18    Q. It's more legal shorthand.
19    A. Okay.
20    Q. To describe a federal law, a federal
21 anti-discrimination law, that basically prohibits the sort
22 of discrimination that you just mentioned; race, sex,
23 religion, national origin. Have you ever had any training
24 in Title VII or -- let me back up. Have you ever had any
25 training in anti-discrimination law?

**Page 29**

1    A. Yes, sir.
2    Q. Could you describe it for us.
3    A. In conferences and seminars over my career.
4    Q. And who gave the conferences and seminars?
5    A. More than likely, either national societies;
6 Society for Human Resource Management. Or in some cases, I
7 believe the presenters of those were legal counsel.
8    Q. And what do you remember from these conferences
9 about anti-discrimination laws?
10    A. It's against the law to discriminate.
11    Q. Did you learn anything else about how to avoid
12 breaking the law, the anti-discrimination laws?
13    A. I'm sure we did. I can't speak specifically to
14 what that was at this time.
15    Q. Okay. When was the last conference or seminar you
16 went to that had an anti-discrimination component?
17    A. Probably five years ago.
18    Q. Are there other employees at Hamot that have
19 similar experience in anti-discrimination law?
20    A. The individuals within our Human Resource
21 Department.
22    Q. Okay.
23    A. I'm sorry.
24    Q. Like who?
25    A. People in our employment group, employee relations

8 (Pages 26 to 29)

EXHIBIT 5

**Page 2**

```
 1              I N D E X
 2
 3   PATRICIA ROGERS
 4      Direct Examination by Mr. Sorek . . . . .  3
 5
 6
 7
 8   EXHIBITS:
 9      P. Rogers Deposition Exhibit 1 . . . . . 37
10      P. Rogers Deposition Exhibit 2 . . . . . 43
11      P. Rogers Deposition Exhibit 3 . . . . . 47
12      P. Rogers Deposition Exhibit 4 . . . . . 52
13      P. Rogers Deposition Exhibit 5 . . . . . 53
14      P. Rogers Deposition Exhibit 6 . . . . . 54
15      P. Rogers Deposition Exhibit 7 . . . . . 58
16      P. Rogers Deposition Exhibit 8 . . . . . 59
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1        P A T R I C I A   R O G E R S, first having
 2   been duly sworn, testified as follows:
 3
 4                DIRECT EXAMINATION
 5   BY MR. SOREK:
 6
 7       Q.  All right.  Good morning, Ms. Rogers.  My name is
 8   Pat Sorek.  I'm here representing the Plaintiff in this
 9   action against Hamot Hospital.  Have you ever had your
10   deposition taken before?
11       A.  No.
12       Q.  Okay.  You probably have had some information
13   about the deposition process from Counsel.  But I would like
14   to tell you a little bit more from my point of view.  A
15   deposition is the same thing as court testimony, except
16   we're not in a courtroom.  You're under oath.  We have a
17   stenographer here taking down everything that everybody
18   says.
19       It's a question-and-answer format where Counsel
20   asks the questions and we look for information in the form
21   of answers from you.  Since that's the way we proceed,
22   sometimes the questions might be vague, or confusing, or
23   ambiguous.  And if you find you don't follow the question,
24   just let me know that.  By the same token, if you give an
25   answer that seems vague, or confusing, or that I don't
```

**Page 4**

```
 1   understand, I may ask you to clarify or explain.
 2       You have to give all your answers in words,
 3   because the court reporter can't take down gestures or
 4   noises, sounds sometimes that we use, like um-hum, to answer
 5   questions.
 6       If you need a break, we'll be happy to give you a
 7   break at any time you feel that's necessary to do whatever
 8   you need to be comfortable or to talk to Counsel.  Do you
 9   understand all of that?
10       A.  Yes.
11       Q.  Are you ready to proceed?
12       A.  Yes.
13       Q.  What is your education beginning with high school?
14       A.  High school.
15       Q.  Where did you go to high school?
16       A.  General McLane High School.
17       Q.  What year did you graduate?
18       A.  1970.
19       Q.  All right.  Have you taken any other courses short
20   of a degree?
21       A.  No.
22       Q.  Have you taken any training as part of your work
23   experience?
24       A.  Yes.
25       Q.  Why don't you list that for me, go through it.
```

