IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LISA BROWN, M.D., | ) |
| Plaintiff | ) |
| v. | ) Civil Action No. 05-32E |
| HAMOT MEDICAL CENTER, | ) |
| Defendant | ) |

### REVISED NOTICE OF DEPOSITION

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of Civil Procedure, counsel for defendant Hamot Medical Center will take the deposition under oath of plaintiff Lisa Brown beginning on Thursday, December 15, 2005 at 12:00 p.m. and continuing on Saturday, December 17, 2005 at 9:00 a.m. at the law offices of Knox, McLaughlin, Gornall & Sennett, P.C., 120 West Tenth Street, Erie, Pennsylvania 16501-1461, or at such other place and time as counsel shall mutually agree.

The purpose of the deposition is to inquire into all matters which relate to this action. The testimony will be recorded by stenographic means.

Respectfully submitted,

TOBIN, O'CONNOR, EWING & RICHARD

By _____
Kerry M. Richard, Esq.
Ziad P. Haddad, Esq.
Forrest G. Read, IV, Esq.
5335 Wisconsin Ave., N.W. Suite 700
Washington, DC 20015
(202) 362-5900

Counsel for Defendant
Hamot Medical Center

EXHIBIT A

Local Counsel:

KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.
Mark J. Kuhar, Esq.
120 West Tenth Street
Erie, Pennsylvania 16501-1461
(814) 459-2800

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by telecopy and by first class, United States mail, postage pre-paid on the 8th day of December, 2005 on the following:

Patrick Sorek, Esq.
Leech Tishman Fuscaldo & Lampl, LLC
525 William Penn Place, 30th Floor
Pittsburgh, PA 15219

Ziad Haddad

## **DECLARATION OF LISA A. BROWN, M.D.**

I, Lisa A. Brown, M.D., hereby declare as follows:

1. My deposition was scheduled for Thursday, December 15, 2005 at noon. I am currently in a family practice medical residency, which requires mandatory attendance unless I make adjustments to free my time during the day. Like most residencies, it consumes far more than eight hours a day, five days a week. I made several adjustments in my professional schedule to begin the deposition at noon on December 15. Opposing counsel did not arrive at the deposition at the scheduled time because of weather delays. The deposition was delayed for over two hours, but I accommodated these changes without argument or question. I was prepared to complete the deposition that evening, even after this delay; however, the court reporter was unable to continue past 7:00 p.m. because of child care issues. I was questioned for at least five hours that day.

2. Before December 15, 2005, I had agreed to continue the deposition on Saturday December 17, if necessary. This was a gesture of good faith, which required additional child care arrangements for my son, who is an elementary school student. This date was also very significant because it was one of the few weekends I had free to spend with my family because of my call schedule.

**EXHIBIT B**

3. On December 17, 2005, I was questioned for more than two hours, from about 9:30 a.m. to 12:20 p.m. I was not interested in submitting to questions for more than that time for the reasons I describe in this declaration, but neither I nor my counsel was abrupt, rude, or discourteous to anyone present. I do not recall opposing counsel mentioning at any time her intention to question me for more than seven hours. It was always my understanding that the reason I would be questioned on December 17 was to account for not being able to complete seven hours on December 15. It was not my understanding nor my desire that I would be subject to unlimited questioning.

4. Opposing counsel has accused me of using "stall tactics" during my deposition. I strongly object to this accusation. At no time did I try to stall or delay the deposition. Opposing counsel spent the majority of the deposition asking particular questions about events that took place fifteen years ago regarding my undergraduate education. I answered each question to the best of ability; however, at times, I needed to reflect on the question in order to recall events that took place so long ago. In addition, I am conscientious, and was attempting to be accurate and complete while answering counsel's questions. Many times counsel asked questions that seemed to be taken from documents such as transcripts, but I was not shown the document, and was asked to recall academic details from memory. I therefore would try to compose an appropriate answer before responding to counsel's questions.

