IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,          )
                       )
        Plaintiff,       )
                       )
      v.             )      Civil Action No. 05-32 E
                       )
HAMOT MEDICAL CENTER,    )
                       )
        Defendant.     )

PLAINTIFF'S BRIEF IN OPPOSITION TO
MOTION TO QUASH OR MODIFY SUBPOENA

This is an action for employment discrimination under Title VII, and for breach of contract.  Plaintiff ("Brown") was in the third year of a five year residency in orthopedic surgery when defendant ("Hamot") terminated her contract.

Key evidence in this case should come from the faculty of Hamot's Orthopedic Residency Program ("the Faculty") from which Brown was terminated.  Brown served subpoenas to the Faculty on March 2, 2006.  After an extension of time and an exchange of correspondence, however, to date, the sum total of the Faculty's responses to her subpoenas of fourteen categories of information has been this Motion to Quash or Modify Subpoena.  The Court should deny the Motion to Quash, subject to any protection the Court may wish to require to protect patient confidentiality, to which Brown would readily agree.

A.    The Court's Previous Rulings on Discovery Favor Disclosure

The Faculty's Motion to Quash no doubt will trigger the Court's recollection of the parties' previous discovery disputes.  Briefly, Brown filed a motion to compel on June

20, 2005, after receiving inadequate responses to her document requests.  Doc. No. 14. At the Court's suggestion at the June 2005 case management conference, Brown agreed to suspend the motion in attempting to work with Hamot's counsel to obtain the missing documents without Court intervention.  After four supplemental productions, and assurances that it had produced all responsive documents, Hamot still had not complied with its discovery obligations.  Brown then renewed her motion to compel in November 2005.  Doc. No. 19.  After argument in chambers on the record, the Court granted Brown's motion on December 6, 2005.

Before the Court's decision, Hamot produced about a box of documents -- less than 1500 pages.  After the Court's decision, Hamot produced about eighteen boxes of documents.  These documents contain information critical to Brown's case; were responsive to Brown's First Request for Production of Documents served in March 2005; and were withheld from Brown until production was compelled by the Court.

Another dispute arose when Brown believed she had met her deposition obligations under Federal Rule of Civil Procedure 30, and declined to submit to deposition questioning beyond seven hours.  The Court compelled her to submit to three-and-a-half more hours of additional questioning by Hamot.  Doc. Nos. 25, 28.

Brown does not relish another contest over discovery in this action.  Her pursuit of discovery from Hamot, however, has been rewarded with large amounts of relevant materials.  She thus asserts that the Faculty's efforts to avoid discovery, like Hamot's, must be vigorously opposed, because information critical to her case likely lies on the other side.  The history of the Court's review of discovery disputes shows the Court's willingness to intervene to permit the investigation of such evidence.

B.     The Faculty Have Failed to Respond to the
       <u>Subpoenas with Documents or Written Answers</u>

The Faculty[1] were served with the subpoenas on March 2, 2006, with a response date of March 15, 2006.  Brown extended the time to respond to March 29, 2006.  Exhibit 2.  Despite objecting to only two of fourteen categories of documents, the Faculty have in essence failed to respond to the subpoenas, other than by filing the Motion to Quash.[2]  The Faculty's unwillingness to comply with their obligations under Rule 45 for all categories of documents to which they do not object, puts them in a poor position to have their Motion to Quash taken seriously.

C.     The Faculty Respondents Have No
       <u>Legitimate Basis to Argue Relevance</u>

The Faculty objects to production of two categories of documents:  those involving legal claims, and those involving complaints by patients.  Brief in Support of Motion to Quash ("Faculty Brief") at 2.  The Faculty argue that the information Brown seeks is "entirely irrelevant" or "completely irrelevant."  <u>Id</u>. at 1,3,4,6.  The Faculty, however, are not in a position to argue relevance.

The Faculty are not parties.  They have not been served with the Complaint, Answer, motions, or discovery requests.  The Faculty asked for a letter from Brown justifying the requests in her subpoena, which she supplied.  <u>See</u> Motion to Quash.

