IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,        )
       )
       Plaintiff,        )
       )
       v.        )    Civil Action No. 05-32 E
       )
HAMOT MEDICAL CENTER,        )    (to be filed under seal)
       )
       Defendant.        )

MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

This is an action for employment discrimination under Title VII, and for breach of contract. Plaintiff ("Brown") was in the third year of a five year residency in orthopedic surgery when defendant ("Hamot") terminated her contract. A teaching hospital, Hamot developed rules and regulations that were intended to foster a resident's education and advancement. The rules were integral to Brown's learning process and compliance with the rules, by both Hamot and Brown, was mandated by the parties' employment contract. Hamot committed material breaches of the parties' employment contract when it disregarded these rules and terminated Brown without proper cause.

I.    Factual Background

The factual background for the determination of Brown's partial summary judgment motion is set forth in the accompanying Concise Statement of Material Facts, to which the court is respectfully referred.

II.    Standard of Decision

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When the party seeking summary judgment bears the burden of proof at trial, the movant must make an affirmative showing that it is entitled to summary judgment. Resolution Trust Corp. v. Gill, 960 F.2d 336, 341 (3d Cir. 1992). Although any reasonable doubts and inferences are to be resolved in favor of the nonmoving party, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 2510 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be [a] *genuine* issue of material fact." Id. at 248, 106 S. Ct. at 2510. Factual disputes are material only if their resolution could affect the outcome of the case under the applicable substantive law. Id. at 248, 106 S. Ct. at 2510. The non-moving party, confronted with a well-supported motion for summary judgment "must do more than simply show that there is some metaphysical doubt" as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).

III.    Argument

    A.    Hamot's failure to terminate Brown for proper cause
        is a breach of the parties' employment contract.

The terms and conditions of Hamot's employment and training of orthopedic residents are governed by a series of five one-year contracts that are typically renewed throughout the course of the residency.  Exhibit C at 134-135; Exhibit B at 1; Exhibit G at ¶35.[1]  Hamot policy is that all residents are expected to complete the Program. Exhibit C at 135.

It is undisputed that Brown and Hamot entered into an employment contract on April 3, 2003 for the period of Brown's residency from July 1, 2003 through June 30, 2004 ("the Contract"). Exhibit B at 1.   By Hamot's own admission, as of April 8, 2003, Lisa Brown met all the requirements for participation in a graduate program of medical education. Exhibit B at 1, ¶4.  In fact, on January 30, 2004, John D. Lubahn, M.D., the Orthopedic Residency Program Director evaluated Brown.  He observed that her clinical performance had improved and was acceptable, and that her microsurgical skills lab work was excellent.  Exhibit I.  On February 11, 2004, Brown received an evaluation in which she was rated average or above average in every one of the 28 categories of skills rated.  Exhibit H.  Despite these evaluations, Brown's employment was terminated eighteen days later, on March 1, 2004.  Exhibit B.

Hamot's employment contract contains specific provisions for the termination and suspension of its residents.  Exhibit B at 7.  The record evidences that there is no genuine dispute of material fact that the method of Brown's termination was contrary to

---

[1] The term "Exhibit" refers to those exhibits contained in the Plaintiff's Appendix in support of her motion for partial summary judgment.

the policy and procedure memorialized in Hamot's contract. Accordingly, this court should find as a matter of law that Hamot breached the parties' employment contract.

It is a basic principle of law that a court's purpose in examining a contract is to interpret the intent of the contracting parties, as they objectively manifest it. Sanford Investment Company v. Ahlstrom Machinery Holdings, Inc., 198 F.3d 415, 421 (3d Cir. 1999); Duquesne Light Company v. Westinghouse Electric Corporation, 66 F.3d 604, 613 (3d Cir. 1995), Mace v. Atlantic Refining Marketing Corporation, 567 Pa. 71, 785 A.2d 491, 496 (2001); Murphy v. Duquesne University of the Holy Ghost, 656 Pa. 571, 777 A.2d 418. 429 2001). The intent of the parties to a written agreement is embodied in the writing itself. Steuart v. McChesney, 498 Pa. 45, 444 A.2d 659, 661 (1982). Courts do not assume a contract's language was chosen carelessly, nor do they assume the parties were ignorant of the meaning of the language employed. Id. at 662. When contractual language is clear and unequivocal, its meaning must be determined by its contents alone. Id. A court may not modify the plain meaning of the contract under the guise of interpretation. Crawford Central School District v. Commonwealth of Pennsylvania, ___ Pa ____, 888 A.2d 616, 622 (2005). Any ambiguity or doubtful language is construed most strongly against the drafter. In re Estate of Brever, 475 Pa. 108, ' 16, 379 A.2d 1305, 1310 (1977); Restatement, Contracts, § 236; Rusiski v. Pribonic, 511 Pa. 383, 515 A.2d 507 (1986).

