**B.    Duty Hours**

1.    Duty hours are defined as all clinical and academic activities related to the residency program; i.e., patient care (both inpatient and outpatient), administrative duties relative to patient care, the provision for transfer of patient care, time spent in-house during call activities, and scheduled activities such as conferences. Duty hours do *not* include reading and preparation time spent away from the duty site.

2.    Duty hours must be limited to 80 hours per week, averaged over a four-week period, inclusive of all in-house call activities.

3.    Residents must be provided with 1 day in 7 free from all educational and clinical responsibilities, averaged over a 4-week period, inclusive of call. *One day* is defined as 1 continuous 24-hour period free from all clinical, educational, and administrative duties.

4.    Adequate time for rest and personal activities must be provided. This should consist of a 10-hour time period provided between all daily duty periods and after in-house call.

**C.    On-call Activities**

The objective of on-call activities is to provide residents with continuity of patient care experiences throughout a 24-hour period. *In-house call* is defined as those duty hours beyond the normal work day, when residents are required to be immediately available in the assigned institution.

1.    In-house call must occur no more frequently than every third night, averaged over a 4-week period.

2.    Continuous on-site duty, including in-house call, must not exceed 24 consecutive hours. Residents may remain on duty for up to 6 additional hours to participate in didactic activities, transfer care of patients, conduct outpatient clinics, and maintain continuity of medical and surgical care.

3.    No new patients may be accepted after 24 hours of continuous duty.

4.    *At-home call* (or *pager call*) is defined as a call taken from outside the assigned institution.

   a)    The frequency of at-home call is not subject to the every-third-night limitation. At-home call, however, must not be so frequent as to preclude rest and reasonable personal time for each

15

resident. Residents taking at-home call must be provided with 1 day in 7 completely free from all educational and clinical responsibilities, averaged over a 4-week period.

b)      When residents are called into the hospital from home, the hours residents spend in-house are counted toward the 80-hour limit.

c)      The program director and the faculty must monitor the demands of at-home call in their programs, and make scheduling adjustments as necessary to mitigate excessive service demands and/or fatigue.

D.      Moonlighting

1.      Because residency education is a full-time endeavor, the program director must ensure that moonlighting does not interfere with the ability of the resident to achieve the goals and objectives of the educational program.

2.      The program director must comply with the sponsoring institution's written policies and procedures regarding moonlighting, in compliance with the ACGME Institutional Requirements.

3.      Any hours a resident works for compensation at the sponsoring institution or any of the sponsor's primary clinical sites must be considered part of the 80-hour weekly limit on duty hours. This refers to the practice of *internal moonlighting*.

E.      Oversight

1.      Each program must have written policies and procedures consistent with the Institutional and Program Requirements for resident duty hours and the working environment. These policies must be distributed to the residents and the faculty. Duty hours must be monitored with a frequency sufficient to ensure an appropriate balance between education and service.

2.      Back-up support systems must be provided when patient care responsibilities are unusually difficult or prolonged, or if unexpected circumstances create resident fatigue sufficient to jeopardize patient care.

I.      Duty Hours Exceptions

An RRC may grant exceptions for up to 10% of the 80-hour limit to individual

16

programs based on a sound educational rationale.  Prior permission of the institution's GMEC, however, is required.

VII.   Evaluation

A.    Resident

1.    Formative Evaluation

The faculty must evaluate in a timely manner the residents whom they supervise.  In addition, the residency program must demonstrate that it has an effective mechanism for assessing resident performance throughout the program, and for utilizing the results to improve resident performance.

a)    Assessment should include the use of methods that produce an accurate assessment of residents'competence in patient care, medical knowledge, practice-based learning and improvement, interpersonal and communication skills, professionalism, and systems-based practice.

b)    Assessment should include the regular and timely performance feedback to residents that includes at least semiannual written evaluations.  Such evaluations are to be communicated to each resident in a timely manner, and maintained in a record that is accessible to each resident.

c)    Assessment should include the use of assessment results, including evaluation by faculty, patients, peers, self, and other professional staff, to achieve progressive improvements in residents'competence and performance.

2.    Final Evaluation

The program director must provide a final evaluation for each resident who completes the program.  This evaluation must include a review of the resident's performance during the final period of education, and should verify that the resident has demonstrated sufficient professional ability to practice competently and independently.  The final evaluation must be part of the resident's permanent record maintained by the institution.

B.    Faculty

The performance of the faculty must be evaluated by the program no less

frequently than at the midpoint of the accreditation cycle, and again prior to the next site visit. The evaluations should include a review of their teaching abilities, commitment to the educational program, clinical knowledge, and scholarly activities. This evaluation must include annual written confidential evaluations by residents.

C.     Program

The educational effectiveness of a program must be evaluated at least annually in a systematic manner.

