IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LISA BROWN, M.D., | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 05-32 E |
| | ) |
| HAMOT MEDICAL CENTER, | ) |
| | ) |
|     Defendant. | ) |

## DEFENDANT HAMOT MEDICAL CENTER'S STATEMENT OF UNDISPUTED AND MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Defendant Hamot Medical Center ("Hamot"), by and through its undersigned counsel and pursuant to LR 56.1, hereby states that there is no genuine issue as to the following undisputed and material facts:

1. Hamot sponsors graduate medical education training programs, including an accredited Orthopaedic Surgery Residency Program (the "Program"), through which it provides clinical training to residents seeking to become orthopaedic surgeons. See Exhibit 1 (Plaintiff's Complaint) and Exhibit 2 (Hamot's Answer) at ¶¶ 4.

2. The Program is conducted in accordance with the Institutional and Program Requirements of the national accrediting entity, the Accreditation Council for Graduate Medical Education ("ACGME"). Although residents are employed by Hamot during their training, the ACGME has declared that, "Residents are first and foremost students, rather than employees, and all accreditation standards and activities reflect this distinction." See Exhibit 3 (ACGME Memorandum dated March 1, 2000).

3. ACGME describes a residency program as follows:

A residency program is a period of education and training that physicians undergo after they graduate from medical school in order to learn how to

    care for patients in their chosen specialty. … <u>When physicians graduate from a residency program</u>, they are eligible to take their board certification examinations and begin practicing independently.

<u>See</u> Exhibit 4 (ACGME Fact Sheet) (emphasis supplied).

4. ACGME obligates every accredited residency program "to require its residents to obtain competence in the six [ACGME competencies] to the level expected of a new practitioner." The "Core Competencies" are: Patient Care, Medical Knowledge, Practice-based Learning and Improvement, Interpersonal and Communication Skills, Professionalism, and Systems-based Practice. <u>See</u> Exhibit 5 (ACGME Common Program Requirements) at 11-14.

5 Although Hamot's orthopaedic residency program comprises five years, the residents are not guaranteed that they will complete the entire five years; rather, each resident is eligible to receive a series of one year "appointments" as a resident in the Program, assuming the resident continues to meet and fulfill the requirements of the Program.

6 The terms of this appointment are reflected in the Resident Agreement of Appointment in the Graduate Program in Medical Education (the "Appointment"). <u>See</u> Exhibit 6 (Resident Agreement of Appointment).

7. The Appointment requires the resident to "meet all requirements for participation in a <u>graduate program of medical education</u> conducted by HMC…" <u>Id.</u> at 1 (emphasis supplied). It requires the resident to maintain licensure by the Pennsylvania State Board of Medicine. <u>Id.</u>

8. Per the Appointment, Hamot agrees to:

    1. Provide the Resident with a program of graduate medical education that meets the Institutional and Program Requirements of the

> Essentials of Accredited Residencies as approved by the Accreditation of Graduate Medical Education (ACGME).

Id. at 2.

9. Further, continued participation is contingent on approval of the Program Director:

> Section 5. Continuation of Training
> Upon satisfactory completion of the resident training year as determined by the program director and faculty, the resident shall be promoted to the next level of resident training required for his/her specialty…

Id. at 7.

10. Plaintiff enrolled in Hamot's Program and received her first one-year appointment in July 2001.

11. In her first year of residency, plaintiff performed poorly on the Orthopedic In-Training Examination ("OITE"), a national examination given annually and designed to be a tool for residents. See Exhibit 8 (November 2001 OITE Results of Dr. Brown).

12. In February 2002, Dr. John Lubahn, the Program's Director, advised plaintiff that her scores needed improvement and that she needed to increase her reading in order to improve them. See Exhibit 9 (February 2002 Semi-Annual Evaluation of Dr. Brown).

13. During plaintiff's second year, she continued to have difficulty keeping up with her required reading. See Exhibit 10 (Deposition Transcript of Lisa Brown) at 206:24-207:9.

14. Dr. Lubahn again stressed to plaintiff the importance of reading as well as time management to accomplish that reading. See Exhibit 11 (July 2002 Semi-Annual Evaluation of Lisa Brown).

15. Plaintiff performed poorly on the November 2002 OITE. See Exhibit 12 (November 2002 OITE Results of Dr. Brown).

16. In her regular semi-annual evaluation in February 2003, Dr. Lubahn explained that plaintiff's OITE scores were in need of improvement, he discussed various study approaches and a reading list for her, and he suggested that plaintiff read a specific article on fracture dislocations. See Exhibit 13 (Deposition Transcript of Dr. John Lubahn) at 17:19-24 and Exhibit 14 (February 2003 Semi-Annual Evaluation of Dr. Brown).

