**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LISA BROWN, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 05-32 E** |
| | ) | |
| **HAMOT MEDICAL CENTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT HAMOT MEDICAL CENTER'S
RULE 56 MOTION FOR SUMMARY JUDGMENT**</u>

Defendant Hamot Medical Center ("Hamot" or "defendant"), by and through its undersigned counsel, hereby submits this memorandum of points and authorities in support of its Motion for Summary Judgment with respect to any and all claims asserted against it in Counts One, Two, Three, Four and Five of plaintiff Lisa Brown's ("plaintiff" or "Dr. Brown") Complaint, and states as follows:

**I.     INTRODUCTION**

Plaintiff was a resident in Hamot's Orthopaedic Surgery Residency Program (the "Program") from July 1, 2001 through June 30, 2004. Her Resident Agreement of Appointment in the Graduate Program in Medical Education dated July 1, 2003 (the "Contract") was not renewed when Hamot determined that plaintiff had failed to progress academically and therefore was not eligible to advance to the fourth year of the Program. Plaintiff sued Hamot claiming that the decision not to advance her to the fourth year of training was based on her sex in violation of federal and state law. In addition she claims that Hamot's decision breached the Contract.

Plaintiff's sex discrimination claims under Title VII of the 1964 Civil Rights Act ("Title VII") and corresponding claim under the Pennsylvania Human Relations Act ("PHRA") cannot

survive summary judgment.  As set forth more fully below, it is undisputed that plaintiff was having significant, persistent struggles in progressing as an orthopaedic surgery resident in Hamot's Program.  It is also undisputed that even after she was given opportunities to correct and improve on the deficiencies in her knowledge base both academically and clinically, plaintiff was not able to elevate her overall performance to the level expected of a resident approaching her fourth year in the Program.  Hamot, therefore, decided not to advance her to the fourth year of training, and did not renew the Contract.  Because there is no genuine issue as to any material facts related to plaintiff's Title VII and PHRA claims, they should be dismissed as a matter of law.

Likewise, plaintiff's claims (Counts III, IV amd V) for breach of contract are ripe for dismissal on summary judgment.  She was given timely notice of nonrenewal, Hamot properly applied its Advancement and Dismissal policy, and Dr. Brown received due process in accordance with Hamot's policies.  Accordingly, Counts III, IV and V of the Complaint should also be dismissed.

## II.    FACTUAL BACKGROUND

### A.    THE EDUCATIONAL NATURE OF THE RESIDENCY PROGRAM

Hamot's Program is a fully accredited Orthopaedic Surgery residency training program, through which it provides clinical training to residents seeking to become orthopaedic surgeons. See Exhibit 1 (Plaintiff's Complaint) and Exhibit 2 (Hamot's Answer) at ¶¶ 4.  The Program is conducted in accordance with the Institutional and Program Requirements of the national accrediting entity, the Accreditation Council for Graduate Medical Education (the "ACGME"). Although residents are employed by the Hospital during their training, the ACGME has declared that "Residents are first and foremost students, rather than employees, and all accreditation

standards and activities reflect this distinction." See Exhibit 3, ACGME Memorandum dated March 1, 2000.  Residency training programs form a necessary part of a physician's education, in which the theories and concepts taught in medical school are translated into practice by residents who are closely monitored by attending physicians.  Each resident completes a clinical curriculum designed to build the knowledge, skills and medical judgment of a resident to the point where they can safely practice independently.  The ACGME describes a residency program as follows:

> A residency program is a period of education and training that physicians undergo after they graduate from medical school in order to learn how to care for patients in their chosen specialty. … When physicians graduate from a residency program, they are eligible to take their board certification examinations and begin practicing independently.

See Exhibit 4 (ACGME Fact Sheet) (emphasis supplied).

The ACGME obligates every accredited residency program "to require its residents to obtain competence in the six [ACGME competencies] to the level expected of a new practitioner."  See Exhibit 5, (ACGME's Common Program Requirements at 11, V.D.).  The six areas of competence, known generally as the "Core Competencies" are:  Patient Care, Medical Knowledge, Practice-based Learning and Improvement, Interpersonal and Communication Skills, Professionalism, and Systems-based practice.  Id. at 11-14.

Although orthopaedic surgery residency programs like Hamot's require the completion of five years of training, residents are not guaranteed that they will complete the entire five years; rather, each resident is eligible to receive a series of one year "appointments" as a resident in the Program, assuming the resident continues to meet and fulfill the academic requirements of the Program.   The terms of this appointment are reflected in the Resident Agreement of

Appointment in the Graduate Program in Medical Education (the "Contract").  See Exhibit 6 (Resident Agreement of Appointment).

The Contract underscores the educational nature of the Program.  It requires the resident to "meet all requirements for participation in a graduate program of medical education conducted by HMC…"  Id. at 1 (emphasis supplied).  It requires the resident to maintain licensure by the Pennsylvania State Board of Medicine.  Id.  And it recognizes that Hamot's principal responsibility to the resident is to provide an environment satisfying the educational requirements of the ACGME:

> HMC agrees to:
>
> 1.  Provide the Resident with a program of graduate medical education that meets the Institutional and Program Requirements of the Essentials of Accredited Residencies as approved by the Accreditation of Graduate Medical Education (ACGME).

Id. at 2.

Finally, the Contract recognizes that the resident's continued participation in the Program is contingent on her fulfillment of Program requirements and approval by the Program Director:

> Section 5. Continuation of Training
> Upon satisfactory completion of the resident training year as determined by the program director and faculty, the resident shall be promoted to the next level of resident training required for his/her specialty…

Id. at 7.

John D. Lubahn, MD is the Program Director for Hamot's Program.  Pursuant to ACGME requirements, he is responsible for the design, implementation and oversight of the five-year curriculum, and is responsible for evaluating residents and making advancement and dismissal decisions.  See Exhibit 5 at 3-5.

## B.    PLAINTIFF ENTERS THE RESIDENCY PROGRAM AND INITIALLY STRUGGLES

After graduating in the bottom 25% of her class at Northeastern Ohio Universities College of Medicine, see Exhibit 7 (Transcript), Hamot selected plaintiff for one of its two first-year training slots and extended her a one-year appointment in July 2001.[1]  Although plaintiff performed sufficiently to obtain renewals of her appointment for the second and third years of the Program, her performance can hardly be described as stellar.

