```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.       :
     Plaintiff         :
                       :
     v.                : Civil Action No. 05-32 E
                       :
HAMOT MEDICAL CENTER,  :
     Defendant         :


         Continued Deposition of LISA BROWN, M. D., taken
    before and by Sonya Hoffman, Notary Public in and for
    the Commonwealth of Pennsylvania on Saturday, December
    17, 2005, commencing at 9:24 a.m., at the offices of
    Knox McLaughlin Gornall & Sennett, P.C., 120 West
    Tenth Street, Erie, PA 16501.


For the Plaintiff:

    Patrick Sorek, Esquire
    Leech Tishman Fuscaldo & Lampl
    Citizens Bank Building, 30th Floor
    525 William Penn Place
    Pittsburgh, PA 15219

For the Defendant:

    Kerry M. Richard, Esquire, P.C.
    Tobin O'Connor Ewing & Richard
    5335 Wisconsin Avenue, NW
    Suite 700
    Washington, DC 20015


              Reported by Sonya Hoffman
           Ferguson & Holdnack Reporting, Inc.
```

145

                    I N D E X

LISA BROWN, M. D.

    Direct Examination by Ms. Richard . . . . . . . . . 3


                   E X H I B I T S

    Brown Deposition Exhibit No. 1 . . . . . . . . . .151
    Brown Deposition Exhibit No. 2 . . . . . . . . . .164
    Brown Deposition Exhibit No. 3 . . . . . . . . . .169
    Brown Deposition Exhibit No. 4 . . . . . . . . . .172
    Brown Deposition Exhibit Nos. 5 - 7 . . . . . . . .179
    Brown Deposition Exhibit No. 8 . . . . . . . . . .181
    Brown Deposition Exhibit No. 9 . . . . . . . . . .183
    Brown Deposition Exhibit No. 10 . . . . . . . . . .197
    Brown Deposition Exhibit No. 11 . . . . . . . . . .213
    Brown Deposition Exhibit No. 12 . . . . . . . . . .214
    Brown Deposition Exhibit No. 14 . . . . . . . . . .224

146

     L I S A   B R O W N, M. D., first having
been duly sworn, testified as follows:

              DIRECT EXAMINATION
BY MS. RICHARD:

    Q.   I'll just remind you that you're still under oath from Thursday and we'll continue from there. All the same rules from Thursday still apply, if you need a break, tell me, if you don't understand the question, tell me all of that.
         I am going to go back over just a couple of questions to cover where we left off two days ago. You mentioned that you had enlisted in the Reserves in, I think, it was February of '02.
    A.   Yes.
    Q.   What caused you to do that?
    A.   I had always had a desire to do something with my career that would be beneficial to the community or to society as a whole. And after the events of 9/11 instead of deciding to do mission work in a different county, I decided that it would probably be best to start out with doing things for our country.
         And two of the other residents were reservists, and one of them had stated to me that one of the benefits of

147

being an orthopedic surgeon in the Reserves is that you get to work with other people eventually. It's always good to see what other surgeons are doing from different parts of the country because sometimes you can get in a rut when you train in the same part of the country and then you end up practicing. And so we talked about that benefit.
    Q.   Who were the other residents who were reservists?
    A.   Jamie DiLulo and Karl Seeam.
    Q.   And which one was it that told you there was a benefit to working with others?
    A.   Jamie DiLulo.
    Q.   You also said that you had considered doing mission work in another country.
    A.   Uh-huh.
    Q.   How seriously had you considered that?
    A.   Not that seriously. Practically, it's -- I have never taken any steps to look into that and practically I knew I couldn't, I have two kids to support. I have medical school loans and I knew that that wasn't anything that I could actively pursue whereas this is something -- the Reserves was something that I could actively pursue and do and not disrupt my training and not disrupt my ability to support my kids, and make a living, and to pay back my loans.
    Q.   Okay. When you were in medical school, did you do

148

that we're all talking about the same thing.

During your semi-annual evaluation with Dr. Lubahn, did you discuss with him plans to study Dr. Rogers hydroxyapatite coated hips?

A. I remember discussing the upcoming research project, and that was the upcoming research project.

Q. And it was your intent to do a review of a previous study?

A. Yes.

Q. What about the next point where it says that you remained somewhat frustrated that you don't have enough time to read?

A. Yes.

Q. Did you have that discussion with him?

A. I don't remember the discussion.

Q. Were you frustrated at that time?

A. Yes.

Q. Tell me what you meant by being frustrated and not having enough time to read?

A. I was on schedule with reading for the services I was on. And that reading and studying that I did in the mornings was not just because I was on those services, but it was also to study for taking Step 3 of the boards. It's one reason why your first year is set up the way it is.

But it always frustrated me that I had this large

205

topic to now start reading for -- or I should say to continue reading for, and it just seemed like there was never enough time to read for orthopedics as well as for the individual rotations that I was on and preparing to take Step 3, which again is the same. When you're reading for the rotations that you're on, it's essentially trying to allow you to take Step 3.

