**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,          :
        Plaintiff          :
                           :
    v.                     :   Civil Action No. 05-32E
                           :
HAMOT MEDICAL CENTER,      :
        Defendant          :

Deposition of JOHN LUBAHN, M.D., taken before

and by Carol A. Holdnack, RPR, Notary Public in and

for the Commonwealth of Pennsylvania, on Thursday

March 16, 2006, commencing at 9:41 a.m., at the

offices of Scarpitti & Mead, Renaissance Center,

1001 State Street, Suite 800, Erie, PA 16501.

For the Plaintiff:
    Patrick Sorek, Esq.
    Leech Tishman Fuscaldo & Lampl, LLC
    525 William Penn Place, 30th Floor
    Pittsburgh, PA 15219

For the Defendant:
    Kerry M. Richard, Esq.
    Tobin O'Connor Ewing & Richard
    5335 Wisconsin Avenue NW, Suite 700
    Washington, DC 20015

    Reported by Carol A. Holdnack, RPR
    Ferguson & Holdnack Reporting, Inc.

**Page 2**

I N D E X

JOHN LUBAHN, M.D.
    Direct Examination by Mr. Sorek . . . . . 3

EXHIBITS:
    Lubahn Deposition Exhibit 1 . . . . . . .114

**Page 3**

1  JOHN LUBAHN, M.D., first having
2  been duly sworn testified as follows:
3
4                DIRECT EXAMINATION
5  BY MR. SOREK:
6
7      Q.  State your name for the record, please.
8      A.  John Lubahn.
9      Q.  And, Dr. Lubahn, have you had your deposition
10  taken before?
11      A.  Yes.
12      Q.  And what kind of case was it?
13      A.  Primarily Workers' Comp. cases, medical/legal
14  cases.
15      Q.  So about how many times have you had your
16  deposition taken?
17      A.  In 25 years?
18      Q.  Yes.
19      A.  50.
20      Q.  Okay.
21      A.  That's a guess, by the way.
22      Q.  All right.  So you're familiar with the deposition
23  process in terms of how it goes.  I represent the Plaintiff,
24  Dr. Brown.  You have counsel here.  It's a
25  question-and-answer process.  The information that you give

**Page 4**

1  is similar to what you would be providing if you were
2  testifying at court.  And that your answers have to be out
3  loud.  You've heard all of that many times before, I take
4  it.
5      A.  Yes.
6      Q.  Who did you talk to besides your lawyer to prepare
7  for the deposition today?
8      A.  Dana.
9      Q.  Ms. Ashley.
10      A.  Yes.
11      Q.  And that's it.
12      A.  Yes.
13      Q.  What documents did you review to prepare for your
14  deposition today?
15      A.  Folders that they brought with them.
16      Q.  "They" meaning who?
17      A.  Dana and Attorney Richard.
18      Q.  What were in the folders?
19      A.  For the most part, documents related to
20  Dr. Brown's performance evaluations, in-training scores, her
21  file.
22      Q.  Okay.
23      A.  That's all I can remember.  It's kind of like this
24  stack of papers we have here.
25      Q.  And you're indicating just maybe 3 or 4 inches of

## 17

1  patient would complain of with that problem.  Would provide
2  the reader or resident with how to treat the problem and how
3  to follow up on the problem.
4           And then usually throughout a standard textbook
5  there are multiple references.  This is adult education.  I
6  assume that the learner at this point knows enough to look
7  up references and read the appropriate and relevant
8  articles.
9       Q.  You don't remember whether your providing this
10  book to Dr. Brown was contemporaneous with this evaluation.
11      A.  I think it was actually later.  But the way I read
12  this, it might have been the time that I gave it to her.
13      Q.  I'm going to ask you to take a look at HMC-3350.
14          MS. RICHARD:  Is that the chronological documents?
15          MR. SOREK:  No, that should be in the sequential
16          numerical.
17          MS. RICHARD:  3350?
18          MR. SOREK:  Yes.
19      Q.  This is your evaluation of Dr. Brown,
20  February 7th, 2003, correct?
21      A.  Correct.
22      Q.  And you also reviewed Dr. Brown's in-training
23  scores, which you said were in need of improvement, correct?
24      A.  Correct.
25      Q.  And you discussed various study approaches for

## 18

1  her; reading lists, certain hours to read on a regular basis
2  on evenings and weekends.  Do you see that?
3       A.  Yes.
4       Q.  Do you know whether you did anything else in
5  advising her about improving her OITE scores other than
6  what's listed here?
7       A.  I don't remember.
8       Q.  You also noted in the beginning of the next
9  paragraph that her clinical performance was acceptable.  Do
10  you see that?
11      A.  Yes.
12      Q.  But you did describe a patient -- a condition in a
13  patient that she called you about, correct?
14      A.  Yes.
15      Q.  And you gave her a suggestion about an article to
16  review, correct?
17      A.  Yes.
18      Q.  Did you feel that that addressed the issue that
19  you brought up in the evaluation?
20      A.  Well, I felt there was a cognitive issue.  And I
21  felt there was perhaps some sort of other issue that I
22  couldn't really describe.  But it's a fracture, that by that
23  time she should have identified the pelvic fracture as well
24  as the acetabular fracture, which are technical terms for
25  fractures in and about the pelvis.  But that did concern me,

## 19

1  that she hadn't been reading enough at this point in time.
2       Q.  Okay.
3       A.  To the point that I gave her a specific article to
4  read, which is above and beyond what I would do for an
5  average resident.
6       Q.  Why is that above and beyond what you would do for
7  an average resident?
8       A.  Well, because I think a resident by that time has
9  good study habits, should have good study habits.  I
10  shouldn't have to tell somebody to read for cases.  I
11  shouldn't have had to tell her to read Epstein's article.
12  By then, she should have, I think, read it on her own.
13      Q.  How would she know what to read?
14      A.  She could have looked it up in the book I gave
15  her.
16      Q.  And do you know, as we sit here today, that those
17  references are -- match?
18      A.  I know the library has two really good orthopaedic
19  trauma texts, that if she would have read that -- all the
20  residents have all the access online, they could have looked
21  it up.  She could have sat down at a computer and plugged in
22  pelvic fractures and read about it for a half an hour that
23  night.
24      Q.  The night when she was asked to review it?
25      A.  Yeah.  Typically, what a resident does is they see

