```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   LISA BROWN, M.D.,              :
             Plaintiff              :
 4                                  :
         v.                         :   Civil Action No. 05-32-E
 5                                  :
     HAMOT MEDICAL CENTER,          :
 6           Defendant              :

 7

 8

 9          Deposition of JAMES A. PEPICELLO, M.D., taken

10      before and by Janis L. Ferguson, Notary Public in

11      and for the Commonwealth of Pennsylvania, on Friday,

12      December 16, 2005, commencing at 9:37 a.m., at the

13      offices of Scarpitti & Mead, 1001 State Street,

14      Suite 800, Erie, Pennsylvania 16501.

15

16   For the Plaintiff:
         Patrick Sorek, Esquire
17       Leech Tishman Fuscaldo & Lampl, LLC
         525 William Penn Place
18       30th Floor
         Pittsburgh, PA 15219
19
     For the Defendant:
20       Kerry M. Richard, Esquire
         Tobin O'Connor Ewing & Richard
21       5335 Wisconsin Avenue NW
         Suite 700
22       Washington, DC 20015

23

24
                 Reported by Janis L. Ferguson, RPR
25             Ferguson & Holdnack Reporting, Inc.
```

Page 26

1  five years now. But it was the custom at the time, and
2  it -- I'm sure it still is in some places. But the first
3  several years of the residency practice, the PGY, as they
4  are referred to now, one and two, typically have more
5  residents than the senior level. In some specialties and in
6  some places, that's not universal, and people would take a
7  year or two of general surgery, because it is a requirement
8  to enter other --
9     Q.  A different specialty?
10    A.  -- specialty residencies, yes. And, in fact, some
11 specialties require a full general surgery residency.
12    Q.  What kinds of evaluation methods did the general
13 surgery residency program have when you were involved in it?
14 And by "evaluation", I mean evaluation of the residents.
15    A.  We had evaluations by the faculty members.
16    Q.  What did they consist of?
17    A.  They were written documents with evaluation of
18 residents' performance. And --
19    Q.  How frequently? I'm sorry for --
20    A.  You know, I don't recall the exact frequency now.
21 But certainly at the end of a -- an academic year or the end
22 of a -- a finite specialty rotation. Let's say, for
23 example, you took a cardiac surgery rotation for three
24 months, and that was going to be the only cardiac surgery
25 you had during the residency, you would have an evaluation.

Page 27

1  And we also took an examination, given by the American Board
2  of Surgery. It's called the in-training examination.
3     Q.  So the residents would take the in-training exam,
4  correct?
5     A.  Um-hum.
6     Q.  And they would get written evaluations from
7  faculty members, either at the end of the year or at the end
8  of the rotation.
9     A.  (Witness nods head.)
10    Q.  You have to --
11    A.  Correct.
12    Q.  Was any faculty member sitting down in, say,
13 conference with a resident? Was that part of any evaluation
14 methods?
15    A.  Yes. That was done.
16    Q.  How long were you a member of the general surgery
17 residency program? I mean, as a faculty member.
18    A.  From the time I finished practice in 1978 until --
19    Q.  '89?
20    A.  -- the date that the residency was discontinued.
21    Q.  Who were some of the other faculty members?
22    A.  Forrest Mischler, Philip Suzanne, Jeffrey Dunn,
23 William Phelps, Medi Zada, Donald Lasher, Charles Kibler,
24 John Chaffee, Henry Young. Many of these people are now
25 deceased. But there were -- and a few more whose -- I can't

Page 28

1  recall right at the moment.
2     Q.  Did you ever have any experience with any
3  residents who had performance issues?
4     A.  Yes.
5     Q.  Could you tell us what you recall about that.
6     A.  We had -- we had a couple of residents whose
7  performance in terms of attending to patients, whose lack of
8  knowledge -- what we considered to be substandard practice
9  over a protracted period of time, after having been warned
10 about them, led to dismissal of a couple of residents.
11    Q.  How did the program consider the in-training exam
12 in its evaluation of residents?
13    A.  Well, it's a tool to determine depth of knowledge
14 about the field of general surgery. So it's just -- it's a
15 measurement of performance.
16    Q.  Could performance on the OITE be a disqualifying
17 factor from further participation in the residency?
18    A.  If combined with issues of substandard
19 performance, in terms of the resident's clinical duties.
20 But it would not be an indicator in and of itself.
21    Q.  Does Hamot get funds to train residents?
22    A.  Yes.
23    Q.  From who?
24    A.  From the Federal Government, through the Medicare
25 program.

