Page 1

1           IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3   LISA BROWN, M.D.,              :
             Plaintiff             :
4                                  :
         v.                        :   Civil Action No. 05-32E
5                                  :
    HAMOT MEDICAL CENTER,          :
6            Defendant             :

7

8
            Deposition of DONALD INDERLIED, taken before
9
    and by Carol A. Holdnack, RPR, Notary Public in and
10
    for the Commonwealth of Pennsylvania, on Thursday
11
    September 1, 2005, commencing at 9:49 a.m., at the
12
    offices of Scarpitti & Mead, Renaissance Center,
13
    1001 State Street, Suite 800, Erie, PA 16501.
14

15

16  For the Plaintiff:

17       Patrick Sorek, Esq.
         Leech Tishman Fuscaldo & Lampl, LLC
18       525 William Penn Place, 30th Floor
         Pittsburgh, PA 15219
19

20  For the Defendant:

21       Kerry M. Richard, Esq.
         Tobin O'Connor Ewing & Richard
22       5335 Wisconsin Avenue NW, Suite 700
         Washington, DC 20015
23

24            Reported by Carol A. Holdnack, RPR
              Ferguson & Holdnack Reporting, Inc.
25

Page 58

1  A. Yes, sir.
2  Q. It shows there's a -- I guess a blind copy of this
3  memo to you and to Ms. Ashley, right?
4  A. Yes, sir.
5  Q. Did Ms. Ashley have a role in the Grievance
6  Committee?
7  A. No, sir.
8  Q. So you're not sure why she got a copy of this.
9  A. Yes, sir. She was sitting in on the Grievance
10 Committee because I could not physically be there. And I
11 had asked her to do so.
12 Q. But you were there by telephone.
13 A. Yes, sir.
14 Q. All right. So there was a meeting on March 30th,
15 April 6th, and April 8th, correct?
16 A. I believe. But I don't remember the specific
17 date.
18 Q. We'll --
19 A. They were close together.
20 Q. We'll confirm it later. Okay. Take a look at the
21 next page, which is Bates 213. It looks like an attendance
22 list, right?
23 A. Yes, sir.
24 Q. Have you ever seen this document before?
25 A. I don't believe so.

Page 59

1  Q. It just says attended meeting 4/6/04 on the --
2  A. Right.
3  Q. -- notepad. Gary Cortina, Nick Stefanovski, Mark
4  Suprock, Mary Beth Cermak, Dr. Lubahn. Do you see that?
5  A. Yes, sir.
6  Q. Do you know who wrote this?
7  A. No, sir, I do not.
8  Q. All right. Could it have been Ms. Ashley?
9  A. I don't know.
10 Q. Okay.
11 A. I don't recognize the handwriting, but that --
12 Q. I have some questions about some documents. And I
13 think Counsel and I will have to talk a little bit about how
14 we're going to handle that.
15     MS. RICHARD: Do you want to talk off the record,
16     or on?
17     MR. SOREK: It will probably go faster if we go
18     off the record.
19     MS. RICHARD: Let's go off the record.
20     (Discussion held off the record.)
21 Q. All right. Mr. Inderlied, we've taken a break to
22 talk about some of the documents that I want to ask you
23 about next. And I would ask you to take a look at the
24 documents from Page 952 -- Bates No. 952 to 966. You're
25 invited to read them. I'm not asking you to read them right

Page 60

1  now, but whatever you're comfortable with.
2  A. (Witness reviews document.) Yes, sir.
3  Q. All right. Do you recognize those documents?
4  A. Yes, sir.
5  Q. What are they?
6  A. They are notes that I took during the hearing or
7  the proceeding.
8  Q. Of the Grievance Committee?
9  A. Of the Grievance Committee. Thank you.
10 Q. Do you know if anyone else was taking notes?
11 A. Not to my knowledge. I don't know that.
12 Q. And if you look at the top, the -- your notes have
13 dates on them that show March 30th, April 6th, and April
14 8th.
15 A. Yes.
16 Q. So can we agree that those were the dates that the
17 committee met?
18 A. Yes, sir.
19 Q. All right. Which of those meetings were you not
20 there in person?
21 A. The April 6th and the April 8th meetings.
22 Q. You had a phone hookup with the committee, right?
23 A. Yes, sir.
24 Q. Was someone sitting in for you physically at the
25 6th and the 8th meetings?

