```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   LISA BROWN, M.D.,                :
              Plaintiff               :
 4                                    :
         v.                           :   Civil Action No. 05-32-E
 5                                    :
     HAMOT MEDICAL CENTER,            :
 6            Defendant               :

 7

 8

 9            Deposition of J. DAVID ALBERT, II, M.D., taken

10   before and by Janis L. Ferguson, Notary Public in

11   and for the Commonwealth of Pennsylvania, on Friday,

12   December 16, 2005, commencing at 2:28 p.m., at the

13   offices of Knox McLaughlin Gornall & Sennett, PC,

14   120 West 10th Street, Erie, Pennsylvania 16501.

15

16   For the Plaintiff:
         Patrick Sorek, Esquire
17       Leech Tishman Fuscaldo & Lampl, LLC
         525 William Penn Place
18       30th Floor
         Pittsburgh, PA 15219
19
     For the Defendant:
20       Kerry M. Richard, Esquire
         Tobin O'Connor Ewing & Richard
21       5335 Wisconsin Avenue NW
         Suite 700
22       Washington, DC 20015

23

24
                   Reported by Janis L. Ferguson, RPR
25             Ferguson & Holdnack Reporting, Inc.
```

Page 22

1  Q. And the -- it looks like they are all physicians
2  underneath. But --
3  A. Um-hum.
4  Q. -- could you match the name with the office so
5  that we can understand --
6  A. I believe so.
7  Q. -- who is who in terms of which person holds which
8  office.
9  A. I'm going to start from the bottom up, because
10 that's probably the easiest. Dr. Craig Lippe was the
11 resident that Dr. Brown chose to have on the committee.
12 Q. All right.
13 A. And let's see where we are here. The osteopathic
14 DME would be Dr. Kruszewski. The person from the medical
15 education committee was Dr. Dulabon. The vice president for
16 medical education was probably Dr. Long. I'm trying to find
17 out where the general -- the resident -- probably the
18 representative of the residency program must have been Dr.
19 Stefanovski.
20 Q. Was that person supposed to be a resident or not?
21 A. No, I believe that was a physician that's in
22 the -- probably the faculty member of the residency program.
23 The resident would be the resident selected.
24 Q. By the aggrieved.
25 A. Right.

Page 23

1  Q. I take it that the committee followed certain
2  procedures in carrying out its duties. Is that correct?
3  A. Yes.
4  Q. How did the committee decide what procedures to
5  follow?
6  A. We first looked at any suggestion from any
7  documentation from the medical center as to what the
8  committee was supposed to do.
9  Q. Let me stop you there.
10 A. Um-hum.
11 Q. Do you remember what you looked at?
12 A. If it's anything more than this document, I'm not
13 certain.
14 Q. Okay. When you say "this", you mean Pepicello No.
15 4?
16 A. Pepicello No. 4. We looked at that. If there
17 were any other appropriate documents -- and, again, I don't
18 know that there were. But if there were, we would have
19 reviewed those. And then we generally discussed the
20 appropriate way to conduct that review within the confines
21 of those requirements.
22 Q. Did the committee keep any records?
23 A. We kept minutes of the meetings.
24 Q. Who kept the minutes?
25 A. Mr. Inderlied did them.

Page 24

1  Q. Was he directed to do that?
2  A. Yes.
3  Q. By whom?
4  A. By me.
5  Q. Apart from the grievance resolution and due
6  process procedure, can you state what procedures the
7  committee followed.
8  A. Can you clarify. You mean --
9  Q. Sure.
10 A. -- written procedures?
11 Q. I'd like to find out the scope of all of the rules
12 or process that the committee followed. For example, there
13 may have been a process on who they would talk to. There
14 may have been a process on what documents they would look
15 at. There may have been a process about, you know, which
16 witnesses or what representatives would be able to talk.
17 There may have been a process about how long people would be
18 able to talk.
19 A. Okay.
20 Q. Can you tell me, did the committee discuss any
21 issues like that?
22 A. Yes, we did.
23 Q. And what was -- what did the committee discuss?
24 A. We talked about how to get the most information so
25 that we could make an appropriate decision. We initially

Page 25

1  talked to the two prime parties, which would be Dr. Lubahn,
2  who made the initial decision, and Dr. Brown, who filed the
3  grievance.
4  Q. And that was the March 30th meeting, correct?
5  A. Yes. In the process of conducting this, I think
6  there was a very strong feeling within the committee that we
7  wanted to do everything to make sure that we came up with
8  the appropriate decision. This, after all, would likely
9  significantly affect Dr. Brown's ability to continue in an
10 orthopedic residency. And for that reason, we probably went
11 beyond what was prescribed in the normal review process.
12 And, in fact, we agreed that we wanted to bring everybody in
13 that had information. We wanted to talk to all of the
14 orthopedic faculty, to the residents, see all the
15 documentation that we could regarding performance by the
16 resident, what accommodations had been made, how that was,
17 you know, followed, if there were recommendations given to
18 her. And, really, from the ground up, document everything
19 that had happened to her during her training to that point.
20 Because we felt that without doing that, we might feel
21 uncomfortable later on, and we wanted to be able to look at
22 this and feel comfortable.
23      And even though it said that it was going to be a
24 majority vote, we all felt strongly that it really needed to
25 be a unanimous vote. Unless we all felt that that was the

