## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LISA BROWN, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 05-32 E** |
| | ) | |
| **HAMOT MEDICAL CENTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### DEFENDANT HAMOT MEDICAL CENTER'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSTITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Hamot Medical Center ("Hamot"), by and through its undersigned counsel and in accordance with LR 56.1.C.2., hereby submits its memorandum of points and authorities in Opposition to plaintiff's Motion for Partial Summary Judgment ("Opposition"), and states as follows:

## I.      INTRODUCTION

On August 15, 2006, Hamot filed a Motion for Summary Judgment as to all five Counts in plaintiff's Complaint.  On the same date, plaintiff filed a Motion for Partial Summary Judgment ("Motion") as to Counts III and IV of her Complaint, i.e., Hamot's alleged breach of contract for terminating her employment from Hamot's orthopedic surgery residency program (the "Program") without proper cause and for allegedly not following its Advancement and Dismissal Policy (the "A&D Policy").  This memorandum of points and authorities is Hamot's Opposition to plaintiff's Motion and addresses plaintiff's points and argument contained in her Motion.  For the avoidance of duplicity, however, this Opposition incorporates by reference the facts and evidence set forth in Hamot's Motion for Summary Judgment to the extent they also explain why plaintiff's Motion should be denied.

## II.    FACTUAL BACKGROUND

In its accompanying Opposition to plaintiff's Concise Statement of Material Facts, Hamot sets forth the factual background necessary for the court's determination of plaintiff's Motion, both responding to facts alleged by plaintiff and reciting additional necessary facts. Accordingly, Hamot respectfully refers the court to its Opposition to plaintiff's Concise Statement of Material Facts.

## III.    ARGUMENT

### A.    Hamot Complied Fully with the Terms of the Agreement and Therefore Plaintiff's Summary Judgment Motion as to Count III Must Be Denied

Plaintiff seeks summary judgment on her claim that Hamot breached its Resident Agreement of Appointment (the "Agreement") with plaintiff because it terminated the Agreement without "proper cause" pursuant to Section 3 of the Agreement.  To prevail, she must show that the Agreement is clear and unambiguous, and that there is no reasonable alternative to her interpretation of the Agreement.  *Pennbarr Corp. v. Insurance Company of North America*, 976 F.2d 145 (3d Cir.1992) (citing *Landtect* at 79. "[i]f the non-moving party presents [the court] with a reasonable reading of the contract … then a question of fact as to the meaning of the contract exists which can only be resolved at trial.").  A "contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Insurance Adjustment Bureau, Inc. v. Allstaet Ins. Co*, --- A.2d ----, 2006, WL 2431634, Pa., 2006 (citing *Kripp v. Kripp*, 578 Pa. 82, 849 A.2d 1159, 1163 (2004).  Plaintiff fails to show the Agreement is unambiguous and meet the required standard.

In fact, Hamot did not terminate the Agreement pursuant to Section 3; rather, it exercised its rights pursuant to Section 5 of the Agreement, which permits non-renewal of a contract upon 120 days notice.  Further, even if plaintiff could somehow establish that the Agreement required

"proper cause" under the circumstances in this case, plaintiff's plethora of academic deficiencies constituted proper cause.

1.    **Hamot Decided Not to Renew Plaintiff's Agreement; It Did Not Terminate Her Agreement for Proper Cause**

Plaintiff alleges a series of foundational facts with which Hamot takes no issue. The parties agree that the Agreement constitutes a one-year renewable agreement setting forth the parties' basic obligations with regard to plaintiff's residency training. See Exhibit B of Plaintiff's Motion (Resident Agreement of Appointment). However, plaintiff continues to fundamentally misunderstand and mischaracterize how her time as an orthopedic surgery resident in the Program came to an end. Her entire argument turns on the false assumption that the Agreement could only be terminated for "proper cause." In contrast, the Agreement expressly provides two mutually exclusive means of terminating the Agreement: 1. Effective immediately upon notice, for proper cause (Section 3), or 2. Effective upon completion of the current contract term, providing that the terminating party provides 120 days notice (Section 5).

Hamot has never suggested that plaintiff was terminated pursuant to Section 3. It has consistently and undisputedly stated that its action was a decision not to renew the Agreement under Section 5.[1] See Exhibit A of Plaintiff's Motion (Non-Renewal Letter from Dr. Lubahn to Dr. Brown). On March 1, 2004, Dr. Lubahn gave plaintiff 120 days written notice that "[he has] decided not to renew [plaintiff's] contract at the end of this academic year, June 30, 2004." Id. Highlighting the distinction between Section 5 (non-renewal) and Section 3 (termination), Dr. Lubahn further wrote that "immediate termination" would result if plaintiff failed to provide competent care during the remainder of the Agreement term.

