Brown v. Hamot Medical Center　　　　　　　　　　　　　　　　　　Donald Inderlied

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
 3   LISA BROWN, M.D.,            :
              Plaintiff           :
 4                                :
         v.                       :  Civil Action No. 05-32E
 5                                :
     HAMOT MEDICAL CENTER,        :
 6            Defendant           :
 7
 8
              Deposition of DONALD INDERLIED, taken before
 9
     and by Carol A. Holdnack, RPR, Notary Public in and
10
     for the Commonwealth of Pennsylvania, on Thursday
11
     September 1, 2005, commencing at 9:49 a.m., at the
12
     offices of Scarpitti & Mead, Renaissance Center,
13
     1001 State Street, Suite 800, Erie, PA 16501.
14
15
16   For the Plaintiff:
17       Patrick Sorek, Esq.
         Leech Tishman Fuscaldo & Lampl, LLC
18       525 William Penn Place, 30th Floor
         Pittsburgh, PA 15219
19
20   For the Defendant:
21       Kerry M. Richard, Esq.
         Tobin O'Connor Ewing & Richard
22       5335 Wisconsin Avenue NW, Suite 700
         Washington, DC 20015
23
24              Reported by Carol A. Holdnack, RPR
                Ferguson & Holdnack Reporting, Inc.
25
```

EXHIBIT 10

FERGUSON & HOLDNACK REPORTING, INC.
814-452-4556

Page 78

1  Q. Do you remember, can you explain what that note
2  means?
3  A. Dr. Cortina may have asked for specifics, specific
4  facts when she was deficient in her responsibilities.
5  Q. Do you remember if he got a response?
6  A. I don't, specifically.
7  Q. And if you look on the left margin of this page,
8  there's also what looks like a note. It says, "Lubahn"
9  something.
10 A. "Lubahn partner".
11 Q. Okay. And --
12 A. Reference to Dr. Cermak.
13 Q. Right. Was there a significance in your mind that
14 she was a Lubahn partner?
15 A. No, sir.
16 Q. You don't think maybe that you may have made the
17 note because she has an association with Dr. Lubahn,
18 professional association?
19 A. Very well could be.
20 Q. Go to Page 964. And there is a passage that looks
21 like from Dr. Stefanovski. Do you see that?
22 A. Um-hum.
23 Q. And kind of read the last clause.
24    MS. RICHARD: After the arrow, or before?
25 Q. This is what I want to ask you about. If you want

Page 79

1  to read that area. It's in that area (indicating).
2  A. (Witness complies.) Okay.
3  Q. You wrote down -- it looks like, "Input from
4  residents important." Do you see that at the end of that?
5  A. Yes, sir.
6  Q. That's something that Dr. Stefanovski said?
7  A. I believe so.
8  Q. Do you believe that was reflected in the
9  committee's discussions? That they were, in fact, valuing
10 the input from the residents?
11 A. Yes, sir.
12 Q. And there's a page missing after this one. All
13 right. So Dr. Seeds also testified at this meeting; is that
14 right?
15 A. Yes, sir.
16 Q. And he was a resident at the time as well, right?
17 A. Yes, sir.
18 Q. And then kind of a third of the way down the
19 page --
20    MS. RICHARD: Which page are we on?
21    MR. SOREK: 966.
22    MS. RICHARD: Okay.
23 Q. You've got an asterisk circled. You have No. 1
24 terminated; No. 2, probation. Do you see that?
25 A. Yes.

Page 80

1  Q. This is a conclusion of the third meeting, right?
2  A. Yes, sir.
3  Q. It looks like it is. Is this the point when
4  somebody said we should take a vote to keep her or not,
5  something to that effect?
6  A. I believe that was a statement, if you see the
7  sentence just above by Dr. Cortina.
8  Q. I see.
9  A. And what option would you follow. And there were
10 two options; termination or probation.
11 Q. I see.
12 A. And he said termination.
13 Q. He said that.
14 A. Yes, sir.
15 Q. All right. And the last note you have, looks like
16 there's an arrow that says, "Uphold Dr. Lubahn," and it's
17 underlined. Do you see that?
18 A. Um-hum.
19 Q. How did this meeting conclude?
20 A. It concluded with the committee voting to uphold
21 Dr. Lubahn's decision.
22 Q. Do you know how the vote was taken? I mean,
23 physically. Sheets of paper? Did they raise their hand?
24 A. I don't believe it was on sheets of paper. Again,
25 I was not physically there. So I do not believe it was on

Page 81

1  sheets of paper. It was discussion of the group and how
2  they voted.
3  Q. Do you know whether at any time -- do you know
4  whether the committee was looking at any documents during
5  its meetings?
6  A. Which meeting are we talking about now?
7  Q. Any of the three meetings.
8  A. To the best of my knowledge, they were not in the
9  first meeting. And I was not present in the other two, so I
10 don't know.
11 Q. Fair enough. You don't remember them talking
12 about documents, such as --
13 A. No, sir.
14 Q. All right.
15 A. No, sir.
16 Q. Do you know whether the committee generated any
17 documents as a result of its meetings?
