```
                                                              Page 1
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2

 3   LISA BROWN, M.D.,              :
            Plaintiff               :
 4                                  :
        v.                          :   Civil Action No. 05-32-E
 5                                  :
     HAMOT MEDICAL CENTER,          :
 6          Defendant               :

 7

 8

 9         Deposition of JAMES A. PEPICELLO, M.D., taken

10   before and by Janis L. Ferguson, Notary Public in

11   and for the Commonwealth of Pennsylvania, on Friday,

12   December 16, 2005, commencing at 9:37 a.m., at the

13   offices of Scarpitti & Mead, 1001 State Street,

14   Suite 800, Erie, Pennsylvania 16501.

15

16   For the Plaintiff:
         Patrick Sorek, Esquire
17       Leech Tishman Fuscaldo & Lampl, LLC
         525 William Penn Place
18       30th Floor
         Pittsburgh, PA 15219
19
     For the Defendant:
20       Kerry M. Richard, Esquire
         Tobin O'Connor Ewing & Richard
21       5335 Wisconsin Avenue NW
         Suite 700
22       Washington, DC 20015

23

24
                 Reported by Janis L. Ferguson, RPR
25               Ferguson & Holdnack Reporting, Inc.
```

EXHIBIT 11

Page 78

1  MS. RICHARD: I actually have just a couple
2  questions.
3
4         CROSS-EXAMINATION
5  BY MS. RICHARD:
6
7  Q. Earlier when Mr. Sorek was asking you questions
8  about any training that might be provided to doctors at the
9  hospital, I think he was referring to personnel laws, and
10 you indicated no. Is there an orientation for doctors?
11 A. Yes, there is.
12 Q. And these are for newly privileged physicians?
13 A. Correct.
14 Q. Who conducts that orientation?
15 A. The Chief Medical Officer.
16 Q. So that would be you in some cases?
17 A. Up until a few months ago, it was me, yes.
18 Q. And who is it now?
19 A. Dr. Richard Long.
20 Q. Is there any -- during that orientation process,
21 is there any coverage of expected behavior of physicians?
22 A. Yes, there is.
23 Q. Does that coverage include the hospital's
24 expectations of physicians with regard to discrimination or
25 harassment?

Page 79

1  MR. SOREK: Object to the form as leading.
2  MS. RICHARD: I'm asking a specific question.
3  Q. Does it include any coverage of those issues?
4  MR. SOREK: It's still leading.
5  MS. RICHARD: That's fine.
6  MR. SOREK: Okay.
7  A. Yes, it does.
8  Q. Can you tell me whether there's anything in
9  writing that goes to doctors conveying the expectations with
10 regard to discrimination or harassment.
11 A. Yes. Contained within the medical staff handbook
12 in the section that contains the fair hearing plan, there is
13 a section specifically that deals with expectations with
14 respect to physician behavior to colleagues, to staff, to
15 patients, and so forth.
16 Q. Thank you. Is John Lubahn a member of the faculty
17 of the orthopedic surgery residency program?
18 A. Yes, he is.
19 Q. Are there any contacts that you have had with
20 anybody -- not counting your counsel -- with regard to Lisa
21 Brown that you haven't been asked about here today?
22 A. Yes.
23 Q. Can you tell me about those.
24 A. Yes. I had a visit from a Board member.
25 Q. Which Board member?

Page 80

1  A. Scott Kern.
2  Q. Okay.
3  A. Who came to me when this issue first arose and
4  discussed it with me specifically.
5  Q. What did he say?
6  A. In so many words, to summarize, he said, I know I
7  shouldn't be here, but I want to discuss this with you, and
8  it won't come up any further. He explained why he was
9  there. The reason was his -- he had a personal relationship
10 with Dr. Brown through family members. And basically was --
11 was asking about the process and asking me to consider the
12 circumstances carefully.
13 Q. Did he ask you to reverse the decision?
14 A. He asked if there was a way to reverse the
15 decision. I don't recall that he specifically asked me at
16 that time to reverse the decision.
17 Q. Did you have any other contacts with anybody?
18 A. Yes. Attorney Jim McNamara and Attorney Joel
19 Snavely, who I believe at the time were representing Dr.
20 Brown, came and spoke to me and, again, asked me about the
21 circumstances, asked me if there was some way that we could,
22 in so many words, work this out. And we discussed it for a
23 while. I did not give any indication of anything beyond
24 that. It really ended at the discussion between the two of
25 them and me.

