IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,                    )
                                     )
            Plaintiff,               )
                                     )
    v.                               )        Civil Action No. 05-32 E
                                     )
HAMOT MEDICAL CENTER,                )        **FILED**
                                     )
            Defendant.               )        SEP 1 5 2006

CLERK, U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

PLAINTIFF'S BRIEF IN OPPOSITION TO
HAMOT'S MOTION FOR SUMMARY JUDGMENT

In this employment discrimination and breach of contract case, Defendant ("Hamot") has moved for summary judgment against Plaintiff ("Brown") on all of her claims. Such a request defies reason, Third Circuit precedent, and, most obviously, a wealth of contrary and persuasive evidence. Hamot could only make this motion through determined avoidance of the evidence favorable to Brown that it knows exists. Considering the larger picture presented by the evidence Brown submits with this brief, the Court should quickly conclude that Hamot's motion must be denied in its entirety.

I.    STANDARD OF DECISION

The Court is well familiar with the summary judgment standard, as well as the applicable test for discrimination claims. Brown seeks to review and emphasize several points.

The test for deciding summary judgment motions in Title VII cases is set forth in decisions such as Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994). To make out a prima facie case, a claimant must show that she is in a protected class, was qualified for the

position, and was rejected. Id. at 763. If this test is met, the burden of production shifts

to the employer to proffer some legitimate non-discriminatory reason for the adverse

decision. If the employer meets this burden on a summary judgment motion, then

> the non-moving plaintiff must demonstrate such weaknesses, implausibilities,
> inconsistencies, incoherencies, or contradictions in the employer's proffered
> legitimate reasons for its action that a reasonable factfinder could rationally find
> them "unworthy of credence," Ezold, 983 F.2d at 531, and hence infer "that the
> employer did not act for [the asserted] non-discriminatory reasons."

Fuentes, 32 F.3d at 765 (footnote and citation omitted).

The Court may not weigh evidence or determine credibility on summary

judgment, since the process does not lend itself to that type of determination. Hampton

v. Borough of Tinton Falls, 98 F.3d 107, 114 (3d Cir. 1996) (court's reasonableness

finding "clearly usurped the role of the jury"); Country Floors, Inc. v. Gepner and Ford,

930 F.2d 1056, 1061-62 (3d Cir. 1991). Thus, resolution of issues that involve the

parties' intent or state of mind are generally unsuitable for summary judgment. Young v.

Quinlan, 960 F.2d 351, 360 n.21 (3d Cir. 1992).

The summary judgment jurisprudence of the Third Circuit in employment

discrimination cases firmly recognizes the inferences that might be drawn by a jury.

Bray v. Marriott Hotels, 110 F.3d 986, 993 (3d Cir. 1997). A prima facie case and

"suspicions with respect to the defendant's credibility or the employer's treatment of the

employee . . . . allow a jury to conclude that the employer was actually motivated by

illegal bias." Id. at 990. In addition,

> Inferences to be drawn from the underlying facts contained in the evidential
> sources submitted to the trial court must be viewed in the light most favorable to
> the party opposing the motion. The non-movant's allegations must be taken as
> true, and when these assertions conflict with those of the movant, the former
> must receive the benefit of the doubt.

2

Jackson v. Univ. of Pittsburgh, 826 F.2d 230, 232 (3d Cir. 1987) (citation omitted).

Thus, on summary judgment, a suspicion or weakness in a proffered reason for

discharge must lead the court to find an acceptable potential inference of unlawful

discrimination, and allow the case to proceed to trial.

Summary judgment is an opportunity for the Court to review evidence, but not in

isolated bits. The record on summary judgment must be reviewed as a whole.

Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990) ("a discrimination

analysis must concentrate not on individual incidents, but on the overall scenario").

Finally, discriminatory conduct is often subtle and difficult to prove. For this

reason, our legal system permits discrimination plaintiffs to prove their cases with

circumstantial evidence. Weldon v. Kraft, Inc., 896 F.2d 793, 800 (3d Cir. 1990).

Moreover, when performance evaluations are at issue, "[s]ubjective evaluations 'are

more susceptible of abuse and more likely to mask pretext.'" Weldon v. Kraft, Inc., 896

F.2d 793, 798 (3d Cir. 1990), citing Fowle v. C&C Cola, 868 F.2d 59, 64-65 (3d Cir.

1989).

II.    ARGUMENT

Hamot argues that Brown was not qualified to continue her education, that males

in the program were not treated more favorably, and that the only reason for Brown's

discharge was academic deficiencies. Memorandum of Points and Authorities in

Support of Defendant Hamot Medical Center's Rule 56 Motion for Summary Judgment,

Doc. No. 54 ("Hamot Brief"), at 16. Such assertions are quickly and comprehensively

rebutted. Brown has evidence that she was qualified under Hamot standards to

complete the Program. She has evidence that males were not put on probation or

discharged for performance deficiencies worse than anything Hamot attributes to her. She has evidence that males were treated as equals by Program faculty and colleagues, and not negatively stereotyped, as she was. She has evidence that males were given extraordinary latitude in being admitted to the Program and given opportunities to advance. She has evidence that males were given special attention in instruction, and that any failure to progress by Brown, which is disputed, is based on Hamot's failure to teach her to the same degree.

In short, with regard to her employment discrimination claims, Brown has more than sufficient evidence to demonstrate that she is qualified, was treated less favorably than similarly situated males, and that Hamot's proffered reason for her discharge is a pretext for sex discrimination.

With regard to Brown's contract claims, Brown likewise has evidence that, apart from the contract issues on which she herself has moved for summary judgment, precludes Hamot's request for summary judgment.

