IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,                          )
                                           )
        Plaintiff,                         )
                                           )
    v.                                     )        Civil Action No. 05-32 E
                                           )
HAMOT MEDICAL CENTER,                      )
                                           )        (to be filed under seal)
        Defendant.                         )


PLAINTIFF'S OPPOSITION APPENDIX


Respectfully submitted,

Leech Tishman Fuscaldo & Lampl


By:     /s/ Patrick Sorek
        Patrick Sorek
        Pa ID No. 41827
        Alisa N. Carr
        Pa. I.D. No. 56658
        525 William Penn Place, 30th Floor
        Pittsburgh, Pennsylvania  15219
Date: September 15, 2006        412-261-1600




FILED

SEP 1 5 2006

CLERK, U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

# LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
## Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

# EXHIBIT A



**Accreditation Council
for Graduate Medical
Education**

Office of the Secretary
535 N. Dearborn St.
Chicago, Ill. 60610

January 5, 1989

John D. Lubahn, M.D.
Chairman, Department of Orthopaedics
Hamot Medical Center
201 State Street
Erie, PA  16550

Dear Doctor Lubahn:

The Residency Review Committee for Orthopaedic Surgery, which is
composed of representatives of the American Academy of Orthopaedic
Surgeons, the American Board of Orthopaedic Surgery and the AMA
Council on Medical Education, has reviewed the information submitted
concerning the following residency:

    Orthopaedic Surgery

    Hamot Medical Center Program
      Hamot Medical Center
      Shriners Hospital For Crippled Children (Erie)
    Erie, PA

    Program 2604122156

Based on all of the information available to it at the time of its
recent meeting, the Residency Review Committee accredited the
program as follows:

    Status: Continued Probationary Accreditation
    Length of Training: 4 years
    Maximum Number of Residents:   8
    Residents per Level: 2-2-2-2

**Member Organizations**

American Board of Medical
Specialties
One American Plaza
Suite 805
Evanston, Ill 60201

American Hospital Association
840 N. Lake Shore Dr.
Chicago, Ill. 60611

American Medical Association
535 N. Dearborn St.
Chicago, Ill. 60610

Association of American
Medical Colleges
One DuPont Circle, N.W.
Washington, D.C. 20036

Council of Medical
Specialty Societies
   Box 70
   Lake Forest, Ill. 60045

The Committee recognized that the program director is taking steps
to improve the program but expressed continuing concern regarding
the following:

1.   In order to provide an adequate interdisciplinary educational
     experience, institutions sponsoring graduate medical education
     in orthopaedic surgery should also sponsor accredited programs
     in general surgery, internal medicine, and pediatrics.  At the
     present time, Hamot Medical Center does not sponsor accredited
     residencies in these areas.  (Special Requirements V.G.)

HMC-02667

CONFIDENTIAL

John D. Lubahn, M.D.
Page Two

2.  There is an insufficient number of faculty to supervise and
    instruct residents at all times.  The Committee notes that the
    director has taken steps to address this issue through a sign in
    system for members of the teaching staff assigned to the
    outpatient service.  The need for this approach, however,
    indicates that current faculty may not have the time or
    commitment required to support resident education.  (Special
    Requirements III.C.2.  Site Visit Report, page 12.)

3.  Members of the teaching staff are not sufficiently involved in
    appropriate scientific societies, their own continuing
    education, or active research projects.  Efforts are being made
    to improve faculty participation in research and other scholarly
    activities, but at the present time the program's record of
    publications and presentations is inadequate.  (Special
    Requirements III.C.3.  Program Information Form, pages 12g-12u.)

4.  Residents do not have sufficient opportunity to develop
    competence in critical assessment of new therapies and medical
    literature or to learn the design and interpretation of research
    studies.  Efforts are being made to improve resident experience
    in this area, but the residents' research record in recent years
    has been insufficient.  It should be noted that resident
    experience in this area should include exposure to basic as well
    as clinical studies, research design, hypothesis testing and
    related statistical techniques, and the reporting and
    interpretation of research results.  (Special Requirements V.F.
    Program Information Form, pages 12r-12u.)

5.  Recent performance by program graduates on the certification
    examinations of the American Board of Orthopaedic Surgery has
    been poor.  It is recognized that improvements in this area will
    take some time, but this is an area that must be addressed.

The program will be reviewed in approximately two years following a
site visit by a specialist.

All current residents and applicants to the program must be advised
in writing of the program's status, and a copy of the appropriate
written notification shall be submitted to this office within fifty
(50) days of the date of this letter, unless reconsideration is
requested.

For information concerning reconsideration of this action and
procedures by which copies of this letter are distributed, please
see the enclosed document entitled "Procedures for Reconsideration
and for Appeal of Adverse Actions."

HMC-02668

CONFIDENTIAL

John D. Lubahn, M.D.
Page Three


Please notify this office regarding any major changes in the
organization and/or leadership of the program.

Sincerely yours,

Steven P. Nestler, Ph.D.
Executive Secretary
Residency Review Committee for Orthopaedic Surgery
312-645-4692

Enclosure

cc: American Medical Association
    The American Board of Orthopaedic Surgery
    The American Academy of Orthopaedic Surgeons
    Dana R. Lundquist
    Richard W. Brzuz
    John A. Ogden, M.D.

/2043a

HMC-02669

CONFIDENTIAL

C O P Y

**ACGME**

Accreditation Council
for Graduate Medical
Education

Office of the Secretary
535 N. Dearborn St.
Chicago, Ill. 60610

July 12, 1989

John D. Lubahn, M.D.
Chairman, Department of Orthopaedics
Hamot Medical Center
201 State Street
Erie, PA  16550

Dear Doctor Lubahn:

The Residency Review Committee for Orthopaedic Surgery, which is
composed of representatives of the American Academy of Orthopaedic
Surgeons, the American Board of Orthopaedic Surgery and the AMA
Council on Medical Education, has reviewed the information submitted
concerning the following residency:

>    Orthopaedic Surgery

>    Hamot Medical Center Program
>      Hamot Medical Center
>      Shriners Hospital For Crippled Children (Erie)
>    Erie, PA

>    Program 2604122156

The Residency Review Committee examined all of the information
submitted in support of the request for reconsideration and
sustained its prior action to accredit the program as follows:

>    Status: Probationary Accreditation
>    Length of Training: 4 years
>    Maximum Number of Residents:   8
>    Residents per Level: 2-2-2-2

In sustaining 4 of the previous 5 citations, the Committee cited the
following:

1.  In order to provide an adequate interdisciplinary educational
    experience, institutions sponsoring graduate medical education
    in orthopaedic surgery should also sponsor accredited programs
    in general surgery, internal medicine, and pediatrics.  At the
    present time, Hamot Medical Center does not sponsor accredited
    residencies in these areas.  (Special Requirements V.G.)

    Program's Response:  The director indicated that orthopaedic
    residents have peer interaction with residents from two family
    practice residencies and have "peer relationships" with general
    surgeons, internists, and pediatricians who are on the staff at
    Hamot Medical Center.

Member Organizations
American Board of Medical
Specialties
One Rotary Place
Suite 805
Evanston, IL 60201

American Hospital Association
840 N. Lake Shore Dr.
Chicago, IL 60611

American Medical Association
535 N. Dearborn St.
Chicago, IL 60610

Association of American
Medical Colleges
One DuPont Circle, N.W.
Washington, D.C. 20036

Council of Medical
Specialty Societies
P.O. Box 70
Lake Forest, IL 60045

HMC-03153

CONFIDENTIAL

John D. Lubahn, M.D.
Page Two

Committee Reconsideration:  The Committee reviewed the program's
response, but as Hamot does not sponsor residencies in general
surgery, internal medicine, or pediatrics, sustained Citation #1.

2.  There is an insufficient number of faculty to supervise and
    instruct residents at all times.  The Committee notes that the
    director has taken steps to address this issue through a sign in
    system for members of the teaching staff assigned to the
    outpatient service.  The need for this approach, however,
    indicates that current faculty may not have the time or
    commitment required to support resident education.  (Special
    Requirements III.C.2.  Site Visit Report, page 12.)

    Program's Response:  The director indicated that J. C. Lyons,
    M.D. has been added to the teaching staff, that a spine surgeon
    would be added to the staff in 1990, and that efforts were being
    made to add to the faculty in the area of hand and upper
    extremity surgery.

    Committee Reconsideration:  The Committee recognizes that
    efforts are being made to address needs in this area.  The
    addition of Dr. Lyons is a positive step and the plans to add
    two more individuals are promising.  However, as these two
    positions have not yet been filled, the Committee sustained
    Citation #2.

3.  Members of the teaching staff are not sufficiently involved in
    appropriate scientific societies, their own continuing
    education, or active research projects.  Efforts are being made
    to improve faculty participation in research and other scholarly
    activities, but at the present time the program's record of
    publications and presentations is inadequate.  (Special
    Requirements III.C.3.  Program Information Form, pages 12g-12u.)

    Program's Response:  The director indicates that he and two
    other members of the staff are involved in ongoing clinical
    research and that all members of the staff are being encouraged
    to become more active, particularly in the Orthopaedic Research
    Society and subspecialty societies.

    Committee Reconsideration:  The Committee recognizes that steps
    have been taken to address needs in this area and that if
    efforts are sustained, this citation will be address in the near
    future.  The Committee determined that the citation was valid at
    the time of the site visit, however, and sustained Citation #3.

HMC-03154

CONFIDENTIAL

John D. Lubahn, M.D.
Page Three

4. Residents do not have sufficient opportunity to develop
   competence in critical assessment of new therapies and medical
   literature or to learn the design and interpretation of research
   studies. Efforts are being made to improve resident experience
   in this area, but the residents' research record in recent years
   has been insufficient. It should be noted that resident
   experience in this area should include exposure to basic as well
   as clinical studies, research design, hypothesis testing and
   interpretation of research results. (Special Requirements V.F.
   Program Information Form, pages 12r-12u.)

   Program's Response: The director indicated that residents work
   with Hamot's Director of research, a statistician, a biochemist,
   and a bioengineer in the research area. A number resident
   research projects were listed.

   Committee Reconsideration: The Committee recognized that recent
   changes in the program had improved resident exposure to
   research and encouraged the director to continue his efforts in
   this area so that the improvements would be sustained over
   time. Citation #4 was rescinded.

5. Recent performance by program graduates on the certification
   examinations of the American Board of Orthopaedic Surgery has
   been poor. It is recognized that improvements in this area will
   take some time, but this is an area that must be addressed.
   (Special Requirements VI.B.)

   Program's Response: The director reports that since he has
   become responsible for the program, resident performance has
   been good. Last year two program graduates scored in the 96th
   and 68th percentile on Part I of the ABOS examination.

   Committee Reconsideration: The Committee recognizes the
   improvement in this area during the last two years. If this
   record is sustained, this citation will be addressed in the near
   future. The Committee concluded that the citation was valid at
   the time of the site visit, however, and sustained Citation #5.

The Committee recognizes that the program director is making a
determined effort to strengthen the educational experience of his
residents. However, continued effort will be needed before these
changes will have their intended impact.

The program will be reviewed in 1991 (or at an earlier date if
requested by the program director) following a site visit by a
specialist.

All current residents and applicants to the program must be advised
in writing of the program's status, and a copy of the appropriate
written notification shall be submitted to this office within fifty
(50) days of the date of this letter, whether or not the action is
appealed.

HMC-03155

CONFIDENTIAL

John D. Lubahn, M.D.
Page Four

For information concerning appeal of this action and procedures by
which copies of this letter are distributed, please see the enclosed
document entitled "Procedures for Reconsideration and for Appeal of
Adverse Actions."

Please notify this office regarding any major changes in the
organization and/or leadership of the program.

Sincerely yours,

Steven P. Nestler, Ph.D.
Executive Secretary
Residency Review Committee for Orthopaedic Surgery
312-645-4692

Enclosure

cc: American Medical Association
    The American Board of Orthopaedic Surgery
    The American Academy of Orthopaedic Surgeons
    Dana R. Lundquist
    Richard W. Brzuz
    John A. Ogden, M.D.

