HAMOT MEDICAL CENTER
EMERGENCY DEPARTMENT

said that at one point after Bradley Poole, the on-duty orthopedic resident, had seen the patient, Williams, she was walking by the exam room and it appeared to her as if Bambrick was adjusting weights that Poole had hung on the patient's arm to reset his shoulder.

Dr. Davison spoke to Bradley Poole, Orthopedic Resident, about Bambrick when Poole arrived in the ED to see the patient. Poole told Dr. Davison that Bambrick was not in the residency program and that he didn't think Bambrick had any rights to treat patients at Hamot. Dr. Davison then called Dr. Pepicello to find out more about Bambrick's affiliation with Hamot. Dr. Pepicello told Dr. Davison that he believed Bambrick was only an "observer" and was not to have any part in patient care. Dr.Davison then called Dr. Lubahn to confirm Bambrick's status.Dr. Lubahn told Dr. Davison that Bambrick is not in the residency program, but had been given permission to observe the orthopedic residents.

Due to concerns about HIPPA and to prevent any possible interference with patient care, this investigator asked Bambrick to wait in the waiting area at Prichard and Dr. Davison's request. When I approached Bambrick I asked him his name and he said "Bambrick, as in damn prick, which is what I can be." I then asked Bambrick if he would wait in the ED waiting area to which he responded by stating that he was an orthopedic physician and showed me his Hamot I.D. which said that he was an orthopedic resident. I then told Bambrick that the patient was under the care of the Ed physician and the on-duty orthopedic resident. Bambrick then left the ED and proceeded to the front circle where he got into his vehicle and left HMC property.

Case Under Review.

*Review with Pepicello in AM*

HMC-06132

CONFIDENTIAL

APR 2 9 2002

## ZUGER KIRMIS & SMITH
### COUNSELORS AND ATTORNEYS AT LAW

Lyle W. Kirmis
Lance D. Schreiner, P.C.
James S. Hill, P.C. *^
Patrick J. Ward***^
Rebecca S. Thiem, P.C.*
Daniel S. Kuntz, P.C.
Jerry W. Evanson, P.C^
Lawrence A. Dopson
Tracy Vigness Kolb, P.C.
Shawnda R. Reid
Constance N. Holfand

316 North Fifth Street
Provident Building
P.O. Box 1695
Bismarck, ND 58502-1695
(701) 223-2711
fax (701) 223-7387
zkslaw@zkslaw.com
www.zkslaw.com

Of Counsel
John A. Zuger

Thomas O. Smith
1944-2001

Also licensed in
Minnesota *
Montana/Illinois **

^Certified Civil Trial Specialist
National Board of Trial Advocacy

Direct email: lschreiner@zkslaw.com

April 23, 2002

John Lubahn, M.D.
300 State Street, Suite 205
Erie, PA 16507

RE:    William S. Bambrick III, M.D.

Dear Dr. Lubahn:

This is a follow up to our telephone conference on April 22, 2002, regarding Dr. William Bambrick. As you know, the North Dakota State Board of Medical Examiners Investigative Panel has issued a complaint against Dr. Bambrick and has requested that his license to practice medicine in North Dakota be revoked or other appropriate action taken. Specifically, the panel has asserted that Dr. Bambrick engaged in a continued pattern of inappropriate care and lacks appropriate documentation in medical records for diagnosis, testing, and treatment of patients. They base these allegations upon a review of Dr. Bambrick's orthopaedic surgical practice involving medical charts pertaining to more than 20 patients.

I understand Dr. Bambrick was a resident at Hamot Medical Center in Erie where you are currently the program director. You indicated to me you would be willing to place Dr. Bambrick in a remedial training program of 3 to 6 months at Hamot Medical Center in an attempt to meet the concerns raised by the state board in North Dakota. Following our discussion, I had a telephone conference with counsel and the secretary of the board. I gave them your name and stated you would be willing to place Dr. Bambrick in the program described above. I was pleased they did not dismiss the offer out of hand. Instead, they have requested that I provide them with a description of Hamot Medical Center's residency program in general, your position in that program, and a description of the type of remedial training you envision for Dr. Bambrick. They specifically stated that hands-on surgical

HMC-06133
CONFIDENTIAL

John Lubahn, M.D.
April 23, 2002
Page 2

training would be far more preferable than simple observation.

I also told them, as you commented to me, you would be willing to speak to the orthopaedic surgeon who reviewed Dr. Bambrick's file to find out the specifics of his concerns. They did not respond directly to that request but instead asked that we begin by providing them with the information requested above.

Would you please provide me with a description of the Hamot Medical Center, its residency program in general, your position, and the type of remedial training you are willing to provide to Dr. Bambrick. Preferably this should be on the letterhead of the program. I will in turn submit the document to counsel for the board.

On behalf of Dr. Bambrick, I thank you for your willingness to participate in this process. I did tell them that it would take me a bit of time to gather the information requested and told them not to expect anything for at least a couple of weeks. They stated that would be fine so, if possible, please try to get something to me within that time frame.

Yours truly,

Lance D. Schreiner

cc:     William S. Bambrick III, M.D.
        Deanna Cook

P:\LSCHREIN\Bambrick ads. Langsdorf\Letters\l-lubahn 4-23-02.wpd

HMC-06134
CONFIDENTIAL

 **Hamot**  

Hamot Health Foundation
201 State Street
Erie, PA 16550
(814) 877-6000
www.hamot.org

*Orthopaedic Faculty Members*

David M. Babins, MD
Gary J. Conna, MD
John J. Kastrup, MD
Keith A. Lesig, MD
Vincent P. Rogers, MD
Nick Stefanovski, MD
Mark D. Suprock, MD

*Hand & Upper Extremity*

Mary Beth Cermak, MD
John M. Hood, MD
John D. Lubahn, MD, FACS
    Program Director
    Department Chairman
D. Patrick Williams, DO

*Pediatric Orthopaedics*

Marguerite J. Jurkovic, DO
James D. Sanders, MD
Karl F. Franzovich, MD
John C. Tavares, MD

May 13th, 2002

Mr Rolf P. Sletten
Executive Secretary of the Board
North Dakota State Board of Medical Examiners
418 East Broadway
Suite 12
Bismark, ND 58501

RE: William S. Bambrick III, M.D.

Dear Mr Sletten

This is a letter to confirm a post graduate position for Dr Bambrick at Hamot Medical Center, for either three or six months. Beyond six months would certainly not seem necessary in my opinion. I have enclosed copies of a narrative summary of our residency program from the previous site visit by the Residency Review Committee. I have also enclosed a copy of our conference schedule. I would expect Dr Bambrick to function much as a senior resident seeing patients in the emergency room and our clinic with our current residency staff, and also taking patients to the operating room and scrubbing and performing surgical procedures under the direct supervision of our faculty in attendance. Call if you are interested in or require additional information. Best regards.

Sincerely yours,

J D Lubahn, MD FACS

JDL/sar

Enclosure: Narrative summary of Residency Program

c.c. Mr L D Schreiner, P.C.

HMC-06136
CONFIDENTIAL

*report Kay*

APR 29 2002

## ZUGER KIRMIS & SMITH
### COUNSELORS AND ATTORNEYS AT LAW

Lyle W. Kirmis
Lance D. Schreiner, P.C.
James S. Hill, P.C. *^
Patrick J. Ward**^
Rebecca S. Thiem, P.C.*
Daniel S. Kuntz, P.C.
Jerry W. Evenson, P.C^
Lawrence A. Dopson
Tracy Vigness Kolb, P.C.
Shawnda R. Reid
Constance N. Hofland

316 North Fifth Street
Provident Building
P.O. Box 1695
Bismarck, ND 58502-1695
( ) (701) 223-2711
fax (701) 223-7387
zkslaw@zkslaw.com
www.zkslaw.com

Of Counsel
John A. Zuger
---------------------
Thomas O. Smith
1944-2001

Also licensed in
Minnesota *
Montana/Illinois **

^Certified Civil Trial Specialist
National Board of Trial Advocacy

Direct email: lschreiner@zkslaw.com

April 23, 2002

John Lubahn, M.D.
300 State Street, Suite 205
Erie, PA 16507

RE:    William S. Bambrick III, M.D.

Dear Dr. Lubahn:

This is a follow up to our telephone conference on April 22, 2002, regarding Dr. William Bambrick. As you know, the North Dakota State Board of Medical Examiners Investigative Panel has issued a complaint against Dr. Bambrick and has requested that his license to practice medicine in North Dakota be revoked or other appropriate action taken. Specifically, the panel has asserted that Dr. Bambrick engaged in a continued pattern of inappropriate care and lacks appropriate documentation in medical records for diagnosis, testing, and treatment of patients. They base these allegations upon a review of Dr. Bambrick's orthopaedic surgical practice involving medical charts pertaining to more than 20 patients.

I understand Dr. Bambrick was a resident at Hamot Medical Center in Erie where you are currently the program director. You indicated to me you would be willing to place Dr. Bambrick in a remedial training program of 3 to 6 months at Hamot Medical Center in an attempt to meet the concerns raised by the state board in North Dakota. Following our discussion, I had a telephone conference with counsel and the secretary of the board. I gave them your name and stated you would be willing to place Dr. Bambrick in the program described above. I was pleased they did not dismiss the offer out of hand. Instead, they have requested that I provide them with a description of Hamot Medical Center's residency program in general, your position in that program, and a description of the type of remedial training you envision for Dr. Bambrick. They specifically stated that hands-on surgical

HMC-06145

CONFIDENTIAL

John Lubahn, M.D.
April 23, 2002
Page 2

training would be far more preferable than simple observation.

I also told them, as you commented to me, you would be willing to speak to the orthopaedic surgeon who reviewed Dr. Bambrick's file to find out the specifics of his concerns. They did not respond directly to that request but instead asked that we begin by providing them with the information requested above.

Would you please provide me with a description of the Hamot Medical Center, its residency program in general, your position, and the type of remedial training you are willing to provide to Dr. Bambrick. Preferably this should be on the letterhead of the program. I will in turn submit the document to counsel for the board.

On behalf of Dr. Bambrick, I thank you for your willingness to participate in this process. I did tell them that it would take me a bit of time to gather the information requested and told them not to expect anything for at least a couple of weeks. They stated that would be fine so, if possible, please try to get something to me within that time frame.

Yours truly,

Lance D. Schreiner

cc:    William S. Bambrick III, M.D.
       Deanna Cook

P:\LSCHREIN\Bambrick ads. Langsdorf\Letters\l-lubahn 4-23-02.wpd

HMC-06146
CONFIDENTIAL

RENEWAL APPLICATION ANSWERS

NUMBER 2.   IN NOVEMBER 1999 I INACCURATELY, BUT INADVERTENT-
LY FILED A RENEWAL MEDICAL LICENSE APPLICATION IN NORTH DAKOTA. THE N.D.
MEDICAL BOARD SUBSEQUENTLY FOUND ME GUILTY FOR THIS INACCURATE
REAPPLICATION FOR AND: A) FINED
ME; B)REQUIRED SUCCESSFUL COMPLETION OF A MEDICAL ETHICS
COURSE; AND C)PLACED ME ON PROBATION FOR ONE YEAR OS OF JULY 20,2000. FOR
THIS N.D. MEDIAL LICENSE TRANSGRESSION, OTHER STATES THAT I HELD MEDICAL
LICENSES SANCTIONED ME AS WELL. THESE INCLUDED FLORIDA, OHIO, AND
PENNSYLVANIA.
        IN MAY 2001 FOLLOWING A CLANDESTINE INDEPENDENT MEDICAL STUDY
OF THE ORTHOPAEDIC SERVICE OF MERCY MEDICAL CENTER IN WILLISTON, N.D., MY
CLINIAL HOSPITAL PRIVILEGES WERE NOT TO BE RENEWED. AT THAT POINT, I
CONTACTED DR. JOHN LUBAHN, THE PRESENT DIRECTOR FOR THE ORTHOPAEDIC
RESIDENCY PROGRAM AT HAMOT EDICAL CENTER IN ERIE, PA. I FOR-
WARDED THE WILLISTON ORTHOPAEDIC STUDY TO HIM. HE GRATIOUSLY HAD THE
STUDY REVIEWED BY OTHER ORTHOPAEDIC COLLEAUGES AND HIMSELF; THEIR
RESULTANT OPINION DID NOT SUBSTANTIATE THE ACTION TAKEN BY THE MERY
MEDICAL CENTER BOARD.
        FURTHERMORE, THE N.D. MEDICAL BOARD INFORMED ME OF A GENERAL
MEDICAL COMPLAINT. AT THATPOINT DR. LUBAHN INTERCEDED ON MY BEHALF. HE
SPOKE WITH THE MEMBERS OF THE N.D. MEDICAL BOARD REVIEW
COMMITTEE.THROUGH PLEA BARGAINING FURTHER SANCTIONS AGAINST MY MEDICAL
LICENSE COULD POSSIBLY BE WITHELD IF FURTHER RETRAINING COULD BE
OBTAINED. A SIX MONTH RETRAINING PERIOD AS A SIXTH YEAR UND DR LUBAHN'S
DIRECTIONWAS AGREED. WHEN I SUCCESSFULLY COMPLETE THIS SIX MONTH
RESIDENCY I WOULD BE ELIGBLE TO RE-
APPLY FOR CHANGE OF MY MEDICAL LICENSE STATUS IN NORTH DAKOTA..