**Page 5**

```
 1       A.  I have taken several courses through the
 2   Association for Hospital Medical Educators, in regard to
 3   residency information.
 4       Q.  Okay.  Identify the courses and tell us when you
 5   took them.
 6       A.  I've been going to AHME for 12 years, every year
 7   for 12 years.
 8       Q.  Okay.  And AHME is Association for Hospital
 9   Medical Education.
10       A.  Yes.
11       Q.  Every year for 12 years.
12       A.  Yes.
13       Q.  All right.  What do you do when you go there?
14       A.  This group of people meets, and they provide
15   lectures on all aspects of residency programs.
16       Q.  Okay.  Of the lectures that you attended, what do
17   you remember about the subject matter?
18       A.  Subject matter.  This past year we worked on core
19   competencies.  We worked on duty hour -- duty hours.  AOA
20   requirements, ACGME requirements.
21       Q.  So that those of us who don't know what those are,
22   AOA, go ahead and define those, and ACGME.
23       A.  The AOA is the American Osteopathic Association.
24   The ACGME is the Association for Graduate Medical Education.
25       Q.  Okay.
```

2 (Pages 2 to 5)

0e78fe41-a7a8-400f-a7c4-799dd9f507a3

Page 10

1  the rules and regulations set forth by them.
2      Q.  How often do they do that?
3      A.  It depends on what -- how you've done in previous
4  years.
5      Q.  So you've gone to the ARCOS meeting for the past
6  two years.
7      A.  Yes.
8      Q.  Anything else you remember about learning at those
9  meetings?
10     A.  No.
11     Q.  What's your work experience after graduating high
12  school?
13     A.  After graduating high school, I worked at the Erie
14  Chamber of Commerce for five years.
15     Q.  And what did you do?
16     A.  I was the production person.  I did newsletters
17  and typing and clerk kind of things.
18     Q.  How about after that?
19     A.  After that, I had children.
20     Q.  Um-hum.
21     A.  And then I worked part-time for a couple of years.
22     Q.  At what?
23     A.  At a little grocery store in our neighborhood.
24     Q.  And that takes us to about when, what year?
25     A.  Until 1984, I was the administrator/secretary at

Page 11

1  our church.
2      Q.  Give me the years you had that position.
3      A.  1984 to 1988.
4      Q.  And was that a paid position?
5      A.  Yes.
6      Q.  How many hours a week did you work at that
7  position?
8      A.  Full-time.
9      Q.  And after '88, then what?
10     A.  In 1988 I became the business manager at Pegasus,
11  which was a head injury facility.
12     Q.  How did you get that job?
13     A.  Interviewed.
14     Q.  Did you see a notice in the newspaper or something
15  like that?
16     A.  Yes.
17     Q.  And what were your duties at Pegasus?
18     A.  My duties at Pegasus were to run the office, do
19  all the books, make sure the accounts payable and receivable
20  were taken care of.
21     Q.  Anything else?
22     A.  Worked -- helped some of the clients.  Worked with
23  their money.
24     Q.  What kind of relationship did you have with the
25  clients such that you would help them with their money?

Page 12

1      A.  I kept all of their cash.  And when they would
2  need cash for things, we would go over what they were going
3  to spend it on and how they were going to spend it.
4      Q.  So this was a resident facility.
5      A.  Yes.
6      Q.  After Pegasus, what did you do?
7      A.  After Pegasus, I came to Hamot.
8      Q.  What year?
9      A.  1992.
10     Q.  In what capacity?
11     A.  I was marketing assistant.
12     Q.  Okay.  Who was your boss?
13     A.  John Monocello.
14     Q.  Is he still at Hamot?
15     A.  Yes.
16     Q.  What's his title?
17     A.  I don't know.
18     Q.  When was the last time you talked to him?
19     A.  Two weeks ago.
20     Q.  You don't know what his title is?
21     A.  I don't know what his title is.
22     Q.  And you went from marketing assistant to what
23  position at Hamot?
24     A.  Orthopaedic residency coordinator.
25     Q.  How did you get that job?