5. Answering questions about my experiences at Hamot are especially difficult. I struggled through many personal and professional obstacles to reach that position. To have that opportunity taken away in mid-course has created tremendous emotional and psychological turmoil that affects my ability to instantly recall detailed information on cue. I find it necessary to pause occasionally to maintain my composure.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and understanding.

\_\_2/13/06\_\_\_                             \_\_/s/ Lisa A. Brown, MD_____
Date                                          Lisa A. Brown, MD

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LISA BROWN, M.D., | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 05-32 E |
| HAMOT MEDICAL CENTER, | ) ) ) |
| Defendant. | ) ) |

DECLARATION OF PATRICK SOREK IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL RECONSIDERATION
OF JANUARY 30, 2006 ORDER GRANTING MOTION TO COMPEL

I, Patrick Sorek, hereby declare as follows:

1. I am counsel for plaintiff in this case. I have personal knowledge of the matters included in this declaration.

2. Through various forms of communication with plaintiff and opposing counsel, I arranged for plaintiff's appearance at her deposition. At no time did I agree or have an understanding that her deposition would require more than seven hours.

3. Opposing counsel planned to take plaintiff's deposition on the day counsel was traveling to Erie, Thursday, December 15, 2005. Defendant's notice set the deposition for noon. As an accommodation to counsel's schedule, plaintiff agreed to continue the deposition into the evening, past normal business hours. She also agreed to continue the deposition on Saturday, December 17, 2005, if necessary. The court reporter was unable to stay past 7:00 p.m. on December 15 because of a child care



EXHIBIT C

arrangement, which meant that a session of questioning on Saturday would be necessary.

4. At no time before or during the deposition did opposing counsel state her intention to question plaintiff for more than the seven hours established by Federal Rule of Civil Procedure 30(d)(2). Plaintiff's purpose in agreeing to continue questioning on Saturday December 17 was to allow opposing counsel to complete her questioning if she did not use seven hours on December 15. A deposition beginning at 2:00 p.m. would not be completed until 9:00 p.m. As it happened, the need to carry over the questioning into December 17 was in fact necessitated by the court reporter's schedule.

5. Neither the Notice of Deposition nor the December 1, 2005 e-mail attached to defendant's Motion to Compel make clear that Hamot wished to question plaintiff for more than a total of seven hours, and I never understood them as such. I interpreted opposing counsel's statement in the December 1 e-mail that she wished to question plaintiff for "up to seven hours" on December 15 as meaning that if, for whatever reason, seven hours were not used on December 15, the remaining time up to seven hours would be used on December 17. I believe this is a reasonable interpretation because the presumption by rule is that depositions are limited to seven hours, and that exceptions to the rule should be expressed far more clearly than counsel's e-mail if one intends to rely on the exception.

6. The seven hour limitation on depositions is a rule plaintiff was interested in invoking for personal reasons, and not as a litigation tactic. It is difficult for her to discuss the numerous personal obstacles she has overcome in her life to reach her objective of becoming a medical doctor. It is especially difficult for her to discuss her

treatment by defendant. While she understands that answering extensive questions from Hamot was part of the litigation process, she also wished to use whatever protections the rules afforded her against the deposition process becoming unnecessarily intrusive and extended.

7. I filed a motion to compel on plaintiff's behalf in June 2005. At the case management conference on June 21, 2005, the Court urged counsel to try to reach a resolution. I attempted to do so. After receiving repeated assurances in writing that defendant had produce all relevant documents, I was convinced that key information was being withheld. Performance evaluations that had been produced for plaintiff, for example, were not produced for any other resident. In addition, defendant had arbitrarily set the time period during which it was willing to produce documents as the three years of plaintiff's presence in the residency program.

8. Accordingly, I filed a renewed motion to compel in November 2005. Defendant responded, and the Court heard argument on the record in chambers on December 6, 2005. The Court granted plaintiff's motion at that time.