Brown stands by her letter, but hastens to add that relevance is a concept larger and more complex than the description contained in her letter.  "Relevant evidence" is

---

[1] A roster of faculty members in Hamot's Orthopedic Residency Program ("Program") is attached as Exhibit 1.  The roster includes the names of the Faculty who received subpoenas.

[2] Brown's counsel did receive a telephone call from Mark Suprock, MD, on March 2, 2006, and a letter from John Kastrup, MD, dated March 7, 2006, in which each stated that he had no responsive documents.

defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Ev. 401. As Brown previously argued to the Court, the discovery rules are designed to enable the parties "to obtain the fullest possible knowledge of the issues and facts before trial." Hickman v. Taylor, 329 U.S. 495, 501 (1947). The rules "are to be accorded a broad and liberal treatment." Id. at 507. In employment discrimination cases, the Third Circuit has stated that:

> we frown upon unnecessary discovery limitations in Title VII, and hence ADEA, cases. See Trevino v. Celanese Corp., 701 F.2d 397, 405 (5th Cir. 1983). In such cases, other courts have refused, and now we refuse, "to allow procedural technicalities to impede the full vindication of guaranteed rights." Id. at 406.

Sempier v. Johnson & Higgins, 45 F.3d 724, 734 (3d Cir. 1995).

Given the breadth of the concept of relevance, the Faculty are not in a position, because of their general lack of knowledge of the case, to credibly argue that the documents Brown seeks are not relevant. They do not know all the current and potential issues in the case for the simple reason that, up to now, they have not been involved in it.

D.    The Faculty Repeatedly Fail to Meet Their Burdens

The party objecting to the production of evidence and filing a motion has the burden of proving its assertions. The Faculty fail to do so at almost every turn.

Federal Rule of Civil Procedure 45 is the only discovery method whereby information may be obtained from a nonparty to the suit. Rule 45(c)(3)(A) authorizes a court to quash or modify a subpoena that subjects a person to undue burden. The objecting party, however, bears a heavy burden of establishing that compliance with the subpoena would be "unreasonable and oppressive." Composition Roofers Union Local

30 v. Graveley Roofing Enter., 160 F.R.D. 70, 72 (E.D. Pa. 1995), citing Heat & Control, Inc. v. Nester Indus., Inc., 785 F.2d 1017, 1023 (Fed. Cir. 1986); Barnes Foundation v. Township of Lower Merion, 1997 WL 169442, *4 (E.D.Pa.1997).  The objector's burden is particularly heavy when the requested relief is a motion to quash, as contrasted to some more limited protection.  Westinghouse Electric Corporation v. City of Burlington, 351 F.2d 762, 766 (D.C. Cir. 1965); Horizons Titanium Corp. v. Norton Co., 290 F.2d 421, 425 (1st Cir. 1961).

Rule 45 must be read in context with the discovery provisions of Rule 26(b); discovery need not be confined to matters of admissible evidence but may encompass that which "appears reasonably calculated to lead to the discovery of admissible evidence."  Fed.R.Civ.P. 26(b)(1).  Relevancy is to be broadly construed for discovery purposes and is not limited to the precise issues set out in the pleadings.  Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978) citing Hickman v. Taylor, 329 U.S. 495, 507 (1947); Great West Life Assurance Company v. Levithan, 152 F.R.D. 494, 497  (3d Cir. 1994).