Section 3 of Hamot's contract provides that termination and suspension of employment may occur at any time upon notice thereof for proper cause. Exhibit B. Brown 's termination letter, and the testimony of Hamot's medical personnel, conclusively establish that proper cause to terminate Brown's employment was not the

4

basis for Hamot's decision.  In fact, proper cause was not even identified or mentioned.  On the contrary, the decision to end Brown's career as an orthopedic surgeon was a unilateral decision by John Lubahn, as shown by Brown's March 1, 2004 termination letter.  Exhibit A.

Citing clinical performance and concerns regarding her knowledge base Lubahn advised Brown that "I have decided not to renew your contract at the end of this academic year, June 30, 2004."  Exhibit A.  Lubahn continued, that while the decision was difficult, "I believe it to be the best for all concerned."  Exhibit A.  The letter does not identify the decision as that of Hamot Medical Center, its faculty or staff, rather, the decision was a personal decision by Lubahn.  Exhibit A.  Moreover, as evident from the record, Lubahn disregarded established policies and procedures that were incorporated into Hamot's employment contract with Brown.

Lubahn's decision to terminate Brown was inconsistent with his recent evaluation of Brown's skills.  Eighteen days prior to her dismissal, Lubahn had characterized Brown's skills as "improved" and "acceptable".  Exhibit H.  Yet despite this evaluation, and Hamot's established policy, incorporated in its employment contracts, of termination only upon a finding of proper cause, Lubahn not only failed to identify the actions or inactions that constituted proper cause, but failed to even reference the standard.  While the Hamot contract does not define "proper cause", logic dictates that before Brown could be fired, her supervisors would have to (1) acknowledge "proper cause" as the standard for termination and, (2) discuss whether Brown's conduct rose to that standard.

None of Hamot's medical professionals could recall such a discussion.  John

Dav d Albert, II, M.D., the Chair of Hamot's Medical Staff Executive Committee and Cha r of the committee that reviewed Brown's dismissal from the program, testified that he had no knowledge of anyone on the Committee discussing the standard of "proper cause" for termination.  Exhibit K at 33.  In fact, Albert could not identify anyone who had actually had a discussion with Brown about whether she met all the requirements for the program.  Exhibit K at 32.  Similarly, James A. Pepicello, Senior Vice President for Surgical Services and the individual who initiated Hamot's review of Brown's term nation through grievance proceedings, testified that he did not consider the proper cause standard in the context of Brown's termination.  Exhibit J at 49.  Pepicello further testif ed that the Board of Directors did not consider the proper cause standard and he coulc not recall any questions asked by Board members regarding whether there was proper cause for dismissal.  Exhibit J at 74, 76.

On January 30, 2004, Lubahn evaluated Brown and observed that her clinical perfo mance had improved and was acceptable, and that her microsurgical skills lab work was excellent.  Exhibit I.  Although Lubahn communicated concerns with regard to Brown's performance on the Orthopaedic In-Training Examination, he did not alert Brown that her continued participation in the Program was in jeopardy.  In fact, Lubahn's evaluation gave tacit approval of Brown's continued participation in the Program over the remaining two years  "I did counsel her that if her performance did not improve over the course of the next two years on the order of 20% to 40% each year, that I would be unable to sign her application to take Part I of the American Board of Orthopaedic Surgeons Exam."  Exhibit I.