    1.    Representative program personnel (i.e., at least the program director, representative faculty, and one resident) must be organized to review program goals and objectives, and the effectiveness with which they are achieved. This group must conduct a formal documented meeting at least annually for this purpose. In the evaluation process, the group must take into consideration written comments from the faculty, the most recent report of the GMEC of the sponsoring institution, and the residents=confidential written evaluations. If deficiencies are found, the group should prepare an explicit plan of action, which should be approved by the faculty and documented in the minutes of the meeting.

    2.    The program should use resident performance and outcome assessment in its evaluation of the educational effectiveness of the residency program. Performance of program graduates on the certification examination should be used as one measure of evaluating program effectiveness. Program graduates should take both Part I and Part II of the American Board of Orthopaedic Surgery examinations and at least 75% of those who take the exams for the first time should pass.

    3.    The program should maintain a process for using assessment results together with other program evaluation results to improve the residency program.

VII.     Experimentation and Innovation

Since responsible innovation and experimentation are essential to improving professional education, experimental projects along sound educational principles are encouraged. Requests for experimentation or innovative projects that may deviate from the program requirements must be approved in advance by the RRC, and must include the educational rationale and method of evaluation. The sponsoring institution and program are jointly responsible for the quality of education offered to residents for the duration of such a project.

18

**X.    Certification**

Residents who plan to seek certification by the American Board of Orthopaedics Surgery should communicate with the office of the board regarding the full requirements for certification.

.\CGME:  June 2001    Effective:  July 2002    Editorial Revision:  June 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA BROWN, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-32 E |
| | ) | |
| HAMOT MEDICAL CENTER, | ) | |
| | ) | to be filed under seal |

APPENDIX TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# Appendix - Exhibit F

| HAMOT MEDICAL CENTER | APPROVED BY MEC: 6/4/99 |
|---|---|
| ORTHOPAEDIC RESIDENCY PROGRAM | REVISED BY MEC:  5/4/01 |

ISSUED BY:  John D. Lubahn, MD
              Program Director, Orthopaedic Residency Program

SUBJECT: Advancement  and Dismissal Policy           **Page 1 of 3**

## PURPOSE

To define the advancement from year to year of all residents.

## POLICY

*Advancement of Residents:*

It is expected that upon entry to the residency all residents will complete the program.  This residency does not accept applicants for one year positions.  However, should a resident not meet the advancement criteria as noted below, this residency will not advance that resident until such time as all requirements are met.  The procedures outlined below are for the purposes of identifying the steps necessary for a resident to advance as well as those that will come into play should advancement not be deemed appropriate.

*General Process:*

In order to advance to the subsequent year of training, all residents must meet the following requirements each academic year:

1.     Must receive an overall rating of "average or above" on all rotations.
2.     Must have no more than one "poor" in the key subcategories of a rotation.
3.     Must participate in the Orthopaedic In-Training Examination given each academic year.
4.     Must be present for greater than 80% of all residency conferences
        in any given academic year.
5.     Must maintain certification in ATLS through the residency.
6.     Must have less than three confirmed, significant patient complaints directed specifically
        at the individual resident per academic year.
7.     Must successfully complete all requirements for the given academic year as identified in
        the Orthopaedic Residency Program Goals and Objectives.
8.     Must meet all the requirements to renew the PA training license.  To advance to the 3rd
        level, the resident must have taken and passed USMLE I, II and III.  USMLE III should
        be taken in the first year of training.

HMC-03256

CONFIDENTIAL

Advancement and Dismissal Policy
Page 2 of 3

8.      Must complete all assigned work including scheduled conferences, journal clubs, morning rounds in a matter deemed as "meeting expectations" by colleagues and supervisors.
9.      Must complete two clinical research projects suitable for slide presentation and/or publication
10.     Must be present at their respective teaching faculty's office at least ½ day per week for pre and post-op care.
11.     Must attend orthopaedic clinic two afternoons a week.
12.     Must be on-call as scheduled.
13.     Must be on emergency room call during daytime hours as assigned.

*Requirements for Advancement to Graduation*:

All requirements including meeting all goals and objectives, must be met prior to being considered for graduation. All residents, by the time of graduation, must have completed an effective teaching workshop.

The Program Director will review all scheduled activity of residents to insure that he/she will have met all requirements to sit for the Orthopaedic Board examination. All chief residents will participate in an exit interview to insure that appropriate feedback is given.