17. In March 2003 Dr. Patrick Williams, a partner in Dr. Lubahn's practice group, reported as follows:

> Over the past several months Dr. Brown, unfortunately, has been struggling in regards to her duties as a resident. She has not progressed academically and has failed to accept a higher level of responsibility needed at her level of residency.

See Exhibit 15 (Memo from Dr. Williams to Dr. Lubahn).

18. Dr. Williams further observed that plaintiff had failed to complete rounds and reported as follows:

> Specifically, she has neglected rounds and subsequently has been untruthful when asked about whether these duties have been performed. Also, Dr. Brown has had difficulty following the responsibilities of the hand service resident. When the scheduled attending has been absent, her presence has not been accounted for on that particular day.

Id.

19. Dr. Williams's memo concluded as follows:

> On many occasions academic questions of a lower level have been proposed to Dr. Brown and her level of comprehension has been severely lacking. When confronted she has stated that she cannot find the time to read due to her resident responsibilities. Obviously, this is very concerning.

> At this time, I hope the orthopaedic faculty can help Dr. Brown, <u>but her progress is of great concern</u>.

<u>Id.</u> (emphasis supplied).

20. On March 26, 2003, plaintiff called Dr. Lubahn about a patient who had a contaminated laceration on his leg, and Dr. Lubahn informed plaintiff that the wound should be thoroughly irrigated and loosely closed. <u>See</u> Exhibit 13 at 65:17-66:2 and Exhibit 16 (Dr. Lubahn's Concerns Leading to Probationary Status for Dr. Brown).

21. The day after the phone call, plaintiff informed Dr. Lubahn that she closed the wound tightly stitched and in layers. <u>Id.</u> and Exhibit 13 at 65:9-12 and Exhibit 16.

22. When questioned about her failure to follow his instructions plaintiff told Dr. Lubahn the noise level in the Emergency Room ("ER") prevented her from hearing his instruction. <u>Id.</u> at 21:4-13 and 22:11-19.

23. On April 2, 2003, Dr. Lubahn met with plaintiff and advised her she would be placed on academic and clinical probation. <u>See</u> Exhibit 10 at 216:25-217:12.

24. Dr. Lubahn hoped that plaintiff would use this time "to improve [her] core knowledge base in orthopaedics and improve [her] clinical skills. Dr. Lubahn also suggested a weekly schedule to plaintiff that would accommodate her need for increased time to study, which included significant work with Dr. Mary Beth Cermak and Dr. David Babins. <u>See</u> Exhibit 17 (Dr. Lubahn's Probation Letter to Dr. Brown).

25. In a post-operative report plaintiff dictated on June 30, 2003, she omitted a significant portion of the procedure from her report. In July, Dr. Lubahn provided her with written feedback and asked her to correct the report. <u>See</u> Exhibit 18 (Letter from Dr. Lubahn to Dr. Brown, July 2003).

26. In August 2003, Dr. Brown acknowledged the inaccuracies, corrected the report and thanked Dr. Lubahn for his help. See Exhibit 19 (Letter from Dr. Brown to Dr. Lubahn, August 2003).

27. Plaintiff began the third year of the Program (in July 2003) under probation and assigned to "basic science." See Exhibit 10 at 250:24-251:2.

28. Plaintiff received relatively positive evaluations for her research, and in Ocotber 2003, Dr. Lubahn removed her from probation. See Exhibit 20 (September 2003 Semi-Annual Evaluation of Dr. Brown).

29. Plaintiff performed poorly on the November 2003 OITE – the results were worse than her previous year's OITE results, as Dr. Brown finished in the bottom 2%. See Exhibit 21 (November 2003 OITE Results of Dr. Lisa Brown).

30. In a January 2004 evaluation, Dr. Lubahn observed that plaintiff's in-training performance was poor. See Exhibit 22 (January 2004 Semi-Annual Evaluation of Dr. Brown). He suggested that she attend the Sylvan Learning Center in Erie for an evaluation of her problems with standardized tests. Id.

31. Dr. Lubahn also observed that plaintiff was at risk of not completing the residency program on time:

> I did counsel her that if her performance did not improve over the course of the next two years on the order of 20% to 40% each year, that I would be unable to sign her application to take Part I of the American Board of Orthopaedic Surgeons Exam.