For example, in her first year of residency, plaintiff performed in the bottom six percent (6%) of first-year residents nationally on the Orthopaedic In-service Training Examination ("OITE"), a national examination given to all orthopaedic residents annually and designed to be a tool for residents to assess their accumulated medical knowledge.  See Exhibit 8 (November 2001 OITE Results of Dr. Brown).  As a result, during plaintiff's semi-annual evaluation in February 2002, Dr. Lubahn, advised plaintiff that her scores needed improvement and that she needed to increase her reading in order to improve them.  See Exhibit 9 (February 2002 Semi-Annual Evaluation of Dr. Brown).

During plaintiff's second year, she continued to have difficulty keeping up with her required reading.  See Exhibit 10 (Deposition Transcript of Lisa Brown) at 206:24-207:9.  Dr. Lubahn again stressed to plaintiff the importance of reading as well as time management to accomplish that reading.  See Exhibit 11 (July 2002 Semi-Annual Evaluation of Lisa Brown).  Nonetheless, from September 2002 through January 2003, plaintiff admitted that she did not keep up with her required level of study, as she "did not spend time reading in the mornings or the evenings."  See Exhibit 10 at 243:18-23.

---

[1]    Residents are selected for participation in residency programs pursuant to a computerized matching service known as the National Residency Matching Program ("NRMP").  In order to match, both the hospital and the resident must list each other as a preference.

Plaintiff once again performed poorly on the November 2002 OITE.  See Exhibit 12 (November 2002 OITE Results of Dr. Brown), scoring in the bottom ten percent (10%) of second-year orthopaedic residents nationwide.  In her regular semi-annual evaluation in February 2003, Dr. Lubahn explained again that plaintiff's scores were in need of improvement, he again discussed various study approaches and a reading list for her, and he suggested that plaintiff read a specific article on fracture dislocations.  See Exhibit 13 (Deposition Transcript of Dr. John Lubahn) at 17:19-24 and Exhibit 14 (February 2003 Semi-Annual Evaluation of Dr. Brown).

### C.     PLAINTIFF IS PUT ON PROBATION

In March 2003, serious questions about plaintiff's academic progress and professionalism emerged.  Dr. Patrick Williams, a hand surgeon and long-time faculty member, reported problems with plaintiff's academic development and neglect of duties.  As Dr. Williams reported:

> Over the past several months Dr. Brown, unfortunately, has been struggling in regards to her duties as a resident.  She has not progressed academically and has failed to accept a higher level of responsibility needed at her level of residency.

See Exhibit 15 (Memo from Dr. Williams to Dr. Lubahn).

Dr. Williams further observed that plaintiff had failed to complete rounds, and had been untruthful when confronted with that fact:

> Specifically, she has neglected rounds and subsequently has been untruthful when asked about whether these duties have been performed.  Also, Dr. Brown has had difficulty following the responsibilities of the hand service resident.  When the scheduled attending has been absent, her presence has not been accounted for on that particular day.

Id.

The memo closed with ominous comments regarding plaintiff's abilities and future:

> On many occasions academic questions of a lower level have been proposed to Dr. Brown and her level of comprehension has been severely lacking.  When

confronted she has stated that she cannot find the time to read due to her resident responsibilities. Obviously, this is very concerning.

At this time, I hope the orthopaedic faculty can help Dr. Brown, <u>but her progress is of great concern</u>.

<u>Id.</u> (emphasis supplied).

Compounding these problems, on March 26, 2003, plaintiff called Dr. Lubahn about a patient who had a contaminated laceration on his leg. Dr. Lubahn instructed plaintiff that the wound should be thoroughly irrigated and loosely closed. <u>See</u> Exhibit 13 at 65:17-66:2 and Exhibit 16 (Dr. Lubahn's Concerns Leading to Probationary Status for Dr. Brown). The day after the phone call, Dr. Lubahn learned that Dr. Brown closed the wound tightly stitched and in layers, i.e., the <u>opposite</u> of what Dr. Lubahn asked her to do. <u>Id.</u> and Exhibit 13 at 65:9-12. When questioned about her failure to follow his instructions – and proper surgical procedure – plaintiff told Dr. Lubahn the noise level in the Emergency Room ("ER") prevented her from hearing his instruction. <u>Id.</u> at 21:4-13 and 22:11-19.

Dr. Lubahn was deeply troubled by this incident. As he testified, quite apart from plaintiff's failure to follow his express directions, as a second year Orthopaedic surgery resident, plaintiff should have had the knowledge and experience to know she should not have closed a contaminated wound. <u>Id.</u> and Exhibit 16.

As a consequence of his concerns, on April 2, 2003, Dr. Lubahn met with plaintiff and advised her she would be placed on academic and clinical probation. <u>See</u> Exhibit 10 at 216:25-217:12. Dr. Lubahn hoped that plaintiff would use this time "to improve [her] core knowledge base in orthopaedics and improve [her] clinical skills." <u>See</u> Exhibit 17 (Dr. Lubahn's Probation Letter to Dr. Brown). Dr. Lubahn and plaintiff also mutually agreed to a modified weekly schedule designed to lighten her normal responsibilities and allow her increased time to read and

study. Dr. Lubahn also assigned plaintiff to work with two well-regarded faculty, Dr. Mary Beth Cermak and Dr. David Babins, who monitored and assisted her during her probation. Id.

During plaintiff's probationary period, she continued to have some difficulties. For example, in a post-operative report she dictated on June, 30, 2003, she omitted a significant portion of the procedure from her report. In July, Dr. Lubahn provided her with written feedback and asked her to correct the report. See Exhibit 18 (Letter from Dr. Lubahn to Dr. Brown). In August 2003, Dr. Brown acknowledged the inaccuracies, corrected the report and thanked Dr. Lubahn for his help. See Exhibit 19 (Letter from Dr. Brown to Dr. Lubahn).