Q. When did you take Step 3?

A. Sometime during -- it must have been sometime during the first year.

Q. I'll save you the brain strength and you can refer back to the exhibits. Is that your Step 3 result, Exhibit No. 5 -- no, I'm sorry, that isn't it either. Exhibit No. 7, is that your Step 3 result?

A. Yes.

Q. And does that have a test date on it?

A. March of 2002.

Q. Do you believe that that's when you actually took the exam?

A. Yes.

Q. So at the time of this July evaluation, you had already taken Step 2; is that correct?

A. Correct.

Q. But you had continued to be frustrated after that?

A. Yes.

206

Q. Were there any other reasons after that that it continued to be frustrating?

A. Again, it was just -- it's the idea that you are reading for the rotations that you're on and to be able to have intelligent conversations with the attending that you're rotating with and understand your patient's disease state and treatment, as well as reading for orthopedics, which was what I was going to be eventually going to be doing every month, not just -- or not the other rotations.

Q. And Dr. Lubahn says that he stressed the importance of good time management and reading for specific cases.

A. Yes.

Q. Is that accurate?

A. I don't remember what the discussion exactly was -- or what his response was.

Q. Do you remember a different response?

A. I don't remember what his response was.

Q. Do you remember anything else about your semi-annual evaluation that's not recorded here?

A. No.

Q. And do you believe it's an accurate reflection of your performance during your PGY-1 year?

A. Yes.

MR. SOREK: Kerry, I have about 11:32 and would

207

ask how much you have to get through?

MS. RICHARD: I have a ways to go.

MR. SOREK: I think we're really bumping up against the allowed time limit under the rules, so I'd ask for something a little more specific than a ways to go because I don't think we're going to --

MS. RICHARD: Initially, I thought that the seven-hour rule applied per day, not for a total deposition time.

MR. SOREK: I don't believe that's true.

MS. RICHARD: And secondarily, I'd say I have at least two hours to go.

MR. SOREK: I would be willing to go -- I'll talk to my client, but I wouldn't be willing to stay that long. Let's take a quick break and I'll talk to my client.

MS. RICHARD: Take a break. If we have to reschedule, I can always get the Court's permission to come back and continue this.

MR. SOREK: Sure, you can try. I'm not sure because we have a position on that. But that's -- let me talk to my client.

(Brief recess taken.)

MR. SOREK: I've talked with my client and I'll

208

*Page 213*

1  noon and went to 7:00 that would be the seven. If
2  we didn't get seven in, either because of
3  scheduling, maybe because of lateness, or you
4  decided I'm just going to quit at five and then
5  add onto seven, we, again -- you know, Saturday
6  depositions are not routine. We would accommodate
7  you by preparing, cutting into Dr. Brown's off
8  time, and coming here on Saturday. So we started
9  at 9:20 and we're going to go until 10 after, and
10 we believe that's an accommodation.
11         MS. RICHARD: I will be happy to take it up with
12 the Court. We're going to continue for 20 minutes
13 from now; is that correct?
14         MR. SOREK: Yes, if that appeals to you at all.
15         MS. RICHARD: I'm going to use what time I have
16 and then I will proceed to ask the Court for more
17 time.
18 BY MS. RICHARD:
19         (Brown Deposition Exhibit No. 11 marked for
20         identification.)
21     Q.   Dr. Brown, I am going to refer you to Exhibit No.
22 11, please.
23     A.   (Witness reviews document.)
24     Q.   Can I ask you to look at Section 13 having to do
25 with duties.

*Page 214*

1      A.   (Witness complies.)
2      Q.   And the subheading Orthopedic Second Year
3  Resident. You've just finished examining that document; can
4  you tell me whether those duties reflect the duties you
5  performed during your second year.
6      A.   Yes.
7      Q.   Are there any of these sections that are
8  subparagraphed A through G that you did not perform?
9      A.   On Section E, I did not present at research day.
10     Q.   Anything else?
11     A.   I don't notice anything else.
12     Q.   Did you complete two research projects?
13     A.   No.
14     Q.   Did you submit any research projects to a referee
15 journal?
16     A.   No.
17     Q.   Did you submit any research projects to a national
18 meeting?
19     A.   No.
20     Q.   Is there anything else in here that you didn't
21 complete?
22     A.   No.
23         (Brown Deposition Exhibit No. 12 marked for
24         identification.)
25     Q.   I'm going to hand you Exhibit No. 12. And, again,

*Page 215*

1  this is a collection of documents that are dated during your
2  PGY-2 year and they are not all necessarily the same,
3  there's several independent documents. So I'd like you to
4  look at all of them and tell me whether you recognize them.
5      A.   (Witness reviews documents.) Yes.
6      Q.   Is there anything in that compilation of documents
7  that you do not recognize?
8      A.   No.
9          MR. SOREK: Can we also just agree that the
10 compilation in the exhibit was put together by
11 counsel?
12         MS. RICHARD: Yes.
13     Q.   I'm going to refer you to the first page, Resident
14 Evaluation, dated February 7, 2003; you do recognize that
15 document?
16     A.   Yes.
17     Q.   Tell me whether there's anything in that document
18 that does not reflect the evaluation that you received from
19 Dr. Lubahn.
20     A.   There is nothing.
21     Q.   Nothing inaccurate?
22     A.   No.
23     Q.   Did you discuss anything else with Dr. Lubahn at
24 that semi-annual evaluation?
25     A.   I don't remember.