## 20

1  a case in the emergency room.  And while the patient is
2  getting further studies done, they go online or they go to
3  the library and read about what they have just seen.
4       Q.  Take a look at Document 3348.
5       A.  Okay.
6       Q.  That document is your April 4th, 2003 probation
7  letter to Dr. Brown, correct?
8       A.  Correct.
9       Q.  And the first sentence actually says, "As a result
10  of the concerns listed below, as we discussed on Wednesday
11  April 2nd, 2003, you'll be on academic and clinical
12  probation for the months of April, May and June 2003,"
13  right?
14      A.  Right.
15      Q.  "The purpose of this time period is to help you
16  improve your core knowledge base in orthopaedics and improve
17  your clinical skills."  That's the second sentence, right?
18      A.  Yeah.
19      Q.  When you talk about the concerns listed below --
20      A.  They never really appear.
21      Q.  They don't.
22      A.  So it was the concerns -- I go on to say, "As we
23  discussed."  And I was referring to the problems that we
24  discussed.  And you're absolutely correct; they don't appear
25  in this letter.

Brown v. Hamot Medical Center                                           John Lubahn, M.D.

6 (Pages 21 to 24)

21

1    Q.   What were the concerns discussed?
2    A.   Well, as I recall, there was an issue that I
3  referred to earlier with Dr. Williams, where she didn't see
4  the patients that she was supposed to.  I think the most
5  significant concern to me in and around this time period was
6  a patient she had called me about from the emergency room
7  who she described as having had a contaminated laceration on
8  the leg.
9         And after some discussion, I suggested she wash
10 out the wound and leave it open.  And the next day I learned
11 that she, in fact, did just the opposite; she closed it very
12 tightly.  And when I called her about it, she said it was
13 noisy in the emergency room, she didn't hear me.  I've
14 terminated residents on the spot for that.
15        I was angry.  I told her.  I felt she wasn't
16 really being honest with me.  And that led to the probation.
17 And that was the biggest concern.
18    Q.   Who were the residents you've terminated on the
19 spot for that kind of conduct?
20    A.   When I was working in Rochester, there was a
21 resident who filled out a history and physical before the
22 patient had gotten to the floor, which I felt was an honesty
23 issue.  And I was part of the process that terminated him.
24 And Dr. Rogers, before I was the program director,
25 terminated a resident for putting on the wrong type of a

22

1  cast.
2    Q.   But it seems like it might be somewhat
3  exaggerating if you say you terminated somebody.  The
4  Rochester incident was you being involved in but not
5  necessarily making the decision.  And then you talk about
6  Dr. Rogers doing --
7    A.   All right.  I'll rephrase it to say that I have
8  seen or been part of residents being terminated on the spot
9  for exactly that behavior; honesty issues.
10    Q.   What was the honesty issue?
11    A.   She said it was too loud in the emergency room for
12 her to hear me.  Which I have a hard time believing that.
13 But if it's true, she should have gone to another phone and
14 called me.  She should have done nothing and called somebody
15 else.  She should have had one of the other physicians call
16 me.  Called another resident.
17        There are many, many other avenues she could have
18 taken, and should have known better.  And she apologized to
19 me.  She said it was the wrong thing to do.  Which was why I
20 felt I was extremely lenient at this point in her career.
21    Q.   Any other of the concerns that you discussed on
22 April 2nd?
23    A.   There were some times I think she had been called
24 to the emergency room and didn't go.  There was a consult
25 she didn't do.  I can't remember the time frame.  I think

23

1  that was subsequent to this, actually.
2    Q.   So that wouldn't be included in your discussion,
3  if it was after.
4    A.   That's my recollection, yes.
5    Q.   Anything else that you can remember?
6    A.   No.
7    Q.   The letter talks about academic and clinical
8  probation.  That's two different things?
9    A.   Well --
10    Q.   Two different types of probation, excuse me.
11    A.   By academic, I meant I wanted her to improve in
12 terms of her chronology and ability to discuss orthopaedic
13 patients and problems.  By clinical, I meant is what I
14 outlined here was the supervisory suggestions with
15 Dr. Cermak and Dr. Babins.  And they both agreed to mentor
16 her somewhat in her day-to-day work habits, study habits,
17 patient care.
18    Q.   The third paragraph of the letter sets out a
19 schedule.  And I would like to know, did you have
20 discussions about this schedule with Dr. Cermak and
21 Dr. Babins?
22    A.   I believe I did, but it's a schedule that would
23 have some flexibility built into it.  It's not fixed in
24 stone.  Residents, when they're on call, can go home at noon
25 the next day.

24

1    Q.   What's the extent of Dr. Babins' and Dr. Cermak's
2  knowledge about their duties or assistance to Dr. Brown that
3  you know of based on this letter?  Does that -- do you
4  understand what I'm trying to ask?
5    A.   Not really.
6    Q.   Try again.  The letter outlines some things that
7  Dr. Babins and Dr. Cermak are supposed to do with Dr. Brown.
8  How do you know what Dr. Cermak and Dr. Babins knew about
9  what they were supposed to do?
10    A.   Well, insofar as the discussions we held, I wanted
11 them to follow her closely.
12    Q.   I'm sorry for interrupting.  You did have
13 discussions, then, that's what I'm getting at.
14    A.   Yes.  Oh, yes.
15    Q.   Discussions with Dr. Babins and Dr. Cermak.
16    A.   I asked both of them if they would be willing to
17 do that, and they both said they would.
18    Q.   And then, go ahead, you were going to tell us
19 about what you discussed.
20    A.   Just on a day-to-day basis spend a little more
21 time with the residents, scrutinize them a little more
22 closely in terms of their thought processes.  When they see
23 a patient and formulate a diagnosis and a treatment plan,
24 how they come to that conclusion, what they base their
25 decision on.  Are they reading appropriate amounts and

Brown v. Hamot Medical Center

John Lubahn, M.D.