Page 29

1     Q.  In the orthopedic surgery residency, do you know
2  how much the hospital gets per resident?
3     A.  I can't give you an exact number. It's based upon
4  the number of residency slots we're assigned. And I just
5  don't recall the number from -- from this past fiscal year.
6  Because it is a moving target. It does change.
7     Q.  Do you know whether it's above six figures per
8  resident?
9     A.  I don't believe it is. I just don't recall the
10 exact number.
11    Q.  Where does the money go that the hospital gets
12 from the Federal Government for training residents?
13    A.  It's in general operating revenue.
14    Q.  When did you first become acquainted with Lisa
15 Brown as a resident of Hamot Hospital?
16    A.  I can't recall the exact date, but probably
17 shortly after she arrived.
18    Q.  Do you remember the circumstances?
19    A.  Not specifically, no.
20    Q.  Do you remember under what circumstances she came
21 to your attention at that time?
22    A.  Well, as -- in the course of my duties as Senior
23 Vice President for Surgical Services, the orthopedic surgery
24 division was -- department was part of that. And I would
25 attend their department meetings, and I believe met her or

Page 30

1  became acquainted with her at one of those department
2  meetings.
3      Q.  And what was the reason for your attending the
4  department meetings?
5      A.  I went to give an administrative report, to hear
6  issues that the orthopedic surgeons might have, and report
7  to them about what was happening at the hospital.
8      Q.  And is that a regular practice of yours?
9      A.  Yes.
10     Q.  How often are the meetings?
11     A.  The meetings are monthly.
12     Q.  Do you pretty much attend monthly?
13     A.  I don't now.  The Chief Medical Officer,
14  Dr. Richard Long, attends the meetings.
15     Q.  Long is -- is he a subordinate of yours?
16     A.  Yes.
17     Q.  What period of time were you attending these
18  departmental meetings?  From when to when?
19     A.  Probably from the year 2000 to late 2003.
20     Q.  And this was in your capacity as Senior Vice
21  President for Surgical Operations?
22     A.  Surgical Services.
23     Q.  Surgical Services.  And the department -- which
24  department was it?  Department of orthopedic surgery?
25     A.  Yes.

Page 31

1      Q.  When did you first become aware that there were
2  issues with Dr. Brown's performance?
3      A.  When I received a phone call from Dr. Lubahn.
4      Q.  And when was that?
5      A.  Would have been early 2004.  I can't recall the
6  exact date.
7      Q.  Did you ever have any personal experience with her
8  work at Hamot?
9      A.  No.
10     Q.  Did you have any personal experience with the work
11  of any of the orthopedic surgical residents?
12     A.  Not personally, no.
13     Q.  The telephone call you got from Dr. Lubahn, what
14  do you remember about that?
15     A.  Well, I remember that he expressed some concern
16  about Dr. Brown's performance.  And, in essence, said he was
17  considering not renewing her contract.
18     Q.  Did he say anything else?
19     A.  Not -- not really specifically, that I can recall.
20     Q.  What did you say?
21     A.  Well, I basically thanked him for the information.
22  Knew that he -- and he indicated that he had given this
23  pretty careful consideration.  And we really -- at that
24  point he was asking -- he was calling me more for
25  informational purposes than anything else.  So the substance

Page 32

1  of the conversation really didn't go much beyond that.
2      Q.  And he called you in particular why?
3      A.  Because at the time I was Chief Medical Officer
4  and responsible for medical education.  And as a program
5  director, he wanted to -- to go one up, if you will,
6  administratively, to -- to discuss it with me.
7      Q.  Did you give him any direction or advice?
8      A.  No.
9      Q.  When did the matter of Dr. Brown's performance
10 next come to your attention?
11     A.  Dr. Lubahn sent Dr. Brown a letter.  I was made
12 aware, because as a consequence of the policy that we have,
13 I needed to be involved in the process.  It's a very
14 prescribed process about what needs to occur.
15     Q.  Okay.  So when we talk about what needs to occur,
16 you're talking about Dr. Brown's termination from the
17 program that was mentioned in this letter that you're
18 referring to that Dr. Lubahn sent Dr. Brown.  Did that
19 question make sense to you?
20     A.  Could you ask it again?
21     Q.  Sure.  You talk about needing to be involved.
22 What you're being involved in is Dr. Brown's termination,
23 which was mentioned in the letter Dr. Lubahn sent to Dr.
24 Brown.
25     A.  (Witness nods head.)  Yes.

Page 33

1      Q.  And how did you become aware of the letter?  And
2  if you -- I have a copy of it, if you'd like to see it, if
3  it would help.
4      A.  I would.
5          (Pepicello Deposition Exhibit 1
6          marked for identification.)
7      Q.  All right.  So we have marked a letter dated March
8  1st, 2004 from Dr. Lubahn to Dr. Brown as Exhibit 1.  And
9  the question is, have you seen that document before?
10     A.  Yes.
11     Q.  Were you aware that Dr. Lubahn planned to send Dr.
12 Brown that letter before the date of the letter, which is
13 March 1st, 2004?
14     A.  He had mentioned to me that he was going to send
15 it, yes.
16     Q.  Was that in a phone call or a personal
17 conversation or what?
18     A.  A phone call.
19     Q.  Do you remember when the call was?
20     A.  Not exactly.
21     Q.  Before March 1st?
22     A.  Yes.
23     Q.  Now, when you say you needed to be involved, what
24 led you to that conclusion?
25     A.  Well, as the administrative person who is