Page 61

1  A. Yes, sir.
2  Q. Who was that, Ms. Ashley?
3  A. Dana Ashley.
4  Q. Because these notes concern the discussion of how
5  the hospital would handle Dr. Brown's grievance, they're
6  important to the case for both sides. Some issues with the
7  notes, as Counsel probably advised you, is the fax copy
8  sometimes makes words and passages illegible, and some lines
9  have been cut off. And I think there's a page missing from
10 one of the notes.
11     This is my chance to find out what these notes
12 say, unless we come up with an alternative. And the one way
13 to find out what they say is to ask you to read through the
14 notes. As an alternative to that, there's -- I believe
15 there's a much more efficient way to get the information.
16 And I think Counsel discussed it with you. That you might
17 look at these notes later and have a transcription. Is that
18 something that you would agree to?
19 A. Yes, sir.
20 Q. All right.
21     MS. RICHARD: In the meantime, we are going to --
22     at some point, when we take a break, we will also
23     go back to the hospital and get the originals.
24     And let you look at those today, so that you can
25     see them.

Brown v. Hamot Medical Center                                                                                                  Donald Inderlied

Page 66

1    A. Not specifically. They would hear from
2  Dr. Lubahn. They would hear from Dr. Brown. They would
3  discuss the situation. Or discuss the issue. And, again, I
4  don't remember if there was any, you know, gee, you talk,
5  and then you talk.
6    Q. Okay.
7    A. Not to my knowledge.
8    Q. At this meeting, the committee did not --
9    A. The meeting of 3/30?
10   Q. The meeting of 3/30, correct.
11   A. Okay.
12   Q. The committee did not look at Dr. Brown's paper
13 evaluations, correct?
14   A. Not to my knowledge.
15   Q. I mean, they discussed her performance. But they
16 were not looking at any documents, right?
17   A. I do not believe they were.
18   Q. All right. If you look at Bates No. 956, about
19 two-thirds of the way down the page, there's a -- it looks
20 like there's an arrow and the name Bill Bambrick, resident.
21 Do you see that?
22   A. Yes, sir.
23   Q. Was there a discussion about Dr. Bambrick?
24   A. Not that I recall.
25   Q. Why was this written there, is what I'm getting

Page 67

1  at?
2    A. Somebody must have mentioned the name. And I
3  wrote it down.
4    Q. Was there a discussion that you remember?
5    A. Not to my knowledge.
6    Q. It looks like Dr. Lippe spoke a fair amount. I
7  mean, is that a fair statement?
8    A. He spoke, yes.
9    Q. And he was a resident at the time, right?
10   A. Yes, sir.
11   Q. All right. Do you remember -- I take it -- let's
12 look at Bates No. 957.
13   A. All right, sir.
14   Q. A third of the way down the page, there's a
15 notation, "Craig." And I take that, that's Dr. Lippe,
16 right?
17   A. (No response.)
18   Q. Do you see that?
19   A. Yes.
20   Q. And you've got a numbered list. No. 1, ability to
21 do, I think. No. 2 --
22   A. Impact.
23   Q. -- impact --
24   A. On program.
25   Q. -- on program. Okay. No. 3, doesn't have support

Page 68

1  of residents, it looks like. Is that accurate?
2    A. Yes, sir.
3    Q. Did he explain what that meant?
4    A. I'm sure he did. I think those were his thoughts
5  on her -- I'm going to say her performance, but I don't know
6  that specifically.
7    Q. And then if you look farther down on the page --
8  well, two-thirds of the way down, I think it says, "If
9  second chance."
10   A. Yes.
11   Q. What's that referring to?
12   A. That's referring to the committee's discussion if
13 an option would be to give her another chance from a -- just
14 another chance. And they had outlined some of the --
15   Q. Conditions.
16   A. -- conditions under which they would do that. The
17 60-day review, specific targets, both clinical and academic.
18   Q. Okay. And then on Bates No. 958, second line from
19 the top, it says, "Follow up with Pep and Joe -- Pay." And
20 Pep, I take it, is Dr. Pepicello?
21   A. Yes, sir.
22   Q. And Joe is Dr. McClellan?
23   A. Yes, sir.
24   Q. And that's a note to yourself, is it, or not?
25   A. That was a note to myself.