Page 26

1 appropriate decision, we would feel uncomfortable holding
2 it. And that's really why we went through a very long
3 process and interviewed as many people as we did and
4 reviewed as much information as we were aware existed.
5  Q. When you said -- I think you said a moment ago you
6 wanted to document. Did you say -- you wanted to document
7 everything. Were you referring to the committee's work, you
8 were documenting?
9  A. I'm not exactly sure if I meant document that.
10 But we wanted to see the documentation. We weren't going to
11 document. We wanted to see all the documentation, so that
12 we could consider that, when we deliberated.
13  Q. What standard of decision did the committee use to
14 reach its conclusion? And by that, I mean in our business
15 we have -- we have terms like substantial evidence or
16 preponderance of the evidence. Is there a description of
17 the -- the standard or rule that the committee was
18 considering when it took its vote?
19  A. As I said, I -- we felt that it had to be a
20 unanimous decision, and I think that meant that each and
21 every one of us had no doubts left after the review process;
22 that that was the appropriate decision. I guess that would
23 lend itself toward your description of preponderance of
24 evidence. There is no higher standard.
25  Q. Was that standard discussed, or was that just kind

Page 27

1 of a feeling?
2  A. I think that was discussed.
3  Q. And agreed on?
4  A. Yes.
5  Q. So is it fair to say that the committee agreed
6 that any decision it would make -- or let me rephrase that.
7 Unless the committee unanimously agreed that it had no
8 doubts about the propriety of Dr. Lubahn's decision, his
9 decision would not be upheld? Is that fair?
10  A. That's fair.
11  Q. What documentation did you review as the chair of
12 the committee?
13  A. I really reviewed exactly the same documentation
14 as everybody else on the committee. What we asked for were
15 any evaluations that had been given to Dr. Brown. We asked
16 for any scores of any exams that she may have taken as part
17 of the program. I think that's probably everything that I
18 can clearly remember in documentation, because I think
19 that's all they had from the program. They don't actually
20 take, you know, normal exams day to day in the orthopedic
21 program, as they would in my program, so we really didn't
22 have that to look at.
23  Q. Who -- who did you ask to provide this
24 information?
25  A. I don't know that I -- I mean, I knew -- I made

Page 28

1 that wish to the committee as a whole. We said we want to
2 see that. Exactly who was responsible for getting the
3 information together for us, I don't recall. Probably
4 whoever was acting as our secretary at the time.
5  Q. Who was that?
6  A. Probably Mr. Inderlied. And he was our recording
7 secretary, and I suspect that we just asked him to make sure
8 that we had that documentation.
9  Q. Do you, in fact, know that the other members of
10 the committee reviewed that documentation, or is that just
11 something you believe?
12  A. My recollection is that we had it at the meeting
13 and that everyone looked at it.
14  Q. Did you have multiple copies or one copy, one set?
15  A. I'm not sure, but I believe everybody had copies.
16  Q. Do you know what happened to those copies?
17  A. No one took them with them, because of the
18 confidential nature of it. And I think they were returned
19 to whoever provided them for us initially for the meeting.
20  Q. Was there a time when everybody was in one room
21 with the copies of these --
22  A. Yes.
23  Q. -- brown documents? Was that at the March 30th
24 meeting, or some other time?
25  A. I believe that was at the first meeting, yes.

Page 29

1  Q. Now, you talked about Dr. Lubahn and Dr. Brown
2 coming in and -- I'll use the word testifying. But talking
3 to the committee.
4  A. Yes.
5  Q. Did the committee review the records before they
6 talked to Lubahn and Brown or while they were talking to
7 them or afterward, or how did that work?
8  A. I believe we looked at the records before we
9 talked to either one of them for a few minutes, just to get
10 a feel for what we would hear from them and what questions
11 we would like to ask.
12  Q. Did you have any of the documents at the
13 subsequent meetings; at the April 6th or April 8th meetings?
14  A. I believe they were available for the second
15 meeting, but I do not believe we had them for the third
16 meeting.
17  Q. And when you say "available", were they sitting in
18 a corner somewhere? Were they passed -- did committee
19 members have them in front of them?
20  A. I believe they were laying on the table between
21 us, but they were not handed out in individual packets.
22  Q. You testified a few minutes earlier about a desire
23 to go beyond the ascribed normal review process. Do you
24 remember saying something like that?
25  A. Something like that, yes.

8 (Pages 26 to 29)