---

[1] Nothing in the non-renewal provision of the Contract requires "proper cause" as a condition to non-renewal.

Hamot complied fully with its obligations to plaintiff under the Agreement.  It notified her that she would not satisfactorily complete the academic requirements to proceed to the next level of training 120 days prior to the end of the Agreement's term.  It allowed plaintiff to continue in the program through June 30, 2004, and it paid her through the end of the Agreement.  See Exhibit 12 (Complaint) at ¶ 6.  Accordingly, Plaintiff's Motion on Count III of the Complaint must be denied.[2]

### 2.     Assuming Plaintiff's Exit from the Program Required Proper Cause, There Was Proper Cause for Hamot to Take Such Action

Assuming for the sake of argument that Hamot was required to have "proper cause" to terminate the Agreement, Hamot decidedly did.  As set forth at length in Hamot's Motion for Summary Judgment, plaintiff had an academic record replete with deficiencies.  Hamot repeatedly cautioned plaintiff about the need to improve her medical knowledge and clinical skills, but despite this knowledge, her deficiencies recurred.  The testimony is absolutely undisputed that plaintiff's inability to overcome her deficiencies and sustain performance at a level commensurate with her level of training was the sole reason for her separation from the Program.

Plaintiff seems to argue that because the Program Director's March 1 letter does not contain the magic words "proper cause", the decision not to advance Plaintiff to the next level -- and thus not to renew her contract -- is legally defective.  This conclusion is indefensible.  The letter itself specifies academic deficiencies that constitute proper cause.  Plaintiff was well aware of why her contract was not being renewed.  She was given multiple opportunities to challenge the decision, and she took them.  In these circumstances, she simply cannot argue that the failure to state "proper cause" in her letter resulted in any harm to her.

---

[2]  Indeed, for these same reasons, Hamot's Motion for Summary Judgment on Count III should be granted.

4

Finally, plaintiff suggests that the meaning of "proper cause" is obvious, and that as a matter of law, "proper cause" did not exist. She cites no authority for this concept. More than likely, in her reply, plaintiff will cite to cases construing "proper cause" in a collective bargaining agreement, or in other statutory settings (unemployment compensation, for example). These cases are inapposite. The Agreement principally creates an academic appointment. The Agreement exists because the Accreditation Council on Graduate Medical Education ("ACGME") requires Programs to enter into written contracts setting forth both the academic requirements of the Program. <u>See</u> Exhibits D and E of Plaintiff's Motion (ACGME Requirements). "Proper cause," as used in the Agreement, must therefore be interpreted in light of the academic relationship between Hamot and plaintiff. Plaintiff's on-going academic deficiencies more than support a finding that Hamot acted with "proper cause." As Program Director, Dr. Lubahn advised plaintiff in writing that his decision not to renew her Agreement was based on her "clinical performance and concerns regarding [her] current knowledge base in orthopaedics for the PGY-3 level." <u>See</u> Exhibit A of Plaintiff's Motion. From an academic perspective, Hamot has no choice but to decline to promote individuals who fail to satisfactorily achieve the educational objectives of the Program. Failure to read "proper cause" in this light will frustrate the objective intent of the parties as set forth in the Agreement. Just as important, it would frustrate the regulatory scheme that underpins all of graduate medical education. If, as plaintiff would argue, hospitals are required to continue to employ and promote unqualified residents, even though they are academically deficient, there will be no way to assure that residents who graduate from residency programs are competent and able to practice independently, as required by the ACGME. Such an interpretation is not warranted by the facts

of this case, and most certainly would not be "required as a matter of law." Accordingly, plaintiff's Motion on Count III of the Complaint should be denied.

### B. Hamot Was Not Contractually Bound by the Advancement and Dismissal Policy

Plaintiff also claims that Hamot breached the Agreement by not properly following its A&D Policy with respect to its decision not to renew the Agreement. Plaintiff's claim cannot possibly succeed because the guidelines and procedures in the A&D Policy are not contractual. Further, even assuming the A&D Policy's guidelines and procedures were binding terms, Hamot followed the A&D Policy as applied to plaintiff.

### 1. The Advancement and Dismissal Policy Is Not a Contract

Not surprisingly, plaintiff cites no legal authority for her claim that Hamot's A&D Policy is a contract. In fact, the policy is not even <u>mentioned</u> in the Agreement, much less did Hamot agree to be contractually bound by it.