18 A. To the best of my knowledge, only the letters that
19 I've seen that went to Dr. Brown.
20 Q. Okay. Do you know whether the committee looked at
21 the paper evaluations of Dr. Brown?
22 A. I do not specifically know that they did that.
23 In, I think, one of the earlier memos that we looked at, it
24 indicated that they could review her file. And a number of
25 them indicated that they had done so.

Brown v. Hamot Medical Center                                                                                                    Donald Inderlied

Page 86

1   Q.  So this letter, the date on this letter can't be
2   correct.
3   A.  No, sir.  It's my understanding that that is
4   incorrect.  It was done on the 8th.  It's a typographical
5   error.
6   Q.  So this letter was sent out the same day the
7   committee took the vote, as far as you know.
8   A.  As far as I know, yes, sir.
9   Q.  All right.  So there wasn't -- you had no
10  involvement in the grievance process between the committee's
11  vote and the issuance of this letter?
12  A.  No, sir, I did not.
13  Q.  Did you have any involvement in the review of
14  Dr. Brown's termination after that?
15  A.  After that letter?
16  Q.  Yes.
17  A.  No, sir.
18  Q.  I'm going to ask you to take a look at Bates
19  No. 233 and 234.  And that's the first document after your
20  notes.
21      (Interruption in the proceedings.)
22  Q.  All right.  Mr. Inderlied, this document is a
23  letter from Dr. Pepicello to me, so I'm going to assume you
24  haven't seen it before.  Is that fair?
25  A.  Yes, sir.

Page 87

1   Q.  You have not seen this document before, correct?
2   A.  No, sir.
3   Q.  One thing I want to ask you about is the second
4   sentence of the second paragraph.  It says, "The committee
5   considered the recommendations of Dr. Lubahn, the fact that
6   Dr. Brown had been on probation at least twice during her
7   residency program, and that she was not performing at the
8   level of the third year resident."  Do you see that?
9   A.  Yes, sir.
10  Q.  Do you know anything about Dr. Brown's
11  probationary status?
12  A.  No, sir.
13      MR. SOREK: That's it, then, for that.
14      (Recess held from 12:30 p.m. to 1:54 p.m.)
15  Q.  Mr. Inderlied, we've had a lunch break, and we're
16  back.  And I want to ask you some more questions about some
17  documents that we've received from the hospital.
18  A.  All right.
19  Q.  Take a look at Bates No. 239.
20  A.  (Witness complies.)  Okay.
21  Q.  That's a May 27th letter from Dr. Pepicello to
22  Dr. Brown, correct?
23  A.  Yes, sir.
24  Q.  And it advises her about the decisions of the
25  hospital committees that reviewed her termination decision

Page 88

1   to uphold the decision, correct?
2   A.  Yes, sir.
3   Q.  Did you have any -- any role in producing this
4   letter for --
5   A.  No, sir.
6       MS. RICHARD:  Wait for him to finish the question.
7   A.  I'm sorry.
8   Q.  All right.  I'm going to ask you to take a look at
9   Bates No. 1064.
10  A.  All right, sir.
11  Q.  What is this document?
12  A.  (No response.)
13  Q.  It's notes, right?
14  A.  Yes.
15  Q.  Are they your notes?
16  A.  My handwriting.
17  Q.  All right.  And it's just a couple entries.  There
18  is a date, May 17th, '04, Medical Education Committee.
19  Review of Dr. Brown's situation.  Dr. Albert presented the
20  case, and Grievance Committee unanimous approval.  That's
21  basically what it contains, right?
22  A.  Yes, sir.
23  Q.  Were you present at that meeting?
24  A.  I made those notes, so I -- but I honestly don't
25  remember being present, unless the Medical Education

Page 89

1   Committee met before another committee.
2   Q.  Can you illuminate -- let's see.  What's the
3   relationship between the Medical Education Committee and the
4   Medical Staff Executive Committee?
5   A.  I don't know.
6   Q.  What is the medical -- what does the Medical
7   Education Committee do?
8   A.  I don't know specifically.
9   Q.  What does the Medical Staff Executive Committee
10  do?
11  A.  I believe their role is to act on behalf of the
12  medical staff.  And they are the -- they are -- the Medical
13  Staff Executive Committee is the officers -- I'm not sure
14  who all is on that committee -- that are representatives of
15  the medical staff.
16  Q.  And I take it they would have a role in hiring,
17  firing, promotion.  Do they?
18  A.  No, sir.
19  Q.  They don't.  They did have a review function in
20  Dr. Brown's case, though.
21  A.  I believe they have a review function, yes.
22  Q.  And do you know where that function comes from?
23  That is, where do they get the authority to say, well, we're
24  not involved in the firing decision, but we'll review the
25  firing decision.

FERGUSON & HOLDNACK REPORTING, INC.
814-452-4556

44d5579d-4ea0-4f27-aee7-29dd845c6666