Page 81

1  Q. Did they ask you to consider reversing the
2  decision?
3  A. Yes.
4  Q. And did you say no?
5  A. I don't recall that I said no. I recall that --
6  what I do recall is that I said we have a process in place
7  to deal with this, and we will let the process take its
8  course.
9  Q. In your experience, does the process ever result
10 in reversal of a decision of somebody, for instance, at a
11 program director level?
12 A. I'm trying to recall my own -- Dr. Brown's case
13 was the only incident in recent memory. When I harken back
14 to my own experience with our surgical residency. It was
15 ultimately the program director's decision was upheld.
16 Q. Was it your opinion that the committee had the
17 discretion to overrule Dr. Lubahn, if they chose to?
18 A. Oh, yes.
19 Q. Was it your opinion that the medical education
20 committee had discretion to overrule the grievance committee
21 if they chose to?
22 A. Yes.
23 Q. And was it your opinion the medical staff
24 executive committee had discretion to overrule the decision?
25 A. Yes, they did.

Page 82

1  Q. And what about the Board of Directors?
2  A. Yes, they did.
3  Q. You indicated that you had presented the case to
4  the Board for consideration on -- I think it was May 25th of
5  2004.
6  A. I believe that was the date, yes.
7  Q. Is it your memory, even though you can't remember
8  specific questions, that there were questions asked by Board
9  members?
10  A. Yes, there were.
11  Q. Would you say there were a lot of questions asked
12  by Board members?
13      MR. SOREK: Object to the form.
14  A. Yes, there were.
15  Q. And can you tell me whether any Board member
16  questioned whether the decision should be overturned and Dr.
17  Brown allowed to come back?
18  A. Yes. Mr. Kern did make a statement to that effect
19  at the Board meeting.
20  Q. Can you tell me what else you remember Mr. Kern
21  saying at the Board meeting.
22  A. Again, not specifically, but he did make a plea,
23  if you will, to the Board to consider this and consider
24  reversing this decision.
25  Q. Did he suggest that there might be legal exposure

Page 83

1  to the Board if they went forward with this decision?
2  A. He did, yes.
3  Q. Did he suggest that it might be a claim for breach
4  of contract?
5  A. I don't recall the exact statement that he made
6  specifically about the legal issues.
7  Q. Did the Board ask questions of Mr. Kern?
8  A. I don't -- I don't recall exactly whether they
9  asked -- whether any specific questions were directed at
10  him.
11  Q. Okay. Were questions asked of you or -- I'm going
12  to also -- let me ask you just that question first. Were
13  questions asked of you --
14  A. Yes.
15  Q. -- by Board members?
16  A. Yes.
17  Q. And did any Board member suggest to you that there
18  might be some alternative to upholding Dr. Lubahn's decision
19  in this case?
20  A. Yes. Questions were asking about were there
21  alternatives to the recommendation.
22  Q. And did you give them any alternatives?
23  A. I didn't suggest any specific alternatives to
24  them.
25  Q. Did they suggest any alternatives?

Page 84

1  A. Yeah, there were a couple of questions about, you
2  know, would it be possible to -- and, again, I really don't
3  remember exactly -- whether it would be possible to make
4  some accommodation in her training or -- again, it's hard to
5  go back that far and remember exactly. But there was
6  discussion about what were the alternatives here in terms of
7  this particular decision.
8  Q. About how long, if you remember, did the Board
9  consider this matter of Dr. Brown?
10  A. I don't know exactly, but, you know, probably 30
11  minutes. Maybe even a bit longer.
12  Q. And at the end, how did they vote?
13  A. They voted to uphold the recommendation, and it
14  was a unanimous vote.
15  Q. Did Mr. Kern vote?
16  A. No. He was excused.
17      MS. RICHARD: I have nothing further, then.
18
19      REDIRECT EXAMINATION
20  BY MR. SOREK:
21
22  Q. Dr. Pepicello, what is the oversight that the
23  hospital has for compliance with these expectations of
24  physician behavior? That is, you talked about the handbook,
25  and you talked about the expectations. How does the

Page 85

1  hospital check to see that the expectations are complied
2  with?
3  A. The Chief Medical Officer is -- in fact, any
4  administrative officer, but it's part of the role of the
5  Chief Medical Officer to investigate complaints about
6  physician behavior or physician responsiveness. And that
7  person, the Chief Medical Officer, is the one who exerts the
8  oversight.
9  Q. Do you know whether, in fact, that there is
10  review -- do you know whether, in fact, that the Chief
11  Medical Officer does that?
12  A. Yes.
13  Q. Have you done it in your role?
14  A. Yes.
15  Q. Describe how you do it. For example, you might
16  say something like, well, once a month I get a report from
17  "X," or I review this file, something like that. Can you
18  describe what you do to carry out your oversight.
19  A. Well, typically, it's done on a -- on an ad hoc
20  basis. If there's a complaint by a patient, a staff member,
21  a colleague about a behavior or a series of behaviors, it
22  would be brought to my attention, and the first step might
23  be sitting down with the person and getting more facts and
24  finding out what the details were and counseling and those
25  kinds of things.