A.    Relevant Problems with Hamot's Program

1.    Hamot's Residency Programs Have Struggled,
In Part Because of Instructional Deficiencies

To borrow a phrase from Hamot's Brief, the history of Hamot's Orthopedic Residency Program, as well as other residency programs, "can hardly be described as stellar." Hamot Brief at 5. In 1989, when John Lubahn was Chair of Hamot's Department of Orthopedics and Director of the Orthopedic Residency Program, the Program was accredited on a probationary basis by the body governing such matters, the Accreditation Council for Graduate Medical Education ("ACGME"). Exhibit A, Jan.

5. 1989 Letter from ACGME, 2667-69.[1]  Among the "continuing concerns" of the

ACGME was the "insufficient number of faculty to supervise and instruct residents at all

times," and teaching staff not being sufficiently involved in continuing education or

active research."  Id. at 2667.  Hamot's efforts to improve its program later that year did

not succeed in having probationary status removed.  Exhibit A, at 3153.

In 1997, the Orthopedic Residency Program underwent an internal review.  The

reviewer stated in part, "No educational objectives were evident for the training

program.  Additionally, there were no specific goals or objectives for each PGY training

level."  Exhibit B, Internal Review ¶ 1, 1802.

In 2003, Hamot discontinued its family practice residency program because it

had too few applicants, and was unable to compete with the other family practice

residency in Erie.  Exhibit C, Oct. 15, 2003 Letter, 2627.

In 2005, Hamot attempted to expand its orthopedic residency program to three

students per year.  The ACGME denied this request, however because of "the lack of

accredited programs in general surgery, pediatrics, and internal medicine."  Exhibit D,

July 28, 2005 ACGME letter, 6655.

In its Brief, Hamot defines its Orthopedic Residency Program as one based on

education.  See, e.g., Hamot Brief at 2 ("The Educational Nature of the Residency

Program").  In seeking summary judgment, Hamot presents the reasons for Brown's

termination as her failures to learn.

The other side of the coin, of course, is Hamot's failures to teach.  After all, there

is no formal, faculty-directed educational system, like an orthopedic residency program,

---

[1] Where they exist, on most exhibits, Brown will refer to the Bates number stamped on
the document for more precise identification.

which does not rely on faculty instruction to meet its objectives. If such were true, orthopedic residents could teach themselves. In actuality, orthopedic residency programs are closely scrutinized by accrediting bodies for the quality of their faculties and their instruction. The evidence in this area favors Brown and precludes summary judgment.

For example, a residency program's morning conferences are an event when residents gather, ideally under faculty supervision, to review and discuss certain medical topics. Exhibit E, Sep. 15, 2006 Brown Declaration ¶14. A steady stream of Hamot residents have been complaining to Lubahn, from at least 1997 to 2004, that faculty do not attend morning conferences. See, e.g., Exhibit F at 5841 (undated – "He felt that a general weakness in our program was that attendings did not attend conferences 'enough'"); at 2341 (August 1997 -- "When asked to describe weaknesses of the program he listed poor faculty attendance at orthopedic conferences"); at 2266 (June 1998 – "When asked about certain weaknesses in the program in areas where he would like to see improvement, he once again mentioned more faculty involvement in conferences"); at 2237 (August 1999 – "Steve raised concerns that faculty were not attending as many of the conferences as they should"); at 2230 (July 2000 – "The number of clinical faculty at various conferences once again has been discussed. He and the other residents would like to see more faculty at conferences"); at 2263 (June 2001 – "He felt that he would like to see some attendings read more and we discussed a number of our current part-time clinical faculty in detail in terms of their knowledge of the orthopaedic literature"); at 2170 (July 2001 – "Jim felt that felt that [sic] more attendings at morning conference would be a big help"); at 2902 (September 2003 –

"Suggestions he had for the program were to continue efforts to improve faculty attendance at conferences and in clinic"); at 2186 (February 2004 – "Dr. Sharma had constructive criticism of the 6:45 am x-ray conference. He felt that it needed better attendance and teaching").

Hamot criticizes Brown for her alleged failures to read medical materials. See, e.g., Hamot Brief at 5. In a remarkable series of admissions at his deposition, John Lubahn, M.D., the Program Director since 1988, Exhibit G at 2305, stated that, although there is a reading list for his portion of the residency,[2] he does not provide the reading list to residents. See also, Exhibit H, Sep. 15, 2006 Brown Declaration ¶ 8. Thus, while residents are held strictly accountable for keeping up with required reading, faculty members apparently do not trouble themselves to advise them what to read in any organized fashion. If a resident is discharged for not keeping up with reading, the resident should be permitted to ask a factfinder whether failing to provide residents with lists of reading materials is reasonable. This cannot be decided on summary judgment.

### 2.    Hamot's Failures to Teach Specifically Affected Brown

Not surprisingly given a fuller picture of the relevant facts, Brown herself was specifically hurt by Hamot's failure to provide instruction. Hamot relies on Patrick Williams, D.O.'s, March 2003 letter in support of its position. Hamot Brief at 6-7. At the time, Brown responded to Williams' letter as follows:

> Dr. Williams refers to my performance that is not at the level of a PGY-2. Again, I am concerned with the lack of swift and frequent evaluations during my three month hand rotation, especially if he felt I was incompetent. At least three times during that rotation I expressed to Dr. Williams the need for direction with reading materials. More than once Dr. Williams told me he was devising a reading list. I expressed how anxious I was to get that list. I never did get that list or any

---

[2] The different phases or courses of a residency are known as "rotations."

7

direction for reading material to increase my hand knowledge base. Additionally, I never receive any feedback from Dr. Williams; positive or negative. He was to be my preceptor for the three hand talks that month. Far enough in advance prior to each talk, I asked Dr. Williams for direction, input, etc. for each talk. Again no direction was given, nor was there any interest in helping. It is my understanding that the role of a resident is to learn and the role of an attending is to teach. Just as attendings need help with their work, there are times residents also need help. In a situation like this, even one mid-rotation evaluation with constructive comments and support might have helped.