HMC-03156
CONFIDENTIAL

# LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
## Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

# EXHIBIT B

# ORTHOPAEDIC INTERNAL REVIEW

Interview of Dr. John Lubahn, Orthopaedic Residency Program Director
October 2, 1997
Completed by Dr. Lee Van Voris

I interviewed Dr. Lubahn for about 60 minutes regarding his residency program, as part of the internal
program review. We addressed the following issues, the responses to which are outlined:

1.    **Goals and Objectives of the Residency Program**

Dr. Lubahn stated that he has a general overall goal of the program which is "to educate and
train physicians in the care and management of injuries and diseases of the musculoskeletal
system and to train the resident physicians in the surgical skills necessary to provide the proper
orthopaedic care" (see attachment).   No educational objectives were evident for the training
program. Additionally, there were no specific goals or objectives for each PGY training level.
Furthermore, the goals which were outlined by Dr. Lubahn have not been updated on an annual
basis, rather they are updated every three to five years. Specific educational and training
objectives were lacking. Dr. Lubahn noted that the Orthopaedic RRC requirements do not
specifically call for goals and objectives. Nevertheless, I made the point that specific goals and
objectives for resident learning are very helpful in establishing the curriculum and measuring
progress of the residents.

Recommendation

- Update the overall goals of the orthopaedic residency training program and also write
specific goals for each level of training. These should be updated on an annual basis in the
spring of each year. Specific educational objectives should be established by the faculty,
program director and residents. In this way, measurement of progress against the goals
and objectives can be made for each resident.

2.    **Instructional Plans and Resources**

Dr. Lubahn stated that his curriculum is based upon an every 18 month rotation and includes
anatomy, basic science, children's orthopaedics, orthopaedic pathology, hand surgery and
general orthopaedics. He noted that specific ethics lectures are included in the curriculum 2-3
times per year. In addition, during Journal Club sessions, statistical analysis and critical review
of the literature are taught. Additionally, once a year a topic regarding medical legal issues also
is discussed. At most Saturday clinical and M&M conferences, socioeconomic and cost
containment issues are integrated into the clinical discussions. Furthermore, Dr. Lubahn states
that any graduate medical education financing issues are discussed with the department and with
the residents at the Saturday morning department meetings and clinical conferences.    Dr.
Lubahn stated that there is no specific training for the residents with regard to communication
skills. Research design is taught during the basic science/research rotation. Dr. Lubahn also
noted that the residents are deeply involved in departmental meetings and observe firsthand the
details of orthopaedic practice.

HMC-01802

CONFIDENTIAL

LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

EXHIBIT C

 

Hamot Medical Center
201 State Street
Erie, PA 16550
(814) 877-6000
www.hamot.org

October 15, 2003

Steven P. Nestler, PhD
Executive Director
Residency Review Committee
ACGME
515 North State Street
Chicago, IL  60610

Dear Dr. Nestler:

Several weeks ago I telephoned you regarding the possible closure of the Hamot Family Medicine Program. Indeed, after some discussion a decision was made to close the program at the end of the year. I believe the main reason is that Erie currently has one additional ACGME approved family practice program and while Hamot's program is approved, the limited number of applicants to family practice now makes it impractical to maintain two programs in the city. Our residents do have the opportunity to work with the residents from the other program but as per our discussion I feel the curriculum of our PGY1 year could be strengthened by focusing on a strong internal medicine rotation as well as the remaining requirements, such as intensive care unit, vascular surgery, neurosurgery, etc.

Hamot is presently approved for 26 ACGME positions (16 for family practice and 10 for orthopaedics) therefore I would like to apply for 5 positions in orthopaedics which would expand our program by one resident per year.

We currently have more than enough clinical material between Hamot Medical Center and the Shriners Hospital for Children. We plan to expand the teaching program by adding full time faculty who are fellowship trained in trauma, sports medicine, and total joint arthroplasty. The sports medicine trained fellow is firmly committed to begin August, 2004. We are still in the negotiating stages with the trauma fellow and the total joint fellow.

I am convinced that the program in Erie is capable of maintaining our current level of excellence with one additional resident per year.

HMC-02627

CONFIDENTIAL

Page 2
Steve P. Nestler, PhD

With the plans for a site visit in January this year I am concerned that the committee would defer the decision on the additional resident thereby necessitating one additional site visit. I believe we would have a better chance of that approval of one additional resident per year if the faculty I recruit are actually in place and the program has been redesigned for the additional resident. I would appreciate, therefore, the delay of the site visit by approximately six months or at least until after August 1st once the new faculty members have started.

I look forward to hearing from you.

Best regards.

Sincerely,

John D. Lubahn, MD
Chairman, Department of Orthopaedics
Program Director, Orthopaedic Residency Program

HMC-02628
CONFIDENTIAL

MEDICAL CENTER
Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

EXHIBIT D





A C G M E

Accreditation Council for
Graduate Medical Education     July 28, 2005

515 North State Street
Suite 2000
Chicago, Illinois 60610

Phone 312.755.5000
Fax 312.755.7498
www.acgme.org

John D. Lubahn, MD
Chairman, Department of Orthopaedics
Hamot Medical Center
201 State Street
Erie, PA  16550

Dear Dr. Lubahn:

The Residency Review Committee for Orthopaedic Surgery, operating with
the accreditation authority that has been delegated to it by the
Accreditation Council for Graduate Medical Education, has reviewed the
information submitted regarding the following residency program:

    Orthopaedic Surgery

    Hamot Medical Center Program
      Hamot Medical Center
      Shriners Hospitals for Children (Erie)
    Erie, PA

    Program 2604122156


Upon review of your April 7, 2005 submission, the
Committee continued to conclude that an increase in
resident complement should not be approved at this
time.  Specifically, they identified that the lack of
accredited programs in general surgery, pediatrics and
internal medicine as well as program resources in spine
surgery (satisfactory for 2 residents per year but not
for 3) as the primary reasons for keeping the program
at 2 residents per year.


Sincerely yours,

Steven P. Nestler, Ph.D.
Executive Director
Residency Review Committee for Orthopaedic Surgery AUG 1 - 2005
(312) 755-5025
spn@acgme.org


CC:   John D. Lubahn, MD


HMC-06655

LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,       )
                                    )
        Plaintiff,        )
                                    )
       v.              )     Civil Action No. 05-32 E
                                    )
HAMOT MEDICAL CENTER,    )
                                    )
        Defendant.    )

## DECLARATION OF LISA BROWN, M.D.

I, Lisa Brown, M.D. an adult individual, state as follows:

1.    A memo from Pat Williams, D.O. stated that I had been struggling in regards to duties and academics, and that I had difficulty following the responsibilities of the hand service resident when my presence was not accounted for on a particular day. This is an untrue statement that had no factual basis. I was not scheduled with Dr. Williams on the day referenced in his memo. Moreover, at that time when on hand service, it was customary for all residents to use available time to read, study and dictate charts when the scheduled surgeon was absent. I used that available time to improve my knowledge base.

2.    Pat Williams, D.O. stated that I neglected rounds then subsequently was untruthful about those duties. This is an untrue statement. The day Dr. Williams was referring to was a Tuesday. At that time, it was customary for residents to begin rounds after the Tuesday morning conference, which started earlier than conferences the

remainder of the week. The patient Dr. Williams references was seen and evaluated by me on the day referred to. I completed rounds on all of my patients every day I was on service and at the hospital. This fact was truthfully and accurately conveyed to Dr. Williams.

3.    Pat Williams, D.O. added in the memo that he hoped the orthopaedic faculty could help me and was personally concerned about my progress. I repeatedly requested from Dr. Williams a comprehensive reading list for the hand service. He ultimately supplied a list more than one year after my hand rotations.

4.    A February 20, 2004 letter drafted by Dr. Cermak reported that I had refused to evaluate a patient in the emergency room ("ER"). This is an untrue statement. I never refused to evaluate or treat a patient in the ER. The patient referred to in the letter was seen by myself within minutes of being triaged by the ER nurse and was treated expeditiously and appropriately. In fact, Dr. Cermak visited the ER as I was completing my work on the patient and commented on the nice repair I had done on the patient's tendon.

5.    A conversation and e-mail between Dr. Benes and Dr. Lubahn refer to multiple occasions that I had delayed in responding to calls from the ER. As ER records reflect, not only did I return pages to the ER within minutes but, my arrival to the ER was timely. Dr. Benes and I had a discussion about the complaints from ER physicians regarding response time for most of the orthopaedic residents. Two names were specifically mentioned in those complaints, however, the complaint were not based on

correct facts. Ultimately, the other resident identified in the complaint had his contract renewed.

6.     Dr. Lubahn stated that I incorrectly repaired a leg laceration on a patient in the ER. I, under the direction and guidance of the ER physician who was present in the ER that evening, repaired the laceration in a manner that was not only acceptable, but correct. The wound was copiously irrigated and closed over a drain as was instructed by the ER attending physician. The patient's wound healed without sequelae.

7.     Dr. Lubahn's evaluation of a presentation given by me on February 25, 2004 concluded that I had insufficient, immediate specific knowledge about the subject matter presented. I presented two cases at that presentation. The first was skillfully presented with all specific questions answered correctly. The second case was also skillfully presented. However, the presentation was evaluated as unsatisfactory because as a Level 3 resident I was not able to recall the answer to a specific question by Dr. Lubhan. When the same question was posed to the Level 5 resident, he was also unable to give a correct answer. The Level 5 resident was not terminated from the program or reprimanded for his error.

8.     Dr. Lubahn stated that I needed to increase reading to improve core knowledge. Not only was this a common statement in most of my evaluations with Dr. Lubahn, this was also a standard recommendation to all of the residents and is reflected in their evaluations. Again, when I asked for specific reading lists of topics, Dr. Lubahn referred me to Chapman's 4 volume Orthopaedic Surgery book and Green's 2 volume Operative Hand Surgery book. His other suggestion was to refer to Internet searches

3

for information.  Specific topics suggested by Dr. Lubahn were esoteric in nature and not practical for improving core knowledge.

9.     Dr. Lubahn stated that I needed to improve OITE scores.  He advised most residents to improve OITE scores.  Other residents scored poorly on the OITE.  I specifically asked Dr. Lubahn on December 22, 2003 for directed help in improving OITE scores.  He subsequently referred me to Sylvan Learning Center.  Dr. Lubahn gave detailed suggestions to other residents and offered personal help to improve their OITE scores.  I was not offered similar assistance.

10.     I did not raise sex discrimination issues to attending physicians or administration personnel prior to the lawsuit, in part because it was very clear that I did not have any support from these individuals regarding these issues.  Given the intense scrutiny I was under, reporting incidents of sexual discrimination would have worsened the problems I was experiencing.  The response given by attending physicians when I requested help with academic or clinical situations was poor at best.  Additionally, I felt that raising issues about gender discrimination would be more isolating and detrimental to my education, training and career.

11.     After receiving the non renewal letter of March 1, 2004 for what was described as academic and clinical insufficiency, my responsibilities in the hospital and with patients did not change.  I continued to act as an independent resident in good standing without additional supervision or preceptorship.  I was treated as any other orthopaedic resident at Hamot.

4

12.    I have never been sued for malpractice.

13.    Morning conferences for orthopaedic residents at Hamot were daily one hour teaching/learning sessions designated for formal education and training. They were to be attended by both residents and students rotating in orthopaedics as well as attending physicians, the program faculty, whose role was to mentor and educate those residents and students.

14.    I experienced extremely difficult events in my life that I would not discuss, publicly, or otherwise, were I not required to do so in this lawsuit. I began my medical education later in life and had a number of hurdles to overcome. My daughter was born with birth defects that required she receive extensive care beyond normal child care, in addition to seven or eight surgeries over the court of her childhood. The summer before I began medical school, my mother was diagnosed with ovarian cancer. During this time, while I was in medical school, I was her primary caregiver and was with her during her three years of therapy. I also endured marriages in which I suffered betrayal not only of my welfare, but my daughter's.