NUMBER 3.   IN MAY 2001 I WAS INFORMED THAT MY HOSPITAL PRO-
BATIONARY STATUS WAS NOT ELEVATED TO FULL ACTIVE STATUS AND THAT MY ACTIVE
HOSPITAL PRIVILEGES AT MERCY MEDICAL CENTER , WILLISTON, N.D. WERE NOT TO BE
RENEWED. PLEASE SEE NUMBER 2 RESPONSE.

HMC-06218
CONFIDENTIAL

 

Hamot Health Foundation
201 State Street
Erie, PA 16550
(814) 877-6000
www.hamot.org

**Orthopaedic Faculty Members**

David M. Babins, MD
Gary J. Cortina, MD
John J. Kastrup, MD
Keith A. Lustig, MD
Vincent P. Rogers, MD
Nick Stefanovski, MD
Mark D. Suprock, MD

**Hand & Upper Extremity**

Mary Beth Cermak, MD
John M. Hood, MD
John D. Lubahn, MD, FACS,
   Program Director
   Department Chairman
D. Patrick Williams, DO

**Pediatric Orthopaedics**

Marguerite J. Jurkovic, DO
James O. Sanders, MD
Karl F. Frankovich, MD
Joao O. Tavares, MD

August 8, 2003

Dennis M. Sculley, M.D.
Chairman of the Qualifications and Credentialing Committee
Hamot Hospital
State Street
Erie, PA   16507

**RE:  WILLIAM BAMBRICK M.D.**

Dear Dr Sculley:

William Bambrick, M.D. has now completed a year of remedial
education in the Hamot Orthopaedic Residency Program and has had
his license reinstated in North Dakota with the provision that he
continue under our tutelage and supervision for an additional year at
Hamot Medical Center.

I am therefore requesting privileges for him as an attending under
supervision.  I am aware of previous instance where such restrictions
have been applied to general surgeons and other sub-specialists on
the staff.

Speaking for myself and I believe the rest of the orthopaedic
attending staff, we are willing to work with Bill in whatever way we
can.  Call if you have any questions.

Best regards.

Sincerely yours,

John D. Lubahn, M.D.
**Department Chairman**

JDL/sar

HMC-06229

CONFIDENTIAL

An affiliate of the Cleveland Clinic and Penn State's College of Medicine  •  Shareholder, VHA, Inc.



**Hamot Medical Center**

201 State Street · Erie, Pennsylvania 16550 · 814/455-6711

COUNCILING SESSION
WITH
DR. BAMBRICK
JULY 31, 1982

Dr. Bambrick was reprimanded for an incident in which he left the
hospital while he was on-call to participate in a softball game.
During the course of his absence, in which he had a general surgical
resident covering for him, the patient was seen in the emergency
room and developed a problem as the result of a fracture that was
not cared for. The patient then went to her home in Pittsburgh,
Pennsylvania, for care and it got back to the hospital that, she
was inappropriately treated in the emergency room by a general
surgical resident who was covering for Dr. Bambrick, who was playing
softball. Dr. Bambrick was told that he is no longer to leave the
hospital for any reason, expecially to perform in a softball game.

HMC-06344

CONFIDENTIAL

Letter of repramand on Dr.  Bambrick

Dr. Bambrick was involved in an  incident during the week of July 11, 1982 at the Shriners Hospital.  After performing surgery for lengthning of heel cords on a female patient on Thursday, July 15, 1982 Dr. Bambrick was instructed to place long leg casts on the patient with a spreader bar. The specific purpos for the spreader bar was to protect the patients left hip subluxation.  Dr. Bambrick took it upon himself to place the long leg casts upon the patient and then decided that it was not necessary to put the spreader bar on the cast and discharged the patient on July 17th without this bar.  Dr. Bambrick was repramanded for this situation and his distain for authority displayed by this course of action.  He was also told that this type of action will not be tolerated in the future.

HMC-06345

CONFIDENTIAL



**Hamot Medical Center**

201 State Street · Erie, Pennsylvania 16550 · 814/455-6711

COUNCILING SESSION
DR. BAMBRICK
DECEMBER 20, 1982

Dr. Bambrick was counciled today because of the numerous times in the past in which his professionalism has been questioned. He has had a great deal of difficulty working with the nursing staff at Shriners Hospital for Crippled Children. His personality has been one in which he has been explosive when faced with an unusual situation and then has changed after he has calmed down. This however, has caused him to become known as someone who cannot be called upon by the nursing staff or the attending staff when there is a problem because of some concern over his reaction.

Dr. Bambrick has been counciled in regard to his ability to get along with the nursing staff and the attending staff on multiple occasions in the past and at this time is being placed on probation and will remain on probation for a period of 6 months.

Following the monthly Department of Orthopedics Meeting, a poll will be taken of the attending staff and if there are any problems found, they will be brought to the attention of Dr. Bambrick so that he can make adjustments in his behavior.

Dr. Bambrick was not suprosed to be placed on probation and knows that he has been in trouble repeatedly throughout his residency. He states that he will change and that he will cause no further problems throughout the remainder of his residency. He was informed that this will be necessary for him to receive a contract on April 1, 1983 for the following year, which will be his last year of residency. He was in agreement with this evaluation

HMC-06346

CONFIDENTIAL

# LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
## Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

# EXHIBIT U

05/19/2004  00:25    8148383063                                        PAGE  02

Dear Resident:

The Orthopaedic In-Training Examination (OITE) is designed to be an educational tool for residents. Although the examination is used by program directors to develop and evaluate their educational programs, it is not intended to be used as a qualifying examination or for determining resident promotions. You are encouraged to keep the examination and figures book for further study.

For each question, select the best answer from the five choices listed. Credit will be given only for correct answers. There is no penalty for incorrect responses. Questions are to be answered without the use of reference materials or the assistance of others.

Scores will be reported for the total examination, as well as several subspecialty areas. The score reports are constructed to allow comparison with other residents at a similar level in training. Adhering to the closed book policy improves the validity of the relative scores among residents. Please keep in mind that there is no passing score for the examination.

The OITE is developed by the American Academy of Orthopaedic Surgeons' (AAOS) Evaluation Committee. Test items are constructed to emphasize information and cognitive skills considered important in the practice of orthopaedic surgery. After the test items are submitted they are subjected to a field test, then revised during a series of edits. Efforts are made to develop correct responses that reflect the position best supported in the literature and by a consensus of practitioners. Despite this meticulous process, some items will remain controversial or ambiguous. This issue is addressed by statistically evaluating the performance of each test question. Test questions that do not perform within the expected ranges are considered for deletion.

The AAOS Evaluation Committee hopes that you find this examination a valuable educational experience.

Sincerely,

Paul Tornetta, III, MD
Chairman, AAOS Evaluation Committee

05/19/2004  00:25    8148383063                                              PAGE  03

  05/24/04   13:26   ☎847 823 8024        AmAcadOrthoSurgs                   ☑002/024

# Orthopaedic In-Training Examination

## 2003

### PROGRAM DIRECTORS' REPORT



## American Academy of Orthopaedic Surgeons

### 6300 N. River Road, Rosemont, IL 60018-4262

05/19/2004  00:25   8148383063                                    PAGE   14
  05/24/04  13:28   ☎847 823 8024       AmAcadOrthoSurgs          ☒013/024

2003 OITE Program Directors' Report

# USE OF THE OITE SCORE REPORTS

## Limitations of the Score Reports for Resident Evaluation

Small differences in the scores of residents must be interpreted with caution since: a) conditions under which the examination is administered differ from program to program, and b) the examination is an incomplete sample of orthopaedic knowledge. OITE scores should be only one of the factors considered in evaluating a resident's overall performance and progress. <u>THE USE OF OITE SCORES FOR DECIDING WHETHER A RESIDENT SHOULD BE RETAINED IN A PROGRAM OR PROMOTED IS INAPPROPRIATE.</u>

## Confidentiality of Score Reports

The AAOS Committee on Evaluation urges that the individual resident score reports be treated as confidential and shown only to the resident and educators directly involved in the individual resident's orthopaedic education. The Committee strongly discourages public disclosure of OITE score reports, or use of these scores for any other purpose than to guide study, alter curricula, or to develop other educational improvements.

# USE OF THE OITE AS AN EDUCATIONAL AID

Identifying the intent of a question, explaining the possible answer, presenting the reasons for and against each possible answer, and proposing alternative answers can demonstrate depth of knowledge or identify misconceptions and encourage study. Studying all the questions on an OITE provides a broad review of orthopaedics. To encourage these educational uses of the OITE, residents are urged to keep their booklets.

Although multiple-choice tests can efficiently and objectively assess an individual's knowledge of a broad subject area and can contribute to an educational program, they have important limitations as methods of evaluation and as an educational aid. They can assess only certain types of knowledge and cognitive processes. For example, the multiple choice format prevents full presentation of a clinical problem including all of the potentially important laboratory and imaging studies or of the possible alternative approaches to a diagnostic or therapeutic problem. Perhaps more importantly, a changing clinical problem cannot be simulated by a multiple-choice question. Furthermore, selecting the best answer to a multiple-choice question does not by itself demonstrate depth of understanding of the issue raised by the question.

Please send your suggestions, comments, and constructive criticism to AAOS Evaluation Committee, 6300 North River Road, Rosemont, IL 60018.

LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

EXHIBIT V

# 2001 ORTHOPAEDIC IN-TRAINING EXAMINATION

## AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS

### 6300 N. River Road, Rosemont, IL 60018

Examination Date: November 10, 2001

| | | | |
|---|---|---|---|
| ID #: | 00324635 | Order Number: | 8000004497 |
| Name: | Bradley T Poole, MD | ExamId: | 13390 |
| YIT: | 1 | Program: | RP3902 |

Section I: Exam Scores for the 2001 ORTHOPAEDIC IN-TRAINING EXAMINATION

| CONTENT DOMAIN | MAXIMUM POSSIBLE | YOUR SCORE | PERCENT SCORE | AVG YIT 1 N = 772 | AVG ALL RESIDENTS N = 3439 | YIT PERCENTILE RANK |
|---|---|---|---|---|---|---|
| Total | 266 | 122 | 45.9 | 145.4 | 163.2 | 11 |
| Pediatric Orthopaedics | 36 | 13 | 36.1 | 16.8 | 20.0 | |
| Medically Related Issues | 6 | 5 | 83.3 | 4.3 | 4.4 | |
| Musculoskeletal Trauma | 46 | 20 | 43.5 | 26.3 | 29.1 | |
| Rehabilitation | 4 | 3 | 75.0 | 2.3 | 2.4 | |
| Hand | 20 | 4 | 20.0 | 7.0 | 8.3 | |
| Hip & Knee Reconstruction | 23 | 12 | 52.2 | 13.2 | 15.1 | |
| Spine | 22 | 15 | 68.2 | 14.1 | 15.3 | |
| Foot & Ankle | 29 | 14 | 48.3 | 16.9 | 18.8 | |
| Sports Medicine | 17 | 8 | 47.1 | 10.2 | 11.6 | |
| Shoulder & Elbow | 22 | 12 | 54.5 | 12.0 | 13.5 | |
| Orthopaedic Science | 17 | 9 | 52.9 | 10.9 | 11.7 | |
| Orthopaedic Diseases | 24 | 7 | 29.2 | 11.3 | 13.0 | |