Page 13

1      A.  I interviewed for the position.
2      Q.  Who did you interview with?
3      A.  Dr. Lubahn, Dr. Van Voris, Chuck Walczak.
4      Q.  And who is Chuck Walczak?
5      A.  He used to be an employee at Hamot.  And he was
6  part of the orthopaedic service line leader.
7      Q.  What is a service line leader?
8      A.  I don't really know.
9      Q.  Was he part of the orthopaedic program?
10     A.  No.
11     Q.  Do you know why he was someone who was
12  interviewing you?
13     A.  I think that he may have been in charge of
14  orthopaedics as a department, but I'm not real sure exactly
15  what his role was, to be honest.
16     Q.  So after the interview, did you ever have any
17  contact with Mr. Walczak?
18     A.  Not much.
19     Q.  And what year did you become the program
20  coordinator?
21     A.  1993.
22     Q.  What are your duties as the program coordinator?
23     A.  Are you asking me what were my duties?
24     Q.  Well, let's -- probably cover all of them.
25     A.  My current position or in my -- I'm not clear on

4 (Pages 10 to 13)

0e78fe41-a7a8-400f-a7c4-799dd9f507a3

Page 18

1    program follows Green Book requirements?
2        A.   Right.
3        Q.   And recordkeeping?
4        A.   Right.
5        Q.   And alumni -- working with alumni, I think you
6    said.
7        A.   Right.
8        Q.   Anything else besides that, with regard to
9    orthopaedics?
10       A.   No.
11       Q.   Recordkeeping; what -- what kind of records do you
12   come in contact with?
13       A.   All residents have their own file, their own
14   personnel file.
15       Q.   Who keeps it?
16       A.   I do. It's in my office. I keep all of their
17   evaluations on the GME Toolkit.
18       Q.   A little bit about the GME Toolkit. What is it?
19       A.   The GME Toolkit is an electronic recordkeeper for
20   us. It's web-based. And all of our evaluations are, for
21   some programs, case logs, things like that, are kept on
22   there.
23       Q.   Let's talk about evaluations. Are all evaluations
24   of all orthopaedic residents done on this Toolkit?
25       A.   Yes.

Page 19

1        Q.   And the Toolkit is what; it's a software program,
2    right?
3        A.   Yes.
4        Q.   And where did you get it?
5        A.   Where did we buy it from?
6        Q.   Yes. If you did buy it.
7        A.   The company was called GME Toolkit, Data Harbor.
8        Q.   Did you have anything to do with acquiring this
9    bit of software?
10       A.   No.
11       Q.   No, you didn't.
12       A.   No.
13       Q.   How long have you been using it?
14       A.   I think two-and-a-half years.
15       Q.   And do you know why it was acquired?
16       A.   So that there would be one place for everything to
17   be. One place for all the evaluations, conferences.
18   Everything would be in one area.
19       Q.   I would like to know -- when you say one place for
20   everything, I want to know what everything is. And so you
21   talked about evaluations and conferences. What is the
22   "everything" that's in this program?
23       A.   There are all the demographics, all the resident
24   demographics.
25       Q.   What does that mean?

Page 20

1        A.   Where they live, their telephone number, their
2    degrees, where they went to medical school, what year they
3    graduated medical school. We put all of the conferences.
4    Every conference lecture that is given is input into
5    their -- and then if they attend the conference, that's put
6    in. So we know who's been at what conference.
7        Q.   Okay. So when you say a conference, some
8    statistical information about there was a conference at Peek
9    'N Peak on such and such day on hip replacement, and the
10   following attended. Is that fair to say? Is it something
11   like that, or is it something else?
12       A.   There's a conference every day.
13       Q.   Okay.
14       A.   There's a lecture every day, a didactic lecture
15   every day.
16       Q.   You're talking about the morning conferences.
17       A.   Right.
18       Q.   So when you say that gets on there, how does it
19   get on there?
20       A.   I put it in, or our secretary.
21       Q.   Where do you get the information?
22       A.   A lecture schedule is put out every month.
23       Q.   You're the one who compiles the lecture schedule,
24   aren't you?
25       A.   With the chief resident, for orthopaedics. All