9. Before the Court's December 6, 2005 ruling, defendant had produced less than 1500 pages of documents, or about a box. After the Court's ruling, defendant produced about eighteen boxes of documents. These documents include key information concerning the administration of the residency program, evaluations of other residents, standards which other residents failed to meet, and assistance which other residents received -- information which demonstrates that defendant treated plaintiff differently than other residents and doctors.

10. Reviewing these documents is a laborious process. The documents are maintained in Erie, and availability of the documents and space to review them must be arranged several days in advance. The importance of these documents mean they must be reviewed carefully. Their volume means that such review is time-consuming. Counsel was able to get through only about half the documents, simply selecting them for copying, after spending an entire day on the task.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

\_\_\_\_\_2/13/06_____     \_\_/s/ Patrick Sorek _____
Date                             Patrick Sorek

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2
   LISA BROWN, M.D.              :
3       Plaintiff                :
                                 :
4       v.                       : Civil Action No. 05-32 E
                                 :
5  HAMOT MEDICAL CENTER,         :
        Defendant                :
6

7

8          Deposition of LISA BROWN, M.D, taken before

9     and by Sonya Hoffman, Notary Public in and for

10    the Commonwealth of Pennsylvania on Thursday,

11    December 15, 2005, commencing at 2:00 p.m., at the

12    offices of Knox McLaughlin Gornall & Sennett, P.C.,

13    120 West Tenth Street, Erie, PA 16507.

14

15

16 For the Plaintiff:

17     Patrick Sorek, Esquire
       Leech Tishman Fuscaldo & Lampl
18     Citizens Bank Building, 30th Floor
       525 William Penn Place
19     Pittsburgh, PA 15219

20 For the Defendant:

21     Kerry M. Richard, Esquire, P.C.
       Tobin O'Connor Ewing & Richard
22     5335 Wisconsin Avenue, NW
       Suite 700
23     Washington, DC 20015

24

25             Reported by Sonya Hoffman
           Ferguson & Holdnack Reporting, Inc.
```

EXHIBIT D

```
 1  golfing.
 2      Q.   Do you know whether they've golfed together?
 3      A.   Yes.
 4      Q.   How often?
 5      A.   Possibly a couple of times, no more than that.
 6      Q.   This is since March 1, 2004?
 7      A.   Yes.
 8      Q.   Before March 1, 2004, had they ever golfed
 9  together?
10      A.   I don't know.
11      Q.   Do you know whether Chris has spoken to Mark
12  Suprock about your situation at Hamot?
13      A.   I don't know.
14      Q.   I'm going to change gears for a moment.
15      A.   Before you do, could I just have a minute to think
16  about your last question.
17      Q.   Yes.
18      A.   I'm sorry, could you read the last question to me.
19           (Previous question read back.)
20      A.   I don't know.
21      Q.   Do you and Mark Suprock ever talk by e-mail?
22      A.   No.
23      Q.   I'm totally changing gears, just so you're
24  prepared for the next question.  When did you finish high
25  school?
```

```
 1        A.    1982.
 2        Q.    Okay.  And you started college in 1989; is that
 3   correct?
 4        A.    Correct.
 5        Q.    Is that the first time you took college courses?
 6        A.    No.
 7        Q.    When was the first time you took college courses?
 8        A.    Right when I graduated from high school.
 9        Q.    Where did you attend?
10        A.    Akron University.
11        Q.    So that would have been in the fall of '82; is
12   that correct?
13        A.    Likely, yes.
14        Q.    How long did you attend there?
15        A.    A few months.
16        Q.    Were you full time at that time?
17        A.    Yes.
18        Q.    For the first semester?
19        A.    It must have been.  I'm not sure if they're on
20   semesters or not.  I don't know if they are, it was so long
21   ago.
22        Q.    Do you remember completing a term there?
23        A.    I did not.
24        Q.    And then did you stop going there altogether or
25   cut back?
```