When determining whether a subpoena places an undue burden on a person, courts consider issues such as relevance, the requesting party's need for the documents, the breadth of the request, the time period covered, the particularity with which the documents are described, and the burden imposed in responding.  Barbine v. Keystone Quality Transport, 2004 WL 1119933, *2  (E.D. Pa. 2004); Grinder v. Keystone Health Plan Central, Inc., 2005 WL 2030456 (M.D. Pa. 2005).  The volume of documents the proposed witness must search is not determinative.  Democratic National Committee v. McCord, 356 F. Supp. 1394, 1396 (D.D.C. 1973).  And, just as

with relevance, a general objection based upon undue burden will not suffice.  <u>Highland</u> <u>Tank & Manfg. Co. v. PS Int'l, Inc.</u>, 227 F.R.D. 374, 379 (W.D. Pa. 2005) <u>citing</u> <u>Peoples</u> <u>Benefit Life Ins. v. Dale</u>, 2001 WL 34012294, *8 (S.D. Miss. 2001).  Allegations of embarrassment must be demonstrated as particularly serious.  <u>Pansy v. Borough of</u> <u>Stroudsburg</u>, 23 F.3d 772, 787 (3d Cir. 1994).

The Faculty make arguments, for example, based on the conditions of their employment, yet they offer no proof of what these conditions are.  <u>See, e.g.</u>, Faculty Brief at 5 ("they are not subject to the direction and control of Hamot").  They also assert "the obvious administrative burden" in searching for requested records, and describe their obligation as "the pinnacle of burden."  Faculty Brief at 7, 8.  Somehow, the notion that their administrative burden is not obvious, and must be proved with evidence, has escaped their attention.  These failures of proof by the moving parties constitute sufficient grounds to deny the Motion to Quash.

E.     <u>Brown Was Sufficiently Similarly Situated to Establish Relevance</u>

Should the Court wish to consider the relevance of the information Brown seeks from the Faculty, she can readily make this showing.

John Lubahn, MD, was the director of Hamot's Orthopedic Residency Program who decided to discharge Brown.  Exhibit 3.  Lubahn was questioned at his deposition on March 16, 2006 about the reasons for Brown's termination.  He stated that one of the reasons for her discharge from the program was her alleged medical error in closing a wound that he advised her to leave open, and failing to be honest in her explanation.  Exhibit 4, Lubahn Transcript at 65 lines 8-14.  In his calculus of the reasons for her discharge, "[o]ut of 100 points, that's 60 percent."  <u>Id</u>. at 66 lines 22-23.  Thus, the

decisionmaker responsible for Brown's termination identified the principal reason for her termination, and it consisted of an alleged error in patient treatment, and his doubt about her explanation of the event.

Beginning with the issue of resident honesty, Hamot faculty member Mark Suprock, MD, testified at his deposition that former resident Eric Thomas, MD, falsified research data.  Exhibit 5, Suprock Transcript at 31-32.  Even worse, the falsification was done "at the request of [Suprock's] colleagues," that is, the other orthopedic faculty.  Id. at 32 lines 6-7.  Dr. Thomas was not discharged from the program, and successfully graduated.  Exhibit 6.

With regard to treatment of patients, Craig Lippe, MD, a resident in the program with Brown, was sued for malpractice for slicing open the skin of a patient while removing a dressing.  Exhibit 7.  Dr. Lippe was not discharged from the program, and successfully graduated.  Exhibit 8.

Jeff Nechleba, MD, was also sued for malpractice while he was a resident, along with Faculty David Babins, MD, and Nicholas Stefanovski, MD, for a hip arthroplasty that resulted in sciatic nerve damage.  Exhibit 9.  There is no evidence that any doctor involved suffered any adverse consequences as a result of this incident.  Dr. Nechleba is now on the orthopedic faculty.  Exhibit 1.

In addition, Brown experienced a number of incidents during her time in the Program when residents put patient health or safety at risk.  These include episodes of missed bone fragments in a hip, improper release of a patient with an unstabilized fracture, laceration of the skin while removing a dressing, and improper use of surgical screws.  Exhibit 10, Brown Declaration, ¶ 4.