The Hamot contract is not ambiguous.  Hamot has established a "proper cause"

standard by which employees can be terminated. Exhibit A. The record conclusively establishes that this standard was not applied. Accordingly, this Court may grant partial summary judgment as a matter of law. <u>Pennbar Corp v. Insurance Company of North America</u>, 976 F.2d 145, 155 (3d Cir. 1992).

B.    Hamot's failure to comply with its Advancement and Dismissal Policy <u>is a breach of the parties' employment contract</u>.

Many features of Hamot's relationship with its residents are governed by written policy. Hamot's adherence to its own policies and procedures is guaranteed in the resident contracts. Exhibit B. Hamot did not follow its own policy on advancement and dismissal in terminating Brown.

Hamot maintains an Advancement and Dismissal policy which outlines the procedures to be followed if a resident is not meeting the requirements of the orthopedic program. Exhibit F. This policy was drafted by Lubahn, the person who terminated Brown. Exhibit F. The policy outlines the process by which residents, who are not meeting expectations, are counseled, warned and if appropriate, ultimately discharged from the program. Exhibit F.

The Advancement and Dismissal policy was drafted in order to comply with the mandates of the Accreditation Council for Graduate Medical Education ("ACGME"), an oversight organization that establishes institutional and program requirements for accredited hospitals. In order to maintain its residency program accreditation, Hamot is

required to implement and utilize an advancement and dismissal policy which outlines a

resident's conditions for reappointment. [2]  The Policy provides as follows:

> All residents will be continuously evaluated by their teaching faculty.
> Should a resident, at any point during the year, be identified as not
> meeting expectations, that resident will be counseled expeditiously by the
> Program Director. At this point, the resident will receive only a verbal
> warning unless the situation should be deemed more serious.  Should the
> resident, who has received a verbal warning, fail to meet expectations on
> subsequent activities, that resident will meet with the program director
> and be placed on an academic probation status.  A letter outlining the
> reasons for an academic probation and the expectations will be given to
> the resident at that time.  Academic probation will generally last 3 - 6
> months but will be individualized to the resident's situation.  During that
> time, the resident is expected to demonstrate improvement and will
> receive, at minimum, monthly reevaluations.   Should the resident
> demonstrate appropriate advancement of skills, knowledge, and attitude
> during that time, he/she may be deemed ready for advancement at the
> appropriate time.  Should it be determined that the resident requires
> additional remediation, he/she will likely need to repeat those activities in
> which he/she did not meet expectations at the current level of training.
> Only when these requirements are met will the resident be considered for
> advancement.  At such time, academic probation will be lifted and the
> resident will continue his/her training at the next level.  Should the
> resident fail to improve or to meet the expectations as identified in the
> academic probation letter, the faculty will determine at that time if
> remediation will be deemed to be helpful.  If so, that resident will continue
> at the same level for a period of time during which continuous evaluation
> will occur.  At the end of such time, the resident will receive feedback as
> to his/her performance and a determination will be made as to whether or
> not the resident could advance at that time.

Exhibt F. [3]

_____ _____

[2]    Section III(D) of the Institutional Requirements directs that the "[t]he
Sponsoring Institution must assure that residents are provided with a written agreement
of appointment or contract outlining the terms and conditions of their appointment…[t]he
agreement must contain or provide a reference to…[c]onditions for reappointment."
Exhibt D.  In concert with information given to residents as a guideline for continued
employment, ACGME requires program directors, such as Lubahn, to "ensure the
implementation of fair policies…" and to establish and implement formal written policies
for the selection, evaluation, promotion and dismissal of residents.  Exhibit D, p.14.

[3]  The procedures to be utilized prior to termination of a orthopedic resident at Hamot
can be summarized as follows:

Through a clearly defined, documented process, which includes, counseling, academic probation, repetition and remediation, a resident is advised of the requisite procedure for advancement and termination. As evident from the record, Hamot did not apply its own advancement and dismissal policy to Brown.