*Process In Case Advancement Criteria Are Not Met*:

All residents will be continuously evaluated by their teaching faculty. Should a resident, at any point during the year, be identified as not meeting expectations, that resident will be counseled expeditiously by the Program Director. At this point the resident will receive only a verbal warning unless the situation should be deemed more serious. Should the resident, who has received a verbal warning fail to meet expectations on subsequent activities, that resident will meet with the Program Director and be placed on an academic probation status. A letter outlining the reasons for an academic probation and the expectations will be given to the resident at that time. Academic probation will generally last 3-6 months but will be individualized to the resident's situation. During that time the resident is expected to demonstrate improvement and will receive, at minimum, monthly re-evaluations. Should the resident demonstrate appropriate advancement of skills, knowledge, and attitude during that time, he/she may be deemed ready for advancement at the appropriate time. Should it be determined that the resident requires additional remediation, he/she will likely need to repeat those activities in which he/she did not meet expectations at the current level of training. Only when these requirements are met will the resident be considered for advancement. At such time academic probation will be lifted and the resident will continue his/her training at the next level.

HMC-03257
CONFIDENTIAL

Advancement and Dismissal Policy
Page 3 of 3

Should the resident fail to improve or to meet the expectations as identified in the academic probation letter, the faculty will determine at that time if remediation will be deemed to be helpful. If so, that resident will continue at the same level for a period of time during which continuous evaluation will occur. At the end of such time the resident will receive feedback as to his/her performance and a determination will be made as to whether or not the resident could advance at that time.

If the initial faculty review reveals that the resident is unlikely to improve with remediation, the resident will be terminated from the program pending the due process procedure.

If the above requirement (#8) regarding taking and passing USMLE III is not met, the resident will not advance to the next level of training. In this case, he/she may have to extend their residency by the number of days equal to the delay in beginning the PGY 3 year. If a resident must extend their residency training beyond the three years, they may not receive pay or benefits at that time, depending on the total number of current residents at Hamot. We will continue to cover the residents on malpractice insurance however.

HMC-03258
CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,                    )
                                     )
        Plaintiff,                   )
                                     )
    v.                               )        Civil Action No. 05-32 E
                                     )
HAMOT MEDICAL CENTER,                )
                                     )        to be filed under seal


APPENDIX TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT


# Appendix - Exhibit G

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA BROWN, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-32 E |
| | ) | |
| HAMOT MEDICAL CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF LISA BROWN, M.D.

I, Lisa Brown, M.D. an adult individual, state as follows:

1.    From July 2001 to June 2004, I was employed by Hamot Medical Center as an orthopedic resident.

2.    Hamot has a five year Orthopedic Residency Program ("the Program") which is directed to educate and train resident physicians in the care and management of injuries and diseases of the musculoskeletal system, and train resident physicians in the nonsurgical and surgical skills necessary to provide proper orthopedic care.

3.    On April 8, 2003, I signed Hamot Medical Center's Resident Agreement of Appointment in the Graduate in Medical Education Contract  (the "Employment Contract").

4.    The terms of the employment Contract began on July 1, 2003 and ended June 30, 2004.

1

5.    The Contract provided that both Hamot and I are bound by all the terms of Hamot's rules and regulations and other policies, which would include Hamot's Advancement and Dismissal policy.

6.    John D. Lubahn, M.D., is the director of Hamot's Orthopedic Residency Program.

7.    On January 30, 2004, Dr. Lubahn, during the course of my evaluation, observed that my clinical performance had improved and was acceptable, and that my microsurgical skills lab work was excellent.

8.    Dr. Lubahn's written evaluation did not reference my possible termination from the program, which occurred approximately one month later.

9.    On February 11, 2004, eighteen days before I was advised of my termination, I received an evaluation in which I was rated average or above average in every one of the 28 categories of skills rated.

10.    On March 1, 2004, Dr. Lubahn provided me with a letter stating that my contract with Hamot would not be renewed at the end of the academic year because of my clinical performance and current knowledge base.

11.    At the time of my dismissal, I had no warning that my performance or knowledge was not meeting the expectations of Dr. Lubahn or the Program.

12.    Since my dismissal, I have become aware of Section 3 of the Hamot employment contract, entitled "Termination and Suspension" which provides that either party may terminate this Agreement at any time upon notice thereof for "proper cause."

13.    The March 1, 2004 termination letter did not reference the term "proper cause".

2

14.     I am not aware of any discussion in which proper cause for my termination was discussed.

15.     I did not have any discussion with Dr. Lubahn in which he outlined the proper cause for my termination.

16.     Dr. Lubahn drafted Hamot Medical Center's Advancement and Dismissal Policy for the Orthopedic Residency Program.

17.     The Advancement and Dismissal Policy sets forth certain procedures which must occur prior to a resident's termination.

18.     At the time my employment contract was terminated, I was not on academic probation.

19.     During the period of my Contract, from July 1, 2003 to June 30, 2004, I did not receive a verbal warning from Dr. Lubahn advising me that I was not meeting the expectations of the Program.

20.     During the period of my Contract, from July 1, 2003 to June 30, 2004, I did not receive an academic probation letter outlining required improvements or goals.