Id.

32. In a letter to Dr. Lubahn dated February 20, 2004, Dr. Mary Beth Cermak reported an incident where plaintiff had refused to go to the ER to treat a patient sent

there by Dr. Cermak. See Exhibit 10 at 258:3-14, Exhibit 13 at 230:2-16 and Exhibit 23 (Letter from Dr. Cermak to Dr. Lubahn).

33. Plaintiff denied that she had refused to go to the emergency room. See Exhibit 23.

34. Dr. Cermak reported that she followed up with the emergency room nurse, who confirmed what had transpired. Id.

35. On February 25th, in an evaluation of a presentation given by plaintiff, Dr. Lubahn concluded that plaintiff "had no immediate knowledge when questioned" more specifically about the presentation's subject matter and that the presentation was unsatisfactory considering plaintiff's level of training. See Exhibit 24 (February 2004 Evaluation of Clinical Presentation).

36. On February 27, 2004, Dr. Lubahn spoke with Dr. Frank Benes, who advised that plaintiff had delayed on multiple occasions in responding to calls from the emergency department. See Exhibit 13 at 60:9-15, 61:6-14 and 63:19-22 and Exhibit 25 (Email from Dr. Benes to Lubahn).

37. In an email, Dr. Benes indicated that he specifically mentioned plaintiff because of "recurrences" in her delays. See Exhibit 25.

38. On March 1, 2004, Dr. Lubahn informed plaintiff that her contract would not be renewed beyond that current academic year, ending June 30, 2004. See Exhibit 13 at 62:6-19, Exhibit 26 (Hand-Delivered Non-Renewal Letter from Dr. Lubahn to Dr. Brown) and Exhibit 27 (Memo Drafted by Dr. Lubahn).

39. In accordance with Hamot's Grievance Resolution and Due Process Procedure ("Grievance Procedure"), plaintiff met with Dr. James Pepicello, Executive

Vice President and Chief Medical Officer, on March 17, 2004, who listened to plaintiff's version of events and circumstances surrounding Dr. Lubahn's decision. See Exhibit 28 (Deposition Transcript of Dr. James Pepicello) at 39:21-40:11 and Exhibit 29 (Grievance Resolution and Due Process Procedure).

40. Dr. Pepicello concluded that Dr. Lubahn's decision was reasonable. See Exhibit 28 at 39:13-20 and 45:1-3 and Exhibit 30 (March 2004 Letter from Dr. Pepicello to Dr. Brown).

41. Pursuant to the Grievance Procedure, a Grievance Committee ("GC") was formed. The GC met on three different occasions – March 30, 2004, April 6, 2004 and April 8, 2004 – to review the decision not to renew plaintiff's contract. See Exhibit 31 (Deposition Transcript of Mr. Don Inderlied) at 60:8-18.

42. Even though the GC was authorized to act on a "majority vote," committee members decided that they would not uphold Dr. Lubahn's decision unless everyone agreed with the decision and was left with no doubts after the review process. See Exhibit 34 (Deposition Transcript of Dr. J. David Albert, II) at 25:5-27:4.

43. At the third meeting, after considering all of the testimony from witnesses and available options, the GC unanimously concluded that the decision was appropriate and recommended that it be upheld. See Exhibit 31 at 80:15-21 and 88:19-20 and Exhibit 28 at 81:16-18.

44. After the GC's decision, the Medical Education Committee ("MEC") reviewed the GC's recommendation. See Exhibit 28 at 81:19-22.

45. The Medical Staff Executive Committee ("MSEC") reviewed the MEC's recommendation. Id. at 81:23-25.

46. The Board of Directors (the "Board") reviewed the MSEC's recommendation. Id. at 82:1-2.

47. After considering the decision not to renew plaintiff's contract and any feasible alternatives to that decision, the Board unanimously voted to uphold the decision and the MSEC's recommendation that the decision stand. Id. at 82:7-84:14.

48. When Dr. Lubahn first informed her of his decision not to renew her contract, plaintiff did not claim discrimination. To the contrary, she told Dr. Lubahn that she "understood the decision based on her academic performance but not her clinical performance." Exhibits 26 and 27.

> Respectfully submitted,
>
> Tobin O'Connor Ewing & Richard
>
>
> /s/ Kerry M. Richard
> Kerry M. Richard
> Ziad Haddad
> Forrest G. Read
> 5335 Wisconsin Avenue, NW, Suite 700
> Washington, DC  20015
> 202-362-5900
> Counsel for defendant