### D. PLAINTIFF'S PERFORMANCE IMPROVED DURING HER THIRD YEAR BUT AGAIN FALTERED

Plaintiff remained on probation at the beginning of her third year (July 2003), during which time she was assigned to three-months of "basic science," a standard part of the third year curriculum that affords Orthopaedic surgery residents "additional time to do self-study" and "to sharpen skills" and "research and just dedicate that time to studying." See Exhibit 10 at 250:24-251:2. Dr. Brown received relatively positive evaluations for her research, and in October 2003, Dr. Lubahn removed her from probation. See Exhibit 20 (September 2003 Semi-Annual Evaluation of Dr. Brown). Unfortunately, despite plaintiff's claim that this extra study time was just what she needed, she admits that she "did not study the amount of time that [she] had originally planned to, or that [she] had hoped to, especially with the upcoming OITE in November." See Exhibit 10 at 252:12-14. Plaintiff performed poorly on the November 2003 OITE – the results were her worst yet, placing her in the bottom two percent (2%) of all third-year Orthopaedic residents nationwide. See Exhibit 21 (November 2003 OITE Results of Dr. Lisa Brown).

Upon receipt of Dr. Brown's test scores, Dr. Lubahn met with her twice to discuss his concerns. Dr. Brown insisted that her scores were the result of test-taking problems, and not an accurate reflection of her medical knowledge. <u>See</u> Exhibit 10 at 256:6-257:1 and Exhibit 22 (January 2004 Semi-Annual Evaluation of Dr. Brown). Having observed Dr. Brown's lack of medical knowledge in the clinical setting, Dr. Lubahn was not convinced. Nevertheless, he was willing to concede that difficulties with test-taking could explain some of her poor performance on the OITE. As a result, he suggested she seek assistance with her test-taking skills at Sylvan Learning Center and report back to him with a plan. <u>Id.</u>

In her January 2004 Semi-Annual Evaluation, Dr. Lubahn observed that plaintiff was at risk of not completing the residency program on time:

> I did counsel her that if her performance did not improve over the course of the next two years on the order of 20% to 40% each year, that I would be unable to sign her application to take Part I of the American Board of Orthopaedic Surgeons Exam.

<u>Id.</u> Plaintiff never met with Sylvan or any other test-preparation service. <u>See</u> Exhibit 10 at 257:8-258:2.

Prior to meeting with Dr. Brown in January 2004, Dr. Lubahn checked with her supervising faculty for the months of October through December, and learned that she had performed acceptably. Thus, despite Dr. Lubahn's misgivings about her test scores, Dr. Lubahn concluded that the six months of academic probation had improved her medical knowledge to an acceptable level, and he believed that if she could have continued at that level, she could advance to the next level of training. <u>See</u> Exhibit 22.

## E.    THE EVENTS OF FEBRUARY 2004 FORCE HAMOT'S DECISION

Unfortunately for plaintiff, a series of negative events occurred in February 2004 that Hamot could not afford to ignore. First, in a letter to Dr. Lubahn dated February 20, 2004, Dr.

Mary Beth Cermak reported an incident where plaintiff had refused to go to the ER to treat a patient sent there by Dr. Cermak. See Exhibit 10 at 258:3-14, Exhibit 13 at 230:2-16 and Exhibit 23 (Letter from Dr. Cermak to Dr. Lubahn). Notably, when confronted by Dr. Cermak, plaintiff denied that she had refused to go to the emergency room. See Exhibit 23. Dr. Cermak, however, followed up with the ER nurse, who confirmed what had transpired. Id.

Next, on February 25th, plaintiff gave a conference presentation to her peers on the subject of hip fractures and dislocations. Presentations are a standard part of the academic curriculum, and plaintiff was assigned the topic well in advance, to allow her adequate time to prepare. During the presentation, Dr. Lubahn noted that Dr. Brown had omitted a key part of the topic, classifications of types of hip fracture/dislocations. He questioned her about this and learned that plaintiff "had no immediate knowledge when questioned." See Exhibit 24 (February 2004 Evaluation of Clinical Presentation). He concluded that she had not read even the basic textbook chapter – which clearly outlined the classifications for different types of hip fracture/dislocations -- when preparing her presentation, and thus he considered her presentation unsatisfactory for plaintiff's level of training. Id.

Ironically, the topic on which Dr. Brown lacked any knowledge was classifications of hip fracture dislocations – the precise topic on which Dr. Lubahn had assigned Dr. Brown an article the previous February 2003. Once again, plaintiff had demonstrated a significant deficiency in her medical knowledge, notwithstanding the fact that she had been told of the subject matter in advance, and been advised to study the subject. See Exhibit 13 at 58:6-59:22 and Exhibit 24.

Finally, on February 27, 2004, Dr. Lubahn heard from Dr. Frank Benes, an Emergency Department physician, who advised that plaintiff (and another junior resident) had delayed on multiple occasions in responding to calls from the Emergency Department. See Exhibit 13 at

60:9-15, 61:6-14 and 63:19-22 and Exhibit 25 (Email from Dr. Benes to Lubahn). Plaintiff was specifically mentioned by Dr. Benes because of "recurrences" in her delays. See Exhibit 25.

As a consequence of all of the foregoing, Dr. Lubahn was forced to conclude that Dr. Brown's previous academic deficiencies had not been satisfactorily remedied, and in fact, she had failed to progress to the point that she could not be advanced to the next level of training. Consistent with ACGME requirements, Hamot's Contract requires that residents be given 120 days advanced notice of a decision not to renew their contracts. Thus, on March 1, 2004, Dr. Lubahn informed plaintiff that Hamot would not renew her contract beyond that current academic year, ending June 30, 2004.[2] See Exhibit 13 at 62:6-19, Exhibit 26 (Hand-Delivered Non-Renewal Letter from Dr. Lubahn to Dr. Brown) and Exhibit 27 (Memo Drafted by Dr. Lubahn).