*Page 216*

1      Q.   I'm going to refer you to the next page. This
2  appears to be a note from Dr. Patrick Williams, it has a day
3  on the top that seems to have a typo in it, but it says
4  3/36/03; do you remember receiving this memo?
5      A.   Yes.
6      Q.   When was that?
7      A.   Sometime in March or April of '03. I don't
8  remember exactly.
9      Q.   There's also a memo two pages -- no, three pages.
10 Following that you wrote a letter to Dr. Lubahn dated
11 April 8, 2003. And I believe it had an attachment to it,
12 which is also dated April 8, 2003, it's the next page. It
13 says at the top, "It's my response to a memo written by Dr.
14 Patrick dated 3/36/03," did you write that memo?
15     A.   Yes.
16     Q.   Did you present that to Dr. Lubahn to be included
17 in your file?
18     A.   Yes.
19     Q.   Did you do that as an attachment to the letter
20 that comes on the page before it dated April 8, 2003?
21     A.   Yes.
22     Q.   That letter -- in that letter you refer to a
23 number of preceding dates; is that correct?
24     A.   Yes.
25     Q.   You refer in the middle of the paragraph to a

1 meeting you had with Dr. Lubahn on April 2, 2003.
2    A.  Yes.
3    Q.  Okay. And in that meeting he discussed with you
4 concerns about your performance; is that correct?
5    A.  Yes.
6    Q.  And advised you that he was going to put you on
7 academic and clinical probation; is that correct? I can
8 refer you to the page before that and it's the letter dated
9 April 4th from Dr. Lubahn to you.
10    A.  Yes.
11    Q.  Yes, it's correct?
12    A.  Yes.
13    Q.  And based on that letter you were placed on
14 probation for April, May, and June for 2003; is that
15 correct?
16    A.  I'm not sure.
17    Q.  If you'll refer to the page prior to the page of
18 your letter, it's HMC-000165. Is that a letter to you from
19 Dr. Lubahn?
20    A.  Yes.
21    Q.  And if you read the first sentence of that letter,
22 tell me whether that refreshes your recollection?
23    A.  Yes.
24    Q.  And does that letter also contain a proposed
25 schedule for you?

217

1    A.  Yes.
2    Q.  And now I'm going to refer you back three more
3 pages to a spreadsheet. Is that the schedule that Dr.
4 Lubahn proposed or is that the schedule you ultimately
5 agreed on?
6    A.  I think it's the schedule we ultimately agreed on.
7    Q.  That schedule gives you some free time during the
8 day -- during the week; is that correct?
9    A.  Tuesday mornings.
10    Q.  And was that intended to allow you to study?
11    A.  That was -- it's my recollection that that was
12 basically a time that there wasn't any activity going on
13 that I could have attended such as OR.
14    Q.  What was your understanding --
15    A.  Actually, I will say that this is inaccurate in
16 the sense that though that was left open, Tuesday mornings,
17 it was on this particular schedule that we are looking at in
18 Exhibit No. 12, though it states that it was open, it's my
19 recollection that I was then scheduled to attend OR with Dr.
20 Cermak on those mornings.
21    Q.  Is that your understanding of the final schedule?
22    A.  I don't believe that there was a written final
23 schedule, but I do recall that I continued to have OR time
24 Tuesday mornings with Dr. Cermak.
25    Q.  Who prepared this schedule?

218

1    A.  I believe I did.
2    Q.  Are you saying that you don't believe that this
3 was the final version of it?
4    A.  No, I don't believe that it was. I don't know,
5 again, that there was a written final version.
6    Q.  I'm going to refer you to another page back in
7 your packet, there's a letter dated April 14th. And this is
8 a letter from Dr. Lubahn to you, did you receive that
9 letter?
10    A.  Yes.
11    Q.  And based on that letter, does that reflect your
12 final schedule for your probationary period?
13    A.  That may have been stated in the letter dated
14 April 14th from Dr. Lubahn to myself, however, it ended up
15 that I was expected to be in the OR with Dr. Cermak Tuesday
16 mornings at Saint Vincent.
17    Q.  Was there ever a change in that schedule? I mean,
18 formalized through written documentation with Dr. Lubahn?
19    A.  No.
20    Q.  Did you ever ask him to approve a change in the
21 schedule?
22    A.  No.
23    Q.  Did you -- if you spend that half day in the OR
24 with Dr. Cermak, did you still have a half day left for
25 reading and research?