15 (Pages 57 to 60)

---

**57**

1    THE WITNESS: Okay.

2    Q.  Okay. That's a letter to you from Dr. Cermak

3  about Dr. Brown, correct?

4    A.  Correct.

5    Q.  And, let's see, Dr. Cermak practices with you,

6  correct?

7    A.  Correct.

8    Q.  Your names are there on the margin of the letter.

9    A.  Right.

10    Q.  Do you remember getting this letter from

11  Dr. Cermak at the time?

12    A.  Yes.

13    Q.  What did you do after you got the letter?

14    A.  I think I talked to Dr. Brown about it.

15    Q.  Do you remember what you talked about?

16    A.  She said it was -- well, I told her that I had

17  gotten a note from Dr. Cermak about a patient that she

18  hadn't seen in the emergency room, and Dr. Brown said it was

19  a misunderstanding.

20    Q.  What was your response after you got that

21  information?

22    A.  Well, one person said one thing and one said

23  another, and I just let it go at that.

24    Q.  Now we're back to the numerical.

25    MS. RICHARD: What page?

---

**58**

1    MR. SOREK: 3491.

2    THE WITNESS: Okay.

3    Q.  This is a note you wrote about a presentation

4  Dr. Brown made about a case, correct?

5    A.  Correct.

6    Q.  Let's see. You say that, "History and management

7  of the tibial fracture was reasonably well-outlined and she

8  progressed well describing the messages to reduce the hip.

9  She had a reasonable understanding the post-operative

10  management. Had no immediate knowledge when questioned

11  regarding classification schemes for posterior hip

12  dislocations, fracture dislocations or fractures dislocation

13  of the hip associated with femoral head fractures." And

14  then you conclude by saying you believe -- well, I'm not

15  sure what you say -- what the sentence actually says.

16    You believe that, "Given her level of training,

17  the fact that she was provided this patient some time in

18  advance to prepare, rendered this an unsatisfactory

19  presentation." So what made the presentation

20  unsatisfactory?

21    A.  She had been given the subject in advance. Had

22  time to read about it, but really hadn't read about it.

23    Q.  Do you know whether she read anything regarding

24  the case?

25    A.  I think she probably did. As I recall, I asked

---

**59**

1  her the Epstein classification, which is ironically what I

2  had asked her to read about, I believe at the end of the

3  PGY-2 year. And she didn't know it. And later in the

4  conferences we had moved on to some other subjects. She got

5  out a book and was reading about it and learning about it.

6  But that was an eye-opener to me, that she just was not

7  motivated enough to study to maintain a core knowledge to

8  move on to the PGY-4 year.

9    Q.  Was the question you were asking her, was it just

10  to name the classification schemes, or was it something

11  other than that?

12    A.  I asked her if she was familiar with posterior

13  fracture dislocations of the hip and their classifications,

14  which leads to a whole discussion of anatomy, blood supply,

15  outcomes, et cetera, et cetera. And she hadn't -- hadn't

16  read that.

17    Q.  Do you remember exactly what was said? You asked

18  her the question. Do you remember what you asked her?

19    A.  My recollection is, do you know any

20  classifications for those types of injuries.

21    Q.  Do you remember what her response was?

22    A.  She didn't know.

23    Q.  Do you remember asking anybody else at that

24  conference whether they had the answer?

25    A.  I did. I asked one of the residents, and they

---

**60**

1  didn't know. I asked the second resident, and they did.

2  Now, those residents weren't assigned any reading. As soon

3  as I got to the second resident, I got a lecture on the

4  subject, so they obviously read the material.

5    Q.  Did you have any discussion about the presentation

6  with Dr. Brown?

7    A.  I don't know that I specifically sat her down

8  afterwards and did, no.

9    Q.  In February of 2004 do you recall any issues

10  involving Dr. Brown regarding her attendance on ER cases?

11    A.  There was an e-mail, I think, from Dr. Benes.

12    Q.  What do you remember about that?

13    A.  That he was considering that Dr. Brown, and my

14  recollection, a couple other residents weren't reporting to

15  the emergency room in a timely fashion.

16    Q.  What did you do about that?

17    A.  I believe I called him and spoke to him.

18    Q.  Called and spoke to Dr. Benes?

19    A.  I believe I did, yes.

20    Q.  And do you remember what he told you?

21    A.  That it was a concern to him, that he would

22  address it with the residents himself. And I think I told

23  him I would discuss it with them.

24    Q.  With the residents?

25    A.  In general, yeah.

---

61

1    Q.  And did you do that?
2    A.  I think I did, yeah.
3    Q.  Not sure?
4    A.  I remember having a discussion at a meeting with
5    the residents on that very subject.
6    Q.  Do you remember what you said?
7    A.  The residents or Dr. Benes?
8    Q.  To the residents.
9    A.  Yeah.  I said, you can't let that continue, if you
10   get a call to the ER, you have to answer in a timely
11   fashion, or if you're in the operating room or have some
12   other pressing issue, you need to let them know where you
13   are and why, and then they have to get somebody else.  But
14   they have to respond.
15       MR. SOREK:  This is a document that I think is in
16   the front.  It's throughout the file, but.
17       MS. RICHARD:  What's the number?
18       MR. SOREK:  It's 1069 or 00197.  It's a March 1st,
19   2004 letter.
20       MS. RICHARD:  The one you're looking at is which
21   one?
22       MR. SOREK:  I have both.  So whatever you come to
23   first.
24       MS. RICHARD:  Go to the chronological section.
25       MR. SOREK:  Yeah, they're in the front.