Page 38

1  A. I don't recall exactly where it came from.
2  Q. Do you recall who gave it to you?
3  A. No, I don't.
4  Q. Do you recall anything about the evaluations that
5  you had reviewed?
6  A. Yes. It was a mixture of opinions. Assessments,
7  I guess, maybe is a better word to describe it.
8  Q. Do you remember having any conclusions once you
9  reviewed the evaluations?
10  A. No, I didn't come to any conclusions. I just read
11  what was there and waited for the opportunity to speak to
12  her.
13         (Pepicello Deposition Exhibit 2
14         marked for identification.)
15  Q. All right, Exhibit 2 is an e-mail from Rosanne
16  Jaworski to you about your role in reviewing Dr. Brown's
17  status in the program in March of 2004, correct?
18  A. Um-hum. Yes.
19  Q. You better say yes.
20  A. I'm sorry.
21  Q. Yes. Just to help the reporter.
22         (Discussion held off the record.)
23  Q. How did this e-mail -- who is Miss Jaworski, by
24  the way?
25  A. She is the individual who would be at a -- I guess

Page 39

1  supervisory director level for medical education, both
2  graduate and continuing medical education and library
3  services.
4  Q. And who does she work for? Which unit?
5  A. Well, this -- it would be in medical affairs. And
6  at the time she would ultimately have reported to me.
7  Q. Does she work for medical education?
8  A. Yes.
9  Q. And it appears that she's giving you some advice
10  about your role in resolutions of Dr. Brown's grievance. Is
11  that fair to say?
12  A. Yes.
13  Q. Other than Dr. Brown's evaluations, did you review
14  any other documents before you met with Dr. Brown?
15  A. Only what was in this file. And I can't recall
16  everything that was in it. But the principal documents were
17  her evaluations -- I think there may have been a letter to
18  her from Dr. Lubahn. And a few other things. Again, I
19  can't remember the exact details of everything that was in
20  there.
21  Q. And you had a meeting with Dr. Brown, correct?
22  A. I did.
23  Q. And what took place at the meeting?
24  A. Well, basically we talked about the fact that this
25  was her opportunity to, in essence, tell her side of the

Page 40

1  story to me.
2  Q. And did she do that?
3  A. Yes.
4  Q. What do you remember about what she said?
5  A. Well, I don't remember a lot of the detail. She
6  did make a comment about the fact that she had had some
7  personal difficulties that prevented her from fulfilling
8  some of the requirements that were placed upon her as a
9  resident. And as I recall, she had a problem with one of
10  her children. And that was pretty much the essence of the
11  conversation.
12  Q. What do you remember about what you said to her
13  during the meeting?
14  A. Well, I didn't say a lot. I mostly listened. And
15  at the end thanked her and said that I would take our
16  discussion into consideration and make a recommendation.
17         (Pepicello Deposition Exhibit 3
18         marked for identification.)
19  Q. All right, Dr. Pepicello, you have had a chance to
20  look at Exhibit 3, which is a March 22nd, 2004 letter from
21  you to Dr. Brown, correct?
22  A. Yes.
23  Q. And the letter, which gives us the date that you
24  and she met, which is in the second paragraph -- March 17th,
25  2004. Is that correct? Is that the date you met with her?

Page 41

1  A. Again, I don't recall exactly, but --
2  Q. Do you have any reason to question the accuracy of
3  that?
4  A. No. No, I don't.
5  Q. All right. Right after that date, in the second
6  paragraph, you talk about your investigation of the
7  situation.
8  A. Um-hum.
9  Q. You have already told us about looking at files.
10  A. Um-hum.
11  Q. Her file. Other than that, what did your
12  investigation of the situation consist of?
13  A. It was the conversation with Dr. Lubahn and the
14  review of the documents that I was given.
15  Q. Is this the conversation with Dr. Lubahn before
16  the March 1st letter?
17  A. Yes.
18  Q. Now, also in the second paragraph, it appears that
19  what you did was recommend that Step 3 of the due process
20  procedure be enacted. Do you see where the letter says
21  that?
22  A. Yes.
23  Q. And I'm going to refer back to Exhibit 2, which is
24  the Jaworski e-mail to you. And the third bullet point
25  says, "At the time Dr. Pepicello meets with Dr. Brown, he

Page 42

1  should not make any statement as to a decision/resolution."
2  Correct?
3      A.   Yes.
4      Q.   And is it fair to say that you did not make any
5  statement about a decision or a resolution?
6      A.   Yes.
7      Q.   Before you met with Dr. Brown -- let me back up a
8  little.  You're aware that there is a grievance resolution
9  and due process procedure, a written procedure for issues
10 that residents have, correct?
11     A.   Yes.
12     Q.   Did you review that procedure -- the written
13 procedure before you met with Dr. Brown?
14     A.   I don't recall that I specifically reviewed the
15 document.
16          (Pepicello Deposition Exhibit 4
17          marked for identification.)
18     Q.   All right.  Dr. Pepicello, we have marked as
19 Exhibit 4 the Grievance Resolution and Due Process Procedure
20 which is -- has a revised date of September 6th, 2002.  And
21 you've had a chance to review that document, correct?
22     A.   Yes.
23     Q.   Step 2 on Page 2 of the grievance policy talks
24 about the opportunity for the aggrieved resident to meet
25 with the Senior Vice President of Medical Education.