Page 69

1    Q. How did this particular meeting wind up?
2    A. I believe at that time they -- as you'll note on
3  the bottom of 957, they recall Dr. Lubahn, reviewed the
4  potential of an option with him. And at that point in time,
5  again, there was some additional, it looks like, discussion
6  with regards to the criteria for that. And the committee
7  agreed to meet again the following Tuesday at 7:00 a.m.
8    Q. So was there any resolution out of this meeting
9  other -- about Dr. Brown, other than we're going to meet
10 again?
11   A. No, sir.
12   Q. All right. Let's take a look at the notes that
13 begin with heading 4/6/04. And that's Bates No. 959. Do
14 you see that?
15   A. Yes, sir.
16   Q. All right. So present at this meeting, Dana
17 Ashley, up in the right-hand corner, Dr. Albert, Cortina,
18 Long --
19   A. Craig Lippe.
20   Q. Craig Lippe. Okay. And --
21   A. Kruszewski.
22   Q. All right. Additional -- sort of just underneath
23 the top.
24   A. Um-hum.
25   Q. Additional discussions with Dr. Benes, Dr.

18 (Pages 66 to 69)

Brown v. Hamot Medical Center                                         Donald Inderlied

Page 70

1  Suprock. Right?
2     A. Yes.
3     Q. Does that mean they were there?
4     A. No, sir.
5     Q. What does additional discussions mean?
6     A. I believe Dr. Albert had some additional
7  discussions with them, with regards to some of the
8  information from the previous meeting.
9     Q. So that's in the interim between --
10    A. Yes, sir.
11    Q. -- March 30th and April 6th.
12    A. Yes, sir.
13    Q. So Dr. Lubahn appeared first, it looks like,
14 correct? Because you have -- I guess -- well, I guess you
15 wouldn't know that. You were at this meeting by phone,
16 right?
17    A. Yes, sir.
18    Q. What looks like Dr. Lubahn and then a list of
19 points. Did he talk first?
20    A. Yes.
21    Q. Okay.
22    A. I'm just trying to -- I'm trying to recall. And I
23 didn't make note that if he was there in person or if
24 Dr. Albert had talked with him prior to the meeting with
25 regards to the prior previous discussion on a second chance.

Page 71

1     Q. And I don't want to rush you. I just --
2     A. No. I just -- I'm trying to remember. And I
3  guess I'm not sure if he was physically there. I believe he
4  was, but I don't know that for a fact. Again, I was not
5  physically there.
6     Q. Okay. Right. Did you ever ask Ms. Ashley if he
7  was there?
8     A. No, sir.
9     Q. But she would know, since she was there in person.
10    A. Yes, sir.
11    Q. All right. One of the points you have under
12 Dr. Lubahn's name is AGME. Do you know what that is?
13    A. The American College of Medical Education. Or
14 what is it? AGME.
15    Q. Or maybe it's -- it is a C. I don't know.
16    A. It's whatever their governing body is.
17    Q. What did he say about their governing body?
18    A. I think he was referring to their standards.
19    Q. Do you recall what standards he mentioned?
20    A. No, sir.
21    Q. Did he mention that he had consulted the
22 standards?
23    A. I don't know that for a fact.
24    Q. And if you read through the -- the rest of your
25 notes about Dr. Lubahn, it appears that his testimony

Page 72

1  consisted of his affirmation of his decision and his
2  declining to offer a second chance to Dr. Brown.
3     A. Yes, sir.
4     Q. Is that fair? All right.
5     A. Yes, sir.
6     Q. And then almost to the bottom of the page, you've
7  got an asterisk circled. And it looks like the phrase,
8  "Obviously wants to give her another chance." Do you see
9  that?
10    A. Yes, sir.
11    Q. And that's -- you're talking about Dr. Cortina?
12    A. Yes, sir.
13    Q. Now, is that your observation?
14    A. That's my observation.
15    Q. All right. Turn to the next page, 960. It looks
16 like Dr. Long, under Dr. Long.
17    A. Yes.
18    Q. He said something about the committee, not second
19 guess -- not second guess John Lubahn. Do you see that?
20    A. Yes.
21    Q. Did he say that?
22    A. Yes. I don't know if that is a direct quote, but
23 that's --
24    Q. A summary.
25    A. -- a summary.