Even under standards governing employee-employer relationships, Hamot was not obligated to follow the terms of the A&D Policy. Generally speaking, "failure to adhere to a company personnel policy does not create a cause of action for breach of an employment contract." *Beider v. W.R. Grace, Inc.*, 461 F.Supp. 1013, 1016 (E.D.Pa.1978), *aff'd* 609 F.2d 500 (3d Cir.1979). Further, when an employment contract exists, "[i]t is not sufficient to show [the employer] had a policy." *Nicholas v. Pennsylvania State University*, 227 F.3d 133, 145-46 (3d Cir.2000) (citing *Morosetti v. Louisiana Land & Exploration Co.*, 522 Pa. 492, 496, 564 A.2d 151, 153 (1989); *see also Richardson v. Cole Memorial Hospital*, 320 Pa.Super. 106, 466 A.2d 1084 (1983). Rather, "it must be shown [the employer] offered it as binding terms of employment…[a] company may indeed have a policy upon which they intend to act, given certain circumstances or events, but unless they communicate that policy as part of a definite

offer of employment they are free to change as events may require." <u>Id.</u>  Unless the terms or policies of a handbook or manual have been bargained for by the parties, any benefits conferred by it are mere gratuities. *Richardson* at 108-09.

Here, the A&D Policy did not result from a meeting of the minds between plaintiff and Hamot; rather, it was a response by Hamot to ACGME requirements.[3]  Because the A&D Policy's terms were not offered as binding terms of plaintiff's residency or agreed on by the parties, Hamot was free to change and adapt the terms according to various situations.  In short, the A&D Policy was simply that, a policy.

The Agreement does not bind Hamot to the A&D Policy, either expressly or by reference. There is no reference to the A&D Policy in the Agreement.  Further, the only language in the Agreement pertaining to policies at all states that it is the <u>Resident</u> who agrees to be bound by Hamot's policies.  <u>See</u> Exhibit B of Plaintiff's Motion at 1.

Because Hamot's A&D Policy is not a contract, plaintiff's Motion as to Count IV of her Complaint must be denied. *Pennbarr* at 150.

**2.    Even if Hamot Were Bound to the Advancement and Dismissal Policy, It Properly Adhered to and Followed the Policy with Respect to Plaintiff**

Even assuming Hamot were bound by the terms of the A&D Policy, it clearly applied those procedures to plaintiff.  The A&D Policy provides that "unless the situation should be deemed more serious," a resident should be given verbal and written warnings, before being placed on probation, and that a resident should be placed on probation before being dismissed from the program or before a decision is made not to advance a resident to the next level of training.  <u>See</u> Exhibit F of Plaintiff's Motion (Advancement and Dismissal Policy).  Hamot

---

[3]  It should be noted that the ACGME only requires teaching institutions to have a policy for advancement and dismissal.  It does not mandate any particular content.

considered the situation "more serious," and thus proceded to handle it in a manner consistent with its obligations to the ACGME.

Specifically, during her second year in the Program, plaintiff was struggling to keep up with her reading and maintain a knowledge base expected of an orthopedic resident with her level of training and experience.  See Exhibit 9 (Deposition Transcript of Lisa Brown) at 206:24-207:9 and 243:18-23.  When, in March 2003, she engaged in particularly egregious behavior, she was placed on academic and clinical probation.[4]  See Exhibit 5.  Plaintiff ultimately came off probation as of October 1, 2003.  Being off probationary status did not give plaintiff a "clean slate" – indeed, though she improved enough to come off probation, her record of persistently failing to meet the Core Competencies was not summarily erased.  See Exhibit 7 (Deposition Transcript of Dr. John Lubahn) at 94:14-95:1.

Next, in the context of her shaky, deficient record, her performance derailed again in February 2004.  The three major events that forced Hamot's hand in February 2004 – the letter from Dr. Mary Beth Cermak, plaintiff's substandard presentation of a medical conference and the report from Dr. Frank Benes – were particularly serious coming from plaintiff, more so than they might have been coming from a resident with a record of solid academic achievement.  See Exhibit 1 (Letter from Dr. Cermak to Dr. Lubahn); Exhibit 2 (February 2004 Clinical Presentation Evaluation of Dr. Brown); and Exhibit 3 (Email from Dr. Benes to Dr. Lubahn).  Moreover, all three events represented recurrences in plaintiff's deficient performance, demonstrating that prior efforts had failed to cure those deficiencies.