Exhibit I, April 8, 2003 Brown Memo. Needless to say, this information amply supports

Brown's position that the reason for any performance deficiency in her reading was at

least in part due to Hamot's failures to teach -- or more accurately, even to

communicate. See also, Exhibit E, Sep. 15, 2006 Brown Declaration ¶¶ 1-3.

This was not the only time Brown addressed such issues in writing. After being

placed on probation, Brown wrote to Lubahn:

It was my understanding, based on our April 2, 2003 meeting, that one of the goals was to find some additional time for reading and self-study. However, in your letter to me you outlined a new schedule which not only did not allow for additional time, but included more scheduled [operating room] time and additional assignments. Let me once again express that I feel this is setting me up for failure.

In the April 7, 2003 conversation I also asked what exactly "academic probation" means as a resident in this program. You answered with the desire to "help me." I also addressed the fact that during my three month hand rotation I had not had frequent, or even a mid-rotation evaluation by the other three hand attendings. In fact, the mid-year evaluation I had with you addressed mainly that, my performance for the first half of my second year. It concerns me that I am being evaluated 1 1/2 weeks after my rotation, particularly if certain attendings felt I was not performing adequately. After asking this question of you more than once during the April 7, 2003 conversation, you expressed to me that Dr. Cermak and Dr. Hood did not have any issues with me, and that I should address them directly with any questions. Dr. William' untimely evaluation, or lack of mid-rotation evaluation was never addressed.

Exhibit J, April 8, 2003 Brown letter. Brown inquired into the circumstances of her probation, and plainly identified the fundamental deficiencies in this process, which she set forth as more negative than positive. A jury must decide whom to believe.

3.    The Orthopedic Residency Program is a Male Bastion

Hamot's orthopedic residency program produces two graduates a year. Exhibit K at 1070, Resident Roster. In the nearly fifty year history of the Program, Lubahn, the Program Director since 1988, could identify only two women admitted. Exhibit H, Lubahn Transcript at 136 line 24 to 137 line 3. Only one has graduated. Id. Nationwide in 2002, although more than half of medical school graduates were women, only 2.6% of orthopedic residents were women. Exhibit L. In this regard, the Third Circuit has stated that "[i]n some cases the inference of unlawful discrimination may be raised, and thus '[a] prima facie case of disparate treatment may be established by statistics alone if they are sufficiently compelling.'" Green v. USX Corp., 843 F.2d 1511, 1527 (3d Cir. 1988) (citations omitted). The statistics alone in this case are compelling. Despite these numbers; despite the orthopedic profession's recognition of this problem, Exhibit L; and despite Hamot's history of virtually uninterrupted male supremacy, Hamot to this day has no affirmative action program for female residents; it grants preferential interviews for such candidates, Exhibit H, Lubahn Transcript at 140 lines 9 to 25, but this effort has failed to yield any results.

Hamot officials were generally at a loss to explain this disparity. See, e.g., Lubahn Transcript at 138 lines 12 to 22. The former head of Hamot's orthopedic residency program did state in his deposition, however, that the specialty of orthopedic surgery is dominated by men because "[i]t's hard, physical labor for the most part. And

most women would rather do a job that requires using their brain rather than there [sic] brawn." Exhibit M, Deposition Transcript of Vincent Rogers, MD, at 21-22. This is precisely the sort of stereotyping that Title VII was designed to remedy, yet it is present at Hamot to this day. "[H]ostile or paternalistic acts based on perceptions about womanhood or manhood are sex-based or 'gender-based.'" Durham Life Ins. v. Evans, 166 F.3d 139, 148 (3d Cir. 1999). Here then is further evidence that Hamot's discharge of Brown is pretext.

B.    Brown's Accomplishments in the Program Rebut Hamot's Position

Hamot attempts in its Brief to present a number of Brown's performance deficiencies. Of course, this represents only one side of the dispute. Brown had performed competently in both the clinical and academic aspects of the program. These facts preclude the Court from determining Brown's performance as a matter of law on summary judgment. Hugh v. Butler County YMCA, 418 F.3d 265, 268 (3d Cir. 2005) ("satisfactory performance of duties, leading to a promotion, does establish a plaintiff's qualifications for a job") (reversing summary judgment for employer).

Lubahn issues semi-annual and annual evaluations of residents written as a narrative summary. He noted in a February 2003 annual evaluation of Brown that "[h]er clinical performance has been acceptable." Exhibit N, February 7, 2003 Resident Evaluation. Lubahn stated in a September 2003 semi-annual evaluation "[h]er clinical performance and basic orthopaedic knowledge seemed to have improved significantly. Her presentation at the department meeting last weekend showed significant improvement as has her interaction with other residents and attendings." Exhibit N, September 16, 2003 Resident Evaluation. In a January 2004 semi-annual evaluation

Lubahn wrote of Brown's performance that "I did counsel her that her clinical performance thus far this year had improved and was acceptable . . . . Lisa did have an excellent performance and evaluation on her microsurgical skills lab earlier this year." Exhibit O, January 30, 2004 Resident Evaluation. It is critical for the Court to recognize that the last evaluation, by Lubahn himself, was given only thirty days before Lubahn discharged Brown on March 1, 2004.

Hamot also compiles form evaluations based on a numbered scale to assess how each resident performs during rotations. David Babins, M.D., completed one such evaluation of Brown's performance during a rotation in July 2003 through June 2004. Dr. Babins graded Brown as follows: (i) "excellent" with regard to communication with patients and families, (ii) "excellent" with regard to patient care which is identified as one of six core competencies, (iii) "average" with regard to 11 of the 27 areas of evaluation, and (iv) "above average" in 14 of the 27 areas of evaluation. Exhibit N, February 11, 2004 Resident Evaluation Form.