15.    One of the members of the Grievance Committee, George Dulabon, did not vote and residents were allowed to testify.

16.    Hamot failed to provide a resolution at step 2 of the grievance procedure.

| 9/15/06 | /s/ Lisa Brown |
| Date | Lisa Brown, M.D. |

# LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
## Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

## EXHIBIT F

Resident Evaluation

Chris Arnold, MD

Dr. Arnold was asked if anything could be changed during the past year. While he enjoyed his research rotation he felt that it could possibly be shortened. He spent one month with Steadman and Hawkins in Colorado to enhance the six month somewhat. He did agree that the research rotation was important for the residency but felt that time was often wasted. Chris will be a chief resident next year with three residents this year finishing. One suggestion for coverage that year would be an attending on call alternate nights.

He felt that a general weakness in our program was that attendings did not attend conferences "enough". He noted a two week interval when I was away in July to cover board exams and on vacation, that conferences frequently went without coverage.

He noted Dr. Suprock, Cortina, and Kastrup as being excellent teachers in the operating room and appreciated Dr. Kastrup's input in conferences which he has attended regularly when assigned.

I reviewed Dr. Arnold's in-training scores with him. Generally they have improved and hopefully will continue to improve this year indicating an adequate fund of knowledge.

John D. Lubahn, MD

HMC-05841

CONFIDENTIAL

Resident Evaluation
Jeff Keverline
August 4, 1997

Jeff and I met to discuss his progress for the academic year. His overall performance has been in general good. He was asked to describe strengths and weaknesses of the program and felt that the clinical experience was a strength. He also, I believe, felt the research rotation was a strong part of the program but would like to see some less time or some clinical integration into the research program.

He enjoyed his Shriners rotation and suggested that as part of the Shriners rotation, the second year be included and that the chief year then be limited to a four month rotation.

When asked to describe weaknesses of the program he listed poor faculty attendance at general orthopaedic conferences. He agreed that biomechanics, basic science, hand and upper extremity, children's, pathology conferences were well covered by faculty. 90-100% of the time a faculty member is in attendance for those conferences, or more often than not the conference is cancelled or changed.

Approximately 30-40% of the general orthopaedic conferences over the last year were presented by resident without faculty in attendance. I advised him that while I felt I was in agreement that this was a high figure, it was not an unacceptably high figure, and one we need to work towards improving.

John D. Lubahn, MD

HMC-02341

CONFIDENTIAL

Exit Interview
Gerry Trinidad
June 8, 1998

I discussed Gerry's strengths and weaknesses with him and what his plans are for his future. I reviewed all of his evaluation forms with him some of which still indicate weakness in the clinical sphere. Some of these came from Mark Suprock, MD and when I asked what Dr. Suprock probably perceives as weaknesses it dealt largely (or Gerry believes) with his ability to quickly and efficiently harvest a graft for a cruciate ligament reconstruction as an example. I must say that I worked with Gerry on a recent surgical procedure allowing him to perform the majority of a basal joint ligament reconstruction arthroplasty. He was obviously well prepared for the procedure and performed it virtually in it's entirety with only one or two questions of me as I first assisted him. I did a large portion of passing the graft, however, that was largely due to my position at the table.

I believe that Gerry Trinidad's clinical knowledge is good. I asked what he hoped to gain from his fellowship and his response was to improve working clinical and technical knowledge of the shoulder, as well as anterior and posterior cruciate ligament reconstruction's, and in general to become a better technician. His next year will be spent with Joe Torg, MD in Philadelphia and the next two years working with Duane Marchyn, MD in Portsmith, OH, a community of approximately 80,000 people due south of Columbus. I believe Gerry will do well in that setting.

When asked about certain weaknesses in the program in areas where he would like to see improvement, he once again mentioned more faculty involvement in conferences. When specifically questioned on this it is Monday and Thursday conferences which between 15-30% of the time go either unattended or taught by a resident. I did advise that I had already met with Chris Arnold, MD and planned to meet with Drs. Suprock, Babins, Rogers, Kastrup, Stefanovski and Cortina to better structure this particular gap in the conference focusing on Chris Arnold's selection of attendings to staff those conferences. 

Dr. Gerry Trinidad has successfully completed this program.

John D. Lubahn, MD
Program Director, Orthopaedic Residency Program

HMC-02266

CONFIDENTIAL

Semi-Annual Evaluation
Steve Hribar, MD
August 17, 1999

Steve Hribar, Jim Sanders and I met from 9:00 am to 9:30 am. We discussed Steve's performance for the last year. His ratings by most faculty were average or above. Since six months had been at the Shriners Hospital, I asked Dr. Sanders for his input. He reminded Steve to be more compulsive and detailed in patient history and physical examinations. Both of use advised him to obtain input from faculty on patients more often than naught, rather than trying to solve problems or treat more complex patients on his own.

In turn Steve raised concerns that faculty were not attending as many of the conferences as they should. I reminded him that for combined conferences it was the resident's responsibility to contact the faculty member in advance and that I considered a faculty members absence under these circumstances the responsibility of both the faculty member and the resident. These are the situations where "absenteeism" is a problem. When a faculty member alone is assigned to present a conference, I am not aware of any scheduled conferences not being given. If they were cancelled or changed it was done in advance such that a new conference could be scheduled. I reminded Steve to read regularly for conferences and surgical procedures, reminding him in the past that has been one of the most effective means of improving the resident's learning experience.

_____

John D. Lubahn, MD
Program Director

HMC-02237
CONFIDENTIAL

**Evaluation**
**Nick Kubik, MD**
**July 24, 2000**

Dr. Kubik's performance for the previous academic year was discussed with him. I believe he has met all of his goals for the year in terms of clinical and technical expertise.

The number of clinical faculty at various conferences once again has been discussed. He and the other residents would like to see more faculty at conferences. I do believe that the overall attendance and participation by the faculty is satisfactory and above average for many programs in the country. 

His evaluations were discussed with him as well as his in-training scores and felt to be satisfactory.

His performance in the laboratory was felt to be satisfactory.

I feel he has achieved a level of performance for promotion to his PGY-4 year.

—————————————————
John D. Lubahn, MD

HMC-02230
CONFIDENTIAL

Brian Dickson, MD
Exit Interview
June 29, 2001

I met with Brian Dickson for his exit interview. I asked him what he would do differently if he were to start his residency over again. His response was that he might like to have more time to spend in the outpatient setting. As with most residents finishing this program he feels that a relative strength is the clinical experience of the program. He specifically appreciated Dr. Hood in the clinic a year or so ago taking the time to explain a hand exam to him and particularly to point out intrinsic tightness.

In contrast to Dr. Galey, his co-chief resident, he felt that Saturday morning conferences were a strength to the program and brought many and varied faculty together at a common setting. He felt that he would like to see some attendings read more and we discussed a number of our current part-time clinical faculty in detail in terms of their knowledge of the orthopaedic literature. For the most part there is a thorough knowledge, however some faculty more than others rely on anecdotal information than their own personal experience. I believe this changes as the ten year cycle evolves for them to take their re-certifying exam. 

Brian in turn asked what I thought were the strengths and weakness of the program were and I feel that more scholarly activity would improve the program however three clinical faculty who I feel expose the residents to scholarly activity are, myself, Jim Sanders and Phyllis Kuhn. Joao Tavares exposes the residents to scholarly activity to a certain extent as well at the Shriners Hospital. Residents would do well to spend more time with Dr. Tavares who balances clinical experience with scholarly activity.

I believe that Brian has performed admirably over his four years here. He has done well on his in-training exams, and I believe he is clinically and intellectually competent to begin a practice in general orthopaedics in Jonesboro, AR. I believe that one of the unspoken strengths of Hamot Medical Center's program is the ability to train an individual as a general orthopaedist and this is ideal for Brian in a community the size of Jonesboro.

Brian Dickson, MD has successfully completed this program.

_____

John D. Lubahn, MD
Program Director

HMC-02263

CONFIDENTIAL

Jim Seeds, MD
Semi-Annual Resident Evaluation
7/12/01


Jim's performance evaluation was held.  His evaluations for his PGY-2 year were above average.

Jim had been previously counseled on having a regular reading and study program and was asked how this was progressing.  He felt that he was reading more and better prepared for this year's in-training exam.

Jim felt that felt that more attendings at morning conference would be a big help. 


_____
John D. Lubahn, MD
Program Director

HMC-02170
CONFIDENTIAL

Jeff Nechleba, MD
Semi-Annual Evaluation
9/16/03

I discussed Dr. Nechleba's performance thus far with him which has been well above average. His clinical performance and in-training scores have shown continued improvement.

Suggestions he had for the program were to continue efforts to improve faculty attendance at conferences and in clinic. The new trauma schedule, we both believe has improved at least initially, the clinic coverage but conference attendance still needs to be improved. 

The meeting was adjourned.

_____
John D. Lubahn, MD

HMC-02902

CONFIDENTIAL

Vivek Sharma, MD
Semi-Annual Evaluation
February 13, 2004
3:30 pm

I reviewed Vivek's performance which thus far has been above average. The available GME Toolkit evaluations were all in the five plus range. I counseled Vivek that he should continue his outstanding work. I reviewed his in-training scores with him which was in the 73rd percentile range.

Dr. Sharma had constructive criticism of the 6:45 am x-ray conference. He felt that it  needed better attendance and teaching. I will provide that input to the chief resident and hopefully an improvement in the teaching quality of that particular conference can be possible.

I reviewed with him plans for Jamey DeLullo, MD becoming a full-time faculty member next year. His assistance in providing depth to the current conference schedule as well as formal teaching through all levels of the residency program will be appreciated.

We discussed written notes for his dictations in the clinic. While dictaphones and typed notes would be ideal, I believe that cost remains a concern. I will pursue the possibility of an electronic record, possibly funded through an outside source for the coming year. The meeting was adjourned.


_____          _____
John D. Lubahn, M.D.                     Vivek Sharma, MD
Program Director

HMC-02186

CONFIDENTIAL

LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

EXHIBIT G

John D. Lubahn, M.D.

Curriculum Vitae

Office
Hand, Microsurgery and Reconstructive Surgery
300 State Street, Suite 205
Erie, Pa 16501

Phone: 814-456-6022
FAX:    814-456-7040
E-mail: hmro@erie.net

Social Security Number
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

Home
5338 Wolf Road
Erie, PA  16505

Wife
Terri L. Wolfe

Date of Birth
July 14, 1949
Ashtabula, Ohio

Certification
Certified by the American Board of Orthopaedic Surgery – September 10, 1982
Recertified - Hand Qualifications, Hand Surgery
American Board of Orthopaedic Surgery, July 1992 and August 1998

Licensure
Pennsylvania        MD 025337-E
Ohio                35-05-0066
New York            129800-1

Education
*Edgewood Senior High School (1963-67)*
-   National Honor Society

*Undergraduate*
Adelbert College - Case Western Reserve University (1967-1971)
Degree: Bachelor Arts, Summa Cum Laude
-   -   Folberth German Award
-   -   Litwack Award for Scholarship and Athletics
-   -   Warrion Trophy for Scholarship, Leadership and Service
-   -   Phi Beta Kappa
-   -   Omicron Delta Kappa
-   -   Delta Phi Alpha (German Honorary)

*Medical School*
Case Western Reserve University, 1971-1975
-   -   Alpha Omega Alpha Honorary Fraternity

*General Surgical Training*
1975-76:   Intern, General Surgery, University of Rochester, Strong Memorial Hospital, 601 Elm Avenue, Rochester, NY
           14647
1976-77:   Associate Resident, General Surgery, University of Rochester, Strong Memorial Hospital

*Orthopaedic Surgical Training*
1977-78:   Associate Resident, University of Rochester, Strong Memorial Hospital, Department of Orthopaedics
1978-79:   Senior Resident, University of Rochester, Strong Memorial Hospital, Department of Orthopaedics
1979-80:   Chief Resident, University of Rochester, Strong Memorial Hospital, Department of Orthopaedics

HMC-02304
CONFIDENTIAL

1977-80:  Member of Replantation Services, Rochester, Strong Memorial Hospital
1980-81:  Christine Kleinert Fellow in Surgery of the Hand, University of Louisville Medical School, 323 E. Chestnut Street, Louisville, KY 40202
June, 1981 Pediatric Hand Surgery, Professor Dieter Buck-Gramcko, Hamburg, Germany

*Paul Harris Fellow Award (July 8, 1998)*
Presented by the Rotary Foundation of Rotary International "In appreciation of tangible and significant assistance given for the furtherance of better understanding and friendly relations among peoples of the world."