Confidential
HMC-00829

# 2002 ORTHOPAEDIC IN-TRAINING EXAMINATION

## AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS

6300 N. River Road, Rosemont, IL 60018

Examination Date: November 9, 2002

ID #:     00324635                    Order Number  8000008279

Name:   Bradley T Poole, MD          ExamId:       21521

YIT:      1                          Program:      RP3902

---

Section I:  Exam Scores for the 2002 ORTHOPAEDIC IN-TRAINING EXAMINATION

| CONTENT DOMAIN | MAXIMUM POSSIBLE | YOUR SCORE | PERCENT SCORE | AVG YIT 1 N = 784 | AVG ALL RESIDENTS N = 3433 | YIT PERCENTILE RANK |
|---|---|---|---|---|---|---|
| Total | 270 | 135 | 50.0 | 148.0 | 165.4 | 23 |
| Pediatric Orthopaedics | 52 | 30 | 57.7 | 29.0 | 32.6 | |
| Medically Related Issues | 12 | 10 | 83.3 | 8.8 | 9.0 | |
| Musculoskeletal Trauma | 35 | 15 | 42.9 | 19.8 | 22.1 | |
| Rehabilitation | 4 | 2 | 50.0 | 1.6 | 1.7 | |
| Hand | 22 | 7 | 31.8 | 9.6 | 11.0 | |
| Hip & Knee Reconstruction | 27 | 9 | 33.3 | 14.7 | 16.8 | |
| Spine | 20 | 12 | 60.0 | 11.9 | 13.0 | |
| Foot & Ankle | 13 | 6 | 46.2 | 6.5 | 7.6 | |
| Sports Medicine | 18 | 10 | 55.6 | 10.7 | 11.8 | |
| Shoulder & Elbow | 10 | 7 | 70.0 | 6.1 | 6.8 | |
| Orthopaedic Science | 21 | 11 | 52.4 | 11.7 | 12.6 | |
| Orthopaedic Diseases | 36 | 16 | 44.4 | 17.7 | 20.3 | |

Confidential

HMC-00873

CONFIDENTIAL

# 2004 ORTHOPAEDIC IN-TRAINING EXAMINATION

## AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS

### 6300 N. River Road, Rosemont, IL 60018

Examination Date: November 13, 2004

| | | | | |
|---|---|---|---|---|
| ID #: | 00324635 | Order Number | 8000014795 |
| Name: | Bradley T Poole, MD | ExamId: | 39015 |
| YIT: | 3 | Program: | RP3902 |

Section I: Exam Scores for the 2004 ORTHOPAEDIC IN-TRAINING EXAMINATION

| CONTENT DOMAIN | MAXIMUM POSSIBLE | YOUR SCORE | PERCENT SCORE | AVG YIT 3 N = 783 | AVG ALL RESIDENTS N = 3664 | YIT PERCENTILE RANK |
|---|---|---|---|---|---|---|
| Total | 268 | 164 | 61.2 | 178.4 | 164.0 | 17 |
| Pediatric Orthopaedics | 36 | 28 | 77.8 | 26.5 | 24.4 | |
| Medically Related Issues | 7 | 5 | 71.4 | 5.0 | 4.9 | |
| Musculoskeletal Trauma | 52 | 30 | 57.7 | 35.6 | 32.8 | |
| Rehabilitation | 4 | 3 | 75.0 | 3.2 | 3.1 | |
| Hand | 18 | 14 | 77.8 | 10.3 | 9.4 | |
| Hip & Knee Reconstruction | 23 | 10 | 43.5 | 15.3 | 13.6 | |
| Spine | 19 | 12 | 63.2 | 10.4 | 9.6 | |
| Foot & Ankle | 18 | 7 | 38.9 | 10.8 | 9.8 | |
| Sports Medicine | 21 | 15 | 71.4 | 15.3 | 13.9 | |
| Shoulder & Elbow | 15 | 9 | 60.0 | 10.8 | 9.5 | |
| Orthopaedic Science | 31 | 18 | 58.1 | 19.6 | 19.0 | |
| Orthopaedic Diseases | 24 | 13 | 54.2 | 15.4 | 14.0 | |

# 2000 ORTHOPAEDIC IN-TRAINING EXAMINATION

## AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS

6300 N. River Road, Rosemont, IL 60018

Examination Date: November 11, 2000

| | | | |
|---|---|---|---|
| ID #: | 00222609 | Order Number: | 800000440 |
| Name: | James R Seeds, MD | ExamId: | 00002704 |
| YIT: | 1 | Program: | RP3902 |

---

Section I:  Exam Scores for the 2000 ORTHOPAEDIC IN-TRAINING EXAMINATION

| CONTENT DOMAIN | MAXIMUM POSSIBLE | YOUR SCORE | PERCENT SCORE | AVG YIT 1 N = 777 | AVG ALL RESIDENTS N = 3440 | YIT PERCENTILE RANK |
|---|---|---|---|---|---|---|
| Total | 265 | 128 | 48.3 | 150.0 | 167.9 | 12 |
| Pediatric Orthopaedics | 32 | 14 | 43.8 | 17.0 | 19.6 | |
| Medically Related Issues | 3 | 1 | 33.3 | 1.6 | 1.7 | |
| Musculoskeletal Trauma | 50 | 29 | 58.0 | 30.3 | 33.2 | |
| Rehabilitation | 8 | 4 | 50.0 | 3.9 | 4.2 | |
| Hand | 17 | 7 | 41.2 | 5.1 | 6.3 | |
| Hip & Knee Reconstruction | 18 | 12 | 66.7 | 11.6 | 13.3 | |
| Spine | 23 | 11 | 47.8 | 14.7 | 16.1 | |
| Foot & Ankle | 19 | 8 | 42.1 | 8.5 | 10.3 | |
| Sports Medicine | 19 | 10 | 52.6 | 12.3 | 13.4 | |
| Shoulder & Elbow | 15 | 7 | 46.7 | 8.3 | 9.6 | |
| Orthopaedic Science | 37 | 16 | 43.2 | 24.9 | 26.7 | |
| Orthopaedic Diseases | 24 | 9 | 37.5 | 11.9 | 13.4 | |

---

Confidential

HMC-00843

# 2001 ORTHOPAEDIC IN-TRAINING EXAMINATION

## AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS

### 6300 N. River Road, Rosemont, IL 60018

Examination Date: November 10, 2001

| | | | |
|---|---|---|---|
| ID #: | 00222609 | Order Number: | 8000004497 |
| Name: | James R Seeds, MD | ExamId: | 13625 |
| YIT: | 2 | Program: | RP3902 |

Section I: Exam Scores for the 2001 ORTHOPAEDIC IN-TRAINING EXAMINATION

| CONTENT DOMAIN | MAXIMUM POSSIBLE | YOUR SCORE | PERCENT SCORE | AVG YIT 2 N = 767 | AVG ALL RESIDENTS N = 3439 | YIT PERCENTILE RANK |
|---|---|---|---|---|---|---|
| Total | 266 | 137 | 51.5 | 167.0 | 163.2 | 7 |
| Pediatric Orthopaedics | 36 | 12 | 33.3 | 20.3 | 20.0 | |
| Medically Related Issues | 6 | 4 | 66.7 | 4.4 | 4.4 | |
| Musculoskeletal Trauma | 46 | 24 | 52.2 | 30.1 | 29.1 | |
| Rehabilitation | 4 | 2 | 50.0 | 2.4 | 2.4 | |
| Hand | 20 | 6 | 30.0 | 8.5 | 8.3 | |
| Hip & Knee Reconstruction | 23 | 11 | 47.8 | 15.5 | 15.1 | |
| Spine | 22 | 12 | 54.5 | 15.7 | 15.3 | |
| Foot & Ankle | 29 | 19 | 65.5 | 19.3 | 18.8 | |
| Sports Medicine | 17 | 8 | 47.1 | 11.9 | 11.6 | |
| Shoulder & Elbow | 22 | 17 | 77.3 | 13.8 | 13.5 | |
| Orthopaedic Science | 17 | 12 | 70.6 | 12.0 | 11.7 | |
| Orthopaedic Diseases | 24 | 10 | 41.7 | 13.2 | 13.0 | |

Confidential
HMC-00831

# 2002 ORTHOPAEDIC IN-TRAINING EXAMINATION

## AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS

### 6300 N. River Road, Rosemont, IL 60018

#### Examination Date: November 9, 2002

| | | | |
|---|---|---|---|
| ID #: | 00222609 | Order Number | 8000008279 |
| Name: | James R Seeds, MD | ExamId: | 22608 |
| YIT: | 3 | Program: | RP3902 |

Section I: Exam Scores for the 2002 ORTHOPAEDIC IN-TRAINING EXAMINATION

| CONTENT DOMAIN | MAXIMUM POSSIBLE | YOUR SCORE | PERCENT SCORE | AVG YIT 3 N = 750 | AVG ALL RESIDENTS N = 3433 | YIT PERCENTILE RANK |
|---|---|---|---|---|---|---|
| Total | 270 | 170 | 63.0 | 179.6 | 165.4 | 25 |
| Pediatric Orthopaedics | 52 | 32 | 61.5 | 35.8 | 32.6 | |
| Medically Related Issues | 12 | 7 | 58.3 | 9.3 | 9.0 | |
| Musculoskeletal Trauma | 35 | 24 | 68.6 | 23.9 | 22.1 | |
| Rehabilitation | 4 | 0 | 0.0 | 1.7 | 1.7 | |
| Hand | 22 | 10 | 45.5 | 12.1 | 11.0 | |
| Hip & Knee Reconstruction | 27 | 18 | 66.7 | 18.4 | 16.8 | |
| Spine | 20 | 15 | 75.0 | 14.1 | 13.0 | |
| Foot & Ankle | 13 | 9 | 69.2 | 8.4 | 7.6 | |
| Sports Medicine | 18 | 11 | 61.1 | 12.8 | 11.8 | |
| Shoulder & Elbow | 10 | 9 | 90.0 | 7.4 | 6.8 | |
| Orthopaedic Science | 21 | 14 | 66.7 | 13.3 | 12.6 | |
| Orthopaedic Diseases | 36 | 21 | 58.3 | 22.2 | 20.3 | |

Confidential

HMC-00874

# 2000 ORTHOPAEDIC IN-TRAINING EXAMINATION

## AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS

6300 N. River Road, Rosemont, IL 60018

Examination Date: November 11, 2000

| | | | | |
|---|---|---|---|---|
| ID #: | 00232871 | Order Number: | 800000440 | |
| Name: | Craig Lippe. MD | ExamId: | 00003331 | |
| YIT: | 1 | Program: | RP3902 | |

---

Section I: Exam Scores for the 2000 ORTHOPAEDIC IN-TRAINING EXAMINATION

| CONTENT DOMAIN | MAXIMUM POSSIBLE | YOUR SCORE | PERCENT SCORE | AVG YIT 1 N = 777 | AVG ALL RESIDENTS N = 3440 | YIT PERCENTILE RANK |
|---|---|---|---|---|---|---|
| Total | 265 | 127 | 47.9 | 150.0 | 167.9 | 11 |
| Pediatric Orthopaedics | 32 | 14 | 43.8 | 17.0 | 19.6 | |
| Medically Related Issues | 3 | 2 | 66.7 | 1.6 | 1.7 | |
| Musculoskeletal Trauma | 50 | 25 | 50.0 | 30.3 | 33.2 | |
| Rehabilitation | 8 | 4 | 50.0 | 3.9 | 4.2 | |
| Hand | 17 | 3 | 17.6 | 5.1 | 6.3 | |
| Hip & Knee Reconstruction | 18 | 7 | 38.9 | 11.6 | 13.3 | |
| Spine | 23 | 14 | 60.9 | 14.7 | 16.1 | |
| Foot & Ankle | 19 | 8 | 42.1 | 8.5 | 10.3 | |
| Sports Medicine | 19 | 10 | 52.6 | 12.3 | 13.4 | |
| Shoulder & Elbow | 15 | 11 | 73.3 | 8.3 | 9.6 | |
| Orthopaedic Science | 37 | 19 | 51.4 | 24.9 | 26.7 | |
| Orthopaedic Diseases | 24 | 10 | 41.7 | 11.9 | 13.4 | |