Page 21

1    the programs are different.
2        Q.   Okay. So we're going to set aside the osteopathic
3    programs for now. So somewhere in this Toolkit is a list of
4    all of the morning conferences that the orthopaedic
5    residents have been to; is that right?
6        A.   Correct.
7        Q.   And do you put it in all at once when you settle
8    on the schedule with the chief resident, or how does that
9    work?
10       A.   After the schedule is sent out to everybody, it
11   usually goes to our secretary, who inputs it at some time
12   during that month. And then all of the sign-in sheets come
13   back to us at the end of the month, and then they're put in,
14   who attended.
15       Q.   Okay. And what's the purpose of keeping this
16   information on the GME Toolkit?
17       A.   The purpose is so that you can run a report, see
18   who's been at morning conference, who hasn't. For the site
19   reviewer, they want to know what lectures we had. They want
20   to know who's attended. We can pull all that information up
21   easily.
22       Q.   And the GME of GME Toolkit, what does that stand
23   for?
24       A.   Graduate medical education.
25       Q.   What else do you have in this Toolkit?

6 (Pages 18 to 21)

FERGUSON & HOLDNACK REPORTING, INC.
814-452-4556

0e78fe41-a7a8-400f-a7c4-799dd9f507a3

Page 22

1    A.   We also keep who's taking ATLS, ACLS, CPR, BLS,
2    all the required -- those kind of required education things.
3        Q.   You're going to have to use real words for those.
4        A.   Advanced trauma life support for ATLS.  ACLS is
5    advanced cardiac life support.  PALS is pediatric advanced
6    life support.  CPR is cardiac pulmonary resuscitation, I
7    think.  Did I miss one?  BLS is basic life support.  Those
8    are all.  So we know when their certification is up, so that
9    we make sure that they get re-certified.
10       Q.   Okay.  What else is in this program, do you keep
11   in the program?
12       A.   Evaluations.  That's the biggest part of this
13   program, is the evaluations.
14       Q.   Okay.  Setting the software information aside,
15   what other documents, documentary records, do you come in
16   contact with?  That you maintain.
17       A.   I maintain all the rotation schedules, the
18   conference schedules.  In the resident file, I would
19   maintain their licensure, their application to the program,
20   their board scores.
21       Q.   What board?
22       A.   Their USMLE.  I don't know what that stands for.
23       Q.   Do you keep their OITE scores?
24       A.   Yes.
25       Q.   And how about any meeting minutes?

Page 23

1        A.   I'm not sure what you mean.
2        Q.   There are committees that meet and deal with
3    issues in the Orthopaedic Residency Program, I take it; is
4    that correct?
5        A.   There's an Orthopaedic Department meeting that
6    resident -- residency program items are brought forth, but I
7    do not have minutes to those.
8        Q.   Okay.  Let's try it this way.  You know what
9    meeting minutes are.
10       A.   Yes.
11       Q.   Are there any -- are there minutes of any meetings
12   that you yourself maintain?
13       A.   No.
14       Q.   Do you ever print out e-mails for any purpose?
15       A.   I do.  Not very often, but I do.
16       Q.   What determines whether you print out an e-mail?
17       A.   I would print out an e-mail if it had something to
18   do with an issue that, if something happened to a resident
19   or if something happened that needed to be documented in
20   their file.
21       Q.   Who decides whether it needed to be documented;
22   you?
23       A.   Me or the program director.
24       Q.   And what do you use to decide whether there is a
25   need to document something?

Page 24

1        A.   I don't know if there's anything that -- any
2    specific process that I go through to decide that.  I'm not
3    sure.
4        Q.   What's the e-mail retention policy that you know
5    about at the hospital?
6        A.   At our hospital?
7        Q.   Yes.
8        A.   I'm not real sure what the e-mail retention policy
9    is.  I'm not sure.
10       Q.   Are you aware of any directions from anybody to
11   preserve e-mails relating to Lisa Brown?
12       A.   After -- repeat that, please.
13       Q.   Are you aware of any direction from anybody to
14   preserve e-mails relating to Lisa Brown?
15       A.   I was asked if I had anything in my file relating
16   to Lisa Brown.
17       Q.   Let's stop there.
18       A.   Okay.
19       Q.   Who asked you?
20       A.   Don Inderlied.
21       Q.   And when did that question get asked?
22       A.   I can't remember.  I don't know the date.
23       Q.   You're going to have to try and search your
24   memory, if you would.
25       A.   Last year.  It's as close as I can get.  I'm not