```
 1   examination test.
 2        A.   Yes.
 3        Q.   When did you take the USMLE Step 1?
 4        A.   At the regular time, but I don't know what month
 5   it was in.
 6        Q.   Do you remember whether it was before or after
 7   your second year of medical school?
 8        A.   I'm pretty sure it was after the second year.
 9        Q.   Okay.  And your score on that was fairly low as
10   well; is that correct?
11        A.   Yes.
12        Q.   Below the national mean?
13        A.   Yes.
14        Q.   Do you remember what percentile you were in for
15   that test?
16        A.   No.
17        Q.   What was happening in your life during those two
18   years of medical school?
19        A.   Six months -- the summer prior to starting medical
20   school my mom was diagnosed with ovarian cancer.  She was
21   receiving intense therapy for the majority of my first three
22   years of medical school, chemotherapy and she had surgical
23   therapy.  My now ex-husband informed me that he was having
24   an affair and moved out for a period of time.  And my oldest
25   daughter, Jessica, had at least one of, but it could have
```

```
 1  been more than that, of her major surgeries during my second
 2  year.
 3      Q.   How many surgeries did she have?
 4      A.   Total eight or nine -- seven or eight.
 5      Q.   And between what age ranges was she --
 6      A.   She had her first when she was hours old and had
 7  her last during my second year of medical school.
 8      Q.   Okay.  And all the rest occurred somewhere in
 9  between?
10      A.   Yes.  The majority of them were in the first few
11  years of her life and then she had continued spine
12  surgeries.
13      Q.   Okay.  Up through your second year of medical
14  school.
15      A.   Yes, that was her last one.
16      Q.   How old was she at that time?
17      A.   Grade school, I think she was in seventh grade.
18      Q.   And then so during that time you were caring for
19  your daughter.
20      A.   And my son.
21      Q.   And your son.  They were both living with you?
22      A.   Yes.
23      Q.   Was your mother living with you as well?
24      A.   No, she was not.
25      Q.   Was she far away from you?
```

1    A.    About 35 minutes.

2    Q.    So it was driving distance, anyhow?

3    A.    Yes.

4    Q.    Were you her primary caregiver at any point during
5  her illness?

6    A.    Yes.

7    Q.    When was that?

8    A.    During my third year of medical school.

9    Q.    Of the courses you took during your first year of
10 medical school, which ones were the most challenging for
11 you?

12   A.    Probably, neurology -- or neuroscience, I should
13 say, and -- I don't remember.

14   Q.    What about during your second year?

15   A.    I don't remember that any of the courses were
16 challenging.  I do remember that one test was kind of
17 ambiguous and I didn't do so well on it.  And now that I
18 think about it, I think it was in something called
19 behavioral medicine or something.  I don't remember exactly
20 the name of the course.  So I don't remember that there were
21 any challenging -- not one being more challenging than the
22 other.

23   Q.    Okay.  Did you have a faculty advisor in medical
24 school?

25   A.    I'm sure we did, but not very -- not anything that

```
 1        A.    I don't remember telling him that.
 2        Q.    Did you tell him any other reason?
 3        A.    Just that I had a family emergency.
 4        Q.    Did you tell someone at some point that your
 5   daughter had been videotaped by someone in your family and
 6   that you were going home to get her?
 7        A.    Not -- I did not tell -- I did tell someone that,
 8   after that week though.
 9        Q.    Who did you tell?
10        A.    Pat Rogers.
11        Q.    Did you tell anyone else?
12        A.    My chief, Karl.
13        Q.    And what did you do as a result of that situation?
14        A.    I immediately took them -- took my kids out of my
15   ex-husband's home and put them at my father's.  Left Michael
16   at my father's until I could find child care for him and
17   that took me until about December -- or January of '03.  And
18   Jessica, as I stated before, did not want to switch high
19   schools in the middle of her high school career and opted to
20   stay with my dad.
21        Q.    Was it your ex-husband that you understood had
22   videotaped your daughter?
23        A.    Yes.
24        Q.    Did you press any charges against him?
25        A.    No.
```