One of the most noteworthy episodes at Hamot along similar lines is the treatment of William S. Bambrick, III, MD. Bambrick is a former Hamot resident and orthopedic surgeon who held a number of medical licenses, but lost them in the course of his career. Bambrick had five malpractice claims against his license when he practiced in Florida, Exhibit 11-A, and had his clinical privileges suspended by a hospital there in 1999, Exhibit 11-B. Bambrick then attempted to practice in North Dakota. The North Dakota State Board of Medical Examiners placed him on probation for a year in July 2000. Exhibit 11-C. The corresponding stipulation and order also mandated payment of costs, completion of a medical ethics course, and making patient records available for review by the Board. Id. In 2002, North Dakota's Board of Medical Examiners issued an Order suspending Bambrick's license to practice medicine in North Dakota. Exhibit 11-D. In January 2003, the State Medical Board of Ohio revoked Bambrick's license to practice medicine based on the disciplinary action taken against Bambrick by the North Dakota's medical examiners. Exhibit 11-E. After these episodes, Dr. Lubahn personally intervened on behalf of Bambrick with respect to Bambrick's readmission to Hamot's orthopedic residency program for a six month period of remedial training. Exhibit 11-F.

Finally, the Court should also consider that among the documents Hamot provided in discovery is an article regarding the underreporting of medical errors by residents. Exhibit 12.

This evidence, as much as any other, illustrates the weaknesses and inconsistencies in Dr. Lubahn's treatment of Dr. Brown. For example, Dr. Lubahn's vigilance with regard to Dr. Brown's patient care stands in sharp contrast to his

treatment of Bambrick and other residents.  Any evidence of this type, in which patients'
health or safety was placed at risk by physicians at Hamot, is relevant to Brown's case
for this reason, and should be produced.

F.     The Faculty Are Similarly Situated to Brown

The Faculty are sufficiently similarly-situated to Brown to make the requested
information relevant, for several reasons.  First, the majority of the Faculty are
graduates of the very residency program at Hamot in which they teach.  Exhibit 10 ¶ 2.
Second, two members of Hamot's Orthopedic Residency Program while Brown was in
the Program are attending physicians in the Program.  Id. ¶ 3.

Third, it is apparent from the very purpose of the Program -- hands-on training of
doctors to treat orthopedic conditions -- that residents perform the same procedures as
Faculty.  There is thus no sound reason to distinguish residents and Faculty for the
purpose of this case.  The two groups practice medicine in lockstep.  Both groups treat
patients.  Both groups can maltreat patients.  Unaddressed maltreatment by either
group should be a concern of Hamot.  Brown of course acknowledges that residents
pass through stages of progressively greater responsibility for patient care during the
course of the residency.  Insofar as patient care is concerned, however, Hamot has no
less reason to monitor and discipline attending physicians -- by withdrawing privileges --
than it has to monitor and discipline residents.  How the Faculty perform as attending
physicians therefore is relevant to Brown's task of showing whether they were treated
more favorably.

The Faculty argue that Hamot must be aware of performance concerns before
the information becomes relevant.  Faculty Brief at 6.  This is incorrect.  The situation

where attending physicians perform poorly or receive many patient complaints, and the hospital subjects the physicians to little or no oversight -- that is, Hamot in fact is unaware -- makes Brown's case even more compelling.  Her claims that she was treated less favorably, and that Hamot failed to provide appropriate education from qualified instructors, are strengthened if Hamot does not regularly and closely evaluate the performance of its faculty.  Discovering what the Faculty have heard about their own performance from third parties thus is highly relevant, whatever the level of Hamot's corresponding knowledge.

G.    Neither Federal nor State Peer Review Statutes
      Preclude Disclosure of the Requested Documents

Any reliance the Faculty place on privilege as a shield from disclosing the requested documents should be promptly turned aside, as the authority below demonstrates.

   1.    There Is No Recognized Federal Peer Review Privilege

Federal Rule of Evidence 501 requires application of federal privilege law to each element of a claim except those where state law supplies the rule of decision.  "Put another way, federal privileges apply to federal law claims, and state privileges apply to claims arising under state law."  Pearson v. Miller, 211 F.3d 57, 65 (3d Cir. 2000). When cases present both federal and state law claims, the federal rule favoring admissibility, rather than the state law privilege, is the controlling rule.  Id. at 66;  W.T. Thompson Co., v. General Nutrition Corp. Inc., 671 F.2d 100, 104 (3d Cir. 1982); Weiss v. County of Chester, 231 F.R.D. 202, 205 (E.D. Pa. 2005).