---

i.  Should a resident, at any point during the year, be identified as not meeting expectations, that resident will be counseled expeditiously by the Program Director. At this point the resident will receive only a verbal warning unless the situation should be deemed more serious.

ii. Should the resident, who has received a verbal warning fail to meet expectations on subsequent activities, that resident will meet with the Program Director and be placed on an academic probation status.

iii. A letter outlining the reasons for academic probation and the expectations will be given to the resident at that time.

iv. Should the resident demonstrate appropriate advancement of skills, knowledge, and attitude during that time, he/she may be deemed ready for advancement at the appropriate time.

v.  Should it be determined that the resident requires additional remediation, he/she will likely need to repeat those activities in which he/she did not meet expectations at the current level of training. Only when these requirements are met will the resident be considered for advancement. At such time academic probation will be lifted and the resident will continue with his/her training at the next level.

vi. Should the resident fail to improve...as identified in the academic probation letter, the faculty will determine at that time if remediation will be deemed to be helpful. If so, that resident will continue at the same level for a period of time during which continuous evaluation will occur. At the end of such time the resident will receive feedback as to his/her performance and a determination will be made as to whether or not the resident could advance at that time.

vii. If the initial faculty review reveals that the resident is unlikely to improve with remediation, the resident will be terminated from the program pending the due process procedure.

While Brown was on academic probation the last three months of her second year in the program, she was not on probationary status when Lubahn terminated her employment on March 1, 2003. Exhibit C at 49. Brown's earlier removal from academic probation is evidence that she, in fact, improved and met the expectations as identified in the academic probation letter; otherwise, the probation could not have been lifted. See, Exhibit F, Advancement and Dismissal Policy, "Only when these requirements are met will the resident be considered for advancement. At such time academic probation will be lifted and the resident will continue his/her training at the next level."

If Brown had remained on academic probation because she had failed to improve, the advancement policy dictates that the next step would be a faculty determination of whether remediation would be helpful. However, contrary to Hamot's written policy, prior to her abrupt termination, Brown did not receive (i) a letter advising she was on academic probation, (ii) a determination by the faculty that remediation was necessary, or (iii) results of a faculty review that Brown should have been terminated from the program pending the due process procedure because she was unlikely to improve with remediation. Exhibit G at ¶¶18-23. Hamot's rules mandate that a resident must be on academic probation before termination can even be considered. Exhibit F at 3 Because Brown was not on academic probation, she did not receive a letter outlining her deficiencies. Without this letter, the faculty was unable to evaluate her progress in accordance with the rules.

Hamot's vice president, Pepicello, testified that the Advancement and Dismissal Policy dictates it is a faculty determination as to whether a resident will be terminated. Exhibit J at 56. Pepicello further testified that he could not recall any questions asked

by Board members regarding whether an advancement/dismissal policy was followed. Exhibit J at 76. Albert, President and Chair of Hamot's Medical Staff Executive Committee, testified that the Committee did not; (i) apply the Advancement and Dismissal Policy to review of the decision involving Brown, or (ii) conduct a detailed review of whether the procedures delineated in the Advancement and Dismissal Policy were actually followed. Exhibit K at 50, 60.

Hamot adopted rules and regulations, including the Advancement and Dismissal Policy, which were fundamental to the training and education of its residents. Hamot promised to follow these policies and expected Brown to do so as well. Exhibit B. Despite the fact that Brown had a record of improvement when deficiencies were brought to her attention, Hamot abrogated its own procedural rules and terminated Brown without proper cause. Accordingly, this court should find on summary judgment that Hamot breached the terms of its employment contract with Brown.


IV.    Conclusion

For the foregoing reasons, the court should enter partial summary judgment in Brown's favor finding that: Hamot committed a material breach of the parties' April 8, 2003 contract in Dr. Brown's termination from the Program; Hamot committed a material breach of the parties' April 8, 2003 contract by failing to comply with Hamot's Advancement and Dismissal Policy for orthopedic residents, and; Lisa Brown may present evidence at trial as to her damages for Hamot's material breach of the parties' employment contract.

Respectfully submitted,

Leech Tishman Fuscaldo & Lampl

By:    /s/ Patrick Sorek
       Patrick Sorek
       Pa ID No. 41827
       Alisa N. Carr
       Pa. I.D. No. 56658
       525 William Penn Place, 30th Floor
       Pittsburgh, Pennsylvania  15219
Date   August 15, 2006                412-261-1600

12