21.     During the period of my Contract, from July 1, 2003 to June 30, 2004, I did not receive any correspondence from Dr. Lubahn advising me that I was not meeting the expectations of the Program.

22.     During the Contract period July 1, 2003 to June 30, 2004, I Brown did not meet with the Program Director to be placed on academic probation.

23.     Prior to the termination of my Contract with Hamot, I did not receive a letter from Hamot or Dr. Lubahn outlining the expectations of the faculty and staff or the Program.

3

24.    During the Contract period July 1, 2003 to June 30, 2004, I did not receive monthly reevaluations.

25.    During the Contract period July 1, 2003 to June 30, 2004, Hamot faculty did not make a determination that I required additional remediation.

26.    During the Contract period July 1, 2003 to June 30, 2004, Hamot faculty did not make a determination that remediation would or would not be helpful to me.

27.    During the Contract period July 1, 2003 to June 30, 2004, Hamot faculty did not review my academic probation letter to determine if remediation would be deemed helpful because I had not been issued an academic probation letter.

28.    During the Contract period July 1, 2003 to June 30, 2004, I was not advised that I could continue at the same level for a period of time during which continuous evaluation would occur.

29.    During the Contract period July 1, 2003 to June 30, 2004, I was not continuously evaluated during a period of remediation.

30.    During the Contract period July 1, 2003 to June 30, 2004, I did not receive feedback as to my performance during, or after, a period of remediation.

31.    During the Contract period July 1, 2003 to June 30, 2004, Hamot faculty did not make a determination, after remediation, as to whether or not I could advance.

32.    During the Contract period July 1, 2003 to June 30, 2004, Hamot faculty did not meet for an initial review to determine if I was unable to improve with remediation.

33.    I was not on academic probation when I was terminated.

4

34.    Since my termination, I have learned that Lubahn, and Hamot, did not follow the procedures set forth in the Advancement and Dismissal Policy.

35.    When I was terminated from the Program, I had completed 3 years of the 5 year program.

36.    The Advancement and Dismissal Policy lists 13 requirements in order for a resident to advance to the subsequent year in training.

37.    I met all 13 of the requirements in the Advancement and Dismissal Policy to advance to the fourth year of the Program.


August 15, 2006                          /s/ Lisa Brown, M.D.
Date                                     Lisa Brown, M.D.

5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,                    )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )     Civil Action No. 05-32 E
                                     )
HAMOT MEDICAL CENTER,                )
                                     )     to be filed under seal

APPENDIX TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# Appendix - Exhibit H

<u><< Back</u>

## Hamot Medical Center-Orthopaedics
## ORTHOPAEDIC RESIDENCY PROGRAM EVALUATION FORM

### Please select the most appropriate rating:

### N/A 1=Unacceptable 2=Poor 3=Average 4=Above Average 5=Excellent

### History and Physical Exam

| Item | 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|---|---|
| Obtain a concise, pertinent history | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Perform appropriate physical exam | 0 | 0 | 0 | 1 | 0 | 0 | 1 |

### Medical Knowledge

| Item | 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|---|---|
| Uses proper technique, organizes equipment and efficiently performs with ease and dexterity | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Able to interpret history and physical findings, order and interpret appropriate diagnostics | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Can identify signs that require urgent vs delayed intervention | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Can identify patients requiring acute intervention and provide stabilization | 0 | 0 | 0 | 0 | 1 | 0 | 1 |

### Coordinator of Care and Treatment

| Item | 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|---|---|
| Ensures optimal post-op care of patients | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Ensures optimal pre-op evaluation/preparation of patients | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Refers patients for care in timely manner when indicated | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Implements appropriate treatment of patients | 0 | 0 | 0 | 0 | 1 | 0 | 1 |

### Communication

| Item | 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|---|---|
| Explains problems to patients and involves patients' families in decisions | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Presents concise and organized cases to faculty and consultants | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Communicates respectfully with team members | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Communicates pleasantly and respectfully with patients and families | 0 | 0 | 0 | 0 | 0 | 1 | 1 |

HMC-03338

CONFIDENTIAL

## Patient Education

Identifies patient education needs, utilizes and coordinates available resources

| 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|-------|
| 0 | 0 | 0 | 0 | 1 | 0 | 1 |

## Procedures and Lab Skills

Performs core procedures competently and with appropriate supervision

| 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|-------|
| 0 | 0 | 0 | 1 | 0 | 0 | 1 |

Documents procedures accurately and in a timely manner

| 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|-------|
| 0 | 0 | 0 | 1 | 0 | 0 | 1 |

Has plan for tests and consults and interprets test results correctly

| 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|-------|
| 0 | 0 | 0 | 1 | 0 | 0 | 1 |

## Attitude

Demonstrates interest and desire to learn by asking questions and through reading

| 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|-------|
| 0 | 0 | 0 | 0 | 1 | 0 | 1 |