## F.    PLAINTIFF UTILIZES APPEAL PROCEDURES

In accordance with Hamot's Grievance Resolution and Due Process Procedure (the "Grievance Procedure"), plaintiff was afforded an opportunity to challenge Dr. Lubahn's decision not to advance her to the fourth year of training See Exhibit 29 (Grievance Resolution and Due Process Procedure). Pursuant to Step 2 of the Grievance Procedure, on March 17, 2004 plaintiff met with Dr. James Pepicello, Executive Vice President and Chief Medical Officer, who listened to plaintiff's version of events and circumstances surrounding Dr. Lubahn's decision. Id. and Exhibit 28 at 39:21-40:11. After reviewing various evaluations and files and considering Dr. Lubahn's decision, as well as considering plaintiff's view of the decision, Dr. Pepicello

---

[2]  Importantly, although plaintiff and her counsel routinely assert that plaintiff was "terminated," they acknowledge that in fact she was permitted to train through the end of her annual contract on June 30, 2004, and that she was paid for her services in accordance with her contract. See, Exhibits 1 and 2 at ¶6 and Exhibit 28 (Deposition Transcript of Dr. James Pepicello) at 32:15-24 and 52:9-13.

concluded that Dr. Lubahn's decision was reasonable.  Id. at 39:13-20 and 45:1-3 and Exhibit 30 (March 2004 Letter from Dr. Pepicello to Dr. Brown).  Accordingly, Dr. Pepicello advanced the process to Step 3 of the Procedure, wherein he "set in motion the formation of the…[ad hoc] grievance committee."  See Exhibit 28 at 67:1-11 and 76:16-18.

At that point, the decision not to renew the Contract was subject to a thorough review by a Grievance Committee composed of a number of physicians from different specialties, and a resident selected by Dr. Brown (the "GC").  The GC met on three different occasions – March 30, 2004, April 6, 2004 and April 8, 2004.  See Exhibit 31 (Deposition Transcript of Don Inderlied) at 60:8-18.  At the first meeting, the GC met with Dr. Brown and Dr. Lubahn, but it did not reach a resolution.  See Exhibit 34 (Deposition Transcript of Dr. J. David Albert, II) at 24:25-25:3.  The GC met again on April 6, at which meeting it heard from Dr. Lubahn and other faculty about possible alternatives to not renewing the Contract. See Exhibit 31 at 69:8-13, 70:13-20 and 75:23-76:1. Once again, they did not reach a resolution and agreed to meet again on April 8 to hear from more faculty and residents who had worked with Dr. Brown.  At the third meeting, after considering all of the testimony from witnesses and available options, the GC unanimously concluded that Dr. Lubahn's decision was appropriate and recommended that it be upheld. Id. at 80:15-21 and 88:19-20 and Exhibit 25 at 81:16-18.[3]

After the GC's decision, the Medical Education Committee ("MEC") reviewed the GC's recommendation and voted to uphold Dr. Lubahn's decision.  The MEC then reported its decision to the Medical Staff Executive Committee ("MSEC"), who again reviewed the decision. After discussion the MSEC also upheld the decision unanimously.  Finally, the decision was

---

[3]  Significantly, the GC was authorized to act based on a "majority vote."  However, Dr. J. David Albert, II, who headed the GC, confirmed that committee members decided on their own that they would not uphold Dr. Lubahn's decision unless everyone present agreed.  See Exhibit 34 at 25:5-27:4.

reviewed by Hamot's Board of Directors (the "Board").  Ultimately, after considering Dr.

Brown's academic record, the decision not to renew plaintiff's contract and any feasible

alternatives to that decision, the Board unanimously voted to uphold the decision not to advance

Dr. Brown to the next level of training.  <u>See</u> Exhibit 28 at 82:7-84:14.  At every stage of review,

the reviewing body had the authority to overrule the recommendation of the preceding

committee, and seriously considered doing so.  <u>Id.</u> At 81:16-82:2.

### G.    PLAINTIFF NEVER RAISED SEXUAL DISCRIMINATION AS A BASIS FOR HAMOT'S DECISION

Tellingly, at no point between March 1 and June 30, 2004, despite numerous

opportunities to do so in the grievance process, did plaintiff raise any concerns about potential

sex discrimination.  For example, when Dr. Lubahn first informed her of his decision not to

renew her contract, plaintiff did not claim discrimination.  To the contrary, she told Dr. Lubahn

that she "understood the decision based on her academic performance but not her clinical

performance."  Exhibits 26 and 27.  Again, although Dr. Brown certainly argued to the GC that

Dr. Lubahn was wrong about her abilities, she never suggested that the decision was

discriminatory in any way.  Finally, as early as March and April 2004, plaintiff was represented

by counsel.  <u>See</u> Exhibit 32 (Plaintiff's Counsel's Letter to Hamot). Even counsel, despite

asserting a number of legal arguments never suggested that plaintiff's sex played any role in

Hamot's decision.

### III.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper when, as here, "there is no genuine issue as to any material

fact and … the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P.56(c);

*Hugh v. Butler County Family YMCA*, 418 F.3d 265, *267 (C.A.3 (Pa.) 2005).  Although the

Court reviews and considers the evidence and all reasonable inferences that can be drawn from it

in the light most favorable to the non-moving party, *Eddy v. V.I. Water & Power Auth.*, 369 F.3d

227 (3d Cir.2004); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986) (citing Fed.R.Civ.P. 56(c)), the Court must grant summary judgment unless the non-

moving party (here Dr. Brown) goes beyond her allegations and sets forth specific facts from

which a reasonable jury could find in her favor, thereby establishing a genuine issue of fact for

trial. Fed.R.Civ.P. 56(e). The evidence may be either direct or circumstantial, and though it need

not be as great as a preponderance, the evidence must be real, admissible, and more than a

scintilla. See *Hugh,* at 267; citing, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct.

2505, 91 L.Ed.2d 202 (1986).

As set forth more fully below, Hamot has demonstrated that the plaintiff has failed to

establish one or more essential elements to her case with regard to each of the Counts in her

Complaint, and thus, Hamot is entitled to judgment as a matter of law on all counts. *Celotex,* 477

U.S. at 323-24, 106 S.Ct. 2548.

## IV.    ARGUMENT

### A. PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF SEX DISCRIMINATION UNDER FEDERAL OR STATE LAW[4]

#### 1.    Legal Framework

For plaintiff to survive Hamot's motion for summary judgment on her sex discrimination

claims arising under Title VII and the PHRA, she must first satisfy the test set forth in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973).  Under the *McDonnell*

---

[4] The standard for summary judgment for claims filed under the Pennsylvania Human Relations Act ("PHRA") is the same as for claims filed under Title VII.  See *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 567 (3d Cir.1996) ("PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently") and *Gomez v. Alleghany Health Svcs., Inc.*, 71 F.3d 1079, 1084 (3d Cr.1995) (PHRA claims are analyzed under McDonnell Douglas "consistently with interpretations of Title VII").