219

1    A.  There was no half day left for reading and
2 research.
3    Q.  Is it your understanding that Dr. Lubahn's letter
4 that says, including the two half day clinics at Hamot, you
5 would still be left with one full day of reading time, which
6 is more than enough for reading and research; is that
7 inaccurate?
8    A.  That is inaccurate. I was -- my schedule never --
9 it did not end up to be that day.
10    Q.  Do you have a record of the schedule that you
11 worked at that time?
12    A.  No.
13    Q.  Do you have any calendars that reflect your
14 schedule at that time?
15    A.  No.
16    Q.  Are there surgical reports or call reports that
17 would indicate when you worked?
18    A.  Surgical documentation would probably reflect that
19 I was in the OR with Dr. Cermak on Tuesday mornings.
20    Q.  The OR at Saint Vincent, you said.
21    A.  Yes, the OR at Saint Vincent Outpatient.
22    Q.  Did you ever indicate to Dr. Lubahn that you
23 didn't feel that the schedule was being adhered to?
24    A.  No.
25    Q.  In your letter dated April 8th, you indicated that

220

## Page 232

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,
    Plaintiff

v.                  Civil Action No. 05-32 E

HAMOT MEDICAL CENTER,
    Defendant

      Continued deposition of LISA BROWN, M. D., taken before and by Sonya Hoffman, Notary Public in and for the Commonwealth of Pennsylvania on Friday, February 17, 2006, commencing at 9:40 a.m., at the offices of Knox McLaughlin Gornall & Sennett, P.C., 120 West Tenth Street, Erie, PA 16501.

For the Plaintiff:
    Patrick Sorek, Esquire
    Leech Tishman Fuscaldo & Lampl
    Citizens Bank Building, 30th Floor
    525 William Penn Place
    Pittsburgh, PA 15219

For the Defendant:
    Kerry M. Richard, P.C., Esquire
    Tobin O'Connor Ewing & Richard
    5335 Wisconsin Avenue, NW
    Suite 700
    Washington, DC 20015

        Reported by Sonya Hoffman
        Ferguson & Holdnack Reporting, Inc.

## Page 233

I N D E X

LISA BROWN, M.D.
    Direct Examination by Ms. Richard . . . . . . . . 3

E X H I B I T S

Brown Deposition Exhibit No. 21 . . . . . . . . . .275
Brown Deposition Exhibit No. 22 . . . . . . . . . .289
Brown Deposition Exhibit No. 23 . . . . . . . . . .302
Brown Deposition Exhibit No. 24 . . . . . . . . . .335

## Page 234

MS. RICHARD: Before we begin, I'm going to note for the record that I've just been advised by counsel that he obtained a ruling on the Judge's motion -- or on his motion for reconsideration from the Judge limiting today's deposition to three and a half hours.

    I have not yet seen that order, I will base my conduct today on Mr. Sorek's statements. If they turn out to not be accurate, I'll take whatever action I need to take. And I am objecting and preserving my objection to the fact that I was not notified that Mr. Sorek intended to seek a ruling.

    If he had notified me, I would have participated in a conference call, and the Judge could have made a decision, at least, with both parties' input. That not being the case, I'm not going to waste this opportunity to take three and a half hours of deposition time.

    In the meantime, Mr. Sorek, have you brought with you today the verification of Dr. Brown's Supplemental Interrogatory Answers?

MR. SOREK: I don't have it with me, but we'll execute it before the end of the deposition.

MS. RICHARD: Are there any changes to any of the

## Page 235

information that you wrote in your two letters supplementing the Interrogatories?

MR. SOREK: No, there isn't.

MS. RICHARD: So the information in there is what she will be verifying today?

MR. SOREK: Yes.

    L I S A  B R O W N, M. D., previously having been duly sworn, testified as follows:

           DIRECT EXAMINATION
BY MS. RICHARD:

Q.    I'm going to remind that you're still under oath. I don't know if it's customary to re-administer the oath --

MR. SOREK: And I'd like to put something on the record. Yesterday I contacted Judge Cohill's chambers to ask for a ruling and to give the Judge a heads up in the sense of we, the Plaintiff, were asking for a ruling before midday today, which would be about the lapse of three and a half hours, which is the period of time that the Plaintiff asked Judge Cohill to reconsider limiting the deposition to.