62

1        MS. RICHARD:  It's March 1st.  It should be coming
2    up.  There it is.  Is that right?
3        MR. SOREK:  Yeah.
4        MS. RICHARD:  Yeah, 1069.
5        THE WITNESS:  Okay.
6    Q.  This is the letter that you wrote to Dr. Brown
7    dated March 1st, 2004 in which you tell her that her
8    contract will not be renewed, correct?
9    A.  Correct.
10   Q.  And the first sentence says, "Based on clinical
11   performance and concerns regarding your current knowledge
12   base in orthopaedics for the PGY-3 level, I have decided not
13   to renew your contract at the end of this academic year."
14   Do you see that?
15   A.  Yes.
16   Q.  When you refer to clinical performance in this
17   letter, what were you referring to?
18   A.  Not going to the emergency room when she was
19   called, in a timely manner.
20   Q.  Had you discussed that with Dr. Brown?
21   A.  I discussed her clinical performance on so many
22   previous occasions, that this -- no, I didn't.
23   Q.  The discussion you had with Dr. Benes, I believe
24   you said --
25   A.  I've got to back up again.  Because I do remember

63

1    telling Dr. Brown about this, about her not reporting to the
2    emergency room individually and then in the group.  And she
3    got defensive about it and angry with me about it.  So I do
4    remember asking her about it.
5    Q.  Tell us everything you remember about what you
6    said to her and what she said to you.
7    A.  I said, Dr. Brown, Dr. Benes sent me an e-mail, he
8    was concerned that you weren't going to the emergency room
9    in a timely fashion or that they had called you on a couple
10   of occasions and you didn't show up when you were supposed
11   to.  And she got angry and said, oh, everybody has been
12   doing that, it's not just me.  Basically.
13   Q.  You thought that was -- you consider that being
14   defensive.
15   A.  Her tone was extremely defensive.  And I would
16   interpret that line, from somebody with her track record, as
17   being extremely defensive.  If I were her, I would have been
18   spot on time for every call.
19   Q.  The information you had about her being one of the
20   people Dr. Benes was referring to, did he tell you -- did he
21   name her specifically?
22   A.  Yes.
23   Q.  Did he name any other residents?
24   A.  The only one I remember is Sharma.
25   Q.  Did you have any discussions with Dr. Sharma?

64

1    A.  I did.
2    Q.  What did you tell him?
3    A.  Same thing I told Dr. Brown, that I wouldn't
4    tolerate that.  He said he was sorry, it wouldn't happen
5    again.
6    Q.  After you talked to Dr. Benes, did you do
7    anything -- did you investigate what was happening?  Did you
8    talk to anybody else?  Did you look at any documents?
9    A.  I didn't look at documents.  I trusted Benes.  I
10   trusted him saying it wasn't a huge issue, but it couldn't
11   continue and we needed to resolve it.
12   Q.  Is it fair to say that your approach to resolving
13   it, as far as Dr. Brown was concerned, was to terminate her
14   contract?
15   A.  I didn't terminate her contract.  I just didn't
16   renew it.  I couldn't trust somebody like that to go on to
17   the fourth year.  That, combined with her not reading things
18   that I told her to read -- the level of responsibility
19   between the third and the fourth year is significantly
20   enough different that I could not pass her on to the fourth
21   year.  And that's what I told her.
22   Q.  When did you tell her that?
23   A.  When I gave her the letter.
24   Q.  When you referred to clinical performance in your
25   letter, did you have anything else in mind besides the

65

```
 1   emergency room?
 2       A.  I think in Dr. Brown's case it goes back to the
 3   initial concerns that were all mentioned earlier.  It's a
 4   culmination of all of her performance.
 5       Q.  Well, I would like to ask you what you had in mind
 6   when you wrote the letter, if you can recall.
 7       MS. RICHARD:  I think he just answered that.
 8       A.  Well, it goes back to the original concern by
 9   Dr. Williams.  It continues on with my having told her to
10   leave a wound open, and she closed it, and in my opinion
11   wasn't as honest with me as she could have been about why
12   she didn't do what I asked.  And that, to me, I can't
13   reconcile that.  And she never really recovered from that,
14   in my opinion.
15       Q.  She never recovered from what?  I'm sorry.
16   Recovered from what?
17       A.  She never proved herself to me that she was
18   trustworthy.  The one time that I had told her to do
19   something, and she did exactly the opposite.  The patient
20   could have died.
21       Q.  What are you referring to; the laceration?
22       A.  Yeah.  That I told her to wash out and leave open,
23   and she did exactly the opposite of what I told her to do.
24   People die from that.
25       Q.  Do people die from physician errors in writing
```

66

```
 1   notes on charts?
 2       A.  Yes.
 3       Q.  You've had that problem with residents, haven't
 4   you?
 5       A.  No, never had that.
 6       Q.  How about Carl Seon?
 7       A.  Patient died?
 8       Q.  No, no, no, no, no.  No.  Problems with Dr. Seon's
 9   handwriting that were brought up in evaluations.
10       A.  Yeah.  I thought you meant a patient died from the
11   handwriting.
12       Q.  The patient you're talking about, as far as
13   Dr. Brown is concerned, that patient didn't die, correct?
14       A.  No.
15       Q.  All right.  So I still have to nail this down.
16   When you -- I have to know, if you can tell me --
17       A.  If I can continue, because I wasn't finished.
18       Q.  Okay, go ahead.  I'm sorry, then.
19       A.  There was the episode that I talked about with the
20   wound that she closed that I told her to leave open.
21       Q.  Yeah.
22       A.  Which is a big one.  Out of 100 points, that's 60
23   percent.  There was a consult that she was asked to do in
24   the OB-GYN service that she didn't do, and had a pretty weak
25   excuse.
```