Page 43

1  Correct?
2      A.   Yes.
3      Q.   And Step 3 says, "If Step No. 2 resolution is
4  still unsatisfactory to the resident/intern or the VP for
5  Medical Education, the resident/intern and/or the VP for
6  Medical Education may direct the matter immediately in
7  writing within seven days to the medical education
8  committee."  Correct?
9      A.   Yes.
10     Q.   Step 3 seems to say that Step 2 -- that is, the
11 review by you -- would result in some resolution.  Is that a
12 fair characterization?
13         MS. RICHARD:  I'm going to object for one second.
14         The policy refers to a Senior Vice President of
15         Medical Education, and you just said a review by
16         him.  I don't believe there's been any testimony
17         that he was the Senior Vice President for Medical
18         Education.
19         MR. SOREK:  All right.
20     Q.   So you have heard your counsel's objection.  Given
21 that objection or that bit of information, were you the
22 right person for Dr. Brown to go to, or not?
23     A.   Yes.
24     Q.   Well, then, did you and she appropriately carry
25 out Step 2, or not?

Page 44

1      A.   Well, she had an opportunity to discuss the matter
2  with me.
3      Q.   Should she have gone somewhere else?
4      A.   There was -- we're getting a little hung up here
5  on the language.  These policies change, the titles of
6  people change.  It reflects the -- a person who has the
7  responsibility for this particular matter.  In this case,
8  that was me.
9      Q.   So -- and then I was referring to Step 3, which
10 refers to a Step 2 resolution.  And my question is, do you
11 believe that you resolved anything in Step 2?  Because it
12 appears to me, in your March 22nd letter to Dr. Brown, that
13 all you did was send the matter to Step 3.  And you did not
14 yourself make any decision about her grievance.  Is that
15 fair?
16     A.   That's fair.
17     Q.   Do you believe that is consistent or inconsistent
18 with the grievance resolution and due process procedure?
19     A.   Ask the question again.  Do I believe --
20     Q.   Is it -- is what occurred consistent with the due
21 process procedure?
22     A.   I believe it is, yes.
23     Q.   Even though -- well, you put into words what your
24 resolution of the grievance was.  How would you characterize
25 what you did?

Page 45

1      A.   Well, I would characterize it as hearing Dr.
2  Lubahn's assessment, listening to Dr. Brown's assessment,
3  finding that the recommendation was a reasonable one.  But
4  that since it was -- since it was negative to Dr. Brown,
5  then it would go to the next step.
6      Q.   It sounds like your resolution, then, was in favor
7  of Dr. Lubahn.  Is that fair to say?
8      A.   I don't know if "in favor of Dr. Lubahn" is the
9  correct way to put it.
10     Q.   I guess what I'm getting at is -- and however you
11 characterize it, that's what matters.  But Step 2 seems to
12 call for a resolution by you, and your letter to Dr. Brown
13 doesn't seem to contain a resolution.  Is that accurate or
14 not?
15     A.   I -- yeah, I guess that's accurate.
16     Q.   Did you have a chance to look at Dr. Brown's
17 contract before you met with her?
18     A.   I don't recall that that was included in the
19 documents that I looked at, no.
20         (Pepicello Deposition Exhibit 5
21         marked for identification.)
22     Q.   Dr. Pepicello, you have been handed Exhibit 5,
23 which is the agreement between Dr. Brown and Hamot.  And
24 it's a multi-page document with about eight pages.
25         Really, the question I have -- you're invited to

Page 50

1  as part of your role in the grievance process?
2      A.   I don't, no.
3      Q.   Did you ever get any notice to preserve any
4  documents that were related to Dr. Brown's dispute with the
5  hospital?
6      A.   Yes, I did.
7      Q.   And do you remember -- would it help you to take a
8  look at the document?
9          (Pepicello Deposition Exhibit 6
10          marked for identification.)
11     Q.   What we have marked as Exhibit 6, an August 4th,
12 2004 memo from Mr. Inderlied to a number of people about
13 preserving documents because of the dispute Dr. Brown had
14 raised with the hospital.  Correct?
15     A.   Correct.
16     Q.   All right.  And you're on the cc list.
17     A.   I am.
18     Q.   And did you take any action after -- well, first,
19 did you receive the memo at the time?
20     A.   Yes.
21     Q.   Did you take any action in response to the memo?
22     A.   There was no action to take, because I had no
23 information, no documents.
24     Q.   And you didn't direct anybody else to preserve
25 anything, correct?