Page 73

1     Q. Not a quote. Okay. Take a look at the next page,
2  Bates 961. And I'm going to ask you about this second plus
3  sign down the page.
4     A. Um-hum.
5     Q. It looks like this passage says, "Hoped the Ortho
6  Department would have sat down and discussed the residents,
7  hyphen, and the department, hyphen, Cortina indicated this
8  would never happen." Do you see that?
9     A. Yes, sir.
10    Q. Did you have an understanding about what would
11 never happen?
12    A. I believe the sitting down and discussing the
13 residents as a group.
14    Q. Was that in the context of an evaluation tool or
15 of Dr. Brown?
16    A. I'm not sure if I understand what you mean.
17    Q. I'm trying to figure out in this passage about
18 a -- the Orthopaedic Department discussing residents.
19    A. Right.
20    Q. And Dr. Cortina saying this is never going to
21 happen. I'm trying to figure out what discussion does
22 Dr. Cortina think is never going to happen. What's the
23 subject of that discussion that he thinks is never going to
24 happen?
25    MS. RICHARD: If you know what he thinks.

19 (Pages 70 to 73)

Page 74

1  A. I don't know what he was thinking. I'm --
2  Q. Did he say anything?
3  A. Again, I don't know if it was a direct quote, the
4  statement above.
5  Q. All right. About middle of the page there's a
6  plus sign that says --
7  A. Plus sign. Okay.
8  Q. Let's see --
9  A. There's two of them there, three of them.
10      MS. RICHARD: Actually, three. The third in that
11      little grouping.
12  Q. Yeah.
13  A. Yes, sir.
14  Q. This passage says, "Giving her special treatment
15  over the other residents." Is that -- is that accurate?
16  A. Yes, sir.
17  Q. Who said that?
18  A. I don't remember specifically.
19  Q. Do you recall what they were talking about?
20  A. Again, if I relate it to this statement above
21  where it feels she could turn her around, they were
22  discussing what would have to happen in order to do that, or
23  which would happen. And I don't remember specifically what
24  they said.
25  Q. The special treatment sounds kind of like a

Page 75

1  criticism, though. I mean, we -- you're saying human
2  resources. It seems to me the catch phrase is more equal
3  treatment, and special treatment is something that is
4  sometimes pejorative. And I guess the question is, did
5  somebody make a comment that some conditions that Dr. Brown
6  might be subject to would be overly favorable to her?
7  A. Yes.
8  Q. Who said that?
9  A. I don't remember which --
10 Q. All right.
11 A. Whether that was Dr. -- I don't know who said
12 that.
13 Q. All right. But the comment was made.
14 A. Comment of that nature. Again, summary. It
15 wasn't necessarily a direct quote. But the discussion was,
16 if we do this, we are now giving her special treatment over
17 the other residents.
18 Q. All right. And then right underneath that there's
19 an arrow. It looks like it says, "Would consider additional
20 probation if all attendings support keeping her." Then
21 "John Lubahn, hyphen, maybe." Do you see that?
22 A. Yes.
23 Q. So, again, at this point in the discussion, was it
24 still open that -- that Dr. Brown -- was the committee still
25 discussing keeping Dr. Brown under certain conditions?

Page 76

1  A. Yes, sir.
2  Q. All right. Is there any significance about how
3  you indicate your notes? Some have arrows, some have plus
4  signs, some have little circles. Is that random, or?
5  A. No meaning whatsoever.
6  Q. All right. Do you know how long the meeting on
7  the 6th lasted?
8  A. I don't, specifically. My belief would be it was
9  probably at 9:00. Again, in that same time frame. Because
10 I believe all of those meetings lasted about the same time.
11 Q. How much time did they last?
12 A. From -- they started at 7:00 in the morning, and I
13 believe they went till 9:00 at least, or maybe after. I
14 didn't note the time that this stopped. But they all
15 started at 7:00 a.m.
16 Q. Let's take a look at the 4/8/04 notes. And at the
17 top, again, I think you're noting attendance.
18 A. Yes.
19 Q. It says, "Committee, all but Dr. Dulabon." Do you
20 see that?
21 A. Right. Yes, sir.
22 Q. Do you know why Dr. Dulabon --
23 A. He was on vacation, as I understand it.
24 Q. And, again, I don't -- I don't mean to be too
25 forward with you.

Page 77

1  A. No, no, no.
2  Q. I appreciate your straightforwardness. I would
3  just ask that if you waited until I finish --
4  A. Oh, I'm sorry.
5  Q. -- it's easier -- it's not for me. It's for the
6  court reporter.
7  A. Yes.
8  Q. I understand your answers. It's just hard for her
9  to --
10 A. Okay. I apologize.
11 Q. -- until I finish.
12 A. Okay.
13 Q. About the middle of the page on the left margin, I
14 think it says -- does that say impact?
15 A. I believe so.
16 Q. "Impact of Lubahn." Do you see that?
17 A. Um-hum.
18 Q. What does that comment mean?
19 A. I don't remember specifically.
20 Q. Okay. Go to the next page, 963.
21 A. (Witness complies.)
22 Q. Second group from the top. I think it says,
23 "Cortina. Specific facts when she was deficient in her
24 responsibilities." Do you see that?
25 A. Yes, sir.