Following on the heels of plaintiff's probationary status from April through October 1, 2003, the troubling events of February 2004 caused Dr. Lubahn appropriately to conclude that

---

[4] Because plaintiff has not alleged in her Motion that Hamot failed to properly adhere to and follow its A&D Policy with respect to plaintiff's probation from April to October 2003, Hamot finds it unnecessary to provide a full account of the application of the A&D Policy to plaintiff during that time period.

the situation was "more serious," a discretionary finding which Dr. Lubahn was clearly entitled to reach under the A&D Policy. *See Bd. Of Curators of the Univ. of Missouri v.Horowitz,* 435 U.S. 78, 98 S.Ct. 948 (1978); *Mauriello v. Univ. of Medicine and Dentistry of New Jersey,* 781 F.2d 46 (Cir.3d 1986). The A&D Policy does not require the Program Director to inform a resident that his or her situation is "more serious," nor does it set forth a specific course of action when such a situation presents itself, but instead leaves the appropriate course of action to the discretion of the Program Director. Because of plaintiff's prior probation, opportunities to remedy her deficiencies, and performance in February 2004, Dr. Lubahn elected not to go through another probationary process with plaintiff, which he was not contractually obligated to do. Viewing the "entire picture" of plaintiff's academic and clinical record, and considering her previous probationary period and the numerous opportunities plaintiff was afforded to remedy her shortcomings, Dr. Lubahn concluded that "her whole performance" warranted non-renewal of plaintiff's contract and non-appointment to a fourth year in the Program. See Exhibit 7 at 76:5-15. *See Regents of the Univ. of Michigan v. Ewing,* 474 U.S. 214, 106 S.Ct. 507 (1985).

Finally, Dr. Lubahn did not act unilaterally in making the decision not to appoint plaintiff to a fourth academic year.[5] As Dr. Lubahn has stated, he discussed the possibility of not renewing plaintiff's contract with various members of the administration and the faculty before reaching his decision. Id. at 69:13-24 and 71:24-72:21. Further, Dr. Lubahn's decision was initially reviewed by Dr. James Pepicello, Executive Vice President and Chief Medical Officer, who concluded that the decision was reasonable, and was then subject to a thorough review by the Grievance Committee ("GC"), composed of a number of physicians from different specialties, as well as a resident selected by plaintiff. After meeting three times and considering

---

[5] It should be noted that per the ACGME, it was Dr. Lubahn's responsibility and obligation as Program Director to make the determination as to residents' competence to advance to the next academic year.

all of the testimony from witnesses and available options, the GC unanimously concluded that Dr. Lubahn's decision was appropriate and recommended that it be upheld. See Exhibit 10 (Deposition Transcript of Don Inderlied) at 80:15-21 and 88:19-20 and Exhibit 11 (Deposition Transcript of Dr. James Pepicello) at 81:16-18.[6]

After the GC's decision, the Medical Education Committee ("MEC") reviewed the GC's recommendation and voted to uphold Dr. Lubahn's decision. The MEC then reported its decision to the Medical Staff Executive Committee ("MSEC"), who again reviewed the decision. After discussion, the MSEC also upheld the decision unanimously. Finally, the decision was reviewed by Hamot's Board of Directors (the "Board"). After considering plaintiff's academic record, the decision not to renew plaintiff's Contract and any feasible alternatives to that decision, the Board unanimously voted to uphold the decision not to advance plaintiff to the next level of training. See Exhibit 11 at 67:1-11 and 76:16-18.

At every stage of review, each reviewing body had the authority to overrule the recommendation of the preceding committee. Id. at 81:16-82:2. Thus, Dr. Lubahn's decision to not reappoint plaintiff to a fourth academic year was not made unilaterally, and the decision was subject to a rigorous examination by various reviewing bodies, all of which had the authority to overrule the decision but ultimately upheld it.

Hamot has set forth a reasonable reading of the Agreement and specific facts evidencing that it properly adhered to and followed its A&D Policy with respect to plaintiff. *Pennbarr* at 150; Fed.R.Civ.P.56(e). Accordingly, the court should deny plaintiff's Motion with respect to Count IV of the Complaint.

---

[6] Significantly, the GC was authorized to act based on a "majority vote." However, Dr. J. David Albert, II, who headed the GC, confirmed that committee members decided on their own that they would not uphold Dr. Lubahn's decision unless everyone present agreed. See Exhibit 12 (Deposition Transcript of Dr. J. David Albert, II) at 25:5-27:4.

V.     **CONCLUSION**

For all of the foregoing reasons, plaintiff's Motion for Partial Summary Judgment with respect to any and all claims contained therein should be denied.

Respectfully submitted,

Tobin O'Connor Ewing & Richard

/s/ Kerry M. Richard
Kerry M. Richard
Ziad Haddad
Forrest G. Read
5335 Wisconsin Avenue, NW, Suite 700
Washington, DC  20015
202-362-5900
Date:   September 15, 2006          Counsel for defendant