Babins also evaluated Brown's performance during an April 2003 through June 2003 orthopaedics rotation. He rated her "average" in 8 of the 27 categories and "above average" in the remaining 19 of the 27 categories. Exhibit N, April 2003 through June 2003 Resident Evaluation Form. Another attending physician, Mary Beth Cermak, M.D., rated Brown's performance throughout the same April 2003 through June 2003 orthopaedics rotation as "average" or better in all but one of 27 categories – including an "excellent" ranking in areas of communication, attitude and patient care. Exhibit N, April 2003 through June 2003 Resident Evaluation Form. Cermak also rated Brown during Brown's July 2002 through September 2002 hand service rotation and rated her

11

overall as "above average." Exhibit N, July 2002 through September 2002 Resident Evaluation Form. John Hood, M.D., and Lubahn also evaluated Brown's performance throughout the July 2002 through September 2002 hand service rotation. Hood rated Brown as "above average" in all but one of the 27 categories. Exhibit N, July 2002 through September 2002 Resident Evaluation Form. Lubahn rated Brown as "average" or better in all 27 categories – including three "excellent" ratings. Exhibit N, July 2002 through September 2002 Resident Evaluation Form.

Moreover, Brown was awarded the Hamot Ambassador of the Month award in 2002. The award represents Hamot's recognition of Brown's dedication to her work. In a June 2002 letter to Brown, Hamot President and CEO, John Malone, wrote "I would like to take this opportunity to personally than you for that high level of commitment and support of Hamot . . . [y]ou set an excellent example for other Hamot associates by demonstrating the high quality of service in your professional and personal actions." Exhibit N, June 5, 2002 Letter. Donald K. Inderlied, Senior Vice President of Human Resources and Chief Compliance Officer, wrote in a September 2002 memo to Brown regarding the award, that "[t]hrough your exemplary energy, behavior and sense of commitment you have demonstrated what excellent customer relations should be." Exhibit N, June 5, 2002 Memo.

Hamot wishes to disregard its praise for Brown by short-circuiting her opportunity to present this evidence to a factfinder. Such positive evaluations nonetheless are proof both that Brown was qualified, and that Hamot's discharge of her from the Program was a pretext for discrimination.

12

C.    Brown's Finishing Her Third Year Rebuts
      Hamot's Assertions about Brown's Qualifications

Hamot bases its summary judgment request in part on Brown's alleged lack of

qualifications.  Hamot's treatment of Brown after March 1, 2004, however, alone raises

questions of fact about their position.

Brown was notified by letter dated March 1, 2004, that she was being dropped

from the Program.  Exhibit O.  Brown continued to participate in the Program for the

next four months, however, through June 30, 2004.  Her duties were unchanged.

Exhibit E, Sep. 15, 2006 Brown Declaration ¶ 11.  If Brown could continue as a resident

for four months with her duties unchanged, a genuine issue is created about her alleged

inability to carry out the duties of an orthopedic resident.

D.    Hamot's Alleged Concern With Brown's
      Knowledge Is Belied By Its Treatment of Problems
      With the Performance of Other Male Residents

Hamot attempts to show that Brown was unqualified by citing alleged problems

with her performance.  The Court cannot determine Brown's qualifications on summary

judgment, however, because many other residents had performance problems worse

than Brown, but who were not disciplined, put on probation, or discharged from the

Program.

One of Brown's predecessors, Eric Thomas, MD, falsified research data during

his residency at Hamot.  Exhibit P, Suprock Transcript at 31-32.  Even worse, the

falsification was done "at the request of [Suprock's] colleagues," that is, the other

orthopedic faculty.  Id. at 32 lines 6-7.  Dr. Thomas was not discharged from the

program, and successfully graduated.  Exhibit P at 4732.

It is relevant to note that Thomas was admitted to the Program after being terminated from another residency program. Because Thomas had friends who knew Lubahn, Lubahn admitted him to Hamot's Orthopedic Residency Program. Exhibit H, Lubahn Transcript at 110 line 20 to 111 line 10.

With regard to treatment of patients, Craig Lippe, MD, a resident in the program with Brown, was sued for malpractice for slicing open the skin of a patient while removing a dressing. Exhibit Q; See also, Exhibit E, Sep. 15, 2006 Brown Declaration ¶ 12. Dr. Lippe was not discharged from the program, and successfully graduated. Exhibit Q.

Jeff Nechleba, MD, was also sued for malpractice while he was a resident, along with Faculty David Babins, MD, and Nicholas Stefanovski, MD, for a hip arthroplasty that resulted in sciatic nerve damage. Exhibit R. There is no evidence that any doctor involved suffered any adverse consequences as a result of this incident. Dr. Nechleba is now on Hamot's orthopedic faculty. Exhibit S, April 14, 2006 Brown Declaration ¶3.

In addition, Brown experienced a number of incidents during her time in the Program when residents put patient health or safety at risk. These include episodes of missed bone fragments in a hip, improper release of a patient with an unstabilized fracture, laceration of the skin while removing a dressing, and improper use of surgical screws. Exhibit S, April 14, 2006 Brown Declaration ¶4. None of these incidents resulted in the discharge of any residents from the Program. Exhibit K, ("In the past 10 years everyone has completed the orthopaedic program with the exception of Lisa Brown, MD").

14

Brown was precluded from discovering other episodes of questionable performance when the Court granted a motion to quash subpoenas of faculty members in the Program. Nonetheless, Lubahn's treatment of these incidents, in which the responsible parties were not disciplined and continued in the Program through graduation, creates genuine issues of material fact when compared to his treatment of Brown.