Past Appointments
July 1980-October 1980: Instructor in Orthopaedics, Rochester Medical Center
1988            American Society for Surgery of the Hand.  Chairman, Regional Review Course Committee.
1999 – 2000    American Orthopaedic Society, Joint Vice President
1999 – 2000    Program Director, Eastern Orthopaedic Association
2001           President, American Orthopaedic Society

Current Appointments
-  Chairman, Department of Orthopaedics, Hamot Medical Center; Erie, Pennsylvania (Elected, 1986)
-  Program Director, Hamot Medical Center, Erie, Pennsylvania (1988)
-  Instructor in Orthopaedics, Shriners Hospital for Crippled Children; Erie, Pennsylvania
-  Instructor in Orthopaedics, St. Vincent Health Center; Erie, Pennsylvania

National Appointments
2002           President of the American Foundation for Surgery of the Hand
1988 – Present  Examiner, American Board of Orthopaedic Surgery Board of Examiners
1987 – Present  Site Visitor, Accreditation Council for Graduate Medical Education, Residency Review Committee – Orthopaedics

Society Memberships
-  -  American Medical Association
-  -  American Orthopaedic Association
-  -  American Academy of Orthopaedic Surgeons
-  -  American Society for Reconstructive Medicine
-  -  Academic Orthopaedic Society
-  -  Eastern Orthopaedic Association
-  -  American Society for Surgery of the Hand
-  -  Orthopaedic Research Foundation
-  -  Pennsylvania Medical Society

Committees
-  -  Association of Orthopaedic Chairmen, Graduate Education Committee
-  -  American Academy of Orthopaedic Surgeons, Committee on Evaluation (Orthopaedic In Training Exams, 1991,1992, 1993, 1994, 1995
-  -  American Society for Reconstructive Microsurgery Guidelines & Outcome Studies, Chairman - 1993
-  -  American Society for Surgery of the Hand - Program Committee, 1993, 1994, 1995
-  -  American Society for Surgery of the Hand – Self Assessment Exam Committee, 1995, 1996
-  -  American Society for Surgery of the Hand – Self Assessment Exam Committee – Chairman, 1997
-  -  American Society for Surgery of the Hand, Hand Professionals Task Force - 1999
-  -  Eastern Orthopaedic Association, Inc - Program Committee 1998-1999
-  -  Eastern Orthopaedic Association, Inc. - 2000 Program Chair

HMC-02305
CONFIDENTIAL

# LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
## Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

# EXHIBIT H

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,         :
        Plaintiff        :
                         :
    v.                   :   Civil Action No. 05-32E
                         :
HAMOT MEDICAL CENTER,    :
        Defendant        :

Deposition of JOHN LUBAHN, M.D., taken before
and by Carol A. Holdnack, RPR, Notary Public in and
for the Commonwealth of Pennsylvania, on Thursday
March 16, 2006, commencing at 9:41 a.m., at the
offices of Scarpitti & Mead, Renaissance Center,
1001 State Street, Suite 800, Erie, PA 16501.

For the Plaintiff:
    Patrick Sorek, Esq.
    Leech Tishman Fuscaldo & Lampl, LLC
    525 William Penn Place, 30th Floor
    Pittsburgh, PA 15219

For the Defendant:
    Kerry M. Richard, Esq.
    Tobin O'Connor Ewing & Richard
    5335 Wisconsin Avenue NW, Suite 700
    Washington, DC 20015

Reported by Carol A. Holdnack, RPR
Ferguson & Holdnack Reporting, Inc.

**2**

1                I N D E X
2
3   JOHN LUBAHN, M.D.
4       Direct Examination by Mr. Sorek . . . . .   3
5
6
7
8   EXHIBITS:
9       Lubahn Deposition Exhibit 1 . . . . . . .114
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1       J O H N  L U B A H N, M.D., first having
2   been duly sworn testified as follows:
3
4              DIRECT EXAMINATION
5   BY MR. SOREK:
6
7       Q.  State your name for the record, please.
8       A.  John Lubahn.
9       Q.  And, Dr. Lubahn, have you had your deposition
10  taken before?
11      A.  Yes.
12      Q.  And what kind of case was it?
13      A.  Primarily Workers' Comp. cases, medical/legal
14  cases.
15      Q.  So about how many times have you had your
16  deposition taken?
17      A.  In 25 years?
18      Q.  Yes.
19      A.  50.
20      Q.  Okay.
21      A.  That's a guess, by the way.
22      Q.  All right.  So you're familiar with the deposition
23  process in terms of how it goes.  I represent the Plaintiff,
24  Dr. Brown.  You have counsel here.  It's a
25  question-and-answer process.  The information that you give

**4**

1   is similar to what you would be providing if you were
2   testifying at court.  And that your answers have to be out
3   loud.  You've heard all of that many times before, I take
4   it.
5       A.  Yes.
6       Q.  Who did you talk to besides your lawyer to prepare
7   for the deposition today?
8       A.  Dana.
9       Q.  Ms. Ashley.
10      A.  Yes.
11      Q.  And that's it.
12      A.  Yes.
13      Q.  What documents did you review to prepare for your
14  deposition today?
15      A.  Folders that they brought with them.
16      Q.  "They" meaning who?
17      A.  Dana and Attorney Richard.
18      Q.  What were in the folders?
19      A.  For the most part, documents related to
20  Dr. Brown's performance evaluations, in-training scores, her
21  file.
22      Q.  Okay.
23      A.  That's all I can remember.  It's kind of like this
24  stack of papers we have here.
25      Q.  And you're indicating just maybe 3 or 4 inches of

---

**37**

1    Q.   Do you remember when?

2    A.   No.

3    Q.   Did you ever discuss Dr. Brown's response with

4    her?

5    A.   Not word by word, I didn't dissect it. I think I

6    probably, on some occasion, mentioned to her that she was

7    being overly defensive and needed just to focus on her

8    problem, her reading skills. And I never made light of the

9    fact that Dr. Williams' concerns weren't valid. But my

10   recollection of my discussions with her and Dr. Williams

11   were, let's get over it and move on.

12   Q.   Okay. Would there be a different level of a

13   severity of problem in your mind if a resident did not round

14   on patients as opposed to rounding on patients and writing a

15   note?

16   A.   I think the issue here is one, that you

17   described. But, two, the issue that Dr. Williams mentions,

18   that she initially said she saw the patient and then didn't

19   see the patient, or whether she really went by at 6:00 a.m.

20   or not. And my recollection was that was what the problem was.

21   Q.   It seems like Dr. Brown is telling you in this

22   note that she did see the patients but she didn't write the

23   note. And what was your view of how to resolve that?

24   A.   My recollection is I told her, Lisa, if you didn't

25   write the note, there's no way for us to know really whether

**38**

1    or not you saw the patient. And so I just stressed to her

2    the importance of every day writing a note.

3    Q.   The second paragraph, Dr. Brown talks about asking

4    Dr. Williams for reading materials, being told by

5    Dr. Williams that he would give her one, and then never

6    getting that. Do you see that?

7    A.   I do.

8    Q.   Is that a legitimate concern of Dr. Brown's?

9    A.   Residents frequently ask for reading materials but

10   aren't ever actually handed a list. And it concerned me

11   here that she expected Dr. Williams to go to the library,

12   pull out articles, make copies and give them to her, which

13   is way above and beyond the call of duty, in my opinion.

14   And that's what I think she was asking for.

15        In retrospect, as I read it initially, I thought

16   she was just asking for some references, but I really think

17   she wanted more. And this is all at a time when she should

18   be able to figure that all out herself.

19   Q.   You do see where she herself says that she wanted

20   a list, a list, a reading list. Dr. Williams said he would

21   get her a list. And she reports that she didn't get any.

22   A.   Yeah, but one of the core competencies for a

23   resident is for them to be able to look up in the library

24   what they need to know about a problem. And this is just

25   telling me that she can't do that or didn't want to do that

**39**

1    or wants the attending to do it for her. And it disturbs me

2    more to look back on it and read it now than it really did

3    at the time.

4    Q.   And so in your experience -- let me think about

5    that. Have you ever known faculty members to provide

6    reading lists to residents?

7    A.   That's a really, really unusual thing, for a

8    faculty member to do it on an individual basis for one

9    resident. We have a reading list for every hand conference.

10   And we frequently review the topics ahead of time. We have

11   journal clubs. It's an ongoing process.

12   Q.   Take a look at your 2286.

13        MS. RICHARD:  That's going to be in the stack or

14        is it in the --

15        MR. SOREK:  It's in the stack, yeah.

16        MS. RICHARD:  Turn to 228 -- yeah. And I'll keep

17        the number of that one handy so you can get back

18        to it.

19   Q.   That's a multi-page document entitled Hamot Hand

20   Service Selected Reading List, right?

21   A.   Right.

22   Q.   What is?

23   A.   Recommended articles to read while you're on the

24   three-month rotation.

25   Q.   Okay. Who put the list together?

**40**

1    A.   I don't remember.

2    Q.   Who is the list given to?

3    A.   I'll back up a little bit. It's based on a

4    publication by a doctor named Peter Stern, as I recall. But

5    it's -- I don't know that it's given to anybody. All the

6    residents, when they're on the service, are advised of that

7    list. We may hand it out. I don't know. I don't hand it

8    out.

9    Q.   Well, they're advised about the list. What are

10   they advised about; that it exists, about where to find it,

11   do they get a copy?

12   A.   Well, it's kind of like in school when the teacher

13   writes something on the board and says, you may see this

14   material again, this is important stuff. That's the message

15   that the attending conveys to the resident; read it.

16   Q.   Yeah, but.

17   A.   You've got three months, read it.

18   Q.   The questions I'm asking are about this document,

19   this document. Is it -- where is this document maintained?

20   A.   I couldn't tell you.

21   Q.   Is it given to residents?

22   A.   Yes.

23   Q.   It's handed to them; is that fair to say?

24   A.   I don't know that. It's more resident to resident

25   than it is me to resident. Williams might give it to them;

41

1  Cermak. I don't personally. This is something that's
2  evolved within our group of four hand surgeons. When the
3  resident is on our service, they come to us, they say, what
4  should we be reading. This is what we give them.
5      Q. Okay. And when you say "this," you're talking
6  about this document starting at 2286. And it -- I would
7  like to know whether you say there's something in the
8  library, go find it, for example, there's something that --
9  the list is in that drawer, go look at it, or, here, I'm
10 going to hand you a copy of the list.
11     A. I don't know the answer to that.
12     Q. All right. This is for -- you're on the hand
13 service, aren't you?
14     A. Yes.
15     Q. Do you know whether any of the rotations have a
16 similar list?
17     A. The reading lists?
18     Q. Yes.
19     A. I believe they do.
20     Q. Do you know, as you sit here today?
21     A. Basic science, I know it does. I can't quote the
22 other ones, no.
23     Q. So you don't know whether the other rotations have
24 a list or whether they provide them to residents?
25     A. I know they all get reading materials. Whether

42

1  there's a list like this, I don't know.
2      Q. So when you say "They all get reading materials,"
3  what are you talking about?
4      A. Well, if Dr. DeLullo is doing intercruciate
5  reconstruction with a resident, and they talk about it the
6  night before, he's probably going to suggest that article to
7  read.
8      Q. Okay.
9      A. He doesn't have to, but he probably is going to.
10     Q. I'm going to confine my questions mostly to what
11 you know to have happened. And so do you know whether
12 Dr. DeLullo does that?
13     A. I know that he does that.
14     Q. And do you know what he gives residents?
15     A. No.
16     Q. Does the subject of reading lists -- has the
17 subject of reading lists for orthopaedic residents come up
18 as a subject of discussion with orthopaedic faculty say in
19 the past three years?
20     A. I don't remember.
21     Q. Could you take a look at 3345.
22     A. Okay.
23     Q. That's the letter you wrote to Dr. Brown on
24 April 14th, 2003, correct?
25     A. Correct.