---

Confidential

HMC-00840

# 2001 ORTHOPAEDIC IN-TRAINING EXAMINATION

## AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS

### 6300 N. River Road, Rosemont, IL 60018

Examination Date: November 10, 2001

| | | | |
|---|---|---|---|
| ID #: | 00232871 | Order Number: | 8000004497 |
| Name: | Craig Lippe, MD | ExamId: | 13708 |
| YIT: | 2 | Program: | RP3902 |

---

Section I: Exam Scores for the 2001 ORTHOPAEDIC IN-TRAINING EXAMINATION

| CONTENT DOMAIN | MAXIMUM POSSIBLE | YOUR SCORE | PERCENT SCORE | AVG YIT 2 N = 767 | AVG ALL RESIDENTS N = 3439 | YIT PERCENTILE RANK |
|---|---|---|---|---|---|---|
| Total | 266 | 158 | 59.4 | 167.0 | 163.2 | 28 |
| Pediatric Orthopaedics | 36 | 15 | 41.7 | 20.3 | 20.0 | |
| Medically Related Issues | 6 | 3 | 50.0 | 4.4 | 4.4 | |
| Musculoskeletal Trauma | 46 | 31 | 67.4 | 30.1 | 29.1 | |
| Rehabilitation | 4 | 2 | 50.0 | 2.4 | 2.4 | |
| Hand | 20 | 12 | 60.0 | 8.5 | 8.3 | |
| Hip & Knee Reconstruction | 23 | 14 | 60.9 | 15.5 | 15.1 | |
| Spine | 22 | 14 | 63.6 | 15.7 | 15.3 | |
| Foot & Ankle | 29 | 19 | 65.5 | 19.3 | 18.8 | |
| Sports Medicine | 17 | 12 | 70.6 | 11.9 | 11.6 | |
| Shoulder & Elbow | 22 | 14 | 63.6 | 13.8 | 13.5 | |
| Orthopaedic Science | 17 | 13 | 76.5 | 12.0 | 11.7 | |
| Orthopaedic Diseases | 24 | 9 | 37.5 | 13.2 | 13.0 | |

---

Confidential
HMC-00827

# LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
## Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

# EXHIBIT W

Semi-Annual Evaluation
Dave Ivance, MD
3/2/02
8:15 am

I reviewed Dave's evaluations thus far. I counseled him that they were above average. Some of the evaluations mentioned that he could use some additional improvement in terms of technical expertise. Based on my own personal experience there are certain procedures such as a recent complex nonunited displaced proximal humerus fracture which I had performed with him. It was technically difficult and he should not feel obligated to perform it on his own and in fact in private practice might wish to consider an orthopaedic surgeon to help in such a case. For the average procedure (i.e., hip fracture, femoral nailing, etc.) I felt that his level of technical expertise was acceptable and probably above average.

With respect to his OITE scores, they were slightly above the mean and slightly below the 50%ile. Probably adequate but indicative of a continued need to read and spend a fair amount of time, I suggested 2 hours on a daily basis in fairly intense self-study. I also noted that it was an opportunity for he and Nick Kubik to set up a study program specifically dedicated to test taking. I offered to provide reading materials and make myself or one of the other faculty members available to assist not only with the written material but various techniques in taking an exam. I noted that question writers asked to write focused stems with parallel distractors in the potential answers and pointed out that there are sometimes more than one correct answer but only one best answer usually based on a particular article, Instructional Course Lectures, or information provided in a text book.

We plan to set up such a meeting either one afternoon a week between 5 pm and 6 pm or 6 pm and 7 pm in the evening, or perhaps on Saturday morning session when time in available before or after the regular conference.


John D. Lubahn, MD

HMC-02256
CONFIDENTIAL

Semi-annual Evaluation
Carl Seon, MD
3/2/02
8:45 am

I reviewed Dr. Seon's evaluation from the Shriners Hospital pointing out that his knowledge base has far exceeded his level of technical expertise and that he would do well to spend as much time as possible seeking out procedures which he could assist with surgically. I further noted that his OITE scores were obviously outstanding and asked that he assist the chief residents in establishing the study session referred to in Dr. Ivances' review.

Finally he had multiple questions regarding the research department which I feel presently remains relatively stable.

John D. Lubahn, MD

HMC-02257

CONFIDENTIAL

Semi-Annual Evaluation
James DeLullo, MD
3/2/02
9:00 am

Jamey is currently at the Shriners Hospital and his evaluation verbally was outstanding. His performance at Hamot was outstanding. His OITE score was excellent, I asked him to consider helping with the study session with Drs. Ivance and Kubik. The rationale and methodology for such a study session was discussed.

 I discussed his future career plans which include the fellowship at Allegheny General focusing on total joint reconstruction and trauma and then possibly a return to Erie.



John D. Lubahn, MD

HMC-02258
CONFIDENTIAL

Semi-Annual Evaluation
Jeffrey Nechleba, MD
3/2/02
9:15 am

His evaluation from the research department was discussed and noted to be above average. Dr. Kuhn was extremely pleased with Jeff's performance. His performance clinically has been above average since leaving the lab and his performance on the OITE exam was certainly above average. I have little concern regarding his level of academic and technical expertise and asked that he also consider assisting with the study sessions to improve OITE scores.

_____

John D. Lubahn, MD

HMC-02259

CONFIDENTIAL

**Craig Lippe, MD**
**Semi-Annual Evaluation**
**1/26/05**

Craig's review of the first half of the year was above average. I did not review specific details of his individual rotations with him. I focused more on his in-training scores which had dropped considerably. He recognizes that he did not study as much as he should have. I stressed the importance of a study plan for the year. I also offered him my services, those of Dr. Nechleba and Dr. DeLullo, and basically whatever it takes to have him on track with a knowledge base to pass his boards.

A review of his research project was discussed. He plans to follow-up on proximal row carpectomy patients with Lisa Reid.

_____
John D. Lubahn, MD
Program Director

HMC-01901

CONFIDENTIAL

Lisa Brown, MD
Hamot Medical Center Orthopaedic Residency Program
Semi-Annual Evaluation
January 30, 2004
3:30 pm

I discussed Dr. Brown's performance thus far since her last evaluation. Her in-training performance was poor. In fact she and I had discussed this on one previous occasion. My recommendation for her to improve her abilities on standardized testing was to have an evaluation at the Sylvan Learning Center in Erie and to report back to me with their recommendations and a plan.

I did counsel her that if her performance did not improve over the course of the next two years on the order of 20% to 40% each year, that I would be unable to sign her application to take Part I of the American Board of Orthopaedic Surgeons Exam. I would consider an additional year here or an additional year of fellowship at which time she could sit for the examination.

I did counsel her that her clinical performance thus far this year had improved and was acceptable. There were areas where her clinical skills did still seem deficient to me and I cited those and suggested additional reading materials.

I do believe that her performance on the OITE exam is a combination of multiple factors including personal, scholastic (meaning knowledge base gleaned from textbooks and journal articles read thus far), and ability to take standardized tests and will continue to evaluate each of these in the future.

Lisa did have an excellent performance and evaluation on her microsurgical skills lab earlier this year.


_____          _____
John D. Lubahn, MD                        Lisa Brown, MD
Program Director                          Orthopaedic Resident

# LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
## Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

# EXHIBIT X


Learning

Talk to a live expert:

**Call 1-888-EDUCATE**
1·888·338·2283

*See why more parents turn to Sylvan than any other tutor:*

Center Finder

Sylvan Tutoring
How Sylvan Gets Results
Sylvan Tutoring Programs
In-Center and Online Tutoring

**Sylvan Special Offers**

Start the school year off right with tutoring from Sylvan.

Call 1-888-338-2283 now.

**Tutoring Resources From Sylvan**
Discovery Tools
Online Resources
Family Activities
Sylvan Tutoring Library

**Resources for Educators**

Find a Sylvan Learning Center

**Contact Sylvan Now**
1-888-EDUCATE
Email Your Local Sylvan

**Site Map**

*New! Introducing Sylvan In Home Tutoring!* Now there's an easy way to find the best, in-home private tutoring for your child! It's the only one-on-one private tutoring service backed by the Sylvan network of people and resources. At participating centers only.
**Learn more about Sylvan In Home Tutoring**

*Get $25 off the Sylvan Skills Assessment®* Every tutoring program at Sylvan begins with this unique diagnostic test. It identifies your child's individual needs and strengths — pinpointing the exact areas Sylvan tutors will help strengthen or enrich.
**Download your coupon here — a $25 value**

**Whether your child needs help with one subject or in school overall, Sylvan can help.**

Relax knowing you've prepared your child for the fall with a summer at Sylvan Call us now and discover why more parents turn to Sylvan for tutoring than to any other tutor:

Tutoring from Sylvan Learning begins with a unique approach that sets us apart from other tutors. We call our approach to tutoring the **Sylvan Advantage®**.

Here's how Sylvan works:

Sylvan Skills Assessment — Sylvan Learning begins by identifying your child's specific tutoring needs with a Sylvan Skills Assessment.

Personalized Tutoring Programs — Sylvan creates a personalized tutoring program just for your child.

Individual Tutoring Attention — Sylvan tutors work with each child individually, so your child receives the specific tutoring help he or she needs. To ensure true understanding, Sylvan teachers use a method of instruction called mastery learning. Students are taught to master a skill before they move on to the next level.

Trained and Certified Teachers — Sylvan teachers are highly trained and certified and they love tutoring.

— Sylvan Learning keeps you updated with progress reports every step of the way.

**Give your child confidence for life.**

If your child is struggling or just not being challenged enough, Sylvan Learning can help him or her develop the confidence that comes from a love of learning.

**Take the first step today – contact Sylvan for tutoring help right now:**



© 2006 Sylvan Learning, Inc.



# LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
## Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

# EXHIBIT Y

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,          )
                              )
     Plaintiff           )
                              )
         v.            )     Civil Action No. 05-32E
                              )
HAMOT MEDICAL CENTER,    )
                              )
     Defendant        )

PLAINTIFF'S RESPONSES TO
DEFENDANT'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, plaintiff Lisa Brown

hereby responds to defendant's First Set of Interrogatories.

General Objections

1.    Plaintiff objects to producing any information in response to the

Interrogatories that is protected by the attorney-client privilege, the work-product

doctrine or any other applicable protection, restriction or immunity from discovery.

2.    Plaintiff objects to producing information in response to any Interrogatories

to the extent that producing such information would be oppressive, unduly burdensome,

unreasonably expensive or would require an unreasonable investigation.

3.    Plaintiff objects to the Interrogatories to the extent that they attempt to

impose obligations upon Plaintiff that are inconsistent with and/or in addition to those

imposed by the Federal Rules of Civil Procedure, the Local Rules of the United States

District Court for the Western District of Pennsylvania, applicable case law, statutes

document was previously provided to plaintiff. That is, documents about her performance appear in her personal file that she does not recall seeing at any time before her termination from the program.

8.     Identify and describe in detail all sex-based comments or treatment that you were subjected to during your tenure at Hamot's Orthopaedic Surgery Residency Program. In answering, please identify (i) the person who subjected you to said comment or treatment, (ii) all persons present at the time you were subjected to said comment or treatment, and (iii) all persons to whom you or someone on your behalf reported said comments or treatment.

Response:

In Carl Seon's first conversation with plaintiff as a PGY 1 resident, he warned her that she should not be late to the operating room because she was putting on lipstick, and that he would slap her on the ass like he would any other resident when she did a good job.

James Seeds' wife commented to plaintiff on several occasions how her husband and brother-in-law, also an orthopedic surgeon, would have heated discussions about why women should not be in orthopedics.

Craig Lippe advised plaintiff that James Seeds told him plaintiff would never make it in the program.

Each time research director Timothy Cooney would address the residents as a group, he would embarrassingly call attention to and distinguish plaintiff's presence by saying "you guys . . . and gal."

Program coordinator Pat Rogers referred to plaintiff as "our 'girl' resident." See Plaintiff's response to Request for Production 16.

During interviews of candidates for the residency program, male residents would make remarks about the appearance of female candidates. They discussed ranking higher the female residents they considered more attractive.

During interviews of candidates for the residency program, Carl Seon remarked about the attractiveness of a particular female candidate, and recommended ranking her higher because of her appearance.