Page 25

1    sure when.
2        Q.   Was it cold out when you remember hearing that?
3        A.   Honestly, I can't remember when.
4        Q.   You didn't get any -- you didn't get any written
5    direction, right?
6        A.   No.
7        Q.   This was just verbal.
8        A.   I was just asked to give him the file, and if
9    there was anything that I had, to give it to him.  And I
10   did.
11       Q.   Anything that you had, about what?
12       A.   Any of her -- any of her records, any of her --
13   anything that was in her file.  Any e-mails I had that were
14   printed -- I mean, that I had printed that were in her file.
15   Anything that was in her file.  Anything, I was -- I turned
16   over to Don.
17       Q.   Did he ask you to turn over any e-mails that
18   weren't printed?
19       A.   Yes.
20       Q.   Okay.
21       A.   I didn't have any.
22       Q.   Did you look?
23       A.   Yes.
24       Q.   Do you have any records about -- does the name
25   Bill Bambrick ring a bell?

7 (Pages 22 to 25)

Page 34

1  that residents were evaluated on, somebody had to select the
2  topics the program was going to evaluate residents on.
3  Punctuality, knowledge of orthopaedics, knowledge of
4  surgery, responsiveness, stuff like that. Where did those
5  come from?
6      A.  I don't know. That form was in use when I started
7  this job, so I don't know.
8      Q.  If I wanted to see a list of the competencies,
9  where would I look?
10     A.  In the Green Book.
11     Q.  And how about on any of the evaluations of
12 residents?
13     A.  Yes, they're on every evaluation.
14     Q.  What was your relationship with Lisa Brown when
15 she was in the residency program, say, starting from the
16 beginning?
17     A.  My relationship with Lisa was just like my
18 relationship with all the residents.
19     Q.  Put it into words.
20     A.  Just that residents -- when a resident comes in, I
21 help them get through their residency program.
22     Q.  Okay. How do you do that?
23     A.  I take care of things for them. If they have --
24 you know, I make sure that they have vacations scheduled. I
25 schedule their vacation for them. I -- I don't know.

Page 35

1      Q.  Well, I don't mean to be flip, but --
2      A.  No, I'm just trying to -- I'm sorry. I work with
3  them on a daily basis. If there's -- if they need me to
4  help them put presentations together, I would type
5  presentations for them, for their conferences in the
6  morning. I would help them type those things out.
7          I help them take care of, you know, any -- I mean,
8  if they needed to have something from the library, if they
9  wanted stuff gathered for them, that kind of stuff. I make
10 sure their schedules -- you know, if they're on -- their
11 call schedules are sent to them, so they know when they're
12 on call. That kind of thing.
13     Q.  Are you supposed to keep track of who's in the
14 hospital and who's not in the hospital, in terms of making a
15 call schedule?
16     A.  Yes.
17     Q.  Just get back to the records for a minute. We
18 talked earlier about Mr. Inderlied coming to you at some
19 point last year and asking for records relating to Lisa
20 Brown, correct?
21     A.  Correct.
22     Q.  Is there any other time that anyone asked you for
23 records relating to Lisa Brown?
24     MS. RICHARD:  You can answer to the extent that it
25     doesn't require you to disclose attorney/client

Page 36

1      privilege to communications.
2      A.  Okay. I gave Mr. Inderlied the file.
3      Q.  We know about that.
4      A.  Okay.
5      Q.  Any other time?
6      A.  No. I have not been given -- I mean, I'm not
7  quite sure I understand what you're asking, to be honest
8  with you.
9      Q.  Sure. We talked about one time when Mr. Inderlied
10 came to you and said something like, and whatever he said,
11 let me have the records for Lisa Brown.
12     A.  Okay.
13     Q.  Other than that time, did anyone ever come to you
14 and ask you to search for or get them records relating to
15 Lisa Brown?
16     A.  Just Attorney Richards has asked if there's
17 anything further that --
18     Q.  Don't say what. That was a yes?
19     A.  Okay.
20     Q.  That was yes. So the answer is yes.
21     A.  Yes.
22     Q.  And your attorney did that; is that fair to say?
23     A.  Yes.
24     Q.  Any other time?
25     A.  No.