Federal courts do not create and apply an evidentiary privilege unless it promotes sufficiently important interests to outweigh the need for probative evidence.

10

Trammel v. United States, 445 U.S. 40, 50 (1980). "Inasmuch as '[t]estimonial exclusionary rules and privileges contravene the fundamental principle that 'the public…has a right to everyman's evidence'  any such privilege must be strictly construed." University of Pennsylvania v. EEOC, 493 U.S. 182, 189 (1990). (citations omitted)

Contrary to the Faculty's  unsubstantiated assertion, there is no recognized federal peer review privilege.  The Health Care Quality Improvement Act of 1986, 42 U.S.C. §§  11101-11152 (HCQIA), which the Faculty cites but fail to discuss in any way, does not preclude the production of the requested documents.  "The HCQIA makes participants in legitimate peer review activities immune from damages stemming from the peer review process.  42 U.S.C. §  11111(a)(1)." Swathmore Radiation Oncology, Inc. v. Lapes, 1993 WL 517722, *3 (E.D. Pa. 1993); Agster v. Maricopa County, 422 F.3d 836 (9th Cir. 2005).  The HCQIA gives qualified immunity from suit to officials who conduct peer reviews that meet the standards outlined in the statute.  "Yet Congress, in providing protection for those involved in peer review, did not establish a privilege for most documents created in that process." Johnson v. Nyack Hospital, 169 F.R.D. 550, 560 (S.D. N.Y 1996).

The Court in Johnson, evaluating motions to quash subpoenas *duces tecum* issued to hospitals to compel the production of peer review materials in a federal civil rights case, further held:

> Congress, in enacting the HCQIA not only considered the importance of maintaining the confidentiality of the peer review process, but took the action it believed would best balance protecting confidentiality with other important interests.  Congress spoke loudly with its silence in not including a privilege against discovery of peer review materials in the HCQIA.

<u>Johnson</u>, 169 F.R.D. at 560.

The HCQIA cannot be used as a shield to prevent the production of documents that may evidence improper conduct.  <u>See</u> <u>Swathmore v. Lapes</u>, 1993 WL 517722 *3 (in light of plaintiff's allegations that medical staff privileges application process was tainted by illegal conduct, HCQIA not applicable) <u>citing</u> <u>Pagano v. Oroville Hospital</u>, 145 F.R.D. 683, 689 (E.D. Cal. 1993); <u>Wei v. Bodnar</u>, 127 F.R.D.91, 94-95 (D. N.J. 1989) (HCQIA inapplicable with respect to allegations of anti-competitive conduct); <u>Teasdale v. Marin General Hospital</u>, 138 F.R.D. 691, 694 (N.D. Cal. 1991) (hospital peer review document discoverable and not privileged in an antitrust action); <u>Pott v. Family Health Systems, Inc.</u>, 189 F.R.D. 518, 524 (E.D. Wis. 1999) ("HCQIA specifically denies immunity under the Civil Rights Act for participants in the peer review proceedings, showing that Congress accorded more weight to vindication of civil rights than to the interests in the confidentiality of the peer review process.").

Discussing the relevance of hospital files that may evidence that an African-American doctor's application for staff privileges was treated differently from those of other physicians, the court in <u>Swathmore</u> held there is no existing federal common law privilege for confidential peer review materials.  <u>Swathmore Radiation Oncology, Inc. v. Lapes</u>, 1993 WL 517722 (E.D. Pa. 1993) <u>citing</u>, <u>University of Pennsylvania EEOC</u>, 493 U.S. 182, 189 (1990), <u>see</u> <u>Weis v. County of Chester</u>, 231 F.R.D. 202 at 205.   As observed by all of the aforementioned courts, Congress has twice had occasion and opportunity to consider the federal medical peer review privilege, with the enactment of the HCQIA and its subsequent amendment, and has consistently failed to grant the privilege, either explicitly or by implication.  Thus, there exists a general objection to the

Courts acting where it appears that Congress has not done so.  See University of Pennsylvania, 493 U.S. at 189.