Cooperative/team attitude with faculty, colleagues and staff

| 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|-------|
| 0 | 0 | 0 | 0 | 1 | 0 | 1 |

Self-directed, motivated and organized

| 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|-------|
| 0 | 0 | 0 | 1 | 0 | 0 | 1 |

## Core Competencies

Patient Care: provides compassionate care that is effective for the promotion of health, prevention, and treatment

| 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|-------|
| 0 | 0 | 0 | 0 | 0 | 1 | 1 |

Medical Knowledge: demonstrates knowledge of biomedical, clinical and social sciences, and applies that knowledge effectively to patient care

| 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|-------|
| 0 | 0 | 0 | 1 | 0 | 0 | 1 |

Practice-Based Learning and Improvement: uses evidence and methods to investigate, evaluate, and improve his/her patient care practices

| 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|-------|
| 0 | 0 | 0 | 1 | 0 | 0 | 1 |

Communication and Interpersonal Skills: demonstrates these skills and maintains professional and therapeutic relationships with patients and the healthcare team

| 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|-------|
| 0 | 0 | 0 | 0 | 1 | 0 | 1 |

Professionalism: demonstrates behaviors that reflect an ongoing commitment to continuous professional development, ethical practice, sensitivity, and responsible attitudes

| 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|-------|
| 0 | 0 | 0 | 0 | 1 | 0 | 1 |

System-Based Practice: demonstrates both an understanding of the contexts and systems in which health care is provided and applies this knowledge to improve and optimize health care

| 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|-------|
| 0 | 0 | 0 | 1 | 0 | 0 | 1 |

## Overall Evaluation

Overall evaluation as a physician

| 0 | 1 | 2 | 3 | 4 | 5 | Total |
|---|---|---|---|---|---|-------|
| 0 | 0 | 0 | 1 | 0 | 0 | 1 |

Comments
- SHE HAS IMPROVED IN MANY ASPECTS SINCE HER FIRST ROTATION. SHE STILL LACKS CONFIDENSE IN SURGERY. SHE STILLS NEEDS TO INCREASE HER CORE ORTHOPAEDIC KNOWLEDGE. SHE MAY NEED MORE ONE ON ONE TUTALEDGE.

HMC-03339

CONFIDENTIAL

Evaluatees:                      Form:
    Lisa Brown (R)                   Faculty Evaluation of Resident

                                 Rotations:
                                     Anesthesia (Anes)
                                     Babins/Cermak (BaCer)
                                     Babins/Rogers (BabRo)
                                     Basic Science (BasSc)
                                     Cortina/Stefanovski (CorSt)
                                     Emergency Medicine (EM)
                                     General Surgery (GenSu)
                                     Hand (Hand)
                                     Intensive Care Unit (ICU)
                                     Internal Medicine (IM)
                                     Neurosurgery (Neuro)
                                     Ortho-Chief1 (Ch1)
                                     Ortho-Chief2 (Ch2)
                                     Orthopaedics (Ortho)
                                     Plastic Surgery (PlaSu)
                                     Radiology (Rad)
                                     Rheumatology (Rheum)
                                     Shriners Hospital (Peds)
                                     Suprock/Kastrup (SuKas)
                                     Trauma (Traum)
                                     Vascular Surgery (VasSu)

                                 Report Date: 02/11/2004 07:09 AM
                                 Reporting Period: 07/01/2003 - 06/30/2004

                                 Do Not Include Pooled Queue

                                                        HMC-03340
                                                    CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,                          )
                                           )
         Plaintiff,                        )
                                           )
     v.                                    )          Civil Action No. 05-32 E
                                           )
HAMOT MEDICAL CENTER,                      )
                                           )          to be filed under seal

APPENDIX TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# Appendix - Exhibit I

Lisa Brown, MD
Hamot Medical Center Orthopaedic Residency Program
Semi-Annual Evaluation
January 30, 2004
1:30 pm

I discussed Dr. Brown's performance thus far since her last evaluation. Her in-training performance was poor. In fact she and I had discussed this on one previous occasion. My recommendation for her to improve her abilities on standardized testing was to have an evaluation at the Sylvan Learning Center in Erie and to report back to me with their recommendations and a plan.

I did counsel her that if her performance did not improve over the course of the next two years on the order of 20% to 40% each year, that I would be unable to sign her application to take Part I of the American Board of Orthopaedic Surgeons Exam. I would consider an additional year here or an additional year of fellowship at which time she could sit for the examination.

I did counsel her that her clinical performance thus far this year had improved and was acceptable. There were areas where her clinical skills did still seem deficient to me and I cited those and suggested additional reading materials.

I do believe that her performance on the OITE exam is a combination of multiple factors including personal, scholastic (meaning knowledge base gleaned from textbooks and journal articles read thus far), and ability to take standardized tests and will continue to evaluate each of these in the future.