*Douglas* analysis, plaintiff must make a prima facie showing that "she is a member of a protected class, qualified for the job from which she was discharged, and that others, not in the protected class, were treated more favorably." *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267, (3d Cir.2005) (citing *McDonnell Douglas Corp.* at 802-03, 93 S. Ct. 1817). If the plaintiff fails to satisfy all the elements of the initial step of the *McDonnell Douglas* framework, then "defendant is entitled to judgment as a matter of law." *Pivorotto v. Innovative Systems*, 191 F.3d 344, 352, n. 4 (3d Cir.1999); <u>see</u> <u>also</u>, *Dorsey v. Pittsburgh Associates*, 90 Fed.Appx. 636, 639, 2004 WL 243508 (C.A.3 (Pa.)) (stating that if a plaintiff is not qualified for a job, her discrimination claim can be rejected); *Blue v. Defense Logistics Agency*, Slip Copy, 2006 WL 1438740 (C.A.3 (Pa.)) (plaintiff failed to show non-members of protected class were treated more favorably than she).

If plaintiff successfully makes the *prima facie* showing of discrimination, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason" for the adverse employment action. *Hugh* at 267 (citing *McDonnell Douglas* at 804-5, 93 S.Ct. 1817. The employer's burden of production in articulating such a reason or reasons for its decision is generally regarded as a light one. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994). Assuming the defendant proffers a legitimate reason or reasons for its action, the burden then shifts back to the plaintiff to show that defendant's nondiscriminatory reason or reasons for its employment action were a pretext for discrimination. *McDonnell Douglas* at 804, 93 S. Ct. 1817.

In order to demonstrate pretext, plaintiff "generally must submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative

cause of the adverse employment action." *Fuentes* at 762. "It is not enough for plaintiff to show that the employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus." *Abramson v. William Paterson College of N.J.*, 260 F.3d 265, 283 (3d Cir.2001). Unless plaintiff can meet one of the standards set forth in *Fuentes*, summary judgment must be granted for defendant on plaintiff's discrimination claims. *Keller v. Orix Credit Alliance, Inc.* 130 F.3d 1101, 1113 (3d Cir.1997).

Hamot is entitled to summary judgment on Dr. Brown's discrimination claims because she cannot establish that she was qualified to advance to her fourth year of training in Hamot's Program, and because she cannot show that other similarly situated male residents were treated more favorably than she. Even if Dr. Brown could somehow make this initial showing, Hamot dismissed Dr. Brown from its training program solely because of her persistent academic failure to progress. Plaintiff cannot demonstrate that Hamot's reasons were pretextual as required by *Fuentes*, and thus, Hamot is entitled to summary judgment on Counts I and II of the Complaint for this additional reason as well.

### 2. Plaintiff Was Not Qualified To Advance to the Position of Fourth Year Resident Because of Her Persistent Academic Deficiencies

Dr. Brown cannot establish a *prima facie* case under *McDonnell Douglas* because she cannot show that she met the academic standards necessary to advance to the next level of training. The "job" of orthopaedic surgery resident is unique in that it exists solely to enable the education of the resident in the field of orthopaedic surgery. Thus, to be qualified for the job, the resident must satisfactorily complete the academic curriculum for the specialty and demonstrate competence in the six core areas identified by the Accreditation Council on Graduate Medical Education ("ACGME"): Patient Care, Medical Knowledge, Practice-based Learning, Interpersonal and Communication Skills, Professionalism and Systems-based Practice (the "Core

Competencies"). See Exhibit 5. Moreover, to be qualified for advancement, the resident must demonstrate increased competence in each of the Core Competencies each year, so that the resident may safely assume greater responsibilities and clinical independence each year. Id. at 17. Therefore, to establish her *prima facie* case, Dr. Brown must demonstrate that she was qualified to undertake the academic curriculum for the fourth year of orthopaedic surgery training. This she cannot do.

Plaintiff's academic performance was riddled with deficiencies that she never effectively overcame. By her own admission, as early as July of her second year plaintiff was having difficulty keeping up with her required reading. She complained to Dr. Lubahn about this. See Exhibit 10 at 206:24-207:9. From September 2002 through January 2003, plaintiff stated that she was not reading either in the mornings or in the evenings, even though Dr. Lubahn gave her suggestions as to study approaches and reading lists, and likewise specified a particular article that she should read. See Exhibit 13 at 243:18-23. This failure to read translated directly to deficiencies in Dr. Brown's medical knowledge and her ability to apply medical knowledge to assess patients (i.e., Practice-based Learning and Improvement). Plaintiff's deficiencies in these areas continued to plague her throughout her training, as she received numerous comments from evaluators about her need to read more and improve her medical knowledge.

Her OITE training exam scores also corroborated the observations of faculty. The OITE is a national examination that serves as a barometer to measure the acquisition of the level of medical knowledge that is required of a Board-certified Orthopaedic surgeon. Though not a "qualification" in itself, plaintiff's performance on the OITE exams over three years showed no improvement in her fund of knowledge over time. Specifically, in November 2001, Dr. Brown scored in the bottom six percent (6%) of all first year Orthopaedic Surgery residents nationwide.

By November 2003, she had fallen in her cohort to the bottom 2% of all third year Orthopaedic surgery residents nationwide. <u>See</u> Exhibits 8, 12 and 21.

Significantly, she had been encouraged to study for these exams each year, and from July through September 2003, she had been assigned to a research rotation to allow her extra time to study and improve her score. Taken together, faculty assessment of plaintiff's medical knowledge, and her OITE scores demonstrate clearly that plaintiff was significantly deficient in the area of Medical Knowledge.

In March 2003, plaintiff demonstrated further academic deficiencies on two particularly egregious occasions. The first was reflected in Dr. Williams' report that plaintiff was not progressing academically, was neglecting to see her patients on morning rounds and routinely neglected to write notes after her morning rounds. <u>See</u> Exhibit 15. These behaviors reflected significant performance deficiencies in the Core Competencies of Patient Care, Interpersonal and Communication Skills, Practice-based Learning and Improvement, and Professionalism. Indeed, this behavior would have been unacceptable for a new first year resident, much less one who was nearing completion of her second year of training.