    At that time, I spoke with Richard Williams,

```
 1   a patient with a certain condition, you will read about that
 2   condition prior to the day beginning. So it wasn't -- it
 3   wasn't, you know, a set time that I would do questions.
 4       Q.   Within the framework of your sort of hours you set
 5   aside to study, what percentage of that did you devote to
 6   doing questions?
 7       A.   I'd have to estimate maybe 20 percent of the time.
 8       Q.   And during what period of time were you doing
 9   that?
10       A.   Various times.
11       Q.   If your PGY-2 year started July 1, when would you
12   have started reviewing questions for the OITE?
13       A.   Shortly after July 1.
14       Q.   And from that time forward did you dedicate 20 --
15   approximately 20 percent to it, or did that time go up or
16   down over time?
17       A.   I don't remember if it went up or down.
18       Q.   Okay. And the exam is in November; is that
19   correct?
20       A.   Yes.
21       Q.   And do you remember what rotations you were doing
22   between July 1 and November 1 of your PGY-2 year?
23       A.   I believe I was doing my hand rotation.
24       Q.   What's the call schedule like for the hand
25   rotation?
```

240

```
 1       A.   The call schedule does not change for the various
 2   rotations. So --
 3       Q.   What was your call schedule during your PGY-2 year
 4   then?
 5       A.   Well, I'll start with telling you about the
 6   weekends. Once a month you were on Friday -- let's say you
 7   started with the first weekend and you were on Friday, then
 8   the second weekend you'd be on Saturday, and the third
 9   weekend you'd be on Sunday, and the fourth weekend you would
10   be off for the weekend. So that would be the weekend.
11           And then from there, the call schedule would
12   rotate just through the residents who were on service and
13   available to take call. And I believe it was probably every
14   fourth night.
15       Q.   When you say "from there", you mean from the
16   nights Monday through Thursday night was the rotation?
17       A.   If you were on Friday, then you were on Friday
18   night, then you'd be on Tuesday night. Then you'd be on
19   Saturday, and then you'd be on Wednesday. And then you'd be
20   on Sunday. It was approximately no fewer than every four.
21   Sometimes, you'd go for a stretch and be on every other
22   night or every third night.
23       Q.   Okay. Did you take any time off in that period
24   July 1 to November 1 of 2002?
25       A.   I requested a week off in September as a -- as a
```

241

```
 1   leave.
 2       Q.   Was it granted?
 3       A.   Yes.
 4       Q.   Do you know if it counted against you as vacation
 5   time?
 6       A.   I don't remember.
 7       Q.   Was there any other time between July 1 and
 8   November that you were not on your regular rotation or
 9   service?
10       A.   No.
11       Q.   Was there any particular rotation that you found
12   difficult during your PGY-2 year?
13       A.   The hand rotation was likely the most challenging.
14       Q.   In what way?
15       A.   To begin with, I had already sensed a disconnect
16   from Dr. Lubahn, and he is, of course, a hand surgeon and
17   the person you do the most work with during the hand
18   rotation. And so that was challenging to feel as if I had
19   to not only perform as an orthopedic surgeon, but had to
20   make him aware that I more or less, let's say, existed.
21           He did not take a great interest in me, and so
22   that was very stressful and very challenging every day to,
23   you know, try and let him know that I was dedicated and
24   committed, as well as trying to perform in the operating
25   room.
```

242

```
 1           Hand surgery -- in addition, hand surgery tends to
 2   be a complicated skill to learn. The anatomy is very
 3   complicated, the procedures are complicated, and it's just
 4   a -- it's just a challenging topic. And so those two things
 5   together would make that probably the most challenging.
 6       Q.   Let's talk about your PGY-3 year. Did your
 7   personal program of self-study change at all during that
 8   PGY-3 year from your PGY-2 year?
 9       A.   It changed in that in my PGY-2 year there was a
10   period of time in which I had a family tragedy and I was
11   commuting to Cleveland quite a bit. And at that time I was
12   on rotation with Mark Suprock and John Kastrup. And I would
13   basically, you know, end my day with having to drive to
14   Cleveland to take care of my kids and begin my day with
15   driving back to Erie in time to round on patients and be
16   available, and at no time miss any days of work or leave any
17   work for my fellow residents.
18           So during that time period, I did not spend time
19   reading in the mornings or in the evenings.
20       Q.   When was that time period?
21       A.   That time period was from about the middle of
22   September probably through sometime in January. I don't
23   remember exactly if it was all the way through January. And
24   at that time I would talk with Mark Suprock about it. And I
25   basically let him know what was going on and told him that I
```

243

looking at, but also HMC-00168, which you wrote, and tell me if that refreshes your recollection.

A. (Witness reviews document.) I'm sorry, can you repeat the question, please.

MS. RICHARD: I'll ask the court reporter to read it back.

(Previous question read back.)

A. He -- based -- well, no.

Q. Okay. We can move on from that question. I am going to refer you to that time period for a moment, so the period of April through June of 2003 is the period that's referenced in Exhibit No. 12 as your period of academic probation; is that correct?

A. Yes.

Q. And during that time, you testified a few minutes ago, that you had stepped up your study habits from say February of '03 going forward.

A. Yes.

Q. So if you started increasing your studying in February, in April did you increase your studying further or did it stay the same from April through June?

A. I apologize for delaying answering, and I know that in the past, stated in a letter to Mr. Sorek, that you actually stated that when I think about a question I'm using that as a stall tactic. And I will assure you that I'm not,

248

it's just that this material, the questions that you are asking me are from a while ago and I need to think about the time period in my head and remember which rotation I was on, which helps prompt my memory. So I apologize if you think that it's a stall tactic.