67

```
 1       Q.  What do you remember about that?
 2       A.  She was called to see a patient who was in labor,
 3   who had what's called a Klippel-Feil syndrome.  And the
 4   obstetricians and gynecologist really wanted to know what it
 5   was.  And were there any concerns that they should have.
 6   And her response was, I'm not going to do it, liability is
 7   too great.
 8       She called one of the attendings, who was on call
 9   that day.  He said, no, you don't have to do it, you should
10   have called me.  She didn't call me.  I ended up doing the
11   consult.  I can't -- I can't understand her thought
12   processes.
13       Q.  But you mention she called an attending, and the
14   attending said not to do it.  Does that mean there was some
15   disagreement, or what?
16       A.  No.  The attending was a total hip surgeon, and he
17   wasn't going to do it.  Which means to a resident they've
18   got to get the right attending, which would have been me in
19   that case.  But she walked away from it, and I got called.
20       And that's irresponsible behavior on the part of a
21   physician.  You learn that in medical school.  You can't
22   just walk away from something.  She deserted the patient.
23   And when I talked to her about it again, it was kind of a
24   defensive-type thing.  I think those issues in and of
25   themselves are sufficient for me not to move her on to the
```

68

```
 1   next year.
 2       Q.  And those were the issues you had in mind when you
 3   wrote this letter.
 4       A.  Yeah, those are the types of clinical concerns
 5   that -- as the Dr. Cermak letter that comes in again later,
 6   where she doesn't go to the emergency room when she is
 7   called.
 8       One of the private offices sent me a letter one
 9   time that they would call her about consults, and she didn't
10   do them.  And I asked her about that one time, and she said
11   she was having a bad day.  That's all she said.  I can't
12   live with that.  I can't take somebody like that and move
13   them on to the next year.
14       Q.  Still, it's important for me to know, and I have
15   to have an answer.  And if I'm -- if you have given it
16   already, you can just tell me that.  When you wrote the
17   letter at the time, when you refer to clinical performance,
18   the things that you just mentioned, is that what you had in
19   mind --
20       A.  Yes.
21       Q.  -- when you wrote the letter?
22       A.  Yes.
23       Q.  And then you say "Concerns regarding your current
24   knowledge base in orthopaedics."  What were you referring to
25   when you said that?
```

Brown v. Hamot Medical Center

John Lubahn, M.D.

18 (Pages 69 to 72)

| 69 | 71 |
|---|---|
| 1  A. That she hadn't read enough. And that even when I | 1  well-outlined and she progressed well describing the |
| 2  gave her a subject to read about, she didn't read it. | 2  messages to reduce the hip. Is that right word, messages? |
| 3  Q. You're referring to, what, the Epstein article? | 3  A. (Witness nods head.) |
| 4  A. If she would have read anything on fractured | 4  Q. "She had a reasonable understanding of the |
| 5  dislocations of the hip, anything, I would have probably | 5  postoperative management, but she didn't know the |
| 6  felt differently. | 6  classification scheme." That's enough for you to consider |
| 7  Q. And do you know whether she did or not? | 7  it a failure. |
| 8  A. She didn't read anything about classifications. | 8  A. If that were a test in college, that would be a |
| 9  Because there's many articles, many books. And after she | 9  57 percent. |
| 10  didn't answer the question, she went right back to the book, | 10  Q. You then say, "The decision is a difficult one for |
| 11  which told me that she hadn't read it. Or if she had read | 11  me as for the entire facility, but I believe it to be best." |
| 12  it, she didn't learn it. | 12  When you talk about the entire faculty, who are you |
| 13  Q. Then you say, "I have decided not to renew your | 13  referring to? |
| 14  contract at the end of this academic year." It sounds like | 14  A. Myself and the clinical faculty. |
| 15  you made the decision; is that correct? | 15  Q. So it seems like you're representing -- did you |
| 16  A. Pretty much. | 16  say the entire clinical faculty? |
| 17  Q. Pretty much is something other than yes or no. So | 17  A. (Witness nods head.) |
| 18  what are you thinking when you say -- | 18  Q. Yes? |
| 19  A. By then I had talked to the administration. I | 19  MS. RICHARD: You have to speak. |
| 20  talked to Dr. Rogers. I talked to Dr. Sanders at Shriners | 20  A. Yes. |
| 21  Hospital. I talked with the faculty; Babins, Cermak. I | 21  Q. It seems like you're representing that the entire |
| 22  can't remember whether I talked to Hood or Williams. I | 22  clinical faculty was involved in the decision, and I would |
| 23  think by this time Suprock and Cortina had voiced some | 23  like to know if that's true or not. |
| 24  concern. That's all I remember. | 24  A. They were -- they were involved in the sense that |
| 25  Q. Do you see any inconsistency in the testimony you | 25  I discussed it all with them. We didn't take a vote. |