Page 51

1      A.   Not specifically.
2          (Pepicello Deposition Exhibit 7
3          marked for identification.)
4      Q.   All right.  I'd ask you to take a look at Exhibit
5  7, which is a document dated January 30th, 2004, signed by
6  Dr. Lubahn.  That appears to be a written evaluation -- a
7  semi-annual -- well, it actually has the title, Semi-Annual
8  Evaluation -- of Dr. Brown by Dr. Lubahn.
9          Do you remember looking at that document at any
10 time in your involvement with Dr. Brown's grievance process?
11     A.   If it were, it was in the -- and I think I do
12 recall seeing this.  But I think all of these evaluations
13 were in her file.  So the answer is yes.
14     Q.   Was it significant to you that 30 days before Dr.
15 Lubahn ended Dr. Brown's participation in the orthopedic
16 surgery residency, that he found that her clinical
17 performance had improved and was acceptable?
18     A.   The question was did I --
19     Q.   The question was, did you think it was significant
20 that 30 days before he sent Dr. Brown the letter ending her
21 participation in the program, Dr. Lubahn himself evaluated
22 her and found that her clinical performance had improved and
23 was acceptable?
24     A.   If the question was did I find it significant, I
25 don't know if "significant" is the right way to describe it.

Page 52

1  It was another piece of information in this line of
2  information.  I don't know exactly what you're getting at
3  when you ask, did I think it's significant.
4      Q.   Did it have any influence at all on your review of
5  her grievance; Exhibit 7?
6      A.   Did that specific piece of information in and of
7  itself or by itself?  No.  It was taken in the context of
8  everything else that was there.
9      Q.   Dr. Lubahn, in his evaluation 30 days before he
10 dismissed Dr. Brown from the program, also seems to review a
11 number of options for Dr. Brown to improve in areas that he
12 had found some deficiencies in, but he doesn't mention the
13 possibility of termination.  Is that significant to you at
14 all?
15         MS. RICHARD:  Today or then?
16         MR. SOREK:  Today.
17     A.   Is it significant that he didn't -- again, I guess
18 it depends upon the interpretation of the word
19 "significant".
20     Q.   Did it have any -- did it have any -- let's go
21 back to your frame of mind, then.  Did it have any influence
22 on your thinking at the time you were involved in the
23 grievance process?
24     A.   Well, again, I was looking at a continuum of
25 information.  And I guess to ask me to interpret the

Page 53

1  significance of this, I mean, again, to speculate, she had
2  been told on a number of occasions that her performance was
3  not acceptable.  It appears by virtue of this evaluation
4  that she at least made some effort to make some improvement,
5  and I guess I would take it at that and take it at its face
6  value.
7      Q.   Did the fact that this was the evaluation that was
8  closest in time to her termination have any influence on
9  your thinking?
10     A.   No.
11         (Pepicello Deposition Exhibit 8
12         marked for identification.)
13     Q.   All right, Dr. Pepicello, I've asked you to take a
14 look at Exhibit 8, which is the hospital's advancement and
15 dismissal policy.  It's got a revision date of 5/4/01 and it
16 says it was revised by MEC.  Is that correct?
17     A.   Yes.
18     Q.   And the policy was authored by Dr. Lubahn,
19 correct?
20     A.   Yes.
21     Q.   Did you review this policy at any time in your
22 involvement in the process of Dr. Brown's grievance?
23     A.   No, I did not.
24     Q.   Did you ask Dr. Lubahn or anyone else in the
25 process whether he had reviewed this policy?

Page 66

1  back -- I really don't -- I really can't tell you, to be
2  honest, what his status was. I didn't really know all the
3  details surrounding his situation.
4    Q. Do you know anything about any malpractice actions
5  brought against him?
6    A. I don't.
7    Q. Do you know anything about any actions by state
8  medical licensing boards against him?
9    A. I don't.
10   Q. Did Dr. Lubahn give you any information like that?
11   A. He didn't.
12   Q. Do you know whether he carried any malpractice
13 insurance?
14   A. I do not know.
15   Q. Would it be appropriate, in your view, for someone
16 in that position to have their background investigated to
17 determine whether they were properly being involved in the
18 program?
19   A. Well, when I discussed this with Dr. Lubahn, and
20 he explained to me the circumstances and what Dr. Bambrick
21 was going to be permitted to do, it really is similar to
22 having medical students observe a clinical care or nursing
23 students or a variety of other people who are in clinical
24 education programs that observe clinical procedures all the
25 time.

Page 67

1    Q. After you met with Dr. Brown and sent her the
2  March 22nd, 2004 letter, what was your role in her
3  participation in the program or her dispute with the
4  hospital after that?
5    A. I really didn't have any specific role, except to
6  set in motion the formation of the -- of the grievance
7  committee. But beyond that, the process took place without
8  my participation.
9    Q. You were not part of any of the grievance
10 committee meetings, were you?
11   A. No, I was not.
12       (Pepicello Deposition Exhibit 9
13       marked for identification.)
14   Q. Dr. Pepicello, we have handed you Exhibit 9 --
15   A. Yes.
16   Q. -- which is the --
17   A. Supervision of Residents --
18   Q. Supervision of Residents Policy. And you've had a
19 chance to review that. Did you review this policy at all
20 during your participation in the grievance process of Dr.
21 Brown?
22   A. No, I did not.
23   Q. Do you believe it is relevant to the situation
24 involving Dr. Brown?
25   A. Let me just read the bullet points carefully here.