FERGUSON & HOLDNACK REPORTING, INC.
814-452-4556

Page 78

1  Q. Do you remember, can you explain what that note
2  means?
3  A. Dr. Cortina may have asked for specifics, specific
4  facts when she was deficient in her responsibilities.
5  Q. Do you remember if he got a response?
6  A. I don't, specifically.
7  Q. And if you look on the left margin of this page,
8  there's also what looks like a note. It says, "Lubahn"
9  something.
10 A. "Lubahn partner".
11 Q. Okay. And --
12 A. Reference to Dr. Cermak.
13 Q. Right. Was there a significance in your mind that
14 she was a Lubahn partner?
15 A. No, sir.
16 Q. You don't think maybe that you may have made the
17 note because she has an association with Dr. Lubahn,
18 professional association?
19 A. Very well could be.
20 Q. Go to Page 964. And there is a passage that looks
21 like from Dr. Stefanovski. Do you see that?
22 A. Um-hum.
23 Q. And kind of read the last clause.
24     MS. RICHARD: After the arrow, or before?
25 Q. This is what I want to ask you about. If you want

Page 79

1  to read that area. It's in that area (indicating).
2  A. (Witness complies.) Okay.
3  Q. You wrote down -- it looks like, "Input from
4  residents important." Do you see that at the end of that?
5  A. Yes, sir.
6  Q. That's something that Dr. Stefanovski said?
7  A. I believe so.
8  Q. Do you believe that was reflected in the
9  committee's discussions? That they were, in fact, valuing
10 the input from the residents?
11 A. Yes, sir.
12 Q. And there's a page missing after this one. All
13 right. So Dr. Seeds also testified at this meeting; is that
14 right?
15 A. Yes, sir.
16 Q. And he was a resident at the time as well, right?
17 A. Yes, sir.
18 Q. And then kind of a third of the way down the
19 page --
20     MS. RICHARD: Which page are we on?
21     MR. SOREK: 966.
22     MS. RICHARD: Okay.
23 Q. You've got an asterisk circled. You have No. 1
24 terminated; No. 2, probation. Do you see that?
25 A. Yes.

Page 80

1  Q. This is a conclusion of the third meeting, right?
2  A. Yes, sir.
3  Q. It looks like it is. Is this the point when
4  somebody said we should take a vote to keep her or not,
5  something to that effect?
6  A. I believe that was a statement, if you see the
7  sentence just above by Dr. Cortina.
8  Q. I see.
9  A. And what option would you follow. And there were
10 two options; termination or probation.
11 Q. I see.
12 A. And he said termination.
13 Q. He said that.
14 A. Yes, sir.
15 Q. All right. And the last note you have, looks like
16 there's an arrow that says, "Uphold Dr. Lubahn," and it's
17 underlined. Do you see that?
18 A. Um-hum.
19 Q. How did this meeting conclude?
20 A. It concluded with the committee voting to uphold
21 Dr. Lubahn's decision.
22 Q. Do you know how the vote was taken? I mean,
23 physically. Sheets of paper? Did they raise their hand?
24 A. I don't believe it was on sheets of paper. Again,
25 I was not physically there. So I do not believe it was on

Page 81

1  sheets of paper. It was discussion of the group and how
2  they voted.
3  Q. Do you know whether at any time -- do you know
4  whether the committee was looking at any documents during
5  its meetings?
6  A. Which meeting are we talking about now?
7  Q. Any of the three meetings.
8  A. To the best of my knowledge, they were not in the
9  first meeting. And I was not present in the other two, so I
10 don't know.
11 Q. Fair enough. You don't remember them talking
12 about documents, such as --
13 A. No, sir.
14 Q. All right.
15 A. No, sir.
16 Q. Do you know whether the committee generated any
17 documents as a result of its meetings?
18 A. To the best of my knowledge, only the letters that
19 I've seen that went to Dr. Brown.
20 Q. Okay. Do you know whether the committee looked at
21 the paper evaluations of Dr. Brown?
22 A. I do not specifically know that they did that.
23 In, I think, one of the earlier memos that we looked at, it
24 indicated that they could review her file. And a number of
25 them indicated that they had done so.