E.    Hamot's Alleged Concern with Resident
      Standards is Implausible, Inconsistent, and Incoherent

Hamot's summary judgment motion attempts to show Brown as unqualified are conclusively undermined by its treatment of William S. Bambrick III. Hamot's position cannot be taken seriously when the Court considers the events surrounding Bambrick's participation in the Program. Bambrick was in the Orthopedic Residency Program, and was designated as a resident, at the same time as Brown.

Bambrick originally was an orthopedic resident at Hamot in the early 1980s, despite coming from a medical school in Mexico which was considered inferior to U.S. schools. Bambrick's residency was distinguished by at least three episodes of counseling for serious performance problems, most notably for leaving a patient in the emergency room to play softball. Exhibit T, 6344-46. Before Lubahn admitted Bambrick to the Program a second time, however, Lubahn never read these records. Exhibit H, Lubahn Transcript at 157 line 25 to 158 line 2.

Hamot nonetheless passed Bambrick through its residency program and into practice as an orthopedic surgeon. His career was distinguished by its apparent hazard to patients and others. Bambrick had five malpractice claims against his license when he practiced in Florida. In 1999, his clinical privileges were suspended by a hospital

15

there. Bambrick then attempted to practice in North Dakota. The North Dakota State Board of Medical Examiners placed him on probation for a year in July 2000, and then suspended his license. Exhibit T at 6133-34, 6145-46, 6218. Bambrick then moved to Ohio. The State Medical Board there revoked Bambrick's license in January 2003 based on the disciplinary action taken against him in North Dakota. Included in the mix of these problems with malpractice, medical board discipline, and licensure, Bambrick was known by Lubahn and officials at Hamot to have had substance abuse problems. Exhibit H, Lubahn Transcript at 149 lines 1 to 22.

Despite Bambrick's troubled background, Lubahn personally and comprehensively intervened on Bambrick's behalf to obtain Bambrick's admission to Hamot's orthopedic residency program for a period of remedial training. Exhibit T, 6136. 6229. Lubahn in essence invented the position Bambrick occupied at Hamot, for the purpose of allowing Bambrick to benefit from one of Lubahn's alleged principles of medical education: "I think everybody deserves a second chance." Exhibit H, Lubahn Transcript at 167 line 21. (In truth, this was Bambrick's seventh or eighth chance, but the summing up of Bambrick's total chances is a decision for the trier of fact.)

Bambrick could not obtain insurance coverage because of his record, however, so he could not touch a patient, and so could not take part in any real training. He did not complete his training. Exhibit H, Lubahn Transcript at 184, 164.

In a particularly memorable episode demonstrating the care with which Lubahn expends his energy on physician rehabilitation projects, and with which Hamot oversees patient care, Bambrick, using his Hamot ID badge, admitted a patient to the Hamot Emergency Room in May 2004. Bambrick did this despite having no admitting

privileges, no insurance, and no license. When a security officer challenged Bambrick about his identity, he replied that his name was Bambrick, "which rhymes with damn prick, which is what I can be." Exhibit T at 6131-32.

The evidence about Bambrick is extremely relevant for a number of reasons. First, it shows Lubahn's complete control over Hamot's Orthopedic residency Program, admitting a person to the Program who by any objective measure had proven himself, time and again, to be unsuited for the practice of medicine. Lubahn essentially acted alone in admitting Bambrick and creating a special position for him in the Program. Second, it shows how far out on a limb Lubahn will climb to assist physicians who have, by any rational measure, extremely troubled histories. Third, it powerfully reinforces the evidence that when Lubahn personally extends himself, it is to help doctors in the old boy network -- and not female residents.

F.    OITE Results Present a Genuine Issue
of Material Fact, And Favor Brown on the Merits

Hamot repeatedly points to Brown's results on a standardized examination -- the Orthopaedic In-Training Examination ("OITE" or "OIT Exam") -- as proof allegedly in support of summary judgment in its favor. Brown has her own favorable evidence on the issue. Such evidence ultimately preponderates in her favor on the merits. For present purposes, however, the relevant evidence renders this point vigorously disputed.

The OIT Exam is given by the American Academy of Orthopaedic Surgeons. In a cover letter to residents who take the Exam, the Chair of the AAOS Evaluation Committee stated that the Exam "is designed to be an educational tool for residents. Although the examination is used by program directors to develop and evaluate their

17

educational programs, it is not intended to be used as a qualifying examination or for determining resident promotions." Exhibit U, first page. Thus, the testing body straightforwardly pronounces that the test is for directors to evaluate the educational effectiveness of their programs, not for deciding whether to promote residents. In its Directors' report from 2003, the testing body provides a consistent and particularly relevant disclaimer about the exam:

**THE USE OF OITE SCORES FOR DECIDING WHETHER A RESIDENT SHOULD BE RETAINED IN A PROGRAM OR PROMOTED IS INAPPROPRIATE.**

Exhibit U, third page (capitalization, bolding, and underline in original). Seen in light of this evidence about the intent of the Exam, Brown's low OITE scores tell a different story -- they are the result of Hamot's failure to teach, rather than some deficiency of Brown's, that Hamot now asks the Court to fix as a matter of law.

Hamot ignored this disclaimer in discharging Brown. Hamot continues to ignore the disclaimer to this day, as revealed by its summary judgment papers. In seeming contradiction of this express disclaimer by the American Academy of Orthopaedic Surgeons, Hamot, through Lubahn, give every appearance of having used OIT Exam scores in a resident retention decision. At minimum, however, there are genuine issues of material fact about how the OITE results were applied in Brown's case.

Moreover, it should come as no surprise that male residents also received low OITE scores. In 2002, Brad Poole's OITE percentile rank was 23. Exhibit V (contains all OITE results cited). In 2001, his rank was 11. In 2004, Poole's rank was 17. In 2002, James Seeds' OITE rank was 25. In 2001, it was 7. In 2000, it was 12. In 2001, Craig Lippe's rank was 28. In 2000, Lippe's rank was 11. These scores "can

hardly be described as stellar." These residents were not discharged from the Program

for academic deficiencies. This circumstance creates genuine issues of material fact.