43

1      Q. And it's a follow-up to a phone conversation. The
2  first sentence says, where you discuss with Dr. Brown, the
3  schedule, her schedule for her probation. Is that a fair
4  summary of the first paragraph?
5      A. Yes.
6      Q. Do you remember the conversation?
7      A. Yeah, somewhat. I think when I provided her with
8  that schedule, she said, gee, you really didn't ask me about
9  it. And I said, well, I really didn't think I had to, but
10 I'm flexible if you have some concerns. I can take the
11 opportunity to talk to Dr. Babins and Cermak to get them to
12 help you out. But, you know, I was -- this letter, I think,
13 is just a response to that.
14     Q. So this letter was an adjustment to the schedule
15 from your probation letter, correct?
16     A. Yes.
17     Q. After you sent this letter, did you ever do any
18 follow-up about whether Dr. Brown had reading time as a
19 result of the schedule that you had worked on?
20     A. I don't recall.
21     Q. In the second paragraph you say, "Please
22 understand that this three-month period is in no way
23 intended to, quote, smother you, rather to give you the
24 opportunity to prove you are serious about orthopaedics,
25 committed to self-study, and enhancing your clinical care

44

1  skills." Correct?
2      A. Correct.
3      Q. In your view, how was Dr. Brown supposed to prove
4  those three principles or her adherence to them; her
5  seriousness to orthopaedics, her commitment to self-study,
6  and her enhancing of clinical care skills?
7          MS. RICHARD: I'm just going to object to the form
8          of the question, but you can answer.
9      A. Well, I think committed to self-study and clinical
10 care skills answer the first part, which is orthopaedics,
11 because they are part of orthopaedics. And commitment to
12 self-study would be to prove to Dr. Babins and Dr. Cermak
13 that, in fact, she was capable of having a discussion about
14 a patient, agreeing on a treatment plan and then following
15 through on it, and then being able to trust her.
16         And then the self-study would be her ability to
17 answer questions about various diagnoses in a clinical or
18 operating room setting with those two attendings to their
19 satisfaction.
20     Q. Did you say those things to Dr. Brown or is that
21 something that she was supposed to know?
22     A. I think any physician is supposed to know that.
23     Q. Take a look at Document 3343.
24         MR. SOREK: This document, you'll remember, Kerry,
25         we will redact the name in this document.

65

1  emergency room?
2      A. I think in Dr. Brown's case it goes back to the
3  initial concerns that were all mentioned earlier. It's a
4  culmination of all of her performance.
5      Q. Well, I would like to ask you what you had in mind
6  when you wrote the letter, if you can recall.
7      MS. RICHARD: I think he just answered that.
8      A. Well, it goes back to the original concern by
9  Dr. Williams. It continues on with my having told her to
10  leave a wound open, and she closed it, and in my opinion
11  wasn't as honest with me as she could have been about why
12  she didn't do what I asked. And that, to me, I can't
13  reconcile that. And she never really recovered from that,
14  in my opinion.
15      Q. She never recovered from what? I'm sorry.
16  Recovered from what?
17      A. She never proved herself to me that she was
18  trustworthy. The one time that I had told her to do
19  something, and she did exactly the opposite. The patient
20  could have died.
21      Q. What are you referring to; the laceration?
22      A. Yeah. That I told her to wash out and leave open,
23  and she did exactly the opposite of what I told her to do.
24  People die from that.
25      Q. Do people die from physician errors in writing

66

1  notes on charts?
2      A. Yes.
3      Q. You've had that problem with residents, haven't
4  you?
5      A. No, never had that.
6      Q. How about Carl Seon?
7      A. Patient died?
8      Q. No, no, no, no, no. No. Problems with Dr. Seon's
9  handwriting that were brought up in evaluations.
10      A. Yeah. I thought you meant a patient died from the
11  handwriting.
12      Q. The patient you're talking about, as far as
13  Dr. Brown is concerned, that patient didn't die, correct?
14      A. No.
15      Q. All right. So I still have to nail this down.
16  When you -- I have to know, if you can tell me --
17      A. If I can continue, because I wasn't finished.
18      Q. Okay, go ahead. I'm sorry, then.
19      A. There was the episode that I talked about with the
20  wound that she closed that I told her to leave open.
21      Q. Yeah.
22      A. Which is a big one. Out of 100 points, that's 60
23  percent. There was a consult that she was asked to do in
24  the OB-GYN service that she didn't do, and had a pretty weak
25  excuse.

67

1      Q. What do you remember about that?
2      A. She was called to see a patient who was in labor,
3  who had what's called a Klippel-Feil syndrome. And the
4  obstetricians and gynecologist really wanted to know what it
5  was. And were there any concerns that they should have.
6  And her response was, I'm not going to do it, liability is
7  too great.
8      She called one of the attendings, who was on call
9  that day. He said, no, you don't have to do it, you should
10  have called me. She didn't call me. I ended up doing the
11  consult. I can't -- I can't understand her thought
12  processes.
13      Q. But you mention she called an attending, and the
14  attending said not to do it. Does that mean there was some
15  disagreement, or what?
16      A. No. The attending was a total hip surgeon, and he
17  wasn't going to do it. Which means to a resident they've
18  got to get the right attending, which would have been me in
19  that case. But she walked away from it, and I got called.
20      And that's irresponsible behavior on the part of a
21  physician. You learn that in medical school. You can't
22  just walk away from something. She deserted the patient.
23  And when I talked to her about it again, it was kind of a
24  defensive-type thing. I think those issues in and of
25  themselves are sufficient for me not to move her on to the

68

1  next year.
2      Q. And those were the issues you had in mind when you
3  wrote this letter?
4      A. Yeah, those are the types of clinical concerns
5  that -- as the Dr. Cermak letter that comes in again later,
6  where she doesn't go to the emergency room when she is
7  called.
8      One of the private offices sent me a letter one
9  time that they would call her about consults, and she didn't
10  do them. And I asked her about that one time, and she said
11  she was having a bad day. That's all she said. I can't
12  live with that. I can't take somebody like that and move
13  them on to the next year.
14      Q. Still, it's important for me to know, and I have
15  to have an answer. And if I'm -- if you have given it
16  already, you can just tell me that. When you wrote the
17  letter at the time, when you refer to clinical performance,
18  the things that you just mentioned, is that what you had in
19  mind --
20      A. Yes.
21      Q. -- when you wrote the letter?
22      A. Yes.
23      Q. And then you say "Concerns regarding your current
24  knowledge base in orthopaedics." What were you referring to
25  when you said that?

109

1 taken any steps -- or what's been your response to
2 residents' concerns about faculty attendance at morning
3 conferences?
4     A. Well, you're going back to a time when, during
5 some of those interviews, Dr. Rogers got sick, Dr. Tavares
6 retired, Dr. Frankovitch retired. I hired Dr. DeLullo. Dr.
7 Kuehn has come and gone. So there's been a dynamic flow of
8 faculty, if you will. We currently have three brand new
9 full-time people at the Shriners Hospital. So I think right
10 now those faculty issues have been resolved.
11        Nechleba, who is now a full-time -- is a
12 geographic full-time faculty member, is somebody I've known
13 after to come to conferences and do conferences. So he
14 leaves as a resident critiquing the program, and now he's
15 part of the program. He solved his own problem, in some
16 respects.
17     Q. You had a plan at one point to add a resident for
18 each of the PGY years to the program, correct?
19     A. Yes.
20     Q. And the plan was turned down by the ACGME,
21 correct?
22     A. Correct.
23     Q. Do you know why?
24     A. The issues they cited were insufficient full-time
25 faculty to have another resident per year, and the absence

110

1 of a spine surgeon, an adult spine surgeon.
2     Q. What was it that led you to want to add an
3 orthopaedic resident?
4     A. I think we have more than enough clinical
5 material. I would add, I subsequently applied for a hand
6 fellowship, and that was accepted. So, on the one hand,
7 they turned us down, and on the other hand they added a
8 person.
9        But there are plenty of times that the attending
10 faculty are in a clinic by themselves or they're in the
11 operating room by themselves. And those are surgical
12 procedures and clinical situations where a resident could
13 learn.
14     Q. You had a temporary -- a temporary place or a
15 temporary spot in 1995 into the residency program. Do you
16 recall that?
17     A. Yes.
18     Q. Do you remember who the resident was?
19     A. Thomas.
20     Q. Eric Thomas?
21     A. Yes.
22     Q. And what -- how did that come about?
23     A. At the time I was, I think, vice president of the
24 Academic Orthopaedic Society. Jim Herndon was president of
25 the American Board of Orthopaedic Surgery. And Reginald

111

1 Cooper was the president of the -- the chairman of the
2 Residency Review Committee. And this resident was
3 terminated from the program in Philadelphia. And he felt
4 that he had been inappropriately terminated, or contract not
5 renewed, whatever.
6     Q. He, the resident.
7     A. He, the resident. He wrote to these individuals
8 and, I guess, made a compelling argument that he should get
9 another chance. And they both called me. I respect both of
10 them, and so I agreed.
11     Q. Do you remember how his -- he came on PGY-3 year?
12     A. I don't remember.
13     Q. You don't, okay.
14     A. Two or three.
15     Q. How did his participation in the program turn out?
16     A. I would describe him as high maintenance. He
17 finished the program. He passed his boards, Parts One and
18 Two. He subsequently joined the military. He's been on the
19 faculty at Tulane. He's a done very well for himself.
20     Q. When you use the phrase "high maintenance," what
21 are you referring to?
22     A. He's a professional football player. He was a big
23 guy. Had a big ego. Didn't think he could do anything
24 wrong. It was hard to get him to toe the line. But I must
25 admit, when you set him down and said, here's what I expect

112

1 of you, he followed up. He did what he was supposed to.
2     Q. What role does the performance on the OITE exam
3 play in the advancement or promotion of residents?
4     A. It's a factor. It's used as a barometer to
5 indicate the resident's core knowledge. When research
6 studies have been done, it's 80 percent plus accurate in
7 determining what the faculty think the resident's knowledge
8 is and what the resident's performance on the exam is. In
9 other words, if faculty are interviewing and they're asked
10 to describe a resident's performance, it tends to parallel
11 the OITE scores.
12        It's a reasonably good predictor of their
13 performance on Part 1 of the board exams. And by that I
14 mean, if somebody scores routinely in the 80th percentile on
15 their OITE, they've got an 80 to 90 plus percent chance of
16 passing the exam on the first try. If they're in the lower
17 20th percentile, then they have a lower percentage of
18 passing.
19     Q. How do you yourself use the OITE in your
20 evaluations of residents?
21     A. When I talk to them and when I look at their
22 scores, which are broken down by hand and upper extremity,
23 spine, pediatric, orthopaedics, basic science, they get the
24 number of questions they missed in each of those areas plus
25 their score in each of those areas. And it's a nice tool to

## 132

1    A.  When I was a resident.
2    Q.  So you haven't taken it yourself since you have
3  become program director; is that correct?
4    A.  I don't really think I've taken the test as a --
5  as a knowledge measurement since when I was a resident in
6  the '70s.
7    Q.  And how about at all?
8    A.  I take the Board exams, and I've taken Board exams
9  and recertified.  And I've taken every exam they've let me
10  take.
11    Q.  We're talking about the OITE now.  Have you ever
12  taken it at all since you've become program director at
13  Hamot?
14    A.  I personally never sat down and took it with the
15  residents, no.
16    Q.  Or at any other time.
17    A.  Not that I remember.
18    Q.  Take a look at the Volume 2, small binder,
19  Document No. 7340.
20    MS. RICHARD:  And that's --
21    MR. SOREK:  Now, these should all be in numerical
22  sequence.
23    A.  (Witness complies.)  Okay.
24    Q.  Okay.  I want to go back and ask you a few other
25  questions about the program, the Residency Program.  Do you