Two male residents were sued for malpractice during the course of their residency, but were not disciplined.

Male residents received low scores on OITE exams, but were not put on probation.

Former resident Stephanie Galey has fewer privileges at Hamot than male former residents.

While firing Brown from the program for alleged performance deficiencies, the program director permitted a male doctor who had been named in multiple malpractice suits, been professionally disciplined in several states, and who lost his medical license, to participate in the program in an effort to become relicensed.

During her time in the program, Brown received roses from Brad Poole as a purported romantic gesture.

Residents organized and went on a chauffeured trip to a strip club in Canada, and it is believed went to strip clubs on other occasions while attending professional conferences.

Craig Lippe confronted plaintiff with the uninvited declaration that he would have sex with her before her residency was over.

Craig Lippe returned from a professional conference in Hawaii, attended with John Lubahn, with a souvenir doll which he gave to Brown. The doll displays imitation male genitals when the covering is lifted. The doll is available for inspection.

When Brown suggested that a female patient's large breasts might be creating postural problems and contributing to her back pain, John Hood pointed to Brown's breasts and asked if the patient's breasts were "bigger than those."

John Hood remarked to plaintiff in an operating room, in the presence of others, that she had a "nice ass . . . big but nice."

LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

# EXHIBIT Z

— copies to DRS Lubahn and Levine

## Special Communication

# Do House Officers Learn From Their Mistakes?

Albert W. Wu, MD, MPH; Susan Folkman, PhD; Stephen J. McPhee, MD; Bernard Lo, MD

> *The most fruitful lesson is the conquest of one's own error. Whoever refuses to admit error may be a great scholar but he is not a great learner. Whoever is ashamed of error will struggle against recognizing and admitting it, which means that he struggles against his greatest inward gain.*
>
> Goethe, *Maxims and Reflections*

Mistakes are inevitable in medicine. To learn how medical mistakes relate to subsequent changes in practice, we surveyed 254 internal medicine house officers. One hundred fourteen house officers (45%) completed an anonymous questionnaire describing their most significant mistake and their response to it. Mistakes included errors in diagnosis (33%), prescribing (29%), evaluation (21%), and communication (5%) and procedural complications (11%). Patients had serious adverse outcomes in 90% of the cases, including death in 31% of cases. Only 54% of house officers discussed the mistake with their attending physicians, and only 24% told the patients or families. House officers who accepted responsibility for the mistake and discussed it were more likely to report constructive changes in practice. Residents were less likely to make constructive changes if they attributed the mistake to job overload. They were more likely to report defensive changes if they felt the institution was judgmental. Decreasing the work load and closer supervision may help prevent mistakes. To promote learning, faculty should encourage house officers to accept responsibility and to discuss their mistakes.

(*JAMA.* 1991;265:2089-2094)

MISTAKES are inevitable in the practice of medicine because of the complexity of medical knowledge, the uncertainty of clinical predictions, time pressures, and the need to make decisions despite limited or uncertain knowledge. Mistakes may be particularly distressing for physicians in training because they are assuming new clinical skills and responsibilities. Mistakes can be powerful formative experiences, beneficial in some cases, harmful in others. Ideally, mistakes would be used by medical educators as teaching tools. However, while mistakes in medical practice have been discussed in essays,[1-4] anthropologic studies,[5-7] and anecdotal accounts,[8,9] little is known about how house officers can learn better from their mistakes.

We examined mistakes reported by house officers at three academic internal medicine training programs to address the following questions: What types of mistakes did they make? What did house officers perceive were the causes of their mistakes? How did house officers and institutions respond to mistakes? What predicted whether house officers learned from their mistakes?

## SUBJECTS AND METHODS

### Subjects

In May 1989, we mailed a questionnaire to 254 house officers in three internal medicine training programs associated with medical schools. Programs were located at large (>500 beds), academic, tertiary-care hospitals.

### Procedures

Questionnaires were filled out anonymously to assure confidentiality. House officers were asked to return a postcard indicating either that they had mailed the completed questionnaire or that they did not wish to participate in the study. If the postcard was not returned, house officers received two additional mailings and a personal reminder from one of the authors. Approval for the study was obtained from institutional review boards at all three institutions.

### Questionnaire

The questionnaire was developed after a review of the literature[1,10-12] and two stages of pretesting. Subjects were asked to describe their most significant medical mistake in the last year, their response to it, and the events that followed. A mistake was defined as an act or omission for which the house officer felt responsible that had serious or potentially serious consequences for the patient and that would have been judged wrong by knowledgeable peers at the time it occurred.

Respondents first wrote a paragraph about the mistake and then answered questions about the age and prognosis of the affected patient, adverse patient outcomes, and perceived causes of the mistake.

In describing responses to the mistake, house officers answered questions about the degree to which they accepted responsibility for the mistake, their emotional response to the mistake, discussions about the mistake with others, the institutional response to the mistake, and changes in practice due to making the mistake.

Questions used four-point Likert-type and categorical response formats. Respondents were also encouraged to write comments at the end of the questionnaire.

From the Department of Veterans Affairs (Dr Wu), the Robert Wood Johnson Clinical Scholars Program (Drs Wu and Lo), the Program in Medical Ethics (Dr Lo), the Center for AIDS Prevention Studies (Drs Folkman and Lo), the Division of General Internal Medicine (Drs Wu, Folkman, McPhee, and Lo), and the Department of Medicine (Drs Wu, Folkman, McPhee, and Lo), University of California, San Francisco.

Presented in part at the 13th annual meeting of the Society for General Internal Medicine, Arlington, Va, May 3, 1990.

Reprint requests to Johns Hopkins University, 624 N Broadway, Baltimore, MD 21205 (Dr Wu).

HMC-06577

## Scales

We grouped items on the questionnaire into scales representing meaningful concepts on the basis of factor analysis and consensus of the authors' judgment. Each scale score was created by summing the responses to the items it included.

*Causes* of the mistake were described by three scales: inexperience (three items), job overload (two items), and case complexity (four items). *Responsibility* for the mistake was measured with three items from the "accepting responsibility" subscale of the Ways of Coping Scale developed by Folkman and Lazarus.[8] *Emotional distress* in response to the mistake was measured with four items. The extent to which the institutional response was *judgmental* was measured with two items. The *extent of discussion* was measured by summing affirmative responses to items that asked whether the physician discussed the mistake with the supervising attending physician, another medical person, the patient or family, or at a conference.

*Learning* from the mistake was measured by two scales that asked house officers how they changed their practices due to the mistake. A scale of constructive changes in practice contained nine items. A scale of defensive changes contained two items. It should be noted that constructive and defensive changes measure separate concepts rather than polar opposites of the same scale. Therefore, a house officer might report both constructive and defensive changes in practice after making a mistake.

Means, SDs, and internal consistency reliability coefficients (Cronbach's α) for each of these scales are shown in Table 1. Relatively large SDs for the overload, judgmental, and defensive scales reflect skewed score distributions. The non-normal distributions make the α coefficient difficult to interpret. To facilitate comparison of the different scale scores, scores were transformed linearly to a scale of 0 through 100, with 0 indicating the lowest and 100 indicating the highest possible score.

## Analysis

Analysis was conducted in two stages. In the first stage, two-sample *t* tests and one-way analyses of variance were used to test the relationship between the dependent variables (constructive change and defensive change) and categorical independent variables (house officer gender and year of residency training; institution and setting of the mistake; patient age group, previous functioning, and life expectancy;

whether or not there was a serious outcome; and extent of discussion). Simple correlations were used to evaluate the relationship between the dependent variables and continuous independent variables (scales for causes of the mistake, accepting responsibility for the mistake, and institutional response to the mistake).

In the second stage, variables that had been found to be related to the dependent variables at $P<.15$ were included in two multiple linear regression equations to test their independent relationship to (1) constructive changes in practice and (2) defensive changes in practice.

## RESULTS

### Characteristics of Respondents

Of the 254 residents surveyed, 114 (45%) responded by reporting a mistake and completing the questionnaire. An additional 56 residents (22%) returned a

postcard acknowledging receipt but declining to complete the questionnaire. The remaining 33% did not respond.

Our study group comprised the 114 respondents who completed the questionnaire. Because the results did not differ by site, we present only aggregated results. Thirty-three percent of the subjects were women. Thirty-six percent of the respondents were interns, 32% were junior residents, and 32% were senior residents. The distributions of gender and year of training were similar among respondents and nonrespondents.

### Types of Mistakes

Types and frequency of mistakes are summarized in Table 2. The most frequently reported type of mistake was a missed diagnosis (33%). In one typical case, a house officer failed to recognize congestive heart failure in a patient with human immunodeficiency virus

Table 1.—Internal Consistency Reliability Coefficients, Means, and SDs for Scores Converted to a Scale of 0 to 100

| Scale | No. of Items | Cronbach's α | Mean (SD) |
|---|---|---|---|
| **Causes** | | | |
| Inexperience | 3 | .50 | 66.1 (26.4) |
| Overload | 2 | .58 | 45.2 (30.4) |
| Judgment/complexity | 4 | .68 | 41.4 (27.7) |
| **Physician response** | | | |
| Emotional distress | 4 | .79 | 71.3 (23.7) |
| Accepting responsibility | 3 | .45 | 54.5 (22.3) |
| **Institutional response** | | | |
| Judgmental | 2 | .30 | 26.7 (22.9) |
| **Changes in practice** | | | |
| Constructive changes | 9 | .74 | 52.2 (20.0) |
| Increased information seeking | 5 | .82 | 48.5 (26.3) |
| Increased vigilance | 4 | .67 | 57.3 (24.4) |
| Defensive changes | 2 | .57 | 17.7 (18.9) |

Table 2.—Types of Mistakes Made by the 114 Survey Respondents

| Type of Mistake | No. (%) of Total Cases | Examples | Patient Outcomes* |
|---|---|---|---|
| Errors in diagnosis | 38 (33) | Failed to diagnose small-bowel obstruction in a patient with ascites | Death |
| | | Failed to examine and diagnose fracture in a "crack" cocaine user | Delayed treatment |
| Errors in evaluation and treatment | 24 (21) | Treated malignant hypertension on the ward instead of in the intensive care unit | Stroke |
| | | Incomplete débridement of a diabetic foot ulcer | Amputation |
| Errors in prescribing and dosing | 33 (29) | Did not read syringe and gave 50 times the correct dose of levothyroxine | None apparent |
| | | Inadvertently stopped asthma medication at the time of hospitalization | Respiratory failure |
| Procedural complications | 13 (11) | Removed pulmonary artery catheter with the balloon inflated | Small amount of bleeding |
| | | Placed central line without a follow-up roentgenogram | Fatal tension pneumothorax |
| Faulty communication | 6 (5) | Failed to document "do not resuscitate" order in chart and failed to inform spouse | Resuscitation was performed against the patient's wishes |
| | | Failed to obtain consent before central line placement | No informed consent for a procedure that had a fatal complication |

*Cause and effect cannot be determined.

HMC-06578

Do House Officers Learn From Their Mistakes?—Wu et al

...sease with severe dyspnea.

Errors in evaluation and treatment were reported in 21% of cases. For example, one resident noted but failed to treat profound hypoglycemia in a patient with the acquired immunodeficiency syndrome admitted with neutropenia and presumed sepsis. The patient had a seizure and died soon thereafter.

House officers reported errors in prescribing and dosing of drugs in 29% of cases. One resident missed an intern's drug dosing error in an elderly woman with congestive heart failure who was well known to him from previous admissions. "I approved the intern's admission orders without noting a significant error," in which an 80-mg dose of a cardiac medication was transcribed as 180 mg. The patient was found dead 2 hours after her first dose.

Errors ascribed to faulty communication were described in 5% of cases. In one such case, a resident accepted misinformation from the emergency department physician that a patient being admitted was not to be resuscitated. "I subsequently found out from the patient's family and personal physician that the patient was *not* a 'no code.' At that point in time the patient had not been treated aggressively and died 24 hours later."

Examples of procedural complications, described in 11% of cases, and other types of mistakes are given in Table 2; a brief summary of all of the mistakes is presented in Table 3.