Page 37

1      (P. Rogers Deposition Exhibit 1 marked for
2      identification.)
3      Q.  We've put a document in front of you that we've
4  marked as Exhibit 1 so that we know what it is later. And I
5  would ask you if you have seen this document before.
6      A.  Yes.
7      MS. RICHARD:  Just one second. Will you look at
8      all three pages and make sure you recognize all
9      three pages.
10     A.  (Witness complies.) Okay.
11     Q.  Okay. The question is, have you seen this
12 document before?
13     A.  I have seen this document. I had not seen this
14 document.
15     MS. RICHARD:  For the sake of the record, when you
16     say "this document," specify what it is.
17     A.  I have seen the memo that states ambassador of the
18 month. I had not seen the two sheets with the signatures on
19 them.
20     Q.  Okay. Let me ask you to look at the second page
21 of Exhibit 1. Do you see -- do you see what appears to be
22 the name Pat Rogers written in the middle of the page?
23     A.  Yes.
24     Q.  Did you write that?
25     A.  Yes.

10 (Pages 34 to 37)

0e78fe41-a7a8-400f-a7c4-799dd9f507a3

Page 62

1  Q. Who would you say is the person in charge of or
2  responsible for the records maintained by the Orthopaedic
3  Residency Program, about the residents? Is it you?
4  A. Me.
5  Q. Have you ever heard of the phrase "affirmative
6  action"?
7  A. I've heard the phrase.
8  Q. Do you know what it means?
9  A. Not really.
10  Q. Does Hamot make any efforts to recruit any
11  particular types of candidates for the Orthopaedic Residency
12  Program?
13  A. No.
14  Q. Do you know of any residents, other than Dr.
15  Brown, who did not complete the Orthopaedic Residency
16  Program?
17  A. In my tenure?
18  Q. Yes.
19  A. No.
20  Q. How about before your tenure, are you aware of any
21  people?
22  A. I know there was one other person that did not
23  complete, but I don't know who it is. I mean, I don't
24  remember their name. I would have to go back in the
25  records.

Page 63

1  Q. With regard to residents' performance, are any
2  other documents created to memorialize the evaluations of
3  their performance, other than the forms that the attendings
4  fill out at the end of the rotations?
5  A. Dr. Lubahn semiannually does a narrative
6  evaluation. That's the only other document.
7  Q. That's twice a year?
8  A. Twice a year.
9  MR. SOREK: Let me take a five-minute break. I'll
10  look through this and see what else we have left
11  to cover, and take it from there. It shouldn't be
12  much longer.
13  (Recess held from 11:39 a.m. to 11:53 a.m.)
14  Q. Ms. Rogers, when Mr. Inderlied asked you to look
15  for documents related to Dr. Brown, where did you look?
16  A. I keep the residents' files in my file cabinet in
17  my office. I looked there. Previous to the GME Toolkit,
18  evaluations were kept in a binder. So I went to the binder
19  and took the evaluations from the binder. Checked my
20  archive e-mail to see if there was any e-mail that needed to
21  be downloaded and put -- to be given to you, or to
22  Mr. Inderlied.
23  Q. What's the oldest e-mail you have in the archive?
24  A. I don't know. Because we change the e-mail
25  systems, so.

Page 64

1  Q. When?
2  A. Couple years ago.
3  Q. You never kind of looked at the last one and --
4  A. No, I don't look -- I rarely look at my archives.
5  Q. Is the action automatic, the archiving?
6  A. No. You have to archive yourself if you put
7  something in archive.
8  Q. Is there a policy about archiving?
9  A. No.
10  Q. Where else did you look?
11  A. That was it.
12  Q. So there's really only the GME Toolkit, your file
13  cabinet, the evaluation binders, and e-mail, right?
14  A. Correct.
15  Q. Do you know if Dr. Lubahn created any documents
16  about Dr. Brown's termination that are not in her file?
17  A. I would only know of the ones that are in her
18  file. I don't know of anything other than that.
19  Q. Do you know if he had discussions with
20  Mr. Inderlied about the termination?
21  A. Other than the meeting that we had, no.
22  Q. Okay. What meeting is that?
23  A. The one with Rosanne and Dr. Lubahn and I. Is
24  that what you're talking about? I'm confused. I'm sorry.
25  Q. Well, we were talking about Mr. Inderlied, and I