Defendants' reference to Small v. Provident Life and Accident Insurance Company, 1999 WL 1128945 (E.D. Pa. 1999), in support of confidentiality and privilege is misplaced.  The District Court in Small only recognized the general confidential nature of medical records,  but then concluded production of the information was not an undue burden.  "Despite defendant's assertion to the contrary, the Court can protect the identity of the effected non-party patients by fashioning a remedy which will cause the personal and irrelevant medical information contained in the non-party records to be redacted before disclosure to the Plaintiff."  Id. at *4.

Defendant's failure to direct this court's attention to any case law in support of a federal common law or statutory privilege precluding the production of the requested documents further demonstrates its failure to meet its heavy burden.

        2.     The Pennsylvania Peer Review Privilege Does Not Apply

Even if the substantive provisions of the Pennsylvania Peer Review Act applied, which they do not, federal courts have consistently held that state privilege statutes are not applicable to federal or state claims brought in federal court.  Weiss v. County of Chester, 231 F.R.D. 202, 205 (E.D. Pa. 2005); W.T. Thompson Co. v. General Nutrition Corp. Inc., 671 F.2d 100, 104 (3d Cir. 1982); Swathmore Radiation Oncology, Inc. v. Lapes, 1993 WL 5177722 (E.D. Pa. 1993); Syposs v. United States of America, 179 F.R.D. 406  (W.D. N.Y. 1998); University of Pennsylvania v. EEOC, 493 U.S. 182 (1990); Pearson v. Miller, 211 F.3d 57, 66 (3d Cir. 2000).  And, "merely asserting that a state statute declares that the records in question are 'confidential' does not make out a

sufficient claim that the records are 'privileged' within the meaning of Fed.R.Civ.P. 26(b)(1) and Fed. R. Evid. 501." Pearson v. Miller, 211 F.3d 57, 66 (3d Cir. 2000) citing, Martin v. Lamb, 122 F.R.D. 143, 146 (W.D. N.Y. 1988); Nguyen Da Yen v. Kissinger, 528 F.2d 1194, 1205 (9th Cir. 1975) ("The records are confidential but not privileged.").

Discussing the applicability of the Pennsylvania Peer Review Act to federal civil rights claims, the Weiss Court observed   "Although the interests reflected in the state privilege are important, they are insufficient to outweigh the need for probative evidence in this case." Weiss, 231 F.R.D. at 206.  Privileges are disfavored and are not lightly created nor expansively construed.  In re Grand Jury, 103 F.3d 1140, 1149 (3d Cir. 1997); United States v. Nixon, 418 U.S. at 683, 710 (1974).  None of the unsupported arguments presented by the Faculty substantiate this Court's deviation from this standard.

The Pennsylvania Peer Review Act, 63 P.S. § § 425.1-425.4, was promulgated to serve the legitimate purpose of maintaining high professional standards in the medical practice for the protection of patients and the general public.  Cooper v. Delaware Valley Medical Center, 630 A.2d 1, 7 (Pa. Super. 1995); Joe v. Prison Health Services, Inc. 782 A.2d 24, 32 (Pa. Super. 2001).  The Act precludes the disclosure of peer review material in certain specified circumstances, namely, in "civil action[s]... arising out of the matters which are the subject of evaluation and review by such committee." Hayes v. Mercy Health Corporation, 559 Pa. 21, 739 A.2d 114 (1999).  In defining the limited scope of the privilege, the Pennsylvania Supreme Court in Hayes, held:

> the intent of the legislature, as revealed by the plain language of Section 3 and
> confirmed by its legislative history, was to prevent the disclosure of peer review

<u>information to outside parties seeking to hold professional health care providers</u> <u>liable for negligence</u>, while at the same time ensuring that such guarantee of confidentiality did not operate to shield from discovery those rare instances in which the peer review process was misused.