Lisa did have an excellent performance and evaluation on her microsurgical skills lab earlier this year.


_____              _____
John D. Lubahn, MD                        Lisa Brown, MD
Program Director                          Orthopaedic Resident

HMC-03259

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,       )
                           )
      Plaintiff,       )
                           )
     v.              )     Civil Action No. 05-32 E
                           )
HAMOT MEDICAL CENTER,  )
                           )     to be filed under seal

APPENDIX TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# Appendix - Exhibit J

357 WEST TENTH STREET
ERIE, PENNSYLVANIA 16502
(814) 452-4556   Fax (814) 454-4377

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,                    :
       Plaintiff            :
                       :
     v.                        :    Civil Action No. 05-32-E
                       :
HAMOT MEDICAL CENTER,                :
       Defendant            :

          Deposition of JAMES A. PEPICELLO, M.D., taken

before and by Janis L. Ferguson, Notary Public in

and for the Commonwealth of Pennsylvania, on Friday,

December 16, 2005, commencing at 9:37 a.m., at the

offices of Scarpitti & Mead, 1001 State Street,

Suite 800, Erie, Pennsylvania 16501.


For the Plaintiff:
    Patrick Sorek, Esquire
    Leech Tishman Fuscaldo & Lampl, LLC
    525 William Penn Place
    30th Floor
    Pittsburgh, PA 15219

For the Defendant:
    Kerry M. Richard, Esquire
    Tobin O'Connor Ewing & Richard
    5335 Wisconsin Avenue NW
    Suite 700
    Washington, DC 20015




          Reported by Janis L. Ferguson, RPR
          Ferguson & Holdnack Reporting, Inc.

1          A.    Yeah, that's fair to say.

2          Q.    I am going to ask you a question on another part

3     of the contract, which is Page 7, Section 3, Paragraph 1.

4     It's really just one sentence.  So Paragraph 1 says, "Either

5     party may terminate this agreement at any time upon notice

6     thereof for proper cause."  Do you see that?

7          A.    Yes.

8          Q.    Do you know what "proper cause" means, as used in

9     this agreement?

10         A.    Well, I can't say that I know.  I could say

11    exactly -- I mean, cause can encompass many, many different

12    things.

13         Q.    Did you consider this language at the time you

14    were reviewing Dr. Brown's grievance?

15         A.    No.

16         Q.    Did you ever consider this language during any

17    part of your role in the ending of her participation in the

18    program?

19         A.    My -- no.  This matter specifically, because I --

20    I don't recall that I examined this document in detail at

21    the time.

22         Q.    We have talked about your March 22nd letter to Dr.

23    Brown.

24         A.    Yes.

25         Q.    Do you recall any other documents that you created

1    Q.   Do you know whether that occurred?  That is, a

2    faculty determination of whether remediation would be

3    helpful?

4    A.   I do not.

5    Q.   And then the middle paragraph on that page says --

6    it's one sentence -- "If the initial faculty review reveals

7    that the resident is unlikely to improve with remediation,

8    the resident will be terminated from the program pending the

9    due process procedure."  Do you see that?

10   A.   Yes.

11   Q.   Is it fair to say that the policy seems to show

12   that it's a faculty determination about whether a resident

13   will be terminated?  Is that fair to say?

14   A.   That's what it states.

15   Q.   Do you know whether Dr. Brown's termination --

16   decision not to renew her contract was a faculty decision?

17   A.   I don't know to what extent discussion with the

18   faculty occurred.

19   Q.   Did you ask?

20   A.   I did not.

21   Q.   Are you aware of any other performance issues with

22   any other residents in the orthopedic surgery residency?

23   A.   No, I'm not.

24   Q.   Are you aware that a malpractice suit was filed

25   against two orthopedic residents in -- I believe it's 2002,

```
1          A.    Yes.

2                (Pepicello Deposition Exhibit 12

3                 marked for identification.)

4          Q.    You have taken a look at Exhibit 12, which is an

5    excerpt from the Board of Directors meeting minutes that

6    concerns Dr. Brown, correct?

7          A.    Yes.

8          Q.    It appears to say that you made the presentation

9    to the Board about Dr. Brown at that time.  Is that correct?

10         A.    Yes.

11         Q.    Did the Board review any documents about Dr. Brown

12   at that time?

13         A.    Not that I can recall.

14         Q.    Did the Board review any documents about Dr. Brown

15   at any time?

16         A.    Not that I know of.

17         Q.    You presented no -- no documents to the Board

18   about Dr. Brown at that time.

19         A.    Correct.

20         Q.    Do you recall what you told the Board about the

21   situation at that time?

22         A.    Not exactly.  I gave a summary of what you have

23   seen in these other minutes and gave the Board an

24   opportunity to ask questions and have discussion.

25         Q.    The minutes say, "The Board was provided with
```

7

1    detailed reasons for nonrenewal of the contract, as well as

2    issues regarding clinical performance and competency by Dr.