The second occasion occurred while plaintiff was in the Emergency Room treating a patient with a contaminated laceration on the leg. She called her supervising physician, Dr. Lubahn, for advice and guidance, and he instructed her to wash out the wound and leave it open. <u>See</u> Exhibits 13 and 16. Instead, plaintiff closed the wound very tightly, creating a significant likelihood of serious infection. <u>Id.</u> When Dr. Lubahn asked plaintiff why she had directly disregarded his instructions, plaintiff claimed that it was too loud in the Emergency Room for her to hear Dr. Lubahn.

Dr. Lubahn concluded that this incident demonstrated performance far below the standard he expected from a resident late in her second year of training.  At best, it showed a lack of medical knowledge, as even a first year resident should have immediately understood the risk of infection created by her actions.  At worst, it demonstrated poor Patient Care, Practice-based Learning and Improvement, Interpersonal and Communication Skills and/or a lack of Professionalism.  A resident in training at any level should understand that if she did not know what to do, and/or if she did not understand her instructions, she should have called her supervisor again or asked another physician before placing a patient at risk.  Id.

As a result of these incidents, and the Program Director's overall assessment of her academic performance up to that time, plaintiff was placed on academic probation for the months of April, May and June of 2003.  See Exhibit 17.   As part of her probation, she and Dr. Lubahn agreed upon an altered schedule specifically designed to give plaintiff extra time to study and improve her knowledge base, while working closely with two highly regarded faculty members: Dr. Mary Beth Cermak and Dr. David Babins.

Plaintiff entered the Third Year of the Program in July 2003 still in probationary status. The Third Year curriculum includes six months of clinical research, and the Program assigned plaintiff to the research lab during July, August and September to give her additional time to read, study and improve her medical knowledge.   See Exhibit 10 at 250:24-251:2.

When plaintiff returned to clinical rotations in October, it appeared that her level of knowledge had improved and she received acceptable feedback in her rotational evaluations through December.  Except for Dr. Brown's Orthopaedic In-service Training Exam ("OITE") scores, plaintiff showed some of her best performance during the fall of 2003.  Unfortunately, Dr. Brown's OITE scores – in the bottom 2% -- were abysmal.  Dr. Brown insisted that her test

scores resulted from poor test-taking skills, rather than reflecting her actual knowledge base. Wanting to believe her, in January 2004 Dr. Lubahn advised Dr. Brown that she was performing satisfactorily, but he cautioned that he felt her poor test scores were caused both by her lack of knowledge and poor test-taking skills.  He advised her to consult with the Sylvan Learning Center to try to overcome her test-taking problems.  Dr. Lubahn added, however, that if plaintiff's performance did not improve dramatically, she was at risk of not completing the residency program on time.  See Exhibit 22.

Almost immediately thereafter, Dr. Brown's academic performance problems resurfaced. In the last week of February, three separate incidents came to Dr. Lubahn's attention:  First, Dr. Lubahn received a letter from another orthopaedic faculty member, Dr. Mary Beth Cermak, reporting that Dr. Brown had refused to respond to an emergency room call, placing a patient at risk.  See Exhibit 23.  Second, Dr. Lubahn received a telephone call from Dr. Frank Benes, an emergency room physician, informing Dr. Lubahn that plaintiff's delays in responding to the Emergency Room were problematic and recurrent.  See Exhibit 25.  Third, despite advanced notice and opportunity to prepare, plaintiff failed to read or prepare for a case presentation she had been assigned.  See Exhibit 24.  As a result, she was unable to respond to basic medical questions, and she failed the presentation.  Id.

These incidents together revealed resoundingly that plaintiff had not overcome the academic deficiencies that lead to her earlier academic probation.  Specifically she remained unacceptably weak in the area of Medical Knowledge, Patient Care, Practice-based Learning and Improvement, Interpersonal and Communication Skills, and Professionalism, rendering her unqualified to be advanced to the fourth year of Orthopaedic Surgery training.  Although she demonstrated some months of acceptable performance, she was unable to sustain that level,

much less rise to the next level, and thus, Hamot properly concluded that she was not qualified to advance to the next level of her training.

Based on the ample and undisputed evidence of plaintiff's academic deficiencies set forth above, plaintiff cannot now demonstrate that she was qualified for advancement to the fourth year of Orthopaedic training in the Program.  Accordingly, plaintiff cannot establish a *prima facie* case, and Hamot is entitled to judgment as a matter of law as to the Title VII and PHRA claims.  See generally *McDonnell Douglas*; *Pivorotto* at 352, n. 4; *Dorsey* at 639.

### 3.  Male Residents in the Program Were Not Treated More Favorably

Even assuming that plaintiff could somehow show that she was qualified to advance to the position of fourth year orthopedic surgery resident, she still must show that similarly situated male residents were treated more favorably than she was treated.  See *McDonnell Douglas* and *Hugh*.  Plaintiff cannot meet this burden, and thus her case fails for this additional reason.

Plaintiff cannot demonstrate that there are any other male residents with similar academic records.  Without question, plaintiff is unique among residents of the Program because no one else in the program has experienced the breadth and persistency of academic deficiencies that plaintiff demonstrated. Plaintiff's deficiencies implicated at least five of the six Core Competencies defined by the ACGME.  More significantly, plaintiff's deficiencies persisted over the span of more than two years, despite verbal and written counseling and a lengthy period of academic probation.  This combination presented a series of challenges to Dr. Lubahn that no other resident had ever presented in all of his 25 years on the Hamot faculty and as Program Director.  See Exhibit 13 at 30:18-31:7.  Indeed, Dr. Lubahn has never accommodated or helped any other orthopedic surgery resident more than he assisted plaintiff.  Id. at 19:3-15.

In sum, plaintiff cannot demonstrate that she was qualified, or that other males in the program were treated more favorably than she. Thus, this Court need go no further, and Hamot is entitled to judgment as a matter of law as to the Title VII and PHRA claims against it. See generally *McDonnell Douglas*; *Pivorotto* at 352, n. 4; *Blue*.

## B. HAMOT DECIDED NOT TO ADVANCE PLAINTIFF TO THE FOURTH YEAR OF TRAINING FOR LEGITIMATE, NON-DISCRIMINATORY REASONS

Assuming *arguendo* that plaintiff could make out a *prima facie* case of sex discrimination, there is no dispute that Hamot's decision not to advance plaintiff to the next level of training was made for entirely legitimate, non-discriminatory reasons.