I'm just trying to be accurate, and I tend to be an overly conscientious person to begin with, and so I don't want to mislead the Court by answering something inaccurately. So if you'll give me a moment to think about this question and then I can answer you.

Q. Absolutely.

A. When -- in January of 2003, I once again resumed hand rotation. Your hand rotation is a six-month rotation that is divided three months and three months. And so I did my first three months the beginning of my PGY-2 year, which was July through September. I then did my month -- three months with Mark Suprock and John Kastrup. And then again in January, I resumed my hand rotation.

And as I stated before, around February my personal life had started to become normal again, which I could dedicate the amount of time studying that I had previously done. However, it's not just now hand surgery material that I need to continue to be up-to-date with, but it's also material that I missed from October, November, and December on general orthopedics. As well as reading for

249

every-morning conference, again, keeping up-to-date on the hand surgeries that I'll be doing for that day, trying to fit in questions for next year's in-training exam, and coming up with a better way to study for that.

So I will tell you that, yes, I did step it up. Once again I started to study on a regular basis and was able to get more accomplished than I had in the previous few months.

Q. So this was April that you stepped it up further.

A. Pretty much. I would dedicate more time.

Q. Then let's go back to the question I originally asked you, which was, starting on July of your PGY-3 year, did your personal program of self-study change at all from your PGY-2 year?

A. In July of my PGY-3 year, I was on basic science. So it did change, yes.

Q. How?

A. On basic science you are not required to be in the OR. Originally, the thought was that basic science you're not supposed to be in the OR at all, but they had changed the program completely with the beginning of my basic science rotation, and I was now called to be in the OR a considerable amount of time more than residents in the past.

That being said, you still have additional time to do self-study. Basic science is a time for you to sharpen

250

your skills, but also to do research and just dedicate that time to studying.

Q. And did you do that?

A. I did that to the best of my ability given that -- again, I will state, that the beginning of my basic science rotation the rotation had changed, in that now the basic science person was thrown into the call schedule, which wasn't previously done.

The call schedule changed in that when you were on call it was a 24-hour coverage of the emergency room, which previously the basic science person did not have to do. In addition, the basic science person was given the task of attending clinic every Tuesday and Thursday afternoon, which previously the basic science person did not have to do. And the basic science person was also called in to cover cases that were no longer covered by residents who had to go home early post call to abide by the new ACGME rules of limiting a resident's hours to 80 hours a week.

This all began with me, my basic science rotation, my first rotation of my PGY-3 year. So if you do the math, I'm in clinic two half-days a week. I'm covering the emergency room approximately two complete 24-hour periods during the week. I am to go home the next day post call, you were supposed to be out of the hospital by 12:00 at the latest in the afternoon. And you were also taken away from

251

**Page 252**

your self-study to cover OR cases, which never had to be done in the past.

Also, additionally, the basic science person was then given the task of preparing the Thursday evening conferences, which required a lot of gathering of questions and information and making a lot of copies. So my studying, as I had intended it to be on my basic science rotation, which was time to dedicate mainly for self-studying and research, no longer existed. That time was no longer sacred time for the basic science person to sharpen their skill and to study.

So I did not study the amount of time that I had originally planned to, or that I had hoped to, especially with the upcoming OITE in November. So I would study in the mornings, I would study in the evening, but basically my studying didn't increase as much as I had thought it would, and as much as it had in the past for other residents who started basic science or who were on their basic science rotation.

Q. I appreciate you giving me very full answers to my questions, but if we're going to get through with your deposition in three and a half hours, I'm going to need you to answer my questions. When they're yes-or-no questions, please try to limit yourself to yes or no, and we'll try to go from there. I know you're just trying to be helpful, but

**Page 253**

I'm under a very tight deadline so I'm going to have to ask you to try to listen very carefully, okay?

We have a pile of exhibits that were marked the last time we were here that I didn't get through, so I'm going to be picking up from those exhibits. I'm going to refer you to Brown Exhibit No. 15 as it was marked the last time and ask you to review that. I will state for the record that although there are many documents stapled together -- I stapled them together, they do not necessarily belong together. I did so solely because they were dated in the time period of your PGY-3 year.

MR. SOREK: And Counsel, when you have such exhibits, could you identify each one as you -- each one that is stapled together at your choosing and would you identify which ones those are?

MS. RICHARD: I'd be happy to. It starts with --

MR. SOREK: Well, you can do it one by one as you introduce them. That's probably best.

MS. RICHARD: I will.

A. (Witness reviews documents.)

Q. Have you had a chance to review those documents?

A. Yes.

Q. Okay. I'm going to ask you to look at the first page of that group of documents marked as Exhibit No. 15, which is noted as HMC-00170, and ask you if you recognize

**Page 254**

that document.