| 70 | 72 |
|---|---|
| 1  just gave and your January 30th evaluation, 3337, where you | 1  Q. What did you discuss -- well, did you discuss not |
| 2  tell her her clinical performance had improved and was | 2  renewing her contract with them? |
| 3  acceptable? | 3  A. Yes. |
| 4  A. Her clinical performance was a roller coaster, if | 4  Q. And did you have that discussion with everyone on |
| 5  you read it and follow it through. I don't see an | 5  the clinical faculty? |
| 6  inconsistency. It was this -- and it just continued to do | 6  A. I went over them earlier, but I'll do it again. I |
| 7  that. And when it continued to do that on into February, I | 7  don't think I mentioned it to Dr. Hood, nor Dr. Williams. I |
| 8  felt that I could not trust that individual, nor was I | 8  discussed it in detail with Cermak and Babins because they |
| 9  willing to take the responsibility to her -- for her to | 9  had been involved. And I discussed it with -- |
| 10  function as a senior resident or a PGY-4 resident. | 10  Q. Suprock and Cortina? |
| 11  Q. A person reading your January 30th, 2004 | 11  A. Suprock, Cortina, Stefanovski, Kastrup. I did not |
| 12  evaluation where you say, "Her clinical performance had | 12  call Galey. I called Rogers. I called Dr. Sanders. I |
| 13  improved and was acceptable," and then seeing the | 13  spoke to Tim Cooney. I spoke to Jim Pepicello. |
| 14  termination letter 29 days later on March 1st might have a | 14  Q. And was the gist of what you discussed with them |
| 15  question about what happened between January 30th and | 15  that you were planning on dropping Lisa Brown from the |
| 16  March 1st to lead you to decide not to renew the contract. | 16  program? |
| 17  And that's my question. | 17  A. Could not renew the contract at the end of that |
| 18  MS. RICHARD: I'm just going to object to the | 18  year. |
| 19  form. If you can answer, you can answer. | 19  Q. Was it in the sense of you advising them of that |
| 20  A. I think I answered what happened. I got another | 20  or asking for their input? |
| 21  two letters about her from the emergency room, and her | 21  A. I advised them of that. I did ask for input. |
| 22  performance in a clinical conference was a failure. | 22  Q. Making the decision on March 1st left about four |
| 23  Q. So that's -- well, actually, your notes about her | 23  months left in Dr. Brown's PGY-3 year, correct? |
| 24  performance say that her presentation of the history and the | 24  A. Yes. |
| 25  management of the tibial fracture is reasonably | 25  Q. Were there any conditions placed on Dr. Brown's |

73

1 participation in the program after March? And we know that
2 her participation was going to end, but between March and
3 June.
4    A. What do you mean by "conditions"?
5    Q. Well, would she be doing the same activities that
6 all the other PGY -- well, the other PGY-3 residents would
7 be doing?
8    A. Yes.
9    Q. She had no restrictions on care she was supposed
10 to provide, correct?
11    A. No.
12    Q. In fact, you told her that -- in your letter,
13 March 1st -- I'm sorry, that's wrong. But you did expect
14 her to stay for the rest of the PGY-3 year.
15    A. Well, to get complete credit for it. And to
16 finish that year, yeah, you would have to.
17    Q. This also should be in the front. 1081.
18    MS. RICHARD: 1081?
19    MR. SOREK: Yes.
20    MS. RICHARD: Okay.
21    THE WITNESS: Okay.
22    Q. That's a note about a meeting with Dr. Brown on
23 March 1st when you gave her the March 1st letter, correct?
24    A. Right.
25    Q. Do you remember what you discussed at the meeting?

74

1    A. Yes.
2    Q. What did you discuss?
3    A. It was a fairly brief meeting, which I believe is
4 accurately outlined in here. I gave her the letter. She
5 read it. She said that she understood my academic concerns
6 but remained defensive of her clinical performance.
7    Q. In this note, you say, in the first sentence, the
8 letter states, "Your decision with that of the institution's
9 Human Resource Department." Do you see that?
10    A. Yes.
11    Q. What do you mean by that?
12    A. Dana and Don Interlied.
13    Q. I think I know where you're going, but we have to
14 kind of fill that in. Those are just two names. What was
15 their involvement?
16    A. Well, they do the contracts, and organize the
17 human relations part of a resident's experience at Hamot on
18 the educational component, or the HR component. So to not
19 renew a contract would involve that department. And to that
20 extent, I involved that department.
21    Q. Were they involved in the decision? Were they
22 involved in just processing the decision once you made it?
23    A. Processing.
24    Q. Okay. Now, we're back to 3315. Actually, well,
25 see if you can find it at -- I have two -- same document at

75

1 two numbers. See if you can find it at 1080.
2    MS. RICHARD: Yes. It's the next page --
3    MR. SOREK: Okay. That's fine too.
4    MS. RICHARD: Okay. Agency 1080?
5    MR. SOREK: Yes.
6    THE WITNESS: Okay.
7    Q. This is a note from you about a meeting with
8 Dr. Brown, March 3rd, 2004. It says you met with her at
9 some length, between 12:15 and 12:45 p.m. for 30 minutes.
10 And who -- I guess who initiated the meeting?
11    A. I don't remember.
12    Q. Do you remember what was discussed?
13    A. Pretty much what was said in the meeting is
14 outlined here.
15    Q. All right. She discussed some of the documents in
16 her file, correct?
17    A. Yes.
18    Q. And it sounds like she wants to challenge
19 Dr. Cermak's letter, correct?
20    A. Yes.
21    Q. Did you discuss that with her, or not?
22    A. I did.
23    Q. Did or did not?
24    A. I did.
25    Q. Do you remember what you said?

76

1    A. Well, I think I said that it wasn't the sole
2 factor in my decision, that it admittedly was her word
3 against, not so much Dr. Cermak's, but the emergency room.
4 And left it at that.
5    Q. The last sentence says you reassured her that the
6 decision not to renew her contract was not based on any one
7 of the documents but the entire picture. When you said "the
8 entire picture," do you know what you had in mind at that
9 time?
10    A. Her clinical performance from day one.
11    Q. And the clinical performance you had in mind on
12 that day was what?
13    A. I don't understand.
14    Q. Okay.
15    A. This was based on her whole performance.
16    MR. SOREK: See if you have 1137.
17    MS. RICHARD: Again, in the chronological section?
18    MR. SOREK: Yes, in the front.
19    THE WITNESS: Okay.
20    Q. This is a document signed by you. It says, "Lisa
21 Brown, MD, 7/12/04," at the top. What's the purpose of this
22 document?
23    A. I guess, in retrospect it's just a summary of some
24 of my thoughts that led to my decision not to renew her
25 contract.

Brown v. Hamot Medical Center

John Lubahn, M.D.