Page 68

1  (Brief pause.) Yes.
2       (Pepicello Deposition Exhibit 10
3       marked for identification.)
4    Q. Dr. Pepicello, that exhibit, Exhibit No. 10, is a
5  letter from you to me about Dr. Brown's -- nonrenewal of Dr.
6  Brown's contract. Correct?
7    A. Yes.
8    Q. And what I'm going to point to is the very last
9  line on Page 2, which says, below your signature, "Get draft
10 to Mark Wassell," W-A-S-S-E-L-L, "and Dr. Pepicello for
11 their review." Do you see that?
12   A. Yes.
13   Q. Who drafted this letter?
14   A. To tell you the truth, I don't recall.
15   Q. You didn't do it?
16   A. No.
17   Q. Are you personally familiar with the information
18 in that letter?
19   A. Yes.
20   Q. Did you make any changes to the letter?
21   A. I don't recall that I did.
22   Q. And on Page 1, the second paragraph, the second
23 sentence of the second paragraph says, "The committee
24 considered the recommendations of Dr. Lubahn, the fact Dr.
25 Brown had been on probation at least twice during her

Page 69

1  residency program." Do you see that?
2    A. Yes.
3    Q. What do you remember about the two times Dr. Brown
4  was on probation?
5    A. Without specifically looking at all those records,
6  again, I really can't tell you.
7    Q. Do you remember looking at any records that --
8  that showed that she was on probation two times, as opposed
9  to one time?
10   A. I don't.
11   Q. The action involving Dr. Brown had to go through
12 three other steps -- or actually went through three other
13 steps before it was ended at the hospital. Is that fair to
14 say?
15   A. Yes.
16   Q. So there was a review by the medical education
17 committee, correct?
18   A. Um-hum.
19   Q. Did you have -- yes? You should say yes.
20   A. Yes. Yes. I'm sorry. Yes.
21   Q. Did you have any role in that review?
22   A. No.
23   Q. There was a review by the medical staff, correct?
24   A. Yes.
25   Q. Did you have any role in that review?

18 (Pages 66 to 69)

## Page 74

1  detailed reasons for nonrenewal of the contract, as well as
2  issues regarding clinical performance and competency by Dr.
3  Lubahn." Do you remember any of those detailed reasons?
4      A.  Well, I can't -- I couldn't give you the entire
5  list. I mean, they are well documented, I think, in other
6  things that you've made reference to today. But they, in
7  essence, would be a summary of those things that we have
8  talked about already.
9      Q.  And the presentation of detailed reasons was done
10 by you, correct?
11     A.  Yes.
12     Q.  Do you recall any questions that the Board asked?
13     A.  Not specifically.
14     Q.  Do you recall anybody on the Board asking whether
15 there was proper cause for the dismissal -- for the
16 nonrenewal of the contract?
17     A.  Not in those terms, no.
18     Q.  Do you recall anybody from the Board asking about
19 whether the advancement dismissal policy was followed?
20     A.  No.
21     Q.  Do you recall anybody from the Board asking about
22 Dr. Lubahn's evaluations of Dr. Brown, and particularly the
23 January 30th, 2004 evaluation?
24     A.  Not specifically, no.
25     Q.  Why do you think there are so few orthopedic

## Page 75

1  surgeons who are women?
2      A.  I don't know how to answer you. I guess it's
3  because the numbers of women who choose orthopedic surgery
4  as a specialty happen to be less than the number of men that
5  do. That has been typical for most surgical specialties.
6  But I don't -- I mean, I don't know that anybody really
7  knows why that is.
8      Q.  Have you ever given it any thought?
9      A.  Not particularly.
10     Q.  Is it a matter of concern for you as a hospital
11 administrator and someone who recruits physicians?
12     A.  Is what a matter of concern?
13     Q.  The low numbers of women in orthopedic surgery.
14     A.  No.
15         (Discussion held off the record.)
16         (Recess held from 12:01 p.m. till 12:11 p.m.)
17         (Pepicello Deposition Exhibit 13
18         marked for identification.)
19 BY MR. SOREK:
20     Q.  Dr. Pepicello, we have marked as Exhibit 13 your
21 letter to Dr. Brown dated May 27, 2004. Correct?
22     A.  Yes.
23     Q.  And that letter tells Dr. Brown the adverse
24 results of review by the various committees of her
25 grievance, correct?