21 (Pages 78 to 81)

Brown v. Hamot Medical Center                                      Donald Inderlied

Page 86

1    Q.  So this letter, the date on this letter can't be
2  correct.
3    A.  No, sir. It's my understanding that that is
4  incorrect. It was done on the 8th. It's a typographical
5  error.
6    Q.  So this letter was sent out the same day the
7  committee took the vote, as far as you know.
8    A.  As far as I know, yes, sir.
9    Q.  All right. So there wasn't -- you had no
10 involvement in the grievance process between the committee's
11 vote and the issuance of this letter?
12   A.  No, sir, I did not.
13   Q.  Did you have any involvement in the review of
14 Dr. Brown's termination after that?
15   A.  After that letter?
16   Q.  Yes.
17   A.  No, sir.
18   Q.  I'm going to ask you to take a look at Bates
19 No. 233 and 234. And that's the first document after your
20 notes.
21       (Interruption in the proceedings.)
22   Q.  All right. Mr. Inderlied, this document is a
23 letter from Dr. Pepicello to me, so I'm going to assume you
24 haven't seen it before. Is that fair?
25   A.  Yes, sir.

Page 87

1    Q.  You have not seen this document before, correct?
2    A.  No, sir.
3    Q.  One thing I want to ask you about is the second
4  sentence of the second paragraph. It says, "The committee
5  considered the recommendations of Dr. Lubahn, the fact that
6  Dr. Brown had been on probation at least twice during her
7  residency program, and that she was not performing at the
8  level of the third year resident." Do you see that?
9    A.  Yes, sir.
10   Q.  Do you know anything about Dr. Brown's
11 probationary status?
12   A.  No, sir.
13       MR. SOREK: That's it, then, for that.
14       (Recess held from 12:30 p.m. to 1:54 p.m.)
15   Q.  Mr. Inderlied, we've had a lunch break, and we're
16 back. And I want to ask you some more questions about some
17 documents that we've received from the hospital.
18   A.  All right.
19   Q.  Take a look at Bates No. 239.
20   A.  (Witness complies.) Okay.
21   Q.  That's a May 27th letter from Dr. Pepicello to
22 Dr. Brown, correct?
23   A.  Yes, sir.
24   Q.  And it advises her about the decisions of the
25 hospital committees that reviewed her termination decision

Page 88

1  to uphold the decision, correct?
2    A.  Yes, sir.
3    Q.  Did you have any -- any role in producing this
4  letter for --
5    A.  No, sir.
6        MS. RICHARD: Wait for him to finish the question.
7    A.  I'm sorry.
8    Q.  All right. I'm going to ask you to take a look at
9  Bates No. 1064.
10   A.  All right, sir.
11   Q.  What is this document?
12   A.  (No response.)
13   Q.  It's notes, right?
14   A.  Yes.
15   Q.  Are they your notes?
16   A.  My handwriting.
17   Q.  All right. And it's just a couple entries. There
18 is a date, May 17th, '04, Medical Education Committee.
19 Review of Dr. Brown's situation. Dr. Albert presented the
20 case, and Grievance Committee unanimous approval. That's
21 basically what it contains, right?
22   A.  Yes, sir.
23   Q.  Were you present at that meeting?
24   A.  I made those notes, so I -- but I honestly don't
25 remember being present, unless the Medical Education

Page 89

1  Committee met before another committee.
2    Q.  Can you illuminate -- let's see. What's the
3  relationship between the Medical Education Committee and the
4  Medical Staff Executive Committee?
5    A.  I don't know.
6    Q.  What is the medical -- what does the Medical
7  Education Committee do?
8    A.  I don't know specifically.
9    Q.  What does the Medical Staff Executive Committee
10 do?
11   A.  I believe their role is to act on behalf of the
12 medical staff. And they are the -- they are -- the Medical
13 Staff Executive Committee is the officers -- I'm not sure
14 who all is on that committee -- that are representatives of
15 the medical staff.
16   Q.  And I take it they would have a role in hiring,
17 firing, promotion. Do they?
18   A.  No, sir.
19   Q.  They don't. They did have a review function in
20 Dr. Brown's case, though.
21   A.  I believe they have a review function, yes.
22   Q.  And do you know where that function comes from?
23 That is, where do they get the authority to say, well, we're
24 not involved in the firing decision, but we'll review the
25 firing decision.

23 (Pages 86 to 89)

FERGUSON & HOLDNACK REPORTING, INC.
814-452-4556

44d5579d-4ea0-4f27-aee7-29dd845c6666