Most disturbingly, male residents who received low scores on the OITE were

given personal pledges of active assistance from Lubahn. For example, when Lubahn

evaluated Dave Ivance in March 2002, he stated:

> With respect to his OITE scores . . . . I also noted that it was an opportunity for he
> and Nick Kubik to set up a study program specifically dedicated to test taking. I
> offered to provide reading materials and make myself or one of the other faculty
> members available to assist not only with the written material but various
> techniques in taking an exam. . . .
>
> We plan to set up such a meeting either one afternoon a week . . . or perhaps on
> Saturday morning session when time in [sic] available before or after the regular
> conference.

Exhibit W at 2256. On the same day, Lubahn asked a particularly high-scoring resident

"that he assist the chief residents in establishing the study session referred to in Dr.

Ivances' [sic] review." Exhibit W at 2257. On the same day, Lubahn asked resident

James DeLullo "to consider helping with the study session with Drs. Ivance and Kubik.

The rationale and methodology for such a study session was discussed." Exhibit W at

2258. When Craig Lippe's OITE scores "dropped considerably," Lubahn "offered him

my services, those of Dr. Nechleba and Dr. DeLullo, and basically whatever it takes to

have him on track with a knowledge base to pass his boards." Exhibit W at 1901.

In a contrast that Brown is entitled to present to a jury, when Lubahn discussed

Brown's OITE scores with her on January 30, 2004, he stated: "My recommendation for

her to improve her abilities on standardized testing was to have an evaluation at the

Sylvan Learning Center in Erie and to report back to me with their recommendation and

a Plan." Exhibit W, Jan. 30, 2004 Semi-Annual Evaluation. Sylvan Learning Center is a

business which tutors children with their primary education.  Exhibit X; Exhibit E, Sep. 15, 2006 Brown Declaration ¶ 9.

The difference in treatment could not be more stark, and is established by documents.  Residents' results on the OITE are critical to Lubahn.  One group of residents, all male, received active, personal pledges of help from him.  Moreover, he actively worked at drawing in other persons to assist in his planned study sessions.  The female resident received no such offers, however.  Instead, she was shuttled off to a children's' tutoring service.  The Third Circuit has recognized that an employer can set an employee up for failure by refusing to provide adequate support and reinforcement.  Woodson v. Scott Paper Co., 109 F.3d 913, 922 (3d Cir. 1997).  A jury can draw an inference of discriminatory animus from this refusal.  Id.  Little more need be argued.

This is less favorable treatment of a woman on a key item of performance.  The standards that Hamot uses to present Brown as unqualified are very much factually disputed.  In addition, Hamot ignores the process by which it evaluates and responds to the same lack of qualifications from male residents.

        G.     Brown Has Evidence of Particular Sex-Related Incidents

Should there be any issue of whether Hamot's treatment of Brown was related to her sex, Brown has other relevant evidence in this regard.

During the course of discovery, Brown submitted answers to interrogatories that enumerate particular sex-related incidents during her time at Hamot.  Exhibit Y.  This list includes episodes of unwelcome and embarrassing comments, items she received, and episodes she endured at the hands of Hamot staff, other residents, and Program faculty, directly related to her status as a woman.

The Court may recall that "[h]ostile or paternalistic acts based on perceptions about womanhood or manhood are sex-based or 'gender-based.'" Durham Life Ins. v. Evans. 166 F.3d 139, 148 (3d Cir. 1999). Brown has ample evidence to connect her treatment to her protected class.

H.    Hamot's Own Data Demonstrates Residents'
      Errors and Their Tendency Not to Report Errors

Program Director John Lubahn was questioned extensively at his deposition about the reasons for Brown's termination. He stated that one of the reasons for her discharge from the program was her alleged medical error in closing a wound that he advised her to leave open, and failing to be honest in her explanation. Exhibit H, Lubahn Transcript at 65 lines 8-14. In his calculus of the reasons for her discharge, "[o]ut of 100 points, that's 60 percent." Id. at 66 lines 22-23. Thus, the decisionmaker responsible for Brown's termination identified the principal reason for her termination, and it consisted of an alleged error in patient treatment, and his questions about the accuracy of her response.

Brown fully rebuts this assertion in her September 15, 2006 Declaration. This evidence creates issues for the ultimate trier of fact, which cannot be decided on summary judgment. But there is other evidence in the case which not only disputes Lubahn's views but show them to be wrong.

Hamot has its own information that residents make mistakes, resulting in serious consequences for the patient, and habitually fail to report these errors. Exhibit Z at 6577-6580. An article entitled "Do House Officers Learn From Their Mistakes?" published in a 1991 volume of the Journal of the American Medicine Association, presents a statistical analysis of the types of errors made by residents. Id.

The study, based upon anonymous responses to questionnaires, revealed that residents' errors in diagnosis, evaluation, treatment, the prescribing and dosing of medication, procedural complications and faulty communication with patients resulted in death, delayed treatment, additional procedures and prolonged hospital stays. Id at 6579. In this study alone, 31% of the mistakes resulted in the death of the patient. Id. Doctors reported that 90% of the patients had adverse results, including amputation, stroke, and loss of physical functions. Id. Doctors prescribed the wrong medication, accidentally overdosed patients, performed surgeries incorrectly (i.e., lacerated livers, perforated bowels), misread "do not resuscitate" orders, removed catheters improperly, erroneously discharged patients, failed to diagnose fatal conditions, and failed to review intern's orders.

With respect to these incidents, the study found that in only 54% of cases did residents discuss these mistakes with supervising physicians. Id. at 6580. The study emphasized that medical training and patient care would benefit from an environment that allows residents to learn constructively from their mistakes. Id. In training programs, where these issues are supposed to be discussed, the residents reported that tough issues were not addressed.