## 133

1  know how many residents have gone through the program at
2  Hamot, in total, since its inception?
3    A.  No.
4    Q.  Do you know when the program was founded?
5    A.  Not exactly.
6    Q.  Does 1948 ring a bell?
7    A.  It does, but that wouldn't, I don't think, be
8  under the ACGME guidelines.  It started out as a
9  preceptorship, and then it became a residency.  And I don't
10  know exactly when it became a residency.
11    Q.  Do you know about how many residents have gone
12  through Hamot's Orthopaedic Residency Program?
13    A.  No.
14    MS. RICHARD:  Just to be clear, since when?
15    Q.  For as long as you can remember.
16    A.  Well, it's been two a year since I've been here,
17  and I can really only comment accurately from 1980 or so on.
18  I don't really know much about the history of it.  I know
19  Drs. Davis and Fortune started it, or I'm told they did.
20  But I've not gone back and read about it, nor had any
21  detailed discussions with anybody about the history.
22    Q.  So your knowledge extends back to about 1980; is
23  that what you're saying?
24    A.  Thereabouts.
25    Q.  And two a year have gone through the program since

## 134

1  then?
2    A.  There may have been a year or two where there were
3  three, and maybe a year where there was one.
4    Q.  In your experience, are you able to say how many
5  residents were terminated from the program?
6    A.  Well, again, the only two I can remember are the
7  ones that came up in the last discussion, one that Dr.
8  Rogers was the program director, and then I believe he was
9  terminated.  And then in this instance, a contract wasn't
10  renewed.
11    Q.  All right.  But right now we'll stick with
12  terminations.
13    A.  Only one person that I'm -- since I've been here,
14  in the middle of the program was told they had to leave.
15    Q.  Do you know the name of that person?
16    A.  I don't remember.  If you said it, I might be able
17  to identify him.  I know it was a male.  I know it was in
18  the first or second year.
19    Q.  Do you remember when that was?
20    A.  Early '80s.
21    Q.  So that's termination.  Contract is not renewed.
22  To me, that's a different category, and, of course, you're
23  the one who will provide the information.  But in your
24  experience, how many residents have not had their contracts
25  renewed?

## 135

1    A.  In orthopaedics, this is the first time.
2    Q.  It's your expectation as program director that
3  once residents are admitted to the program, that they will
4  complete the program; is that correct?
5    MS. RICHARD:  I'm just going to object to the form
6    of the question, but you can answer.
7    A.  Can you say it again.
8    Q.  Sure.  It's your expectation as program director
9  that when an applicant is admitted to the residency program,
10  that they will complete the program.
11    A.  Yes.
12    Q.  That's Hamot's expectation as well.
13    MS. RICHARD:  I'm going to object.  If he knows
14    what Hamot's expectation is, he can say so, but.
15    A.  Well, if they didn't have -- that's why we're in
16  business, yes, I think.
17    Q.  ACGME; is that ACGME's expectation as well?
18    MS. RICHARD:  Again, I'm going to object on the
19    basis of he has no way of knowing what ACGME's
20    expectation is.
21    A.  I don't think they have an expectation.  They're a
22  review body.  I don't think that's an appropriate way to
23  view the ACGME or the overseer.  And I can't answer that.  I
24  have no idea what they think.  I look to them for guidance
25  and rules and regulations.

## 136

1    Q. Well, they do tell you how many years an
2 acceptable program is supposed to be, don't they?
3    A. Yes.
4    Q. So isn't that some indication to you what they --
5 how long the program -- how long they expect a program to
6 last?
7    A. I think the word "expectations" in terms of the
8 ACGME has to do more with quality and education and what
9 they're supposed to learn in the program, and not whether
10 they finish. I think if somebody learns everything they're
11 supposed to, then I think the ACGME probably would look at
12 that individual and say you should finish.
13    Q. All right.
14    A. But if they don't have the knowledge base, I don't
15 think that the ACGME would expect them to finish.
16    Q. But the standard -- the standard length of time
17 the ACGME sets for completion of an orthopaedic surgery
18 residency is five years, correct?
19    A. Yes.
20    Q. And there's study and establishment of standards
21 that a resident is supposed to meet in each of those years,
22 from the ACGME, correct?
23    A. Yes.
24    Q. In your experience, how many women have gone
25 through the -- on to Hamot's Orthopaedic Residency Program?

## 137

1    A. Dr. Galey, one.
2    Q. Okay. And Dr. Brown is the other one who was in
3 the program but didn't complete it, correct?
4    A. Right.
5    Q. Any residents who may not have been terminated or
6 may not have had their contracts renewed but were advised to
7 leave, and did?
8    A. In fact, there was a Dr. Wong, who voluntarily
9 left. But I -- not that I recall, your specific question,
10 no.
11    Q. Now, we'll get back to 7340. So this is a letter
12 to you in June of 2002 from a Dr. Augustus White.
13    A. Yes.
14    Q. Of the American Association of Orthopaedic
15 Surgeons, correct?
16    A. I just said it's the American -- it does say
17 American Association. I would say that he represents the
18 Academy's Committee of Diversity.
19    Q. All right.
20    A. The Association is some sort of another corporate
21 name that they have to have. The letterhead and the stamp
22 is from the Academy, the American Academy of Orthopaedic
23 Surgeons.
24    Q. Can you briefly describe the difference in terms
25 of your familiarity.

## 138

1    A. I answered it as best I could. The Academy some
2 years ago set up a separate corporation C, something to make
3 them tax exempt. I think one is tax exempt, one isn't.
4    Q. You're more familiar dealing with the Academy; is
5 that fair to say?
6    A. Right. And that's what -- the Diversity Committee
7 is part of the Academy.
8    Q. So in this letter, at the end of the first
9 paragraph Dr. White says he's asking for your help. Do you
10 see that?
11    A. Yes.
12    Q. And then he states in the second paragraph, only
13 2 -- second sentence, "Only 2.6 percent of all orthopaedic
14 surgeons are women even though women make up more than half
15 of all medical school graduates." Do you see that?
16    A. Yes.
17    Q. Do you have any reason to doubt the accuracy of
18 that statistic?
19    A. No.
20    Q. Why is that?
21    MS. RICHARD: If you know.
22    A. I don't know is the answer.
23    Q. Have you ever thought about it?
24    A. Yes.
25    Q. And what was your thinking?

## 139

1    A. Well, as the program chair, we've tried to get
2 more women in the program. And we've, I would say,
3 preferentially interviewed women for the program, as well as
4 Blacks, Hispanics, Native Americans and Latinos. We've
5 tried to follow up on Dr. White's recommendations. But we
6 go through a match. And as such, we get what we match, so
7 to speak. But we certainly do try to follow up on what
8 Dr. White recommends in this letter.
9    Q. You talked about preferential interviewing. What
10 is that?
11    A. Well, if we had -- we get roughly 200 applicants
12 for the program. And we look at geography and we look at
13 their Board scores and their letters of recommendation. And
14 if we have two applicants who were comparable who we thought
15 we would like to interview, and one was a woman and one was
16 a man, we would grant the interview to the woman.
17    Q. And can you say how many times you've done that?
18    A. Every time.
19    Q. Starting when?
20    A. Boy, as long as I can remember, we've -- as a
21 committee, we've preferentially selected minority people to
22 interview. We haven't always matched them. But we have
23 tried to interview more.
24    Q. Is the interviewing that you described, is that
25 policy or is that just something that's -- that I'll

Brown v. Hamot Medical Center                                    John Lubahn, M.D.

6 (Pages 140 to 143)

---

**140**

1  describe as ad hoc, that you just tell people about? Is it
2  written down, is it official, or is it something else?
3  　　A.  I don't believe it's written down.  But I'm the
4  chairman of the committee and I select other faculty.  And
5  we and other members -- currently, it's Dr. Delullo who
6  reviews the applicants.  We have the resident who is in the
7  lab look at the applicants.  And it's a collective decision.
8  It's not a unilateral decision as to who we interview.
9  　　Q.  Are you able to say how many times you've done
10  these -- made a decision to preferentially interview
11  minority or women?
12  　　MS. RICHARD:  I think he said every time.
13  　　Q.  Okay.  Then I'll ask the number.
14  　　A.  I can't give you a number.
15  　　Q.  Have you ever heard the phrase "Affirmative
16  Action"?
17  　　A.  Yes.
18  　　Q.  Do you know what it is?
19  　　A.  I think I just described it.  I think that
20  preferentially interviewing minorities is Affirmative
21  Action.
22  　　Q.  All right.  So apart from preferential
23  interviewing, can you say what else you did to accomplish
24  the goals that Dr. White describes?
25  　　A.  I don't think there's anything else I can do.

---

**141**

1  　　Q.  If you look at the next page, 7341, it has a form
2  to fill out with categories for, I think, background and the
3  sex of the resident.  And it looks like you filled in that
4  chart.  Do you see that?
5  　　A.  Well, I'm going to say that I don't know that I
6  filled it in.  And it's not particularly familiar with me,
7  but somebody filled it in.  And it was sent to our program,
8  and it looks like a questionnaire from the Diversity
9  Committee.
10  　　Q.  The top line, the line that's the total number of
11  current residents.
12  　　A.  Yes.
13  　　Q.  The second block.  I believe underneath the W
14  there's an M and a W two blocks next to each other.
15  　　A.  Yes.
16  　　Q.  It's filled in with a one.  That one represents
17  Dr. Brown, doesn't it?
18  　　A.  I'm going to bet that in 2002 it meant Dr. Galey,
19  but I don't know.
20  　　Q.  All right.
21  　　A.  If these two go together, and I don't know that.
22  　　Q.  If what two?  You mean these two pages?
23  　　A.  Yeah.  If this survey went along with the letter
24  that you just referred to from Dr. White, dated June 21st,
25  2002.

---

**142**

1  　　Q.  Well, if you look at the --
2  　　A.  Well, PGY-2, then it would be Dr. Brown.  It's a
3  woman.
4  　　Q.  And also if you look at the last paragraph of the
5  cover letter.
6  　　A.  All right.
7  　　Q.  Dr. White says, "Please cooperate with the
8  Diversity Committee by completing the attached form."
9  　　A.  Fair enough.
10  　　Q.  All right.  And there's two questions on the next
11  page, 7341, "To what degree do you feel your current
12  residency program supports these goals.  Please circle the
13  appropriate response below."  And 5 is circled.  Do you see
14  that?
15  　　A.  Yes.
16  　　Q.  5 represents completely supports, correct?
17  　　A.  Yes.
18  　　Q.  And the question is, how does the current -- how
19  did Hamot's program support those goals other than the
20  preferential interviewing that you just described?
21  　　A.  I don't think to get more minority people into the
22  program, the only thing we can do is interview more.  We
23  have to interview them so they can match for our program.
24  We can't hire them outside the match.
25  　　Q.  Actually, you can do that, because you've done

---

**143**

1  that -- you've added residents in the middle of residences
2  and on others' recommendations during the course of your
3  experience, haven't you?
4  　　A.  But to get people into the program that are
5  brought in at the PGY-1 year, that's done through the match.
6  We're given so much money for each resident, and we can't
7  add people on at different years.  The only people we can
8  get are people who have left other programs.
9  　　Q.  Okay.  And that's happened in the past, though,
10  correct?
11  　　A.  Yes.
12  　　Q.  None of those have been women, correct?
13  　　A.  No.
14  　　Q.  The next question is, "To what degree are you
15  interested in welcoming qualified women and minorities into
16  your Orthopaedic Residency Program."  And No. 5 is extremely
17  interested and that's circled.  Do you see that?
18  　　A.  Yes.
19  　　Q.  And so if I asked you the steps you've taken to
20  welcome qualified women, ethnic minorities, would your
21  answer be the same as you just gave?
22  　　A.  Last year, out of about 30 interviews, we had
23  seven women.
24  　　Q.  Did any match?
25  　　A.  No.  Our first choice was a woman.