## Outcomes of Mistakes

In response to the question, "What adverse effects did the mistake have for the patient?" 90% of residents reported that patients had significant adverse outcomes following mistakes. These included physical discomfort (32%), emotional distress (27%), additional therapy (25%), additional procedure (13%), prolonged hospital stay (24%), and death (31%). Mistakes often had multiple adverse outcomes. For 10% of patients, no adverse outcome was attributed to the mistake. A brief summary of the reported outcomes of the mistakes is included in Table 3.

## Causes of Mistakes

The causes of mistakes reported by house officers varied (Table 4). House officers usually attributed mistakes to more than one cause. Fifty-four percent reported that mistakes were caused in part because they did not know information they should have known (eg, being unaware of the significance of a prolonged episode of ventricular tachycardia). Fifty-one percent reported "too many other tasks" (eg, one resident neglected to continue to administer a re-

quired medication, being "too busy with other sick patients and supervising interns and students"). Forty-one percent reported fatigue (eg, after inadvertantly ordering potassium replacement as a bolus, one resident commented, "It

was 3 AM and I'm not sure I was completely awake").

## Circumstances of Mistakes

The mistakes occurred during medical school in 3% of cases, during the first

Table 3.—Summary of 114 Mistakes and Outcomes Reported by House Officers

| Error | Patient Outcome |
|---|---|
| **Diagnostic Errors** | |
| Misdiagnosed hypertension-induced pulmonary edema as pleural effusion | None |
| Failed to diagnose cryptococcoma on roentgenogram | Death |
| Possibly failed to diagnose AIDS' adrenal insufficiency | Death |
| Failed to diagnose small-bowel obstruction in a patient with ascites | Death |
| Missed physical findings because of concentration on abdomen | None |
| Failed to diagnose gastrointestinal bleeding | Death |
| Failed to place a nasogastric tube and to diagnose gastrointestinal bleeding | Stroke |
| Did not check chest roentgenogram in a patient with pneumothorax | Delayed diagnosis |
| Failed to recognize signs of cardiac disease in a patient with AIDS-related complex | Delayed treatment |
| Misread electrocardiogram and treated a patient with verapamil | Hypotension |
| Failed to note acidosis in a hypotensive patient after a procedure | None |
| Failed to recognize tension pneumothorax at cardiac arrest | Death |
| Failed to examine and diagnose pneumothorax in an intubated patient | Delayed therapy |
| Failed to diagnose eclampsia | Death |
| Misdiagnosed ovarian cyst as pelvic inflammatory disease | None |
| Missed signs of sepsis in an elderly woman after an invasive procedure | None |
| Failed to examine and diagnose fracture in a "crack" cocaine user | Delayed treatment |
| Did not recognize respiratory acidosis | Death |
| Failed to diagnose hypoxia in an agitated AIDS patient | Delayed therapy |
| Did not examine and failed to diagnose cavernous sinus syndrome | Delayed diagnosis |
| Failed to consider tension pneumothorax at cardiac arrest | Death |
| Failure to diagnose sepsis in a lung cancer patient | Death |
| Missed hemothorax on chest roentgenogram | Death |
| Did not consider right ventricular infarct during cardiac arrest | Death |
| Failure to notice neurological disease in an asthmatic outpatient | Delayed diagnosis |
| Missed electrocardiogram changes in an elderly woman with back pain | Delayed care |
| Failed to order arterial blood gas tests and to recognize diabetic ketoacidosis | Delayed treatment |
| Failed to diagnose cholangitis and impending sepsis | Delayed treatment |
| Presumed a diagnosis of *Pneumocystis carinii* pneumonia in a patient with sepsis | Death |
| Treated cardiac disease as sepsis and induced congestive heart failure | Death |
| Did not recognize falling partial thromboplastin time as a sign of recurrent pulmonary embolism | Death |
| Failed to collect sputum and to diagnose tuberculosis | Disseminated tuberculosis, death |
| Misdiagnosed tubal pregnancy as ulcer disease | None |
| Missed electrocardiogram changes and failed to diagnose acute myocardial infarction | None |
| Failed to diagnose atypical vertebral aneurysm | None |
| Failed to do lumbar puncture and to diagnose cryptococcal meningitis | Death |
| Misinterpreted coagulation study | Overdose of sodium warfarin |
| Failed to obtain correct chief complaint of headache before dialysis | Death |
| **Errors in Evaluation and Treatment** | |
| Conservative treatment of an overdose of sodium warfarin | Hematoma |
| Inadequate evaluation of status of gastrointestinal bleeding | Transfer to ICU† |
| Failed to administer nitroprusside in aortic dissection | Death |
| Failed to perform anticoagulation in a patient with cardiomyopathy | Stroke |
| Delayed antibiotic therapy in a patient with ascites | Death |
| Delayed central line placement | Prolonged stay |
| Slow response to a call to see a patient after a liver biopsy | Surgery |
| Insufficient fluids administered to a patient with probable pancreatitis | Hypotension, transfer to ICU |
| Failed to treat hypoglycemia in AIDS | Fatal seizure |
| Did not evaluate decreased urine output in a patient receiving chemotherapy | Drug toxicity |
| Delayed penicillin treatment of suspected meningococcus infection | None |
| Delayed electrocardiogram in a patient with possible myocardial infarction | Transfer to ICU |
| Did not consider thrombolytic therapy in a patient with acute myocardial infarction | Possible loss of myocardial function |
| Failed to treat an episode of ventricular tachycardia in chronic obstructive pulmonary disease | None |
| Failed to treat coronary artery disease in a patient with vasculitis | Death |
| Misinterpreted admission arterial blood gas result in pneumonia | Death |
| Delayed seeing a patient with acute congestive heart failure | None |
| Failed to make a timely evaluation of hypotension in an AIDS patient | Death |
| Removed Foley catheter too early from transplantation patient | None |
| Induced renal failure and congestive heart failure during workup of a hypoglycemic seizure | Death |
| Hesitated to perform a brain biopsy in an AIDS patient | Delayed treatment |
| Incomplete débridement of a diabetic foot ulcer | Amputation |
| Treated malignant hypertension on the ward instead of in the ICU | Stroke |
| Scheduled a treadmill test for a patient before ruling out myocardial infarction | Risked extending infarct |
| | *(Continued on p 2092.)* |

Table 3.—Summary of 114 Mistakes and Outcomes Reported by House Officers (cont)

| Error | Patient Outcome |
|---|---|
| **Errors in Prescribing and Dosing** | |
| Prescribed nonsteroidal anti-inflammatory agents for a patient with renal insufficiency | Worsened renal function |
| Nearly gave an overdose of labetalol | None |
| Prescribed a relative overdose of glyburide | Hypoglycemia |
| Failed to decrease the verapamil dose for renal function | Fatal cardiac toxicity |
| Wrote a prescription for an overdose of phenytoin | Hospitalized for toxicity |
| Gave incomethacin to a dehydrated patient | Renal failure |
| Failed to check the salsalate level | Renal failure, dialysis |
| Gave an extra dose of sustained-release verapamil for hypertension | Heart block, pacemaker |
| Gave esmolol to a patient after a myocardial infarction | Persistent bradycardia, extended infarct |
| Wrote a prescription for 10 times the correct dose of intravenous heparin | None |
| Gave a cancer patient an overdose of narcotics | Respiratory failure, transfer to ICU |
| Did not read syringe and gave 50 times the correct dose of levothyroxine | None |
| Failed to notice an elevated creatine kinase value in a patient receiving lovastatin | Myalgia |
| Gave an overdose of intrathecal amphotericin | None |
| Inadvertently discharged a patient without nitroglycerin | Readmission |
| Forgot to order potassium replacement for a patient after a myocardial infarction | Death |
| Ordered potassium via bolus instead of slow infusion | None |
| Failed to notice an intern's incorrect insulin order | Hypoglycemia |
| Failed to notice an intern's incorrect order for verapamil | Death |
| Ordered phenothiazine for haloperidol overdose | None |
| Treated 4-year-old with tetracycline for a dog bite | Possible tooth staining |
| Prescribed verapamil to a patient receiving beta-blocker therapy | None |
| Inadvertently stopped asthma medication at the time of hospitalization | Respiratory failure, transfer to ICU |
| Increased the rate of insulin drip unaware that the concentration had been changed | Hypoglycemia |
| Treated hypokalemia with oral replacement | Fatal arrhythmia |
| Insufficient potassium replacement in a patient receiving amphotericin | Death |
| Incorrect dosing interval for antibiotic | None |
| Prescribed lorazepam to a patient with respiratory muscle weakness | Death |
| Wrote a prescription for an overdose of gentamicin (not given) | None |
| Ordered 10 times the correct dose of levothyroxine | Prolonged hospital stay |
| Exacerbated ICU psychosis with lorazepam | Myocardial infarction |
| Gave captopril to a patient with a documented allergy | None |
| Gave ampicillin to a patient allergic to penicillin | Rash |
| **Procedural Complications** | |
| Failed to heed a suggestion to reposition central venous catheter | Endocarditis |
| Removed pulmonary artery catheter with the balloon inflated | Small amount of bleeding |
| Pneumothorax from central line | Chest tube placed |
| Unable to place central line | Missed antibiotic doses |
| Blood return during lumbar puncture | None |
| Pneumothorax during thoracentesis | Chest tube placed |
| Perforated bowel during paracentesis | Change in therapy |
| Lacerated liver during liver biopsy | Death |
| Perforated subclavian vein during central line placement | Death |
| Induced hemoptysis during thoracentesis | None |
| Placed central line without a follow-up roentgenogram | Fatal tension pneumothorax |
| Perforated ventricle during pacemaker placement | Death |
| **Faulty Communication** | |
| Failed to note incorrect arterial blood gas reading by intern | Premature discharge |
| Failed to follow the attending physician's protocol for gastrointestinal bleeding | None |
| Failed to obtain consent before central line placement | No informed consent for a procedure that had a fatal complication |
| Accepted misinformation that the patient was not to be resuscitated | Death |
| Failed to document "do not resuscitate" order in chart and failed to inform spouse | Resuscitation was performed against the patient's wishes |
| Did not assert authority in resuscitation with questionable intubation | Death |

*AIDS indicates acquired immunodeficiency syndrome.
†ICU indicates intensive care unit.

Table 4.—Perceived Causes of Mistakes

| Cause | No. (%)* |
|---|---|
| Inexperience | |
| Should have known information | 62 (54) |
| Not enough experience | 48 (42) |
| Did not ask for advice | 38 (33) |
| Job overload | |
| Too many other things to take care of | 58 (51) |
| Fatigued | 47 (41) |
| Faulty judgment in complex case | |
| Missed warning signs | 57 (50) |
| Atypical presentation | 44 (39) |
| Very complex case | 43 (38) |
| Hesitated too long | 36 (32) |

*Includes those who agreed strongly or somewhat. Respondents could agree with more than one cause.

pacity. House officers discussed the mistake with the patient or patient's family in only 24% of cases. Fifty-eight percent of house officers reported talking to a nonmedical person about the mistake. Only 5% of house officers did not tell anyone about the mistake. On a scale ranging from 0 to 100 for extent of discussion, the mean score was 52.5 (SD, 22.8). On average, house officers discussed the mistake with two of the following: their supervising attending physician, another medical person, the patient or family, or at a conference.

Most house officers were willing to accept responsibility for their mistakes. Subjects' responses included "promising to do things differently the next time" in 76% of cases, "criticizing or lecturing oneself" in 62% of cases, and "apologizing or doing something to make up" in 21% of cases. On a scale ranging from 0 to 100 for accepting responsibility, the mean score was 54.5 (SD, 22.3).

House officers experienced emotional distress in reaction to the mistakes. After a fatal mistake involving a young patient, one house officer wrote: "This event has been the greatest challenge to me in my training." They felt remorseful in 81% of cases, angry at themselves in 79% of cases, guilty in 72% of cases, and inadequate in 60% of cases. On a scale that ranged from 0 to 100, the mean level of distress was 71.3 (SD, 23.7). The correlation between distress and accepting responsibility was 0.58 (P<.0001). Twenty-eight percent of house officers feared negative repercussions from the mistake.