Page 65

1  was asking about any documents between Dr. Lubahn and him.
2  A. Okay.
3  Q. And then you mentioned a meeting. And I guess I
4  would like to know about the meeting. When was it?
5  A. The meeting that -- when Dr. Lubahn, myself,
6  Rosanne Jaworski. And then Don Inderlied was called in at
7  the end of the meeting, to talk about if we were able to
8  renew -- if we could not renew a contract.
9  Q. You're talking about Dr. Brown?
10  A. Right.
11  Q. And do you remember when this was?
12  A. No. It was -- without looking at the
13  documentation, I don't know the date.
14  Q. Do you remember it being -- as being around the
15  time Dr. Brown received her termination letter?
16  A. Yes.
17  Q. Did you help draft the letter?
18  A. No.
19  Q. Do you know who did draft the letter?
20  A. I'm assuming Dr. Lubahn.
21  Q. You know there was a Grievance Committee that Dr.
22  Brown invoked to review the termination of her contract,
23  right?
24  A. Yes.
25  Q. Did you provide any documents to the committee?

17 (Pages 62 to 65)

Page 66

1    A.   The only documents that I have provided have been
2    to Don Inderlied. That's all.
3        Q.   And when you say to Don Inderlied, you mean that
4    time we've already talked about. You don't mean at a
5    separate time or a number of times, do you?
6        A.   No.
7        Q.   He asked you at one time last year to provide
8    documents to him relating to Lisa Brown, correct?
9        A.   Correct.
10       Q.   And other than that one time, he hasn't asked you
11   at other times to provide documents; is that correct?
12       A.   He has asked me to make sure that I have given him
13   every document I have. I have given him every document I
14   have. He has everything, every document that I have.
15       Q.   Okay. After you gave him the documents -- and
16   this was last year, correct?
17       A.   Right.
18       Q.   After you -- and you produced those documents for
19   him.
20       A.   Yes.
21       Q.   And after you did that, has he come to you after
22   that and said, check again, or, are you sure?
23       A.   The only other information I've gotten is from my
24   attorney, asking me for documents.
25       Q.   And we're not talking about that. We're talking

Page 67

1    about Mr. Inderlied.
2        A.   No, he has not asked me for any other documents.
3        Q.   Did you provide any documents to the Medical
4    Education Committee regarding Dr. Brown?
5        A.   No.
6        Q.   How about the Board of Directors?
7        A.   No.
8        Q.   How far back do your resident files go?
9        A.   To the beginning of Orthopaedic Residency Program.
10       Q.   When is that?
11       A.   I'm sorry. Is that what you're asking me?
12       Q.   Yes.
13       A.   1948.
14       Q.   Those are under your control, right?
15       A.   Yes.
16       Q.   Have you gone to any lectures or seminars from any
17   of your professional organizations about probation or
18   termination of residents?
19       A.   I'm sure that we've talked about that in some of
20   these meetings, but I don't remember specifically.
21       Q.   Does the hospital offer any training or seminars
22   or lectures about termination of doctors?
23       A.   No.
24       Q.   Termination of other employees?
25       A.   I've not been to them.

Page 68

1        Q.   Have you been to any seminars or lectures dealing
2    with equal employment opportunity?
3        A.   No.
4        Q.   Does that phrase mean anything to you in
5    particular?
6        A.   No.
7        Q.   Okay. If I asked you to define equal employment
8    opportunity today, what would you say?
9        A.   I would say that it's a human resource issue, that
10   I'm not real sure what it's for.
11       Q.   Does the Orthopaedic Residency Program keep any
12   records on attending physicians?
13       A.   The only thing we have on our attending physicians
14   is, during our site review, we have to keep copies of their
15   CVs, their curriculum vitaes.
16       Q.   It's true, isn't it, that residents do evaluations
17   of attendings, or faculty, right?
18       A.   Yes.
19       Q.   Do you maintain those records?
20       A.   Yes.
21       Q.   So when you said the only thing you had was CVs,
22   this is in addition to that, right?
23       A.   I misunderstood what your question was.
24       Q.   Sorry. So you do have the evaluations of
25   attendings by residents.