<u>Hayes v. Mercy Health Corporation</u>, 559 Pa. at 29, 739 A.2d at 118 (emphasis added).

The Supreme Court observed that Dr. Hayes was seeking to learn, through internal hospital proceedings, whether such misuse had occurred in his case.  <u>Id</u>. at 28. "Dr. Hayes concern was not the underlying medical matter which led to his suspension, but rather the fairness and integrity of the Medical Board's review of that suspension." <u>Id</u>.

As in <u>Hayes</u>, Dr. Brown seeks an independent review of the rationale, methods and criteria employed by Hamot to evaluate her performance.  The Faculty's  reliance upon the Act to thwart production of documents is misplaced; the Act is applicable to negligence claims involving medical malpractice, not employment discrimination and breach of contract claims by a former resident.

H.    <u>Potential Embarrassment is No Basis for Withholding Documents</u>

The Faculty assert that the information Brown seeks "is likely to cause professional embarrassment," and therefore should be protected from disclosure. Faculty Brief at 6-7.  This assertion has little merit for a number of reasons.

First, patients and others who believe they were maltreated by any of the Faculty have filed lawsuits against the Faculty, residents, and Hamot.  <u>See, e.g.</u>, Exhibits 7,9. These suits are public documents in which, from the apparent perspective of the Faculty, their "professional embarrassments" are set out in minute detail in a public forum.  Given this state of affairs, the merely facial exploration of similar information in this employment action cannot be more uncomfortable.

15

The Faculty also contend that Brown is seeking this information not for reasonable purposes, but to embarrass doctors "and place indirect pressure on Hamot." Faculty Brief at 8.  On the contrary, Brown is attempting to find facts about medical performance because that allegedly was the main reason for her discharge.  To the extent this search involves evidence that others performed poorly, such is often the consequence of litigation for malpractice, employment discrimination, breach of contract, negligence, fraud, and numerous other causes of action.  Any potential embarrassment to individuals, and "pressure" on an employer, reaches no more extreme degree here than in any case with similar evidence, and potential evidence.[3]

The Faculty assert that some of the requested information is "inherently confidential."  Faculty Brief at 6.  To the extent the Faculty are asserting privilege, Brown has addressed this subject above.  To the extent the Faculty are talking about patient-identifying information, Brown agrees.  Brown does not seek information about the identities of any patients who may have been maltreated by any of the Faculty, or other physicians at Hamot.  Such information can be redacted.  Brown is willing to enter into a confidentiality agreement concerning the relevant information, as the parties have done already with regard to Hamot records.

I.      Conclusion

In accordance with the foregoing, the Court should deny the Motion to Quash in its entirety, and direct that documents and responses sought by the subpoenas be provided in ten days.

---

[3]  At the risk of stating the obvious, the professional embarrassment Brown has suffered at Hamot's and the Faculty's hands, in the relatively insular medical community of Erie, Pennsylvania, does not compare.

Respectfully submitted,

Leech Tishman Fuscaldo & Lampl

__/s/ Patrick Sorek_____
Patrick Sorek, Pa. ID 41827
Alisa N. Carr, Pa. ID 56658
Citizens Bank Building, 30th Floor
525 William Penn Place
Pittsburgh, Pennsylvania  15219
(412) 261-1600

Counsel for plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Plaintiff's Brief in Opposition to Motion to

Quash or Modify Subpoena was served today by first class mail, postage prepaid, on:

>       Mark Kuhar
>       Knox McLaughlin Gornall & Sennett
>       120 West Tenth Street
>       Erie, Pennsylvania  16501-1461
>
>       Kerry M. Richard
>       Ziad Haddad
>       Tobin O'Connor Ewing & Richard
>       5335 Wisconsin Avenue, NW, Suite 700
>       Washington, DC  20015

___4/14/06_____                __/s/ Patrick Sorek_____
Date