3    Lubahn." Do you remember any of those detailed reasons?

4        A.    Well, I can't -- I couldn't give you the entire

5    list.  I mean, they are well documented, I think, in other

6    things that you've made reference to today.  But they, in

7    essence, would be a summary of those things that we have

8    talked about already.

9        Q.    And the presentation of detailed reasons was done

10   by you, correct?

11       A.    Yes.

12       Q.    Do you recall any questions that the Board asked?

13       A.    Not specifically.

14       Q.    Do you recall anybody on the Board asking whether

15   there was proper cause for the dismissal -- for the

16   nonrenewal of the contract?

17       A.    Not in those terms, no.

18       Q.    Do you recall anybody from the Board asking about

19   whether the advancement dismissal policy was followed?

20       A.    No.

21       Q.    Do you recall anybody from the Board asking about

22   Dr. Lubahn's evaluations of Dr. Brown, and particularly the

23   January 30th, 2004 evaluation?

24       A.    Not specifically, no.

25       Q.    Why do you think there are so few orthopedic

97

1    surgeons who are women?

2         A.    I don't know how to answer you.  I guess it's

3    because the numbers of women who choose orthopedic surgery

4    as a specialty happen to be less than the number of men that

5    do.  That has been typical for most surgical specialties.

6    But I don't -- I mean, I don't know that anybody really

7    knows why that is.

8         Q.    Have you ever given it any thought?

9         A.    Not particularly.

10        Q.    Is it a matter of concern for you as a hospital

11   administrator and someone who recruits physicians?

12        A.    Is what a matter of concern?

13        Q.    The low numbers of women in orthopedic surgery.

14        A.    No.

15             (Discussion held off the record.)

16             (Recess held from 12:01 p.m. till 12:11 p.m.)

17             (Pepicello Deposition Exhibit 13

18              marked for identification.)

19   BY MR. SOREK:

20        Q.    Dr. Pepicello, we have marked as Exhibit 13 your

21   letter to Dr. Brown dated May 27, 2004.  Correct?

22        A.    Yes.

23        Q.    And that letter tells Dr. Brown the adverse

24   results of review by the various committees of her

25   grievance, correct?

1      A.    Correct.

2      Q.    What did you do in preparation for drafting that

3   letter, providing that information to Dr. Brown?

4      A.    What did I do in preparation?

5      Q.    Sure.  Did you look at anything?  Did you look at

6   any notes, documents, talk to anybody?

7      A.    No.

8      Q.    So that letter basically closes the loop in terms

9   of --

10     A.    It's basically a summary of the process, yes.

11     Q.    Did you have any role in -- I think you

12  mentioned -- what was the phrase -- starting the process of

13  review by the medical staff executive committee, the medical

14  education committee, and the Board of Directors?

15     A.    Did I -- I'm sorry, could you --

16     Q.    Who is the person who caused those people to take

17  up Dr. Brown's grievance?

18     A.    It was me.

19     Q.    Did you have any role in the process that the ad

20  hoc grievance committee, the medical education committee,

21  medical staff executive committee, or the Board of Directors

22  used in reviewing the decision about Dr. Brown's nonrenewal?

23     A.    Did I have any role in the --

24     Q.    In the process.  In setting the process of how

25  those decisions were reviewed.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,                        )
                                         )
          Plaintiff,                     )
                                         )
     v.                                  )          Civil Action No. 05-32 E
                                         )
HAMOT MEDICAL CENTER,                    )
                                         )          to be filed under seal

APPENDIX TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# Appendix - Exhibit K

1                IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    LISA BROWN, M.D.,                    :
                    Plaintiff            :
4                                         :
          v.                             :    Civil Action No. 05-32-E
5                                         :
     HAMOT MEDICAL CENTER,                :
6                    Defendant            :

7

8

9               Deposition of J. DAVID ALBERT, II, M.D., taken

10       before and by Janis L. Ferguson, Notary Public in

11       and for the Commonwealth of Pennsylvania, on Friday,

12       December 16, 2005, commencing at 2:28 p.m., at the

13       offices of Knox McLaughlin Gornall & Sennett, PC,

14       120 West 10th Street, Erie, Pennsylvania 16501.

15

16   For the Plaintiff:
          Patrick Sorek, Esquire
17        Leech Tishman Fuscaldo & Lampl, LLC
          525 William Penn Place
18        30th Floor
          Pittsburgh, PA 15219
19
     For the Defendant:
20        Kerry M. Richard, Esquire
          Tobin O'Connor Ewing & Richard
21        5335 Wisconsin Avenue NW
          Suite 700
22        Washington, DC 20015

23

24
                    Reported by Janis L. Ferguson, RPR
25                  Ferguson & Holdnack Reporting, Inc.

Ferguson & Holdnack Reporting, Inc.
357 WEST TENTH STREET
ERIE, PENNSYLVANIA 16502
(814) 452-4556  Fax (814) 454-4377

1

1    reviewed.  But I would doubt that they reviewed anything

2    outside of the confines of the actual committees --

3    meetings.