In accordance with the accreditation standards promulgated by the ACGME, Hamot is obligated to educate residents to assure that upon graduation, they can care for patients competently and independently. See Exhibit 5. Hamot – and in particular, Dr. Lubahn – must certify upon graduation that each resident is competent to practice independently and safely and is proficient in each of the Core Competency areas. As a corollary to this obligation, Hamot must decline to advance or graduate those residents who fail to meet the academic standards of the program and the ACGME. Naturally, but for a resident's participation in the graduate medical education program, the "job" of resident would not exist, and thus someone who does not advance loses his/her employment with Hamot.

As detailed above, plaintiff demonstrated numerous persistent academic deficiencies, including insufficient medical knowledge, patient care problems, interpersonal and communication skills, practice-based learning and improvement, and professionalism problems. She was unable to overcome these deficiencies despite notice and ample opportunity to cure them. As a result, Dr. Lubahn reasonably concluded that she was not qualified to advance to the next level of training, and thus, plaintiff's contract was not renewed. As Dr. Lubahn stated, in

the context of plaintiff's chronically chronically poor track record, in February 2004 he "got another two letters about her from [the ER], and her performance in a clinical conference was a failure."  <u>See</u> Exhibit 13 at 70:20-22.  If, for example, plaintiff had "read anything on fracture dislocations of the hip, anything, I would have probably felt differently."  <u>Id.</u> at 69:1-6.

## C. PLAINTIFF CANNOT SHOW THAT HAMOT'S REASONS FOR NOT RENEWING PLAINTIFF'S CONTRACT WERE PRETEXTUAL

To survive summary judgment, plaintiff must show that Hamot's proffered reasons are a pretext for discrimination.  In order to do so, plaintiff must adduce evidence that either casts sufficient doubt upon each of Hamot's legitimate reasons so that a factfinder could conclude each is a fabrication ("Prong 1") or allows a factfinder to infer that discrimination was more likely than not a motivating or determinative cause for the employment action ("Prong 2").  *Fuentes* at 762.  Plaintiff cannot satisfy either prong of the *Fuentes* test.

### 1. Plaintiff Cannot Cast Sufficient Doubt on Hamot's Reasons for Not Renewing Her Contract

Under Prong 1 of *Fuentes*, plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'"  <u>Id.</u> at 765 (quoting *Ezold v. Wolf, Black, Schorr & Solis-Cohen*, 983 F.2d 509 (3d Cir.1992) and *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir.1993)) (emphasis in original).  The nonmoving party "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent."  <u>Id.</u>  Prong 1 of *Fuentes* sets a "stringent standard."  *Parks v. Rumsfeld*, 119 Fed.Appx. 382, 2005 WL 19465 (C.A.3 (Pa.)).  In

an opinion written by then-Circuit Court Judge Alito, the Third Circuit has stated that the "'question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination].'" *Keller* at 1109 (quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157 (7th Cir.1996). Judge Alito went on to write that "[i]n simpler terms, [a plaintiff] must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason" for its decision. Id.

The standard is particularly hard to meet here, where the decision not to advance plaintiff to the fourth year of training was an entirely academic decision. The Supreme Court has long held that "[c]ourts are ill-equipped to evaluate academic performance." *Horowitz* at U.S. 92, S. Ct. 956. The Supreme Court reaffirmed that proposition clearly in *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 225, 106 S. Ct. 507, 513 (1985), writing that "[w]hen judges are asked to review the substance of a genuinely academic decision…they should show great respect for the faculty's professional judgment." The Supreme Court continued that judges "may not override [the decision] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." Id.; *Manning v. Temple University*, 157 Fed.Appx. 509 Cir.3d 2005 (unpublished decision), following, *Mauriello v. University of Medicine and Dentistry of New Jersey*, 781 F.2d 46 (Cir.3d 1986).

Plaintiff's deficiencies and underperformance have been fully detailed and demonstrated, *supra*. There are numerous reports and correspondence between attending physicians and Dr. Lubahn, and between Dr. Lubahn and plaintiff, regarding plaintiff's poor performance, prior to and including February 2004. These documents demonstrate that Dr. Lubahn had observed and evaluated plaintiff over a long period of time. Plaintiff concedes that the records of her

evaluations with Dr. Lubahn are accurate. Taken together, these reports, conversations and evaluations support a non-discriminatory finding. *Hugh* at 269. There are simply too many undisputed, material facts evidencing that Hamot made its decision based on the entirety of plaintiff's academic record to allow a reasonable factfinder to conclude that Hamot's reason for not renewing her contract was a fabrication.

### 2. **Plaintiff Cannot Demonstrate that Discrimination Was a Motivating or Determinative Factor in Hamot's Decision Not To Renew Her Contract**

Just as plaintiff cannot satisfy Prong 1 of *Fuentes*, she fails to satisfy *Fuentes'* Prong 2. In order to demonstrate that an "invidious discriminatory reason" or an "illegitimate factor" was "more likely than not a motivating or determinative cause of the employer's action," *Fuentes* at 764-65, plaintiff "must point to evidence that proves…discrimination in the same way that critical facts are generally proved – based solely on the natural probative force of the evidence." *Keller* at 1111. To make such a showing, a plaintiff might produce evidence "that the employer in the past had subjected [plaintiff] to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of [plaintiff's] protected class more favorably, or that the employer has discriminated against other members of [plaintiff's] protected class or other protected categories of persons." *Fuentes* at 765. There is simply no evidence that a discriminatory reason was more likely than not a motivating or determinative factor in Hamot's decision not to renew her contract. Because plaintiff cannot satisfy either Prong 1 or Prong 2 of *Fuentes*, Hamot is entitled to summary judgment as to plaintiff's Title VII and PHRA claims against it.

### D. HAMOT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S BREACH OF CONTRACT CLAIMS

#### 1. <u>Hamot Complied Fully with the Terms of the Contract and Count III Should Therefore Be Dismissed</u>

Plaintiff alleges in Count III of the Complaint that she was terminated without "proper cause" in violation of the Contract.  <u>See</u> Exhibit 1 at Count 3.  She concedes, however, that the Contract did not terminate.  Instead it was allowed to expire after Hamot gave notice of intent not to renew.[5]  Plaintiff also acknowledges that she was paid through the expiration of the Contract on June 30, 2004.  In these circumstances, plaintiff has failed to state a claim.  *E.g.*, *Reed v. Pittsburgh Bd. of Educ.*, 862 A.2d 131 (PA. 2004) (a claim for breach requires damages resulting from the breach).  For this reason alone, the Court should dismiss Count III of the Complaint.