A. Yes.

Q. What is it?

A. This is a letter from John Lubahn about a dictation. It is addressed to me, and it's dated July 23rd.

Q. Did it involve a case that you participated in with him?

A. Yes.

MR. SOREK: I'll note briefly for the record, it seems to contain a patient name and if you want to redact the name or mark it confidential, that would be fine with us.

MS. RICHARD: I will be very happy to do that, thank you. We will redact the formal document before we leave here today.

Q. And in this letter, does he ask you to look at this case a little further?

A. He asks me to basically review a dictation on a case.

Q. And according to this letter, he does that because he felt that your dictation was inadequate; is that correct?

A. Yes.

Q. Now, I want you to look at HMC-00172 and tell me whether you recognize that document.

A. Yes.

**Page 255**

Q. What is that?

A. It's a response to his letter, from me, addressed to Dr. Lubahn.

Q. And in there you said, "I would like to thank you for calling my attention to the inaccurate operative report dictated June 30, 2003." Is that correct?

A. Yes.

Q. What was inaccurate?

A. Actually, when I had viewed that dictation, I realized that it appeared as if the second half of the dictation was never transcribed. And I know that because I had a certain way of ending all of my dictations and this one did not include that.

So I added the end of that -- or the second half of that dictation to make the dictation accurate and had made sure that's exactly what the case involved and reviewed the x-rays and dictated the addendum.

Q. Okay. I'm going to ask you to look at HMC-00178 and ask you to tell me what that is.

A. That is 2003 scores from the OITE.

Q. Are those your scores from the OITE?

A. Yes.

Q. Is that the document that was produced by the American Academy of Orthopedic Surgeons?

A. It states that on top, yes.

Q. I'm going to refer you further on into that same Exhibit No. 15, HMC-00189 and ask you if you recognize that document?

A. Yes.

Q. What is that?

A. That is an evaluation dated January 30th of 2004 by Dr. Lubahn, an evaluation of my performance.

Q. Did he share this with you?

A. Please -- I don't understand what you're asking.

Q. Did he share this document with you?

A. I don't remember when the first time I saw this document was.

Q. Do you remember meeting with him and having a discussion on the subjects that are covered by this memo?

A. Yes.

Q. Do you know when that discussion occurred?

A. January 30, 2004.

Q. One of the things I mentioned is that -- not that I mentioned, I'm sorry. One of the things that's mentioned in this memo is that the two of you had discussed your in-service training exams on one previous occasion; was that the meeting that you initiated in December with him?

A. Yes. I believe that's what he means by it.

Q. Do you know of any other time that the two of you had discussed your in-service training exams?

256

A. I don't recall.

Q. This memo indicates that he suggested you contact Sylvan Learning Center for an evaluation; did you do that?

A. Yes.

Q. When?

A. Sometime within the month of February. I don't recall the exact date.

Q. Did you set up an appointment with them?

A. Yes.

Q. When was that appointment?

A. Sometime in February. I don't remember the exact date.

Q. And what happened in that appointment?

A. Actually, it never came to fruition. They needed to send me information first and we postponed it until after I received the information. And that was sometime in -- we postponed it to sometime in -- I can't remember if it was March or April, but just after -- after February.

Q. Did you eventually meet with them after -- sometime in March or February -- I'm sorry, March or April, I don't mean to confuse you.

A. No.

Q. Did you ever meet with them?

A. At that point I was terminated -- or my contact was not renewed.

257

Q. That's not my question.

A. No.

Q. Okay. Thank you. I'm going to ask you to look at 00194, also in Exhibit No. 15, HMC-00194, and tell me if you recognize that document.

A. Yes.

Q. What is it?

A. It is a letter from Mary Beth Cermak to John Lubahn regarding a patient in the emergency room that I had taken care of.

Q. Dated February 20, 2004.

A. Yes.

Q. Do you remember that incident?

A. Yes.

Q. Can you tell me about it.

A. I remember the incident quite well because it was a night that I was on call and it was the night that we were having our rank list meeting. And I was disappointed because I wasn't going to be able to attend the rank list meeting because right when the meeting started, I was called by a nurse in triage for the emergency room.

And she stated to me that Dr. Cermak's patient had arrived and I was to -- and I had -- I'm sorry, and she had mentioned that I was aware of the patient. And I said to her, I will tell you that I don't know what patient you're

258

talking about, and I'm not sure if this is a patient who has arrived from out of town to go straight to the OR because he had a significant hand injury, or if he's a patient that I am to take care of in the emergency room.

I said, I'm on my way down to the see the patient, but in the meantime you might want to call Dr. Cermak and let her know that the patient is here. And if the patient is to go right to the OR, can you please let me know so I can make those arrangements. I had gotten down to the emergency room so quickly that the patient was still sitting in triage and hadn't even been put into a room yet.