24 (Pages 93 to 96)

93

1 under process in case advancement, criteria are not met. Do
2 you see that?
3    A.  Yes.
4    Q.  Did you apply this process to Dr. Brown?
5    A.  I think in general. Maybe not to this specific
6 level, but I think in general.
7    Q.  Generally, what did you think you did that was
8 consistent?
9    A.  Well, she was on academic probation. She was
10 closely evaluated, scrutinized, given more than one
11 opportunity to improve. I think if you stretch it out over
12 three years, she was given many opportunities to improve. I
13 think she was given feedback.
14    Q.  Let me stop you there. The -- about in the
15 middle, the provision talks about a letter outlining reasons
16 for academic probation, and expectations given to the
17 resident. It talks about the period of probation. And then
18 it says, "During that time, the resident is expected to
19 demonstrate improvement and will receive, at minimum,
20 monthly reevaluations." Do you know whether those monthly
21 reevaluations were done?
22    A.  I don't think we produced written documents on a
23 monthly basis. I know we spoke with her on a monthly basis
24 through the end of June of 2000 and -- it would have been 3.
25    Q.  Do you know what the policy is referring to?

94

1 Face-to-face discussion, or phone discussion, or?
2    A.  I think it's open to debate.
3    Q.  The last sentence says -- well, let me back up a
4 little bit. This section also says, "Should it be
5 determined that the resident requires additional
6 remediation, he or she will likely need to repeat those
7 activities in which he or she did not meet expectations at
8 the current level of training. Only when these requirements
9 are met will the resident be considered for advancement, at
10 such time academic probation will be lifted and the resident
11 will continue his/her training at the next level." Did that
12 apply to Dr. Brown?
13    A.  Yes.
14    Q.  In your view, once academic probation is lifted,
15 does the resident then have a clean slate?
16    A.  No.
17    Q.  How does that work?
18    A.  Well, I think the slate is the slate. And the
19 resident at any given time should know where he or she
20 stands academically and in terms of their clinical
21 performance.
22    Q.  And they would gather that information how?
23    A.  I don't think that's information that you gather.
24 You already have it. Everything that Dr. Brown knew to that
25 point had been discussed with her. She knew her performance

95

1 to that date.
2    (Brief interruption.)
3    Q.  If you take a look at the third page of the
4 policy. The first sentence, "Should the resident fail to
5 improve or to meet the expectations as identified in the
6 academic probation letter, the faculty will determine at
7 that time if remediation will be deemed to be helpful."
8 Does that apply to Dr. Brown's case?
9    A.  I think it does.
10    Q.  So tell us about the -- what you know about the
11 faculty's determination whether remediation will be deemed
12 to be helpful.
13    A.  Well, the faculty here means really the full-time
14 faculty which is basically me. Although, Dr. DeLullo has
15 now joined me, and I do take into consideration the
16 evaluations of all of the part-time faculty.
17    Q.  So when this policy refers to faculty, it actually
18 means you.
19    A.  Dr. Kuehn, at the time, I believe. Dr. Rogers was
20 out on leave at the time. He was the other full-time paid
21 faculty member. But just to elaborate on Dr. Brown, it was
22 she would meet the expectations and then not meet them. It
23 was an up-and-down kind of ride with her.
24    Q.  Was there a fact -- was there a faculty
25 determination whether remediation will be deemed to be

96

1 helpful?
2    A.  Well, that was really the time that I spoke with
3 Dr. Babins and Dr. Cermak, and asked them to work very
4 closely with her. It was my recollection of the same
5 probationary time we're talking about -- which is thinking
6 backwards in '03, it's June, May and April.
7    Q.  Well, correct me if I'm wrong on this. But it
8 seems like, if you read the first sentence the resident is
9 supposed to -- the resident gets the academic probation
10 letter, and that this provision applies if the resident
11 fails to improve on the deficiencies identified in the
12 letter. It seems like then there's a faculty determination,
13 but I could be wrong. I'm asking, what is your
14 interpretation of that.
15    A.  Yeah, I don't think she necessarily failed. So
16 from that perspective, it doesn't apply, but she was closely
17 scrutinized by the faculty.
18    Q.  And this was after the probation was over, or
19 during?
20    A.  I view that statement as kind of a continuum. I
21 guess if you view it as if the -- if she should have gone
22 through the probation, and failed to meet the requirements
23 of the probation, then the faculty decides what do we do
24 next. That really didn't apply here.
25    Q.  Why not?

Brown v. Hamot Medical Center

John Lubahn, M.D.

1 (Pages 120 to 123)

---

**120**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

```
LISA BROWN, M.D.,        :
          Plaintiff     :
                        :
     v.                 :   Civil Action No. 05-32E
                        :
HAMOT MEDICAL CENTER,    :
          Defendant     :
```

Continued deposition of JOHN LUBAHN, M.D., taken before
and by Carol A. Holdnack, RPR, Notary Public in and
for the Commonwealth of Pennsylvania, on Friday,
April 21, 2006, commencing at 9:40 a.m., at the
offices of Scarpitti & Mead, Renaissance Center,
1001 State Street, Suite 800, Erie, PA 16501.

For the Plaintiff:
     Patrick Sorek, Esq.
     Leech Tishman Fuscaldo & Lampl, LLC
     525 William Penn Place, 30th Floor
     Pittsburgh, PA 15219

For the Defendant:
     Kerry M. Richard, Esq.
     Tobin O'Connor Ewing & Richard
     5335 Wisconsin Avenue NW, Suite 700
     Washington, DC 20015

          Reported by Carol A. Holdnack, RPR
          Ferguson & Holdnack Reporting, Inc.