## Page 76

1      A.  Correct.
2      Q.  What did you do in preparation for drafting that
3  letter, providing that information to Dr. Brown?
4      A.  What did I do in preparation?
5      Q.  Sure. Did you look at anything? Did you look at
6  any notes, documents, talk to anybody?
7      A.  No.
8      Q.  So that letter basically closes the loop in terms
9  of --
10     A.  It's basically a summary of the process, yes.
11     Q.  Did you have any role in -- I think you
12 mentioned -- what was the phrase -- starting the process of
13 review by the medical staff executive committee, the medical
14 education committee, and the Board of Directors?
15     A.  Did I -- I'm sorry, could you --
16     Q.  Who is the person who caused those people to take
17 up Dr. Brown's grievance?
18     A.  It was me.
19     Q.  Did you have any role in the process that the ad
20 hoc grievance committee, the medical education committee,
21 medical staff executive committee, or the Board of Directors
22 used in reviewing the decision about Dr. Brown's nonrenewal?
23     A.  Did I have any role in the --
24     Q.  In the process. In setting the process of how
25 those decisions were reviewed.

## Page 77

1      A.  No.
2      Q.  Do you know where those committees determined what
3  process they should use?
4      A.  I cannot quote you the names of the documents. I
5  think one of the documents we looked at earlier today
6  outlines the role of the grievance committee. But the
7  medical education committee, the medical staff executive
8  committee, and the Board of Directors are bodies that
9  receive information from the step below and make their
10 decisions based upon that information that's given to them.
11 It's kind of the way the process works.
12     Q.  So is it fair to say that the committees you just
13 mentioned used a process that they routinely use for the
14 decisions they make?
15     A.  Yes.
16     Q.  Have, in your experience -- in your most recent
17 experience as an administrator -- which I believe starts in
18 1999?
19     A.  2000.
20     Q.  2000.
21     A.  Um-hum.
22     Q.  Have you had to deal with any performance issues
23 of any other orthopedic residents?
24     A.  No.
25         MR. SOREK: That's all I have.

Page 78

1  MS. RICHARD: I actually have just a couple
2  questions.
3
4        CROSS-EXAMINATION
5  BY MS. RICHARD:
6
7  Q. Earlier when Mr. Sorek was asking you questions
8  about any training that might be provided to doctors at the
9  hospital, I think he was referring to personnel laws, and
10 you indicated no. Is there an orientation for doctors?
11 A. Yes, there is.
12 Q. And these are for newly privileged physicians?
13 A. Correct.
14 Q. Who conducts that orientation?
15 A. The Chief Medical Officer.
16 Q. So that would be you in some cases?
17 A. Up until a few months ago, it was me, yes.
18 Q. And who is it now?
19 A. Dr. Richard Long.
20 Q. Is there any -- during that orientation process,
21 is there any coverage of expected behavior of physicians?
22 A. Yes, there is.
23 Q. Does that coverage include the hospital's
24 expectations of physicians with regard to discrimination or
25 harassment?

Page 79

1  MR. SOREK: Object to the form as leading.
2  MS. RICHARD: I'm asking a specific question.
3  Q. Does it include any coverage of those issues?
4  MR. SOREK: It's still leading.
5  MS. RICHARD: That's fine.
6  MR. SOREK: Okay.
7  A. Yes, it does.
8  Q. Can you tell me whether there's anything in
9  writing that goes to doctors conveying the expectations with
10 regard to discrimination or harassment.
11 A. Yes. Contained within the medical staff handbook
12 in the section that contains the fair hearing plan, there is
13 a section specifically that deals with expectations with
14 respect to physician behavior to colleagues, to staff, to
15 patients, and so forth.
16 Q. Thank you. Is John Lubahn a member of the faculty
17 of the orthopedic surgery residency program?
18 A. Yes, he is.
19 Q. Are there any contacts that you have had with
20 anybody -- not counting your counsel -- with regard to Lisa
21 Brown that you haven't been asked about here today?
22 A. Yes.
23 Q. Can you tell me about those.
24 A. Yes. I had a visit from a Board member.
25 Q. Which Board member?

Page 80

1  A. Scott Kern.
2  Q. Okay.
3  A. Who came to me when this issue first arose and
4  discussed it with me specifically.
5  Q. What did he say?
6  A. In so many words, to summarize, he said, I know I
7  shouldn't be here, but I want to discuss this with you, and
8  it won't come up any further. He explained why he was
9  there. The reason was his -- he had a personal relationship
10 with Dr. Brown through family members. And basically was --
11 was asking about the process and asking me to consider the
12 circumstances carefully.
13 Q. Did he ask you to reverse the decision?
14 A. He asked if there was a way to reverse the
15 decision. I don't recall that he specifically asked me at
16 that time to reverse the decision.
17 Q. Did you have any other contacts with anybody?
18 A. Yes. Attorney Jim McNamara and Attorney Joel
19 Snavely, who I believe at the time were representing Dr.
20 Brown, came and spoke to me and, again, asked me about the
21 circumstances, asked me if there was some way that we could,
22 in so many words, work this out. And we discussed it for a
23 while. I did not give any indication of anything beyond
24 that. It really ended at the discussion between the two of
25 them and me.