Hamot's records also contained information regarding a second study, conducted in 2003 by a hospital affiliated with Yale-New Haven Medical center. The study concluded that residents were much less likely than nurses to use the hospital's existing error reporting system, or even be aware of its existence. Exhibit AA at 1401. Residents described hospital culture regarding error reporting as non-supportive. Id.

These materials were produced by Hamot from its files during discovery. Hamot was fully cognizant of resident training problems and the need to develop solutions, yet thirteen years after the study, Hamot arguably has failed to do so. Armed with this knowledge, there is a genuine dispute of material fact as to whether the alleged deficiencies in Brown's performance were in fact inconsistent with that of other residents, or with Hamot's policies, training, education and procedures.

    *I.*      Hamot's Contract Arguments Do Not Support Summary Judgment

          1.     Hamot Did Not Comply With the Terms of Brown's Contract

Hamot's assertion that Brown's contract was not terminated, but was "allowed to expire", attempts to improperly rewrite the parties' contract and the facts.

The terms and conditions of Hamot's employment and training of orthopedic residents are governed by a series of five one-year contracts. Exhibit H at 134-135; Exhibit BB ¶ 35; August 15, 2006 Declaration of Lisa Brown ¶ 35. The use of 5 separate contracts is actually a pretense since it is established Hamot policy is that all residents are expected to complete the Program. Exhibit H, Lubahn Transcript at 135. Section 5 of the Hamot Contract provides:

Continuation of Training

Upon satisfactory completion of the resident training year as determined by the program director and faculty, the Resident shall be promoted to the next level of resident training required and approved for his/her specialty, unless either HMC or the Resident shall give written notice to the other of termination upon completion of the current contract year. Such notice must be provided at least one hundred twenty (120) days before completion of the contract year.

Exhibit CC, Hamot Medical Center Resident Agreement ("Contract") (emphasis added).

The Contract builds in an expectation and obligation to promote Brown to the next program level unless the contract is terminated by one of the parties. The Contract gives Hamot two choices: (1) promote Brown to the next level or, (2) terminate the contract. Hamot does not have the option to passively let the Contract expire, it must make an affirmative decision and act accordingly. Hamot elected to terminate the Contract. In doing so, according to Hamot's own rules, the decision to terminate Brown's contract must be based upon proper cause. Exhibit CC, Contract, Section 3. Brown vigorously contests the existence of proper cause and argues this is an issue that must be submitted to the factfinder. See brief above.

In addition to Hamot's lack of proper cause to terminate, Hamot must prove that both the program director and the faculty concluded that Brown failed to satisfactorily complete the program level. Exhibit CC, Contract, Section 5. The record proves that Hamot cannot meet this burden.

Brown's termination letter, and the testimony of Hamot's medical personnel, conclusively establish that proper cause to terminate Brown's employment was not the basis for Hamot's decision. In fact, proper cause was not even identified or mentioned. On the contrary, the decision to end Brown's career as an orthopedic surgeon was a unilateral decision by John Lubahn, as shown by Brown's March 1, 2004 termination letter. Exhibit O.

Citing clinical performance and concerns regarding her knowledge base Lubahn advised Brown that "I have decided not to renew your contract at the end of this academic year, June 30, 2004." Exhibit O. Lubahn continued, that while the decision was difficult, "I believe it to be the best for all concerned." Exhibit O. The letter does not

24

identify the decision as that of Hamot Medical Center, its faculty or staff, rather, the decision was a personal decision by Lubahn. Exhibit O. Moreover, as evident from the record, Lubahn disregarded established policies and procedures, concerning advancement and dismissal, that were incorporated into Hamot's employment contract with Brown. Finally, the Lubahn's decision to terminate Brown was inconsistent with his recent evaluation of Brown's skills.

Whether or not Brown was terminated, whether her termination was in accordance with the contract, and whether it was based on proper cause, are genuine issues of material fact in dispute which defeat Hamot's request for summary judgment. Hamot's reliance upon Reed v. Pittsburgh Board of Education, 862 A.2d 131 (Pa. Cmwlth. 2004) does not alter this conclusion.[3]

Reed concerned a teacher's efforts to gain employment with the City of Pittsburgh School District. The City of Pittsburgh is required to maintain lists of eligible teachers based upon rank or standing. Persons on the list are entitled to be considered for employment with the School District. Reed was placed on the eligibility list and after several years of not receiving invitations to interview or apply for employment, filed a breach of contract claim asserting the eligibility list was an employment contract. Id at 135.

In holding that the parties did not have a binding contract, the Commonwealth Court concluded that the eligibility list was not an offer of employment, but an invitation for persons, such as Reed, to apply for teaching positions. Id. Persons on the list will

---

[3] Hamot's reference to Noonan v. Howmedica, Inc., 2006 WL 2163791 (3d Cir. 2006) and Horvat v. Forbes Regional Hospital, 2006 WL 1625638 (3d Cir. 1996) are not discussed as both cases were identified by the Court of Appeals for the Third Circuit as not precedential.

be "considered" for employment.  The District made no other manifestation of assent to hire Reed, therefore, no contract was formed.  The eligibility list was not a contract.

The facts of this case could not be more opposite.  Not only was Brown an existing employee, but serving under the terms of an undisputed employment contract with specific language regarding her termination and established policies and procedures.  As discussed within, Hamot cannot terminate Brown from the Program without proper cause.  Hamot failed to present proper cause and follow the procedures mandated in the Contract, issues plaintiff has the right to present to a jury.

2.    Hamot Failed to Comply With Its
       Own Advancement and Dismissal Policy

Contrary to Hamot's representations, the record conclusively establishes that Hamot did not follow its own policy on advancement and dismissal in terminating Brown.