---

Brown v. Hamot Medical Center                                    John Lubahn, M.D.

8 (Pages 148 to 151)

| 148 |
| --- |

1   one or two years --
2       THE WITNESS:  That's not always sexual.
3       MS. RICHARD:  Okay.  That's what I wanted to be
4   clear about.  But now go forward.  Correct that
5   answer and go forward to answer his question.
6       A.  The one physician made inappropriate sexual
7   advances to a number of nurses, and didn't comply with the
8   recommendation for treatment and was terminated.  And that's
9   the only one I know that was terminated for that reason.
10      Q.  Now, I would like to know whether you are aware of
11  any other similar incidents of inappropriate sexual conduct
12  that did not result in termination.
13      A.  I've not been made aware of any.
14      Q.  And you don't know any personally.
15      A.  No.
16      Q.  I would like to turn to -- in Volume 2, a small
17  binder, turn to 6136.
18      MS. RICHARD:  Sorry.  I couldn't find the number
19      on that page, 6136.  There it is.
20      A.  Okay.
21      Q.  I want to ask you some questions about your
22  assistance to William Bambrick.
23      MS. RICHARD:  And for the record, I'm going to
24      assert confidentiality over this portion of the
25      testimony.  You can go ahead and answer.

| 149 |
| --- |

1       Q.  How did you come to be involved in assisting
2   Dr. Bambrick?
3       A.  Well, I guess I would say it's a relatively long
4   story.  And I'll answer that.  And if you want me to stop or
5   speed up, tell me.  But I initially met him in the early
6   '80s.  When I came here, he was a senior resident.  Finished
7   the program.  Went to Florida.  Had kind of a -- he passed
8   his Boards.  Did well academically, but had kind of a stormy
9   course in Florida.
10      Q.  Stop there.  Stormy course consisting of what?
11      A.  A divorce, drugs, malpractice cases.  And he left
12  Florida to move to North Dakota.  He went to a rehab
13  program.  And from what I know of him, he's clean since he
14  left Florida, which would have been in the early '90s.  And
15  practiced there for close to 15 years.  And then --
16      Q.  Practiced where, North Dakota?
17      A.  North Dakota.  Although, I'm estimating the years,
18  because I have no idea when he actually left Florida.  And
19  from what I could learn, had a pretty clean slate there, at
20  least in terms of not going back to drugs or alcohol.  And
21  by drugs, I think it was all marijuana.  I don't know that
22  he was involved in anything worse than that.
23      Another group in town and he didn't get along.
24  They had his practice audited.  The hospital asked him to
25  leave based on the audit, which I was privileged to read.

| 150 |
| --- |

1   And I've done this for a number of physicians.  I'm doing
2   one for a physician in the Pittsburgh area right now who
3   wants to come here for some remedial work.  And if it works
4   out, it works out.  And I at least offered that to Dr.
5   Bambrick.
6       Now, I would say that, unfortunately, he could
7   never get the malpractice coverage to come to Erie and
8   really work in a tutorial like it was meant.  He's fairly
9   ill with diabetes, and never was really ever able to go
10  through the tutorial as it was intended.  And my
11  understanding is he's now on disability.
12      Q.  You actually knew him personally in the early
13  '80s; is that correct?
14      A.  I knew him as well as an attending knows a
15  resident.  I wouldn't describe it as a personal
16  relationship.
17      Q.  Sure.  But he was a resident while you were a
18  faculty -- he was a resident at Hamot while you were on the
19  faculty, correct?
20      A.  Right.  Basically a teacher/student relationship.
21      Q.  Did you have anything to do with his admission to
22  the residency program at Hamot?
23      A.  No.
24      Q.  Now, Dr. Bambrick came to Hamot from a Mexican
25  medical school; is that correct?

| 151 |
| --- |

1       MS. RICHARD:  If you know.
2       A.  I know that he attended medical school, but I
3   don't know that he came to Hamot from that school.  He may
4   have had some training in between.
5       Q.  Take a look at 6335.
6       MS. RICHARD:  It's got to be in between there.
7       There it is.
8       A.  (Witness complies.)  Okay.
9       Q.  Okay.  This is a letter from Dr. Joseph Smith at
10  Hamot Medical Center dated December 23rd, 1976, correct?
11      A.  Correct.
12      Q.  And in this letter Dr. Smith says in the middle of
13  the second paragraph, "I would have to be very honest and
14  say that I am somewhat biased against the program in
15  Guadalajara, for I feel that their standards of acceptance
16  and the quality of teaching that is provided is definitely
17  inferior to any of the American schools."  Have you ever
18  seen this letter from Dr. Bambrick's file?
19      A.  I have not.
20      Q.  Do you agree or disagree with the sentiment that
21  Dr. Smith expressed about the medical program in
22  Guadalajara?
23      A.  In 1976, I was an intern myself, and was aware
24  that there was considerable bias by many Americans towards
25  the Mexican schools.  But during the course of my training,

156

1    Q.  If you look at 61 -- we're going to go back to 61.
2    MS. RICHARD:  61 what?
3    MR. SOREK:  Well --
4    A.  You know, I'll go on to say that Dr. Bambrick's
5  performance here was more or less a complete failure and he
6  didn't make it, so.  For whatever reason, I think that
7  people in North Dakota were right and he did need to quit.
8  And all I did was give him another chance, but he didn't
9  pass in Erie either.
10    Q.  Let me ask you to take a look at 6344.
11    A.  Okay.
12    Q.  This looks like a report of a counseling session
13  with Dr. Bambrick dated July 31st, 1982.  And it purports to
14  describe a reprimand that Dr. Bambrick got for leaving the
15  hospital to participate in a softball game; is that correct?
16    A.  Yes.
17    Q.  And in the middle of the paragraph it says, "There
18  was a patient in the emergency room who developed a problem
19  as a result of a fracture that was not cared for."  Do you
20  see that?
21    A.  Yes.
22    Q.  And then Dr. Bambrick -- at the end, Dr. Bambrick
23  was told, "He is no longer to leave the hospital for any
24  reason, especially to perform in a softball game."  Correct?
25    A.  Correct.

157

1    Q.  Were you aware of this when you were assisting
2  Dr. Bambrick in -- a few years ago, in 2002, 2003?
3    A.  This particular episode, I was not.
4    Q.  Okay.  Did you look at his Hamot records when you
5  were agreeing to assist Dr. Bambrick?
6    A.  No.  I believe I asked Dr. Rogers and
7  Dr. Frankovitch whether they thought it would be worth
8  providing him with a tutorial session, if you will.
9    Q.  All right.  Take a look at the next page.  And
10  this is --
11    A.  06345, is that what you're asking me about?
12    Q.  Correct.
13    A.  Okay.
14    Q.  This purports to be a letter of reprimand to
15  Dr. Bambrick about an incident during the week of July 11th,
16  1982, or about three weeks before the counseling session we
17  just looked at.  And the last two sentences say, "Dr.
18  Bambrick was reprimanded for this situation and his distain
19  for authority displayed by this course of action.  He was
20  also told that this type of action will not be tolerated in
21  the future."  And it appears to describe Dr. Bambrick's
22  decision not to place a spreader bar on the cast.  Is that
23  an accurate characterization?
24    A.  Right.
25    Q.  Did you see this document before you assisted

158

1  Dr. Bambrick?
2    A.  I didn't review any of his Hamot records.
3    Q.  Take a look at 6346.
4    A.  (Witness complies.)  This describes a situation
5  where Dr. Bambrick is put on probation.
6    Q.  All right.  And the first sentence of the last
7  paragraph says, "Dr. Bambrick was not supposed to be placed
8  on probation and knows that he has been in trouble
9  repeatedly throughout his residency."  Do you see that?
10    A.  I'll say that when I asked Dr. Rogers and
11  Frankovitch about whether or not I ought to help him, they
12  had both said that he had some problems as a resident.  But
13  both concurred with me that now having practiced Board
14  certified, done what we felt was a good job for 10 or 15
15  years, we felt he was worth at least given another look.
16  And we gave him another look, and he didn't make it.
17    Q.  Take a look at the next page, 6475.  And I'll
18  really just ask you to look at the comments at the bottom.
19    A.  "Bill will always" -- I don't know -- "problem,
20  marginal work.  I think he is aware of his ability and
21  will" -- looks like "work to handle the problems.  Dr.
22  Frankovitch."
23    Q.  So that's Dr. Frankovitch.  But the first clause
24  in that comment is, "Bill will always" -- and your
25  interpretation controls, but I would suggest the next word

159

1  is produce.  "Bill will always produce marginal work."
2    MS. RICHARD:  I'm going to object, only because
3  this is somebody else's handwriting, and he's had
4  already told you what he thinks it means.  You're
5  now saying what you think it means, and I think we
6  can move from there because it's not a question.
7    MR. SOREK:  Well, it is a question.
8    Q.  Could that word be produce?
9    MS. RICHARD:  If you --
10    A.  I don't think so.  I think Dr. Bambrick has always
11  been marginal.  And if that's what the essence of the
12  evaluation is, marginal.  And I have no fundamental
13  disagreement with that.  I think when he was a resident, he
14  was marginal.  And when I gave him a chance to come back
15  here, he was worse than marginal.  He didn't pass.  And he's
16  gone.  And he won't come back.
17    Q.  Reading any of these documents that you didn't
18  look at, at the time, would that change your -- sitting here
19  today, would it change your decision about whether to help
20  him in 2002, 2003?
21    A.  No.
22    Q.  So getting back to 6136.
23    MS. RICHARD:  Go back, like 400 pages back.
24    MR. SOREK:  Actually --
25    MS. RICHARD:  I guess because there's some missing

Brown v. Hamot Medical Center                                John Lubahn, M.D.

## 12 (Pages 164 to 167)

### 164

1  A. He couldn't afford a license for -- to function as
2  a resident. Couldn't afford the training license.
3  Q. Do you know how much the license cost?
4  A. It was $30,000 a month, I think. It was really
5  expensive.
6  Q. Who did that money go to?
7  A. The money never went to anybody. He never paid
8  it.
9  Q. Who was asking to be paid that money? Is it the
10 state or is it the insurance company?
11 A. Insurance company.
12 Q. Okay. So the state would issue the license, but
13 the state would only issue the license conditional on
14 getting insurance.
15 A. Yes.
16 Q. Do other doctors pay less in malpractice insurance
17 premiums?
18     MS. RICHARD: Less than what?
19 Q. Less than 30,000 a month.
20 A. Yeah.
21 Q. Do their malpractice premiums, are they based, in
22 part, on their performance as a physician?
23 A. Yes.
24 Q. So it's not really accurate to say his clinical
25 privileges were limited in the operating room by the

### 165

1  malpractice crisis in Pennsylvania, is it? Because it
2  appears that we have before us the information to determine
3  that Dr. Bambrick's own performance also limited his ability
4  to get a license.
5      MS. RICHARD: I'm going to object. You're
6      characterizing the document. If you want to ask
7      him a question, you can ask him a question. But
8      you're characterizing the document in that
9      testimony.
10 A. I disagree with you.
11 Q. Okay.
12 A. I think the cost was prohibitive. Because we have
13 a crisis in Pennsylvania, and we did back in '03, and I
14 think it's still at a crisis level.
15 Q. And the crisis -- define the crisis.
16 A. The cost of malpractice. We couldn't have trained
17 this guy because of the cost.
18 Q. Okay. But is it fair to say that his cost was at
19 that level because of his prior history as a physician with
20 drug and alcohol problems, malpractice suits, suspension of
21 licenses, et cetera?
22     MS. RICHARD: I'm going to object. You're being
23     argumentative with the witness. Please ask a calm
24     question and we'll go on.
25     MR. SOREK: Well, I will disagree with your