A few house officers reported persistently negative psychological impact of mistakes. After a mistake caused the death of a patient, one house officer commented, "This case has made me very nervous about clinical medicine. I worry now about all febrile patients since they may be on the verge of sepsis." For another house officer, a missed diagnosis made him reject a career in subspecialties that involve "a lot of data collection and uncertainty."

year of residency in 53% of cases, during the second year of residency in 36% of cases, and during the third year of residency in 9% of cases. The mistakes happened with inpatients in 77% of cases, emergency department patients in 14% of cases, and outpatients in 9% of cases. The patients involved in the mistakes were less than 18 years old in 1% of cases, 18 through 64 years in 60% of cases, and 65 years or older in 39% of cases. House officers estimated the life expectancy of patients to be less than 1 month in 10% of the cases, 1 to 6 months in 22% of the cases, 6 to 12 months in 18% of the cases, and greater than 12 months in 50% of the cases.

## House Officers' Responses to Mistakes

House officers reported discussing the mistake with the supervising attending physician in only 54% of cases. However, 88% of house officers discussed the mistake with another physician who was not in a supervisory ca-

HMC-06580

Table 5.—Changes in Practice Described by Respondents Following Mistakes (n = 114)

| Change in Practice | No. (%)* |
|---|---|
| **Constructive Changes** | |
| Increased information seeking | |
| Seek more advice | 71 (62) |
| Ask peers | 68 (60) |
| Ask superiors | 64 (56) |
| Read | 62 (54) |
| Ask for references | 30 (26) |
| Increased vigilance | |
| Pay more attention to detail | 93 (82) |
| Personally confirm data | 82 (72) |
| Change organization of data | 59 (52) |
| Trust others' judgment less | 56 (49) |
| **Defensive Changes** | |
| Keep mistakes to self | 15 (13) |
| Avoid similar patients | 7 (6) |

*Includes those who agreed strongly or somewhat.
Respondents could agree with more than one change.

Table 6.—Predictors of Constructive Changes in Practice

| Predictor | β | P* |
|---|---|---|
| Female physician | 7.43 | <.05 |
| Serious outcome for patient | 3.46 | NS |
| Mistake caused by inexperience† | 0.23 | <.001 |
| Mistake caused by job overload† | −0.15 | <.01 |
| Mistake caused by case complexity† | 0.20 | <.001 |
| Accepted responsibility‡ | 0.23 | <.01 |
| Greater extent of discussion§ | 0.25 | <.01 |
| Institution judgmental† | 0.01 | NS |
| $R^2$ | 0.49 | |
| Adjusted $R^2$ | 0.44 | |

*NS indicates not significant.
†The following scale was used for causes of the mistake, judgmental institutional response, and constructive change: 0, disagree strongly; 33, disagree somewhat; 67, agree somewhat; and 100, agree strongly.
‡The following scale was used for accepting responsibility: 0, not at all; 33, somewhat; 67, quite a bit; and 100, a great deal.
§The following scale was used for the extent of discussion (with the supervising attending physician, another medical person, the patient or family, and/or at a conference): 0, none of these; 25, one of these; 50, two of these; 75, three of these; and 100, all four of these.

## Institutional Responses to Mistakes

Mistakes were discussed in attending rounds in 57% of cases and at the morning report or morbidity and mortality conference in 31% of cases. However, house officers stated that, in almost half of these conferences (48%), "the tough issues were not addressed." One house officer believed "the key issues were ignored by the morbidity and mortality committee, ie, being overworked, having too many patients to care for at one time."

House officers felt that the hospital atmosphere inhibited them from talking about the mistakes in 27% of cases and that the administration was judgmental about the mistakes in 20%. One house officer felt that public discussion is counterproductive: "Training programs do not sympathize or help one learn from one's mistakes. Instead, the administration is usually critical and often ostracizes the individual." In contrast, although another house officer was initially reluctant, she found discussing

her mistake to be a positive experience: "Presenting this case at intern's report was difficult—I felt under a lot of scrutiny from my peers. In the end, I felt as though I had gotten more respect from presenting this kind of case rather than one where I had made a great diagnosis."

## Changes in Practice

Almost all residents (98%) reported some change in practice in response to their mistakes. The most frequently reported changes were paying more attention to detail (82%), confirming clinical data personally (72%), and seeking advice (62%). Most residents (98%) reported at least one constructive change. Only 18% reported one or more defensive changes. A summary of constructive and defensive changes reported by house officers is shown in Table 5. In addition, 26% of respondents described ordering more tests as a result of their mistakes. In review, the authors believe that ordering more tests might have prevented the mistake in most cases. Thus, we did not group this item with defensive changes.

## Factors Relating to Reported Changes in Practice

We examined how predictor variables—physician characteristics, patient characteristics, type and seriousness of the mistake, causes of the mistake, and responses to the mistake by the physician and the institution—were related to reported constructive and defensive changes in practice.

In univariate analysis, constructive changes in practice were significantly associated ($P<.05$) with female gender, serious outcome, inexperience, or case complexity as causes of the mistake, accepting responsibility for the mistake, and extent of discussion of the mistake. Defensive changes in practice were significantly associated with house officers' perceptions of job overload as a cause of the mistake and perceptions that the institution responded judgmentally. Changes in practice were not significantly related to age, functional level, or prognosis or to physician year of training or institution.

In multivariate analysis, reported constructive changes in practice were associated with several independent predictors (Table 6). Residents were more likely to report constructive changes if the mistake was caused by faulty judgment in a complex case or by inexperience, but they were less likely to do so if they perceived that the mistake was caused by job overload. Physicians who responded to the mistake with greater acceptance of responsibility and more discussion were also more

likely to report constructive changes. The independent variables shown in Table 6 were associated with 44% of the variance in constructive changes. Constructive change is reported on a scale of 0 to 100, with 33 equivalent to an average response of "disagree somewhat" and 67 equivalent to an average response of "agree somewhat." The independent effect of a predictor variable on constructive change can be calculated by multiplying the β coefficient by the difference in score or category for that predictor variable, as noted in Table 6.

Defensive changes in practice were more likely if there was a judgmental institutional response to the mistake (β = .37, $P<.001$). In multivariate analysis, the model was associated with 29% of the variance in defensive changes. However, the small number of respondents reporting defensive changes gave this analysis relatively little power to detect significant predictors.

## COMMENT

Mistakes are inevitable in clinical medicine, given its inherent uncertainty and complexity and the need to make decisions despite limited information. Because house officers are taking on new clinical responsibilities, they may be particularly likely to make mistakes.

This study suggested several ways to help house officers learn from their mistakes and institute constructive changes in practice. First, house officers should be encouraged to accept responsibility for their mistakes. In our study, residents who reported accepting responsibility reported constructive changes in practice more often than residents who did not accept responsibility. However, accepting responsibility for mistakes was also strongly associated with emotional distress. For example, one resident described persistent feelings of guilt and shame after inappropriate management of a diabetic foot ulcer led to an amputation. Thus, supervising physicians who encourage house officers to accept responsibility for their mistakes need to respond sensitively to the distress those house officers may experience.

Second, house officers should be encouraged to discuss their mistakes with attending physicians. While house officers candidly described their mistakes in the questionnaire, barely half had told their attending physicians about them, although the attending physician is legally and ethically responsible for patient care. Several house officers expressed the desire for helpful discussion. One resident wanted more discussion so that "some of the unsaid horrors of our experiences can be discussed and dealt with." Another wrote, "I was very disturbed that there was never really an

HMC-06581

opportunity to discuss the mistake. . . . I was also very frightened by the impact that carelessness or ignorance on my part could have on someone else's life." In training programs, mistakes are traditionally discussed at conferences and rounds. In this study, however, when their mistakes had been discussed in a conference, half of the house officers said that the "tough issues were not addressed." In nonmedical specialties, avoidance of important issues may be a common response to mistakes. For example, in psychiatry, suicide review conferences often transform "negative evidence into a positive display of an attending's skill."[5] In surgery, a morbidity and mortality conference consists of "ceremonial apologies" by attending physicians.[6] The limited role of residents in these proceedings may preclude useful discussion. Future studies should explore why house officers are reluctant to tell their supervisors about their mistakes and how to encourage fruitful discussion.

Because mistakes may have harmful consequences for patients, it is important to try to reduce their frequency and severity. Our findings regarding the reported causes of mistakes suggest specific strategies for preventing mistakes. First, more active supervision may prevent some mistakes or mitigate their adverse effects. Senior physicians should be more available for critical decisions about patient care, especially in complex cases that require more mature clinical judgment. One officer complained, "As an intern, I couldn't—and didn't—know enough to manage the case." Another speculated, "If I had had more attending support all along with this patient, the diagnosis would have been made much sooner and the patient might have survived."

Attention must be given to house officer work load. McCue[22] has suggested that sleep deprivation during training may teach house officers to tolerate and rationalize unnecessary errors. In our study, house officers reported that job overload played a part in 65% of mistakes. Moreover, house officers who reported being fatigued or having too many tasks to perform were less likely to seek information following a mistake. Such information seeking might help prevent future mistakes.[23]

Disclosure of mistakes to patients or their families is a difficult issue. In our study, such disclosure was reported by fewer than one fourth of house officers. This finding is consistent with reports suggesting that physicians are reluctant to tell patients about mistakes.[5,24,25] Legal and ethical experts, however, suggest that a patient generally should be told about a mistake.[4,26-28] Disclosure

of a mistake may also foster learning by compelling the physician to acknowledge it truthfully. Indeed, our study suggests that accepting responsibility may precede learning from a mistake. Finally, Hilfiker[8] argues that disclosing a mistake to the patient may be the only way for the physician to achieve a sense of absolution. However, telling patients about mistakes may be difficult because there are no guidelines about how to do so. One way might be for the attending physician and house officer to inform the patient of the mistake together. Such joint discussions might benefit house officers by providing emotional support and role modeling.

Our findings may be limited in several important ways. First, since accounts of mistakes and changes in practice were anonymous, we have no external confirmation of the data. Some residents may have exaggerated the impact of their mistakes. Many patients were terminally ill and medically unstable, and the mistakes might not have caused the adverse outcomes. Second, the limited response rate, the relatively small sample size, and the sample of internal medicine residents at large teaching hospitals limit the generalizability of our findings. It is likely that nonrespondents felt more defensive than respondents. If so, the actual severity of outcomes might be worse than we reported, and the proportion of mistakes that are discussed might be less than our findings indicate. Finally, some associations we found may be due to unmeasured confounding variables rather than cause-and-effect relationships. For example, unmeasured personality characteristics of house officers might cause them both to discuss mistakes with others and to make constructive changes in practice.

Medical training and patient care will benefit from an environment that allows house officers to learn constructively from their mistakes. Supervising physicians need to encourage house officers to accept responsibility for their mistakes and need to provide opportunities for discussing mistakes. Directors of training programs should resolve problems in staffing and scheduling that may contribute to mistakes and impede learning. Physicians can learn from their mistakes even as they strive to minimize their occurrence.

This work was supported in part by the Department of Veterans Affairs, Washington, DC; the Robert Wood Johnson Foundation, Princeton, NJ; center grant MH42459 from the National Institute of Mental Health, Bethesda, Md; and primary care training grant D28PE19179 from the Department of Health and Human Services, Washington, DC.

The authors thank Gerald Charles, MD; Thomas Newman, MD, MPH; Haya Rubin, MD, PhD; Warren Browner, MD, MPH; Thomas Inui, MD, ScD; Susan Tolle, MD; Thomas Cooney, MD; Kelly Skeff, MD; Mary Rose; and Jacqueline Renyer for helpful comments in reviewing the manuscript.