Page 69

1        A.   Yes.
2        Q.   Any other documents like that, about attendings,
3    that you maintain?
4        A.   No.
5        Q.   Did you ever speak to Dr. Lubahn about Lisa
6    Brown's performance?
7        A.   Yes.
8        Q.   Try to think back to the number of times and the
9    first time you may have done that.
10       A.   The first time -- I don't know when the first time
11   would have been. Dr. Lubahn asked me to put the letter that
12   Dr. Williams wrote in her file, about that issue. And this
13   is more what Dr. Lubahn and I talked about, was, you know,
14   if something came up, he would ask if I would please put
15   this in her file. Or that -- it was that kind of
16   conversation. It wasn't -- did we chitchat about what was
17   going on; no.
18       Q.   Did you ever chitchat with Dr. Lubahn about what
19   was going on with Dr. Brown?
20       A.   Not very often.
21       Q.   How about the times when you did?
22       A.   The times where we did were items, you know, that
23   things that had come up, like this Dr. Williams thing, or
24   the ED thing, when something would -- when something
25   happened, he would ask me, you know, did you -- did you get

18 (Pages 66 to 69)

0e78fe41-a7a8-400f-a7c4-799dd9f507a3

EXHIBIT 6



**Hamot Medical Center**
201 State Street
Erie, PA 16550
(814) 877-6000
www.hamot.org

March 1, 2004

Lisa Brown, MD
5459 CiderMill Road
Erie, PA   16509

Dear Dr. Brown:

Based on clinical performance and concerns regarding your current knowledge base in orthopaedics for the PGY-3 level, I have decided not to renew your contract at the end of this academic year, June 30, 2004.  The decision is a difficult one for me as for the entire faculty, but I believe it to be the best for all concerned.

During the remainder of this academic year, any failure on your part to provide competent care as outlined in your contract, such as not responding to patient consults or calls from the emergency room will result in immediate termination.

Sincerely,

John D. Lubahn, MD
Program Director

*Hand delivered by John D Lubahn*
*March 1, 200*

EXHIBIT 7

**Procedures and Lab Skills**

|  |  | Unacceptable | Poor | Average | Above Average | Excellent |  |
|---|---|---|---|---|---|---|---|
| 1) | Performs core procedures competently and with appropriate supervision | 1 | 2 | ③ | 4 | 5 | NA |
| 2) | Documents procedures accurately and in a timely manner | 1 | 2 | ③ | 4 | 5 | NA |
| 3) | Has plan for tests and consults and interprets test results correctly | 1 | 2 | ③ | 4 | 5 | NA |

**Attitude**

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| 1) | Demonstrates interest and desire to learn by asking questions and through reading | 1 | ② | 3 | 4 | 5 | NA |
| 2) | Cooperative/team attitude with faculty, colleagues and staff | 1 | 2 | 3 | 4 | ⑤ | NA |
| 3) | Self-directed, motivated and organized | 1 | 2 | ③ | 4 | 5 | NA |

**Core Competencies**

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| 1) | **Patient Care:** provides compassionate care that is effective for the promotion of health, prevention, and treatment | 1 | 2 | 3 | ④ | 5 | NA |
| 2) | **Medical Knowledge:** demonstrates knowledge of biomedical, clinical and social sciences, and applies that knowledge effectively to patient care | 1 | ② | 3 | 4 | 5 | NA |
| 3) | **Practice-Based Learning and Improvement:** uses evidence and methods to investigate, evaluate, and improve his/her patient care practices | 1 | 2 | ③ | 4 | 5 | NA |
| 4) | **Communication and Interpersonal Skills:** demonstrates these skills and maintains professional and therapeutic relationships with patients and the healthcare team | 1 | 2 | ③ | 4 | 5 | NA |
| 5) | **Professionalism:** demonstrates behaviors that reflect an ongoing commitment to continuous professional development, ethical practice, sensitivity, and responsible attitudes | 1 | 2 | 3 | ④ | 5 | NA |
| 6) | **System-Based Practice:** demonstrates both an understanding of the contexts and systems in which health care is provided and applies this knowledge to improve and optimize health care | 1 | 2 | ③ | 4 | 5 | NA |

**Overall Evaluation**

|  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| 1) | Overall evaluation as a physician | 1 | 2 | ③ | 4 | 5 | NA |

2) Comments _Poorly Prepared For Cases. Always Is A Rush_

Confidential

HMC-00453