4         Q.   I'm going to hand you what was marked previously

5    as Pepicello Exhibit 5, and that's the 2003/2004 contract

6    between Lisa Brown and the hospital.  And I have a question

7    about Page 7 and a question about Page 1.  But you're

8    welcome to look at as much of that as you need to feel

9    comfortable.

10        A.   I don't know that I have ever actually seen this,

11   so --

12             MS. RICHARD:  Take your time.  It's a fairly long

13             document.

14             THE WITNESS:  Right.

15             (Recess held from 3:22 p.m. till 3:26 p.m.)

16        Q.   Doctor, I'll ask you about the third paragraph on

17   the first page.

18        A.   Um-hum.

19        Q.   The paragraph says, "The resident meets all

20   requirements for participation in the graduate program

21   conducted by HMC."  Do you see that?

22        A.   Um-hum.

23        Q.   Did anyone on the committee ever discuss that

24   provision; that is, a contractual agreement by Hamot that

25   Dr. Brown met the requirements for participation in the

1    program?

2        A.    Not to my knowledge.

3        Q.    As you sit here today, do you have any idea about

4    its significance?

5        A.    I don't.  I have no idea at all.

6        Q.    I'm going to ask you to take a look at Page 7,

7    Section 3, Paragraph 1.  Says, "Either party may terminate

8    this agreement at any time upon notice thereof for proper

9    cause."  Do you see that?

10        A.    Um-hum.

11        Q.    Do you remember any discussion in the committee

12    about whether what the committee was doing -- let me

13    rephrase that.  About whether there was proper cause to

14    terminate Dr. Brown's participation in the program?

15        A.    I don't recall a specific discussion about this

16    document or its provisions, no.

17        Q.    Dr. Albert, I'm going to hand you what we

18    previously marked as Pepicello Exhibit No. 7, and it's a

19    January 30th, 2004 Semi-Annual Evaluation of Dr. Brown by

20    Mr. Lubahn and ask you to take a look at it.

21        A.    (Witness complies.)

22        Q.    Do you remember reviewing this document as part of

23    your work with the committee?

24        A.    We did, yes.

25        Q.    Do you remember any discussion about that

```
1              (Brief recess held.)

2        A.    I'm sorry, Page 2?

3        Q.    Page 2.  I was directing your attention to the

4   last paragraph.

5        A.    Okay.  Do you have a question?

6        Q.    Yes.  I take it from your previous answer a few

7   minutes ago that there was not a detailed review in your

8   committee about whether this process described in the

9   Advancement and Dismissal Policy was followed.  Is that

10  correct?

11       A.    I believe that is true.  I believe it was, but I

12  don't know that we specifically, you know, reviewed the

13  document in that respect.

14       Q.    Okay.  Do you remember any discussion about -- and

15  I'm looking at the first sentence -- Dr. Brown not meeting

16  expectations and being counseled expeditiously by the

17  program director?

18              (Discussion held off the record.)

19       A.    And which?

20       Q.    I'm looking at the first sentence.

21       A.    "All residents will be continuously evaluated by

22  the teaching faculty."

23       Q.    Actually, I'm looking at -- sorry -- the second

24  sentence.  "If a resident isn't meeting expectations, the

25  resident will be counseled by the program director."  Do you
```

1   goals and objectives?

2        A.    Specifically, I don't recall.

3        Q.    Did the committee ever discuss any other

4   performance problems of any other residents in the

5   orthopedic surgery program?

6        A.    That was not part of our review.  No.

7        Q.    So it never came up, for example, that a

8   malpractice case had been filed against Dr. Lippe and

9   Dr. Seeds?

10       A.    No.  Actually, I didn't even know that.

11       Q.    So no one made any specific comments about a

12  specific performance problem of another resident.

13       A.    No.  That was not what we were considering.  We

14  were -- even though we were gathering information, we were

15  narrowly considering the question of whether Dr. Lubahn's

16  decision should be upheld.

17       Q.    And, again, the standard you were using was

18  without a doubt; no one should have a doubt about whether it

19  was correct -- or the decision was correct?

20       A.    I think we wanted a unanimous decision.  I mean, I

21  don't know if that's the same as not having a doubt, but

22  pretty close to it, I suppose.  I mean, as you said, a

23  preponderance of the evidence that we all felt comfortable

24  that we could say it was the correct decision.

25       Q.    Yeah.  I'd like to know, in fact, what standard