Assuming the decision not to renew the Contract somehow required "proper cause", it simply cannot be denied that plaintiff's academic deficiencies constitute "proper cause" as defined in the Contract.  When there is undisputed evidence in the record establishing that plaintiff "performed at least some of the duties of her job ineffectively," summary judgment as to plaintiff's breach of contract claim is appropriate.  *Horvat* at *2 (finding that when plaintiff has conceded at least some of her deficiencies, there is no question for the jury); <u>see</u> <u>also</u> *Noonan v. Howmedica, Inc.*, Slip Copy, 2006 WL 2163791 (C.A.3 (N.J.)) (no genuine issue as to any material fact in breach of contract claim where plaintiff admitted at deposition that he performed unsatisfactorily at work).

The Contract is an educational appointment.  In order to continue under the Contract, plaintiff was obliged to fulfill the educational requirements of the program.  As discussed above, plaintiff failed to meet the academic standards of the program, and thus, if "property cause" was

---

[5]  Nothing in the non-renewal provision of the Contract requires "proper cause" as a condition to non-renewal.

required, Hamot in fact had "proper cause" not to renew the contract. Accordingly, Count III of the Complaint should be dismissed.

### 2.    Count IV of the Complaint Should Be Dismissed Because Hamot Properly Adhered to and Followed Its Advancement and Dismissal Policy

In Count IV of the Complaint, plaintiff claims that Hamot breached the Contract by not properly following its Advancement and Dismissal Policy (the "A&D Policy") with respect to its decision not to renew plaintiff's contract. See Exhibit 1 at Count 4 and Exhibit 33 (Advancement and Dismissal Policy). The A&D Policy provides that a resident should be given verbal and written warnings, before being placed on probation, and that a resident should be placed on probation before being dismissed from the program or before a decision is made not to advance a resident to the next level of training. The policy itself allows that if a situation is "more serious," the Program Director need not follow this order strictly. See Exhibit 33. Hamot complied with this policy.

Initially, plaintiff was provided with regular verbal and written feedback about her short-comings. When, in March 2003, she engaged in particularly egregious behavior, she was placed on probation. Throughout her probationary period and afterwards, she continued to receive feedback reflecting the Program's concerns with her academic struggles. Plaintiff began her third year in July 2003 on academic and clinical probation. Throughout that probationary period, plaintiff received continuous feedback and evaluations from attending physicians, before coming off probation as of October 1, 2003. See Exhibit 13 at 49:14-16. Being off probationary status did not give plaintiff a "clean slate" – indeed, though she improved enough to come off probation, her record of persistently failing to meet the Core Competencies was not summarily erased. Id. at 94:14-95:1.

Next, in the context of her shaky, deficient record, her performance derailed again in February 2004, as discussed in Section II.E., *supra*. The three major events that forced Hamot's hand in February 2004 – the letter from Dr. Cermak, the letter from Dr. Benes and the substandard presentation – were particularly serious coming from plaintiff, more so than they might have been coming from a resident with a record of academic achievement. Moreover, all three events represented recurrences in plaintiff's deficient performance even after she was given ongoing, multiple opportunities to cure those deficiencies.

Viewing the "entire picture" of plaintiff's academic and clinical record, and considering her previous probationary period and the numerous opportunities plaintiff was afforded to remedy her shortcomings, Dr. Lubahn properly concluded that "her whole performance" warranted non-renewal of plaintiff's contract and non-appointment to a fourth year in the Program. See Exhibit 13 at 76:5-15.

### 3. Count V of the Complaint Should Be Dismissed Because Hamot Followed Its Grievance Resolution and Due Process Procedure

In Count V of the Complaint, plaintiff alleges that Hamot breached the Contract by failing to apply properly its Grievance and Due Process Policy (the "DP Policy"). The undisputed evidence belies this claim.

As discussed in Section II.F., *supra*, Hamot followed each step of the process outlined and described in the DP Policy. First, Dr. Pepicello met with plaintiff, reviewed Dr. Lubahn's decision and determined it to be reasonable. See Exhibit 28 at 45:1-3. Next, with plaintiff's agreement, Dr. Pepicello convened the GC to review plaintiff's concerns and Dr. Lubahn's decision, as provided in the DP Policy. The GC carefully heard plaintiff's concerns and reviewed Dr. Lubahn's reasoning. It met three times to assure itself that it had given plaintiff the benefit of every possible doubt. Only then did the GC uphold Dr. Lubahn's decision. Finally,

each the full Medical Education Committee, the Medical Staff Executive Committee and the Hamot's Board of Directors all independently reviewed and approved the decision. Plaintiff can cite to no irregularity or lack of process. Accordingly, though plaintiff surely does not like and may not agree with the determination of the various individuals and committees charged by the Grievance Procedure with reviewing the decision not to renew her contract, the apparatus undisputedly functioned as it was designed to and produced a contractually sound process and result.

## CONCLUSION

For each of the foregoing reasons, Hamot is entitled to Summary Judgment on all counts of the Complaint, and therefore requests that this Court dismiss each Count with prejudice, and enter such other relief as it deems just and proper.

Respectfully submitted,

TOBIN, O'CONNOR, EWING & RICHARD

/s/ Kerry M. Richard
Kerry M. Richard, Esq.
Ziad P. Haddad, Esq.
Forrest G. Read, IV, Esq.
5335 Wisconsin Ave., N.W. Suite 700
Washington, DC 20015
(202) 362-5900
Counsel for Defendant
Hamot Medical Center

Local Counsel:

KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.
Mark J. Kuhar, Esq.
120 West Tenth Street
Erie, Pennsylvania 16501-1461
(814) 459-2800

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by first-class, postage pre-paid U.S. mail on this 15th day of August, 2006 on the following:

Patrick Sorek, Esq.
Leech Tishman Fuscaldo & Lampl, LLC
525 William Penn Place, 30th Floor
Pittsburgh, PA 15219


/s/ Ziad Haddad
Ziad Haddad