I helped that nurse find a room for that patient and put that patient in a room. I then evaluated that patient, I paged Dr. Cermak, who was in the middle of the rank meeting, and -- I believe she was still in the rank meeting at that point, and she had then come down and joined me in continuing to evaluate and treat that patient.

We had discussed what I was doing, what the plan was, and what his follow-up would be. He then -- or I then proceeded to do exactly what we had discussed and planned. She told me if I had any other questions I could contact her, but she was off to a funeral for a family member. And the patient was treated and I thought she was quite pleased with the way I had treated the patient, and that was the last that I had ever heard of that experience until I saw

259

**Page 260**

1  this letter.
2  Q. Did Dr. Lubahn discuss this letter with you at
3  some point?
4  A. No -- actually, I will say he did, but it was
5  after March 1st. And now I do remember that we discussed
6  the letter, only in that I was shocked to see it in my
7  personnel file, after I received a letter from him that I
8  was no longer going to be working at Hamot. And I told him
9  that, you know, I was pretty shocked to see that Dr. Cermak
10 would have written a letter like this, especially when the
11 patient was adequately cared for.
12 Q. I'm going to refer you to HMC-00201, which is in
13 that same Exhibit No. 15, and ask you if you've seen that
14 note.
15 A. I've never seen this before.
16 Q. I'll direct you to the second line -- or
17 actually, why don't I just ask you to read it and tell me
18 whether it reflects the discussion you had with Dr. Lubahn.
19 A. This is a meeting with -- he has entitled, Meeting
20 with Dr. Lisa Brown, 3/3/04. "I met with Dr. Lisa Brown and
21 discussed her file with her again at some length between
22 12:15 p.m. and 12:45 p.m. She had concerns regarding the
23 accuracy of Dr. Cermak's letter. Specifically, she had
24 concerns regarding some of the other entries in the file,
25 but these were not discussed in detail. I discussed her

**Page 261**

1  last evaluation with her. She asked why it was not given to
2  her specifically to sign. And I noted that it was in her
3  file to read and sign at her convenience. She did state
4  that she had an appointment this afternoon with Sylvan
5  Learning to discuss some of my concerns, but I counseled her
6  that this would still be in her best interest to pursue. I
7  reassured her that the decision not to renew her contract
8  was not based on any one of the documents in her file, but
9  the entire picture."
10 Q. Is that note consistent with your memory of your
11 meeting with Dr. Lubahn?
12 A. What I feel is inconsistent is that he states that
13 he discussed my file with me again, which I never discussed
14 my file with him previous to that, that I recall. That's
15 what I remember.
16 Q. Otherwise, does it reflect your meeting with him?
17 A. From what I remember at this point.
18 Q. I'm going to refer you to 00193, which is not in
19 order, it actually comes after 00194 in the pile, but it is
20 part of Exhibit No. 15.
21 A. (Witness reviews document.)
22 Q. Have you looked at that?
23 A. Yes.
24 Q. Do you recall the conference that's referred to in
25 that note?

**Page 262**

1  A. Yes.
2  Q. Can you tell me when you were first assigned to
3  that presentation.
4  A. I don't recall the exact date that I was assigned
5  to that presentation. I will tell you, though, that I was
6  assigned to it after all of the residents and faculty
7  received a memo from Dr. Lubahn stating that the department
8  meeting was on this Thursday and that all residents are to
9  attend, even those residents who are post call. Which was
10 directed at me because I was post call on this date.
11       And I remember that specifically, because
12 typically when you're post call your duties end at 12:00 in
13 the afternoon. And at this point it was kind of a
14 last-minute situation for me because I did not plan on even
15 attending this department meeting because I was post call on
16 this date.
17 Q. The presentation -- the memo at the top says,
18 "Clinic Presentation, Practiced-Based Learning." That's one
19 of the core competencies that you have to achieve as a
20 resident; is that correct?
21 A. I'm not sure.
22 Q. Do you know what the six core competencies are?
23 A. I don't know exactly what they're entitled, but I
24 know that they have added -- ACGME has added core
25 competencies, and practice-based learning, and ethics and

**Page 263**

1  six different topics.
2  Q. And you were asked to present this conference as
3  part of that competency; is that correct?
4  A. If Dr. Lubahn decided that that was part of a core
5  competency then I don't know that we were told that in
6  advance.
7  Q. Did all residents have to present conferences?
8  A. Not every conference -- well, it changed
9  throughout my time at Hamot.
10 Q. During this year, your PGY-3 year, did all
11 residents have to present conferences?
12 A. I don't believe so.
13 Q. Who didn't?
14 A. I don't believe the chiefs had to. And from what
15 I recall, a lot of the department meetings -- which that's
16 what these were, department meetings, a lot of the
17 department meetings the residents were assigned --
18 certain residents were assigned to present.
19       (Brief interruption.)
20 Q. Okay. The particular topic that you presented on,
21 did you draft that presentation from scratch?
22 A. I'm not sure what you mean.
23 Q. Did you go do research and put together a
24 PowerPoint presentation on that?
25 A. No.