---

**121**

```
 1                I N D E X
 2
 3   JOHN LUBAHN, M.D.
 4      Direct Examination by Mr. Sorek . . . . .  122
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**122**

1    J O H N  L U B A H N, M.D., first having
2    been duly sworn, testified as follows:
3
4              DIRECT EXAMINATION
5    BY MR. SOREK:
6
7    Q.  Good morning, Dr. Lubahn.
8    A.  Good morning.
9    Q.  We're doing the continuation of the deposition we
10   completed a few weeks ago this morning.  You understand
11   you're still under oath.  And the same procedures that we
12   used last time apply, in terms of taking breaks, asking for
13   advice from counsel, asking for clarification of questions
14   that you think are confusing or vague.  Are you ready to
15   start?
16   A.  Sure.
17   Q.  You've been the director of the Orthopaedic
18   Residency Program at Hamot for how long?
19   A.  Since roughly 1987.
20   Q.  I don't think we did this last time, and if we
21   did, you can remind me.  There should be in the documents a
22   CV of yours.  Do you recall talking about that last time?
23   A.  No.
24   Q.  I don't think we did.  Could you just look through
25   the CV.  And apart from what I expect --

---

**123**

1    MS. RICHARD:  Where is it in these documents?
2    MR. SOREK:  It's in 2304.
3    MS. RICHARD:  The first binder?
4    MR. SOREK:  Yeah.
5    MS. RICHARD:  And it continues for several pages.
6    BY MR. SOREK:
7    Q.  It continues for 2334, so that's 30 pages.  And
8    the question is, is that your CV?  And is it accurate, apart
9    from any updates you might have from the end of it?
10   A.  Apart from any updates, it's accurate.
11   MS. RICHARD:  Take your time and make sure that
12        that's the one you remember.
13   A.  Well, it's totally different print.  I did a
14   deposition -- here's another one.
15   MS. RICHARD:  Oh, yeah, actually, this is not
16        correct.  The first document ends on Page 2317.
17        Are you asking him to look at just that first
18        document, or do you want him to look at the
19        document that follows it starting at 2318 as well?
20   MR. SOREK:  If you look at the following document
21        as well.
22   A.  From a few minor typos, it appears to be accurate,
23   reasonable.
24   Q.  All right.  So you probably have some things to
25   add to the end of the second document or the first document.

---

Brown v. Hamot Medical Center                                    John Lubahn, M.D.

28 (Pages 228 to 231)

---

228

1      A.  (Witness complies.)  I don't know much about this,
2   in looking it over.
3      Q.   Do you have any personal knowledge of any
4   personnel issues involving Dr. David Levy and his
5   interactions with staff that they objected to?
6      A.  I don't know anything about that.
7      Q.  All right.  All right.  Take a look at 6551.
8      A.  (Witness complies.)
9      Q.  Just ask you to take a look at the subject line.
10  Do you see that?
11     A.  Yes.
12     Q.  Do you know of any incidents involving this
13  doctor?
14     A.  This is news to me.
15     Q.  All right.  Meaning you don't know.
16     A.  Correct.
17     Q.  And the next page, 6552.  Just read the Re: line.
18     A.  John Almquist.
19     Q.  Yeah.  Do you know of any personnel issues
20  involving Dr. Almquist?
21     A.  No.
22     Q.  All right.  Do you know of incidents when
23  residents have missed their rounding responsibilities?
24     A.  They were the ones that we discussed last time,
25  yes.

---

229

1      Q.  Any other incidents?
2      A.  Not that I can recall at the spur of the moment.  I
3   did recall the incidents with Dr. Green where he didn't go
4   to the emergency room when he was supposed to.
5      Q.  Dr. Brown had a -- there was an incident in which
6   Dr. Benes believed there were problems with her responding
7   to emergency room calls.  Do you remember that?
8      A.  Yes.
9      Q.  Did you discuss that with Dr. Brown one-on-one?
10     A.  We did have that discussion, I remember.  And she
11  got defensive about it.
12     Q.  The records of who is called and when -- or,
13  actually, they're kept -- they're kept on paper for
14  emergency room calls, aren't they?
15     A.  Right.
16     Q.  Did you ever check those records regarding
17  Dr. Brown's attendance in the emergency room?
18     A.  Not with respect to that particular complaint, no,
19  I didn't.
20     Q.  Okay.  By that answer, do you mean to say that
21  there were times, other times that you did check?
22     A.  Yes.
23     Q.  For Dr. Brown or for other doctors?
24     A.  I mention the time with Dr. Green, and with
25  Dr. Brown, I did.  There was a question of the patient that

---

230

1   Dr. Cermak had, I know.
2      Q.  Okay.  So you're saying you checked the ER records
3   of her appearance, correct?
4      A.  Yes.
5      Q.  What was your conclusion?
6      A.  Well, with respect to Dr. Cermak's patient, she
7   didn't show up on time.
8      Q.  Okay.  Based on your review of the records.
9      A.  Discussion with the nurses and with Dr. Cermak.
10     Q.  But you did look at the records, the emergency
11  room records, that note times that calls are made and that
12  people appear.
13     A.  In that particular case, I did, I think.
14     Q.  And did your review of the ER records confirm what
15  you had learned from other parties?
16     A.  Yes.
17     Q.  All right.  Before Dr. Brown had her grievance
18  hearing based on nonrenewal of her contract -- so after
19  March 1st, but before, say, March 30th, which I believe was
20  the first day of the grievance hearing, did you have a
21  meeting with the attending physicians to discuss Dr. Brown?
22     A.  I don't believe I had one to specifically discuss
23  that.  I believe the issue came up at a department meeting.
24         MS. RICHARD:  Pat, it is 1:00.  So if you can give
25     me some idea of, you know, just another minute,

---

231

1      or.  We're going to have to wrap it up.
2         MR. SOREK:  Yeah.  I think the bell has rung, so I
3      believe that's it, Dr. Lubahn.  So we'll wrap it
4      up.
5         MS. RICHARD:  Okay.  Thank you.
6
7         (Deposition concluded at 1:01 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---