Page 81

1  Q. Did they ask you to consider reversing the
2  decision?
3  A. Yes.
4  Q. And did you say no?
5  A. I don't recall that I said no. I recall that --
6  what I do recall is that I said we have a process in place
7  to deal with this, and we will let the process take its
8  course.
9  Q. In your experience, does the process ever result
10 in reversal of a decision of somebody, for instance, at a
11 program director level?
12 A. I'm trying to recall my own -- Dr. Brown's case
13 was the only incident in recent memory. When I harken back
14 to my own experience with our surgical residency. It was
15 ultimately the program director's decision was upheld.
16 Q. Was it your opinion that the committee had the
17 discretion to overrule Dr. Lubahn, if they chose to?
18 A. Oh, yes.
19 Q. Was it your opinion that the medical education
20 committee had discretion to overrule the grievance committee
21 if they chose to?
22 A. Yes.
23 Q. And was it your opinion the medical staff
24 executive committee had discretion to overrule the decision?
25 A. Yes, they did.

21 (Pages 78 to 81)

Page 82

1  Q. And what about the Board of Directors?
2  A. Yes, they did.
3  Q. You indicated that you had presented the case to
4  the Board for consideration on -- I think it was May 25th of
5  2004.
6  A. I believe that was the date, yes.
7  Q. Is it your memory, even though you can't remember
8  specific questions, that there were questions asked by Board
9  members?
10 A. Yes, there were.
11 Q. Would you say there were a lot of questions asked
12 by Board members?
13    MR. SOREK: Object to the form.
14 A. Yes, there were.
15 Q. And can you tell me whether any Board member
16 questioned whether the decision should be overturned and Dr.
17 Brown allowed to come back?
18 A. Yes. Mr. Kern did make a statement to that effect
19 at the Board meeting.
20 Q. Can you tell me what else you remember Mr. Kern
21 saying at the Board meeting.
22 A. Again, not specifically, but he did make a plea,
23 if you will, to the Board to consider this and consider
24 reversing this decision.
25 Q. Did he suggest that there might be legal exposure

Page 83

1  to the Board if they went forward with this decision?
2  A. He did, yes.
3  Q. Did he suggest that it might be a claim for breach
4  of contract?
5  A. I don't recall the exact statement that he made
6  specifically about the legal issues.
7  Q. Did the Board ask questions of Mr. Kern?
8  A. I don't -- I don't recall exactly whether they
9  asked -- whether any specific questions were directed at
10 him.
11 Q. Okay. Were questions asked of you or -- I'm going
12 to also -- let me ask you just that question first. Were
13 questions asked of you --
14 A. Yes.
15 Q. -- by Board members?
16 A. Yes.
17 Q. And did any Board member suggest to you that there
18 might be some alternative to upholding Dr. Lubahn's decision
19 in this case?
20 A. Yes. Questions were asking about were there
21 alternatives to the recommendation.
22 Q. And did you give them any alternatives?
23 A. I didn't suggest any specific alternatives to
24 them.
25 Q. Did they suggest any alternatives?

Page 84

1  A. Yeah, there were a couple of questions about, you
2  know, would it be possible to -- and, again, I really don't
3  remember exactly -- whether it would be possible to make
4  some accommodation in her training or -- again, it's hard to
5  go back that far and remember exactly. But there was
6  discussion about what were the alternatives here in terms of
7  this particular decision.
8  Q. About how long, if you remember, did the Board
9  consider this matter of Dr. Brown?
10 A. I don't know exactly, but, you know, probably 30
11 minutes. Maybe even a bit longer.
12 Q. And at the end, how did they vote?
13 A. They voted to uphold the recommendation, and it
14 was a unanimous vote.
15 Q. Did Mr. Kern vote?
16 A. No. He was excused.
17    MS. RICHARD: I have nothing further, then.
18
19         REDIRECT EXAMINATION
20 BY MR. SOREK:
21
22 Q. Dr. Pepicello, what is the oversight that the
23 hospital has for compliance with these expectations of
24 physician behavior? That is, you talked about the handbook,
25 and you talked about the expectations. How does the

Page 85

1  hospital check to see that the expectations are complied
2  with?
3  A. The Chief Medical Officer is -- in fact, any
4  administrative officer, but it's part of the role of the
5  Chief Medical Officer to investigate complaints about
6  physician behavior or physician responsiveness. And that
7  person, the Chief Medical Officer, is the one who exerts the
8  oversight.
9  Q. Do you know whether, in fact, that there is
10 review -- do you know whether, in fact, that the Chief
11 Medical Officer does that?
12 A. Yes.
13 Q. Have you done it in your role?
14 A. Yes.
15 Q. Describe how you do it. For example, you might
16 say something like, well, once a month I get a report from
17 "X," or I review this file, something like that. Can you
18 describe what you do to carry out your oversight.
19 A. Well, typically, it's done on a -- on an ad hoc
20 basis. If there's a complaint by a patient, a staff member,
21 a colleague about a behavior or a series of behaviors, it
22 would be brought to my attention, and the first step might
23 be sitting down with the person and getting more facts and
24 finding out what the details were and counseling and those
25 kinds of things.