Hamot maintains an Advancement and Dismissal policy which outlines the procedures to be followed if a resident is not meeting the requirements of the orthopedic program.  Exhibit DD.  This policy was drafted by Lubahn, the person who terminated Brown.  Id.  The policy outlines the specific and detailed process by which residents, who are not meeting expectations, are counseled, warned and if appropriate, ultimately discharged from the program.  Exhibit DD.  There are no exceptions to the procedures mandated by this Policy.

The principal requirement of the Policy is that a resident must be on academic probation at the time they are terminated.  Exhibit DD.  Hamot's own papers admit that at the time of Brown's termination she was off probationary status.  Document No. 54 at 27.  In fact, Hamot further acknowledges that Brown had "improved enough to come off

probation." Id. For this reason alone, Hamot's motion for summary judgment must be denied.

As detailed in Hamot's own Policy, the prerequisites to termination are fundamental to the overall purpose of training and educating its residents. Through a clearly defined, documented process, which includes, counseling, academic probation, repetition and remediation, a resident is advised of the requisite procedure for advancement and termination. Exhibit DD. If Brown had remained on academic probation because she had failed to improve, the advancement policy dictates that the next step would be a faculty determination of whether remediation would be helpful. However, contrary to Hamot's written policy, prior to her abrupt termination, Brown did not receive (i) a letter advising she was on academic probation, (ii) a determination by the faculty that remediation was necessary, or (iii) results of a faculty review that Brown should have been terminated from the program pending the due process procedure because she was unlikely to improve with remediation. Exhibit BB, August 15, 2006 15, 2006 Declaration of Brown ¶¶ 22-29. Both the record and admissions by Hamot evidence that Hamot did not follow its own policy prior to terminating Brown.

Hamot's attempts to justify its actions, by focusing on the alleged "entire picture" of Brown's residency are unpersuasive. Regardless of Brown's alleged conduct, her termination had to follow specific regimented procedures. The suggestion that Brown engaged in "more serious" conduct" that fell outside the policy is unsupported by the record. By Hamot's own admission in its contract with Brown, as of April 8, 2003, Lisa Brown met all the requirements for participation in a graduate program of medical education. Exhibit CC at 1, ¶ 4. As previously discussed in detail, Brown received a

number of evaluations in which she was rated average or above average in every one of the 28 categories of skills rated. Exhibit N. Hamot has no evidence sufficient to persuade the Court that its failure to comply with its own policy is acceptable as a matter of law.

Accordingly, this court should find on summary judgment that Hamot breached the terms of its employment contract with Brown and deny Hamot's motion for summary judgment.

3.    Hamot Did Not Follow Its Grievance and Due Process Procedure

Hamot did not follow its grievance policy after terminating Brown's employment. Contrary to Hamot's representations, the process was replete with irregularities and lack of compliance with published procedures.

As with Hamot's policy for Advancement and Dismissal, the Grievance Resolution and Due Process for Residency Physicians/Interns Policy outlines specific procedures which must be followed for adjudication of resident complaints or grievances related to dismissal, non-renewal of the Agreement of Appointment or any other action that could threaten a resident's career. Exhibit EE. Hamot's Policy provides as follows:

Any problem, grievance, misunderstanding, or alleged violation(s) of policies or Agreement of Appointment breeches (sic) will be resolved as follows:

Step #1.

The resident/intern must attempt to resolve the grievance or complaint via the usual chain of command beginning with the individual, then that person's advisor or supervisor and then the program director.

Step #2.

Should the resident/intern feel that the issue has not been adequately resolved or is not satisfied with the program director's decision, he/she may file a written complaint within fourteen (14) days with the Sr. VP of Medical Education.

Step #3.

If Step #2 resolution is still unsatisfactory to the resident/intern or the VP for Medical Education, the resident/intern and/or the VP for Medical Education may direct the matter immediately, in writing, within seven days, to the Medical Education Committee. A committee appointed by the Chair of the MEC, comprising of the VP for Medical Education or designate, the osteopathic DME, a representative of the residency program, a member of the Medical Education Committee, a resident selected from the resident's program by the aggrieved resident, and the Chair of the MEC (or a designate) shall receive and evaluate all pertinent information including, if necessary, direct testimonies from the affected parties within thirty (30) days of having been appointed. The resident/intern shall have the right to meet with the committee and to call witnesses in his/her behalf. The committee shall make its decision and resolve the matter, in writing, by a majority vote within fourteen (14) days of concluding its review."

Exhibit EE.

Hamot failed to provide a resolution at step two of the grievance procedure. Exhibit E, September 15, 2006 Declaration of Lisa Brown ¶ 16. Hamot improperly focused on Brown's performance on the OITE as a condition for retention in the Program, when the OITE exams were not administered for that purpose. Exhibit U. Hamot failed to require the votes of the entire grievance committee. Id. ¶ 15. In fact, voting members were absent when Brown's grievance was addressed. Id. ¶ 15.

Each of these defects deviated from the policies and procedures of the grievance committee and creates a genuine dispute of material fact as to whether the grievance policies were followed and, whether Hamot's failure to follow its policy constitutes a breach of its employment contract with Brown.

III.    CONCLUSION

The evidence cited above plainly demonstrates the disputes of fact that preclude summary judgment and prevent the Court from finding as a matter of law that Hamot did

not discriminate against Brown or violate its enforceable promises it made to her.

Accordingly, Hamot's Motion for Summary Judgment should be denied in its entirety.

Respectfully submitted,

Leech Tishman Fuscaldo & Lampl

/s/ Patrick Sorek
Patrick Sorek, Pa. ID 41827
Alisa N. Carr, Pa. ID 56658
Citizens Bank Building, 30th Floor
525 William Penn Place
Pittsburgh, Pennsylvania  15219
(412) 261-1600

Counsel for plaintiff

30