### 166

1      characterization, but I certainly --
2  A. Well, I think $30,000 a month was -- is
3  extraordinary, even given his risk. He was going to be in a
4  supervisory capacity, a training license, and there were
5  people looking over his shoulder all the time. And I
6  thought that was an exorbitant amount to pay.
7  Q. I'm not questioning that. What I'm questioning is
8  or -- asking the question about is, determination of the
9  risk came at least, in part, would you agree, from his
10 previous performance as a physician and not exclusively
11 matters outside of that?
12 A. I think it's the insurance company that makes the
13 call.
14 Q. All right. You also wrote on Page 6201, bottom of
15 the first paragraph, "His communication skills with
16 patients, colleagues and other professionals are also above
17 average." Do you see that?
18 A. Yes.
19 Q. On what do you base that determination?
20 A. In the operating room, I think he knew he was
21 under the microscope. He did a good job. And --
22 Q. At what? I'm sorry.
23 A. Communicating with his -- with his peers; nurses,
24 myself. When asked a question, he knew the answer and was
25 appropriate. He would read before he would come to the

### 167

1  operating room. He recertified in his boards. So his
2  knowledge base I didn't think was his problem.
3  Q. In the third paragraph you say, "As a Board
4  examiner for American Board of Orthopaedic Surgery for the
5  past ten years, I feel I have the experience and insight to
6  judge whether an individual's character and clinical
7  competence are within the norms of what should be permitted
8  in clinical practice, period. I believe Dr. Bambrick meets
9  this criteria." On what did you base that belief?
10 A. My interviews with Dr. Bambrick regarding his
11 knowledge of various patients. We discuss a clinical
12 situation, and he would respond to it. And as a Board
13 examiner in orthopaedics, based on his knowledge at the
14 time, I think he could have passed the exam.
15 Q. To what extent when you made that statement did
16 you take into account his previous performances as a
17 physician?
18 A. Which previous performance?
19 Q. His performance in Florida, his performance at
20 Hamot as a resident, and his performance in North Dakota.
21 A. I think everybody deserves a second chance. And
22 he passed his boards after Hamot. He overcame those
23 weaknesses. And from what I can gather, he overcame his
24 weaknesses in Florida at least for a number of years, and
25 practiced at least at the level of maybe above the standard

Brown v. Hamot Medical Center                                    John Lubahn, M.D.

17 (Pages 184 to 187)

184

1    A. I don't remember.
2    Q. When was Dr. Bambrick last authorized to
3    participate in the Orthopaedic Residency Program in whatever
4    status you allowed him to have?
5    A. Well, what he did is something I would authorize a
6    doctor from Meadville to do or anybody who wanted to come
7    and watch. It's not a closed shop in that sense, but
8    observerships are granted all the time. So when it was
9    clear that he wasn't ever going to get his license, ever
10   become an orthopedist again, then he went away.
11   Q. How long was he an observer in the program?
12   A. Again, I don't recall exactly.
13   Q. When was the last time you spoke to him?
14   A. I don't remember.
15   Q. What were the circumstances of him going away?
16   A. Well, I mean, he just doesn't come around anymore.
17   There's no point in it. He came to try to learn and salvage
18   his career. But once that became apparent, that he wasn't
19   going to do that, he quit coming. And that was before that
20   episode in the emergency room.
21   Q. Take a look at -- in the Volume 1, in the big
22   binder, 2752.
23   A. (Witness complies.) Okay.
24   Q. All right. The document is a summary page for the
25   computer application of a medical student for the residency;

185

1    is that correct?
2    A. Yes.
3    Q. Are these applications -- these are reviewed in
4    order to give interviews; is that correct?
5    A. Yes.
6    Q. And when the applications are being reviewed, the
7    reviewers will write notes on the application; is that
8    correct?
9    A. Yes.
10   Q. And who does the reviewing of the applications?
11   A. Depending on whatever year it is, it's been
12   myself, it's been Dr. Delullo, Dr. Rogers, sometimes it's
13   the chief resident, sometimes it's the resident who is
14   assigned to the laboratory.
15   Q. Are there more than one reviewer or just one
16   reviewer per application?
17   A. There's more than one reviewer per application.
18   Q. What's the practice at Hamot? Two, three?
19   A. There's usually about two.
20   Q. I'm sorry. Practice.
21   A. Two.
22   Q. Okay.
23   A. Average.
24   Q. And so there's a scoring system. What, the
25   application gets a 1, 2 or a 3 or some variation of those

186

1    numbers, correct?
2    A. Right.
3    Q. And then looks like there's -- the reviewer writes
4    notes on the cover of the application, correct?
5    A. They can. They can just write interview, no
6    interview. There's -- it's -- we usually get 200
7    applications for two spots, and we usually interview 30
8    people. Thereabouts. And so it's an interview -- it's a
9    method to get from 200 to 30 or 35.
10   Q. Have you ever discussed with your reviewers what
11   to look for --
12   A. Yes.
13   Q. -- when you're doing applications?
14   A. Yes.
15   Q. 2752 seems to show a note that says, "Married.
16   Wife attorney." Do you see that?
17   A. Yes.
18   Q. Is that something that reviewers are supposed to
19   look for, marital status?
20   A. Not necessarily, but that's what this person wrote
21   down.
22   Q. Okay. Do you know why?
23   A. No idea why this person did that.
24   Q. Is that Dr. Cermak's handwriting?
25   A. I don't think she's ever done that. So, no, I

187

1    don't think that is. I don't know whose writing that is. I
2    see her writing a lot. Do you know what year it was?
3    Q. Let's see. Graduation date June 2002.
4    A. I don't know who that would have been.
5    Q. Does the marital status of a resident have
6    anything to do with their -- with their selection by Hamot?
7    A. Well, the two ways it can have something to do, is
8    if they are married, they have to want to come to Erie. So
9    if their spouse can get a job here, that's often an issue.
10   And then there's a so-called -- I think it's called a
11   married match, where you can match -- it's called a couples
12   match, and you can match a couple. And the spouse -- both
13   spouses put down their preferences. And I think if they
14   both list the same city, then the computer somehow gives
15   them an edge.
16   Q. Take a look at 2799.
17   A. (Witness complies.) Okay.
18   Q. This looks like an application in which the
19   reviewer has noted on the last note -- it looks like it says
20   ice hockey at Harvard. Do you see that?
21   A. It looks like it.
22   Q. What would that have to do as part of the
23   selection process?
24   A. Point of interest. Point of discussion.
25   Q. What would you find worth discussing about whether

Ferguson & Holdnack Reporting, Inc.
814-452-4556

LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

EXHIBIT I

April 8, 2003

My response to a memo written by Dr. Patrick Williams dated (3/(36)/03):
I am requesting this response to be included in my permanent record.

The first time I became aware of concerns Dr. Williams had about my performance on my three month hand rotation was two days before I was to leave that rotation. I phoned Dr. Williams after Dr. Lubahn made me aware of Dr. Williams telling him that he wanted to discuss a patient with me who had previously been discharged. Dr. Williams told me I did not round on that particular patient nine days prior to that conversation. I explained to him that I did round on that patient that Tuesday morning after conference at Shriners' Hospital but noticed he had written a note earlier that morning and did not repeat the exact same information I had ascertained while rounding on that patient. He insisted that I never saw the patient that day. He then added something to the effect that I probably did see the patient but it was at 6:00 PM. I again assured Dr. Williams I did see the patient after Shriners' and prior to going to St. Vincents. I explained to Dr. Williams that I was not being neglectful, but instead did not want to be disrespectful by "agreeing with above." We discussed the situation and I apologized for the misunderstanding, assuring Dr. Williams that I would not omit writing a note in the future - regardless if that patient had already been seen by him or any other attending. Dr. Williams then stated in his memo that I am "untruthful" and neglect patient care. These accusations are unfounded. This concerns me as well as why it took Dr. Williams nine days to discuss a problem with me.

This raises other issues in that memo. Dr. Williams refers to my performance that is not at the level of a PGY-2. Again, I am concerned with the lack of swift and frequent evaluations during my three month hand rotation, especially if he felt I was incompetent. At least three times during that rotation I expressed to Dr. Williams the need for direction with reading materials. More than once Dr. Williams told me he was devising a reading list. I expressed how anxious I was to get that list. I never did get that list or any direction for reading material to increase my hand knowledge base. Additionally, I never receive any feedback from Dr. Williams; positive or negative. He was to be my preceptor for the three hand talks that month. Far enough in advance prior to each talk, I asked Dr. Williams for direction, input, etc. for each talk. Again no direction was given, nor was there any interest in helping. It is my understanding that the role of a resident is to learn and the role of an attending is to teach. Just as attendings need help with their work, there are times residents also need help. In a situation like this, even one mid-rotation evaluation with constructive comments and support might have helped.

# LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
## Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

# EXHIBIT J

April 8, 2003

John D. Lubahn, MD
Hamot Medical Center
201 State Street
Erie, PA., 16550

Dear Dr. Lubahn,

This letter is a follow up of the conversations we had April 7, 2003 and April 8, 2003. After receiving your letter dated April 4, 2003 outlining a discussion regarding my academic and clinical standing in Hamot's Orthopaedic program, we addressed certain issues outlined in that letter. I was disappointed that you formulated a plan without my initial input and without completely understanding where and why there are deficiencies in my core knowledge. I had hoped we would have come up with a plan together based on my needs as well as your experience. It was my understanding, based on our April 2, 2003 meeting, that one of the goals was to find some additional time for reading and self-study. However, in your letter to me you outlined a new schedule which not only did not allow for additional time, but included more scheduled OR time and additional assignments. Let me once again express that I feel this is setting me up for failure. You did allow me to rearrange the schedule somewhat, and I followed up with Dr Babins and with you regarding that schedule change. I will put my schedule in writing for my current attendings to have for their records.

In the April 7, 2003 conversation I also asked what exactly "academic probation" means as a resident in this program. You answered with the desire to "help me." I also addressed the fact that during my three month hand rotation I had not had frequent, or even a mid-rotation evaluation by the other three hand attendings. In fact, the mid-year evaluation I had with you addressed mainly that, my performance for the first half of my second year. It concerns me that I am being evaluated 1 1/2 weeks after a rotation, particularly if certain attendings felt I was not performing adequately. After asking this question of you more than once during the April 7, 2003 conversation, you expressed to me that Dr. Cermak and Dr. Hood did not have any issues with me, and that I should address them directly with any questions. Dr. Williams' untimely evaluation, or lack of mid-rotation evaluation was never addressed.

Attached to this letter is a copy of my response to concerns and accusations from Dr. Patrick Williams which were presented to me as a "memo" to be put in my permanent record. I am requesting this response to be kept in my permanent record.

Sincerely,

Lisa A. Brown, MD
PGY-2, Orthopaedic Resident

Cc: my permanent file

APR 8 2003

LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

# EXHIBIT K

**Current list of residents by gender:**

| | | |
|---|---|---|
| PGY-1 | Kevin Kuzma, MD |
| | Joseph Fazalare, MD |
| | | |
| PGY-2 | Aaron Wallace, MD |
| | Ryan Will, MD |
| | | |
| PGY-3 | Jason Evans, MD |
| | Vivek Sharma, MD |
| | | |
| PGY-4 | Brad Poole, MD |
| | | |
| PGY-5 | Craig Lippe, MD |
| | Mark Pollard, MD |

**Resident Graduates (All successfully completed program):**

2004
Jeff Nechleba, MD
Jim Seeds, MD

2003
James DeLullo, MD
Carl Seon, MD

2002
Dave Ivance, MD
Nick Kubik, MD

2001
Stephanie Galey, MD
Brian Dickson, MD

2000
Ted Green, MD
Steve Hribar, MD
Jeff Keverline, MD

1999
Christopher Arnold, MD

**In the past 10 years everyone has completed the orthopaedic program with the exception of Lisa Brown, MD**

# LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
## Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

# EXHIBIT L