### References

1. Dubovsky SL, Schrier RW. The mystique of medical training: is teaching perfection in medical house-staff training a reasonable goal or a precursor of low self-esteem? JAMA. 1983;250:3057-3058.
2. Katz J. Why doctors don't disclose uncertainty. Hastings Cent Rep. 1984;14:35-44.
3. Carmichael DH. Learning medical fallibility. South Med J. 1985;78:1-3.
4. Applegate WB. Physician management of patients with adverse outcomes. Arch Intern Med. 1986;146:2249-2252.
5. Millman M. Overlooking medical mistakes. In: The Unkindest Cut: Life in the Backrooms of Medicine. New York, NY: William Morrow & Co Inc; 1977:90-153.
6. Bosk CL. Forgive and Remember: Managing Medical Failure. Chicago, Ill: University of Chicago Press; 1979.
7. Mizrahi T. Managing medical mistakes: ideology, insularity and accountability among internists-in-training. Soc Sci Med. 1984;19:135-146.
8. Hilfiker D. Facing our mistakes. N Engl J Med. 1984;310:118-122.
9. Levinson W, Dunn PM. Coping with fallibility. JAMA. 1989;261:2252.
10. Gruver RH, Freis ED. A study of diagnostic errors. Ann Intern Med. 1957;47:108-210.
11. Sanazaro PJ, Williamson JW. A classification of physician performance in internal medicine. J Med Educ. 1968;43:389-397.
12. Sanazaro PJ, Williamson JW. Physician performance and its effects on patients: a classification based on reports by internists, surgeons, pediatricians and obstetricians. Med Care. 1970;8:299-308.
13. Freidson E. The bases for colleague evaluation. In: Freidson E. Doctoring Together: A Study of Professional Social Control. New York, NY: Elsevier Science Publishing Co Inc; 1975:138-185.
14. Janis IL, Mann L. Decision Making: a Psychological Analysis of Conflict, Choice and Commitment. New York, NY: Free Press; 1977.
15. Voytovich AE, Rippey RM, Suffredini A. Premature conclusions in diagnostic reasoning. J Med Educ. 1985;60:302-307.
16. Dawson NV, Arkes HR. Systematic errors in medical decision making: judgment limitations. J Gen Intern Med. 1987;2:183-187.
17. Hart JT, Humphreys C. Be your own coroner: an audit of 500 consecutive deaths in a general practice. BMJ. 1987;294:871-874.
18. Dubois RW, Brook RH. Preventable deaths: who, how often and why? Ann Intern Med. 1988;109:582-589.
19. Paget MA. The Unity of Mistakes: A Phenomenological Interpretation of Medical Work. Philadelphia, Pa: Temple University Press; 1988.
20. Folkman S, Lazarus RS. The Ways of Coping. Palo Alto, Calif: Consulting Psychologist Press; 1988.
21. Light D. Becoming Psychiatrists: The Professional Transformation of Self. New York, NY: WW Norton & Co Inc; 1979:207-217.
22. McCue JD. The distress of internship: causes and prevention. N Engl J Med. 1985;312:449-452.
23. Colford JM Jr, McPhee SJ. The ravelled sleeve of care: managing the stresses of residency training. JAMA. 1989;261:889-893.
24. Novack DH, Detering BJ, Arnold R, Forrow L, Ladinsky M, Pezzullo JC. Physicians' attitudes toward using deception to resolve difficult ethical problems. JAMA. 1989;261:2980-2985.
25. Bok S. Lying: Moral Choice in Public and Private Life. New York, NY: Pantheon Books Inc; 1978.
26. Gillon R. Doctors and patients. BMJ. 1986;292:466-469.
27. Vogel J, Delgado R. To tell the truth: physicians' duty to disclose medical mistakes. UCLA Law Rev. 1980;28:51-94.
28. Warner E. Telling patients about medical negligence. Can Med Assoc J. 1983;129:366-368.

HMC-06582

# LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
## Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

# EXHIBIT AA

## Practice Trends

### PILOT STUDY

# Residents Often Fail to Report Medical Errors

BY DOUG BRUNK
San Diego Bureau

SAN DIEGO — Medical residents are less likely than nurses to be aware of their hospital's error reporting system, and even fewer seem to use it, according to results of a pilot study presented at the American College of Preventive Medicine.

"I was disappointed at how much residents didn't know about error reporting,

and how much their attitude was still consistent with the general medical culture of blaming individuals for errors," Dr. Dorotha Wild told this newspaper.

She based her comments on results from a small survey of 24 internal medicine and preventive medicine residents and 36 nurses at Griffin Hospital, Derby, Conn., during the academic year 2001-2002. The hospital is affiliated with Yale-New Haven Medical Center.

Residents were much less likely than nurses to use the hospital's existing error reporting system (3 residents vs. 26 nurses) or even to be aware of its existence (13 residents vs. 35 nurses).

Residents were more likely than nurses to describe the hospital culture regarding error reporting as nonsupportive (3.5 vs. 2.1 on a 5-point scale).

Both groups reported feeling uncomfortable discussing medical errors with

patients (3.1 vs. 3.4 on a 5-point scale).

"We know that it's important for patients to be told about errors, and it also probably decreases the likelihood of a lawsuit if a physician does so," said Dr. Wild, a resident at the hospital. "But unless you teach physicians during residency how to report medical errors, they're not going to."

The survey also showed that although residents seem to talk to nurses about nursing errors, nurses seem to prefer talking to supervisors about resident errors.

Residents were more likely than nurses to report errors if they did not like the person who committed the error (25% vs 1%). Both groups said they were more likely to report an error if it had serious consequences (67% vs. 85%).

"You have to put a lot of effort into making your error reporting system convenient, easy and anonymous to get people to report what's happening," Dr. Wild said. She plans to replicate the survey in a larger sample in the next 1-2 years. ■

---

Nearly 90% of colon cancer cases and deaths can be prevented.

It's worth repeating. Talk to your patients about colon cancer screening. Because if they don't hear about it from you, they don't think they need it.

American Cancer Society
Guidelines for Colorectal Cancer Screening
for Individuals at Average Risk

---

INDEX OF ADVERTISERS

Abbott Laboratories
Duin

American Cancer Society
Colon Cancer

Aventis Pharmaceuticals
Lasix

HMC-01401
CONFIDENTIAL

# LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
## Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

# EXHIBIT BB

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,                         )
                                          )
         Plaintiff,                       )
                                          )
    v.                                    )       Civil Action No. 05-32 E
                                          )
HAMOT MEDICAL CENTER,                     )
                                          )
         Defendant.                       )

## DECLARATION OF LISA BROWN, M.D.

I, Lisa Brown, M.D. an adult individual, state as follows:

1.    From July 2001 to June 2004, I was employed by Hamot Medical Center as an orthopedic resident.

2.    Hamot has a five year Orthopedic Residency Program ("the Program") which is directed to educate and train resident physicians in the care and management of injuries and diseases of the musculoskeletal system, and train resident physicians in the nonsurgical and surgical skills necessary to provide proper orthopedic care.

3.    On April 8, 2003, I signed Hamot Medical Center's Resident Agreement of Appointment in the Graduate in Medical Education Contract (the "Employment Contract").

4.    The terms of the employment Contract began on July 1, 2003 and ended June 30, 2004.

1

5.    The Contract provided that both Hamot and I are bound by all the terms of Hamot's rules and regulations and other policies, which would include Hamot's Advancement and Dismissal policy.

6.    John D. Lubahn, M.D., is the director of Hamot's Orthopedic Residency Program.

7.    On January 30, 2004, Dr. Lubahn, during the course of my evaluation, observed that my clinical performance had improved and was acceptable, and that my microsurgical skills lab work was excellent.

8.    Dr. Lubahn's written evaluation did not reference my possible termination from the program, which occurred approximately one month later.

9.    On February 11, 2004, eighteen days before I was advised of my termination, I received an evaluation in which I was rated average or above average in every one of the 28 categories of skills rated.

10.    On March 1, 2004, Dr. Lubahn provided me with a letter stating that my contract with Hamot would not be renewed at the end of the academic year because of my clinical performance and current knowledge base.

11.    At the time of my dismissal, I had no warning that my performance or knowledge was not meeting the expectations of Dr. Lubahn or the Program.

12.    Since my dismissal, I have become aware of Section 3 of the Hamot employment contract, entitled "Termination and Suspension" which provides that either party may terminate this Agreement at any time upon notice thereof for "proper cause."

13.    The March 1, 2004 termination letter did not reference the term "proper cause".

2

14.    I am not aware of any discussion in which proper cause for my termination was discussed.

15.    I did not have any discussion with Dr. Lubahn in which he outlined the proper cause for my termination.

16.    Dr. Lubahn drafted Hamot Medical Center's Advancement and Dismissal Policy for the Orthopedic Residency Program.

17.    The Advancement and Dismissal Policy sets forth certain procedures which must occur prior to a resident's termination.

18.    At the time my employment contract was terminated, I was not on academic probation.

19.    During the period of my Contract, from July 1, 2003 to June 30, 2004, I did not receive a verbal warning from Dr. Lubahn advising me that I was not meeting the expectations of the Program.

20.    During the period of my Contract, from July 1, 2003 to June 30, 2004, I did not receive an academic probation letter outlining required improvements or goals.

21.    During the period of my Contract, from July 1, 2003 to June 30, 2004, I did not receive any correspondence from Dr. Lubahn advising me that I was not meeting the expectations of the Program.

22.    During the Contract period July 1, 2003 to June 30, 2004, I Brown did not meet with the Program Director to be placed on academic probation.

23.    Prior to the termination of my Contract with Hamot, I did not receive a letter from Hamot or Dr. Lubahn outlining the expectations of the faculty and staff or the Program.

3

24.     During the Contract period July 1, 2003 to June 30, 2004, I did not receive monthly reevaluations.

25.     During the Contract period July 1, 2003 to June 30, 2004, Hamot faculty did not make a determination that I required additional remediation.

26.     During the Contract period July 1, 2003 to June 30, 2004, Hamot faculty did not make a determination that remediation would or would not be helpful to me.

27.     During the Contract period July 1, 2003 to June 30, 2004, Hamot faculty did not review my academic probation letter to determine if remediation would be deemed helpful because I had not been issued an academic probation letter.

28.     During the Contract period July 1, 2003 to June 30, 2004, I was not advised that I could continue at the same level for a period of time during which continuous evaluation would occur.

29.     During the Contract period July 1, 2003 to June 30, 2004, I was not continuously evaluated during a period of remediation.

30.     During the Contract period July 1, 2003 to June 30, 2004, I did not receive feedback as to my performance during, or after, a period of remediation.

31.     During the Contract period July 1, 2003 to June 30, 2004, Hamot faculty did not make a determination, after remediation, as to whether or not I could advance.

32.     During the Contract period July 1, 2003 to June 30, 2004, Hamot faculty did not meet for an initial review to determine if I was unable to improve with remediation.

33.     I was not on academic probation when I was terminated.

4

34.    Since my termination, I have learned that Lubahn, and Hamot, did not follow the procedures set forth in the Advancement and Dismissal Policy.

35.    When I was terminated from the Program, I had completed 3 years of the 5 year program.

36.    The Advancement and Dismissal Policy lists 13 requirements in order for a resident to advance to the subsequent year in training.

37.    I met all 13 of the requirements in the Advancement and Dismissal Policy to advance to the fourth year of the Program.


August 15, 2006                      /s/ Lisa Brown, M.D.
Date                                 Lisa Brown, M.D.


5

# LISA BROWN, M.D., v. HAMOT MEDICAL CENTER
## Civil Action No. 05-32E

Plaintiff's Exhibits in Opposition to
Defendant's Motion for Summary Judgment

# EXHIBIT CC

HAMOT MEDICAL CENTER

RESIDENT AGREEMENT OF APPOINTMENT

IN THE

GRADUATE PROGRAM IN MEDICAL EDUCATION

This Agreement is for a period of one (1) year commencing on July 1, 2003 and ending on June 30, 2004, by and between

HAMOT MEDICAL CENTER,

(hereinafter referred to as "HMC")

and

Lisa Brown

hereafter referred to as "Resident")

WITNESSETH:

WHEREAS, HMC is organized for the purpose of operating a health care facility, including medical services incident to both inpatient and outpatient care; and

WHEREAS, HMC, as a sponsoring institution of Graduate Medical Education, is committed to excellence in resident physician education and to providing an environment where residents can improve their skills and knowledge in a supervised yet semi-independent manner consistent with the requirements of the appropriate accrediting bodies; and

WHEREAS, the Resident meets all requirements for participation in a graduate program of medical education conducted by HMC, including approval of the Pennsylvania State Board of Medicine, the qualifications for resident eligibility outlined in the Essentials of Accredited Residencies in Graduate Medical Education and other regulatory and accrediting agencies as may be applicable; and

WHEREAS, HMC and the Resident intend to be legally bound by the terms of this Agreement, and the Resident also agrees to be bound by all terms of the HMC rules and regulations and other policies approved by the Medical Staff Executive Committee or the HMC Board of Trustees;

NOW, THEREFORE, HMC and Resident mutually agree to the following terms and provisions:

HMC-03374
CONFIDENTIAL