Brown v. Hamot Medical Center                           John Lubahn, M.D.

1 (Pages 1 to 4)

**Page 1**

```
        IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,           :
         Plaintiff          :
                            :
    v.                      :  Civil Action No. 05-32E
                            :
HAMOT MEDICAL CENTER,       :
         Defendant          :
```

Deposition of JOHN LUBAHN, M.D., taken before and by Carol A. Holdnack, RPR, Notary Public in and for the Commonwealth of Pennsylvania, on Thursday March 16, 2006, commencing at 9:41 a.m., at the offices of Scarpitti & Mead, Renaissance Center, 1001 State Street, Suite 800, Erie, PA 16501.

For the Plaintiff:
    Patrick Sorek, Esq.
    Leech Tishman Fuscaldo & Lampl, LLC
    525 William Penn Place, 30th Floor
    Pittsburgh, PA 15219

For the Defendant:
    Kerry M. Richard, Esq.
    Tobin O'Connor Ewing & Richard
    5335 Wisconsin Avenue NW, Suite 700
    Washington, DC 20015

    Reported by Carol A. Holdnack, RPR
    Ferguson & Holdnack Reporting, Inc.

**Page 2**

1                    I N D E X
2
3  JOHN LUBAHN, M.D.
4      Direct Examination by Mr. Sorek . . . . .  3
5
6
7
8  EXHIBITS:
9      Lubahn Deposition Exhibit 1 . . . . . . .114
10
...
25

**Page 3**

1      JOHN L U B A H N, M.D., first having
2   been duly sworn testified as follows:
3
4              DIRECT EXAMINATION
5   BY MR. SOREK:
6
7      Q.  State your name for the record, please.
8      A.  John Lubahn.
9      Q.  And, Dr. Lubahn, have you had your deposition
10  taken before?
11     A.  Yes.
12     Q.  And what kind of case was it?
13     A.  Primarily Workers' Comp. cases, medical/legal
14  cases.
15     Q.  So about how many times have you had your
16  deposition taken?
17     A.  In 25 years?
18     Q.  Yes.
19     A.  50.
20     Q.  Okay.
21     A.  That's a guess, by the way.
22     Q.  All right. So you're familiar with the deposition
23  process in terms of how it goes. I represent the Plaintiff,
24  Dr. Brown. You have counsel here. It's a
25  question-and-answer process. The information that you give

**Page 4**

1   is similar to what you would be providing if you were
2   testifying at court. And that your answers have to be out
3   loud. You've heard all of that many times before, I take
4   it.
5      A.  Yes.
6      Q.  Who did you talk to besides your lawyer to prepare
7   for the deposition today?
8      A.  Dana.
9      Q.  Ms. Ashley.
10     A.  Yes.
11     Q.  And that's it.
12     A.  Yes.
13     Q.  What documents did you review to prepare for your
14  deposition today?
15     A.  Folders that they brought with them.
16     Q.  "They" meaning who?
17     A.  Dana and Attorney Richard.
18     Q.  What were in the folders?
19     A.  For the most part, documents related to
20  Dr. Brown's performance evaluations, in-training scores, her
21  file.
22     Q.  Okay.
23     A.  That's all I can remember. It's kind of like this
24  stack of papers we have here.
25     Q.  And you're indicating just maybe 3 or 4 inches of

Ferguson & Holdnack Reporting, Inc.
814-452-4556

EXHIBIT 7

Brown v. Hamot Medical Center                                    John Lubahn, M.D.

18 (Pages 69 to 72)

**69**

1    A.    That she hadn't read enough. And that even when I
2    gave her a subject to read about, she didn't read it.
3    Q.    You're referring to, what, the Epstein article?
4    A.    If she would have read anything on fractured
5    dislocations of the hip, anything, I would have probably
6    felt differently.
7    Q.    And do you know whether she did or not?
8    A.    She didn't read anything about classifications.
9    Because there's many articles, many books. And after she
10   didn't answer the question, she went right back to the book,
11   which told me that she hadn't read it. Or if she had read
12   it, she didn't learn it.
13   Q.    Then you say, "I have decided not to renew your
14   contract at the end of this academic year." It sounds like
15   you made the decision; is that correct?
16   A.    Pretty much.
17   Q.    Pretty much is something other than yes or no. So
18   what are you thinking when you say --
19   A.    By then I had talked to the administration. I
20   talked to Dr. Rogers. I talked to Dr. Sanders at Shriners
21   Hospital. I talked with the faculty; Babins, Cermak. I
22   can't remember whether I talked to Hood or Williams. I
23   think by this time Suprock and Cortina had voiced some
24   concern. That's all I remember.
25   Q.    Do you see any inconsistency in the testimony you

**70**

1    just gave and your January 30th evaluation, 3337, where you
2    tell her her clinical performance had improved and was
3    acceptable?
4    A.    Her clinical performance was a roller coaster, if
5    you read it and follow it through. I don't see an
6    inconsistency. It was this -- and it just continued to do
7    that. And when it continued to do that on into February, I
8    felt that I could not trust that individual, nor was I
9    willing to take the responsibility to her -- for her to
10   function as a senior resident or a PGY-4 resident.
11   Q.    A person reading your January 30th, 2004
12   evaluation where you say, "Her clinical performance had
13   improved and was acceptable," and then seeing the
14   termination letter 29 days later on March 1st might have a
15   question about what happened between January 30th and
16   March 1st to lead you to decide not to renew the contract.
17   And that's my question.
18        MS. RICHARD: I'm just going to object to the
19        form. If you can answer, you can answer.
20   A.    I think I answered what happened. I got another
21   two letters about her from the emergency room, and her
22   performance in a clinical conference was a failure.
23   Q.    So that's -- well, actually, your notes about her
24   performance say that her presentation of the history and the
25   management of the tibial fracture is reasonably

**71**

1    well-outlined and she progressed well describing the
2    messages to reduce the hip. Is that right word, messages?
3    A.    (Witness nods head.)
4    Q.    "She had a reasonable understanding of the
5    postoperative management, but she didn't know the
6    classification scheme." That's enough for you to consider
7    it a failure.
8    A.    If that were a test in college, that would be a
9    57 percent.
10   Q.    You then say, "The decision is a difficult one for
11   me as for the entire facility, but I believe it to be best."
12   When you talk about the entire faculty, who are you
13   referring to?
14   A.    Myself and the clinical faculty.
15   Q.    So it seems like you're representing -- did you
16   say the entire clinical faculty?
17   A.    (Witness nods head.)
18   Q.    Yes?
19        MS. RICHARD: You have to speak.
20   A.    Yes.
21   Q.    It seems like you're representing that the entire
22   clinical faculty was involved in the decision, and I would
23   like to know if that's true or not.
24   A.    They were -- they were involved in the sense that
25   I discussed it all with them. We didn't take a vote.

**72**

1    Q.    What did you discuss -- well, did you discuss not
2    renewing her contract with them?
3    A.    Yes.
4    Q.    And did you have that discussion with everyone on
5    the clinical faculty?
6    A.    I went over them earlier, but I'll do it again. I
7    don't think I mentioned it to Dr. Hood, nor Dr. Williams. I
8    discussed it in detail with Cermak and Babins because they
9    had been involved. And I discussed it with --
10   Q.    Suprock and Cortina?
11   A.    Suprock, Cortina, Stefanovski, Kastrup. I did not
12   call Galey. I called Rogers. I called Dr. Sanders. I
13   spoke to Tim Cooney. I spoke to Jim Pepicello.
14   Q.    And was the gist of what you discussed with them
15   that you were planning on dropping Lisa Brown from the
16   program?
17   A.    Could not renew the contract at the end of that
18   year.
19   Q.    Was it in the sense of you advising them of that
20   or asking for their input?
21   A.    I advised them of that. I did ask for input.
22   Q.    Making the decision on March 1st left about four
23   months left in Dr. Brown's PGY-3 year, correct?
24   A.    Yes.
25   Q.    Were there any conditions placed on Dr. Brown's

Case 1:05-cv-00032-MBC   Document 56-8   Filed 09/15/2006   Page 3 of 4

Brown v. Hamot Medical Center                                    John Lubahn, M.D.

19 (Pages 73 to 76)

### 73

1  participation in the program after March? And we know that
2  her participation was going to end, but between March and
3  June.
4      A. What do you mean by "conditions"?
5      Q. Well, would she be doing the same activities that
6  all the other PGY -- well, the other PGY-3 residents would
7  be doing?
8      A. Yes.
9      Q. She had no restrictions on care she was supposed
10 to provide, correct?
11     A. No.
12     Q. In fact, you told her that -- in your letter,
13 March 1st -- I'm sorry, that's wrong. But you did expect
14 her to stay for the rest of the PGY-3 year.
15     A. Well, to get complete credit for it. And to
16 finish that year, yeah, you would have to.
17     Q. This also should be in the front. 1081.
18        MS. RICHARD: 1081?
19        MR. SOREK: Yes.
20        MS. RICHARD: Okay.
21        THE WITNESS: Okay.
22     Q. That's a note about a meeting with Dr. Brown on
23 March 1st when you gave her the March 1st letter, correct?
24     A. Right.
25     Q. Do you remember what you discussed at the meeting?

### 74

1      A. Yes.
2      Q. What did you discuss?
3      A. It was a fairly brief meeting, which I believe is
4  accurately outlined in here. I gave her the letter. She
5  read it. She said that she understood my academic concerns
6  but remained defensive of her clinical performance.
7      Q. In this note, you say, in the first sentence, the
8  letter states, "Your decision with that of the institution's
9  Human Resource Department." Do you see that?
10     A. Yes.
11     Q. What do you mean by that?
12     A. Dana and Don Interlied.
13     Q. I think I know where you're going, but we have to
14 kind of fill that in. Those are just two names. What was
15 their involvement?
16     A. Well, they do the contracts, and organize the
17 human relations part of a resident's experience at Hamot on
18 the educational component, or the HR component. So to not
19 renew a contract would involve that department. And to that
20 extent, I involved that department.
21     Q. Were they involved in the decision? Were they
22 involved in just processing the decision once you made it?
23     A. Processing.
24     Q. Okay. Now, we're back to 3315. Actually, well,
25 see if you can find it at -- I have two -- same document at

### 75

1  two numbers. See if you can find it at 1080.
2        MS. RICHARD: Yes. It's the next page --
3        MR. SOREK: Okay. That's fine too.
4        MS. RICHARD: Okay. Agency 1080?
5        MR. SOREK: Yes.
6        THE WITNESS: Okay.
7      Q. This is a note from you about a meeting with
8  Dr. Brown, March 3rd, 2004. It says you met with her at
9  some length, between 12:15 and 12:45 p.m. for 30 minutes.
10 And who -- I guess who initiated the meeting?
11     A. I don't remember.
12     Q. Do you remember what was discussed?
13     A. Pretty much what was said in the meeting is
14 outlined here.
15     Q. All right. She discussed some of the documents in
16 her file, correct?
17     A. Yes.
18     Q. And it sounds like she wants to challenge
19 Dr. Cermak's letter, correct?
20     A. Yes.
21     Q. Did you discuss that with her, or not?
22     A. I did.
23     Q. Did or did not?
24     A. I did.
25     Q. Do you remember what you said?

### 76

1      A. Well, I think I said that it wasn't the sole
2  factor in my decision, that it admittedly was her word
3  against, not so much Dr. Cermak's, but the emergency room.
4  And left it at that.
5      Q. The last sentence says you reassured her that the
6  decision not to renew her contract was not based on any one
7  of the documents but the entire picture. When you said "the
8  entire picture," do you know what you had in mind at that
9  time?
10     A. Her clinical performance from day one.
11     Q. And the clinical performance you had in mind on
12 that day was what?
13     A. I don't understand.
14     Q. Okay.
15     A. This was based on her whole performance.
16        MR. SOREK: See if you have 1137.
17        MS. RICHARD: Again, in the chronological section?
18        MR. SOREK: Yes, in the front.
19        THE WITNESS: Okay.
20     Q. This is a document signed by you. It says, "Lisa
21 Brown, MD, 7/12/04," at the top. What's the purpose of this
22 document?
23     A. I guess, in retrospect it's just a summary of some
24 of my thoughts that led to my decision not to renew her
25 contract.

Ferguson & Holdnack Reporting, Inc.
814-452-4556

Brown v. Hamot Medical Center                                    John Lubahn, M.D.

24 (Pages 93 to 96)

**93**

1  under process in case advancement, criteria are not met. Do
2  you see that?
3      A.   Yes.
4      Q.   Did you apply this process to Dr. Brown?
5      A.   I think in general. Maybe not to this specific
6  level, but I think in general.
7      Q.   Generally, what did you think you did that was
8  consistent?
9      A.   Well, she was on academic probation. She was
10  closely evaluated, scrutinized, given more than one
11  opportunity to improve. I think if you stretch it out over
12  three years, she was given many opportunities to improve. I
13  think she was given feedback.
14     Q.   Let me stop you there. The -- about in the
15  middle, the provision talks about a letter outlining reasons
16  for academic probation, and expectations given to the
17  resident. It talks about the period of probation. And then
18  it says, "During that time, the resident is expected to
19  demonstrate improvement and will receive, at minimum,
20  monthly reevaluations." Do you know whether those monthly
21  reevaluations were done?
22     A.   I don't think we produced written documents on a
23  monthly basis. I know we spoke with her on a monthly basis
24  through the end of June of 2000 and -- it would have been 3.
25     Q.   Do you know what the policy is referring to?

**94**

1  Face-to-face discussion, or phone discussion, or?
2      A.   I think it's open to debate.
3      Q.   The last sentence says -- well, let me back up a
4  little bit. This section also says, "Should it be
5  determined that the resident requires additional
6  remediation, he or she will likely need to repeat those
7  activities in which he or she did not meet expectations at
8  the current level of training. Only when these requirements
9  are met will the resident be considered for advancement, at
10  such time academic probation will be lifted and the resident
11  will continue his/her training at the next level." Did that
12  apply to Dr. Brown?
13     A.   Yes.
14     Q.   In your view, once academic probation is lifted,
15  does the resident then have a clean slate?
16     A.   No.
17     Q.   How does that work?
18     A.   Well, I think the slate is the slate. And the
19  resident at any given time should know where he or she
20  stands academically and in terms of their clinical
21  performance.
22     Q.   And they would gather that information how?
23     A.   I don't think that's information that you gather.
24  You already have it. Everything that Dr. Brown knew to that
25  point had been discussed with her. She knew her performance

**95**

1  to that date.
2      (Brief interruption.)
3      Q.   If you take a look at the third page of the
4  policy. The first sentence, "Should the resident fail to
5  improve or to meet the expectations as identified in the
6  academic probation letter, the faculty will determine at
7  that time if remediation will be deemed to be helpful."
8  Does that apply to Dr. Brown's case?
9      A.   I think it does.
10     Q.   So tell us about the -- what you know about the
11  faculty's determination whether remediation will be deemed
12  to be helpful.
13     A.   Well, the faculty here means really the full-time
14  faculty which is basically me. Although, Dr. DeLullo has
15  now joined me, and I do take into consideration the
16  evaluations of all of the part-time faculty.
17     Q.   So when this policy refers to faculty, it actually
18  means you.
19     A.   Dr. Kuehn, at the time, I believe. Dr. Rogers was
20  out on leave at the time. He was the other full-time paid
21  faculty member. But just to elaborate on Dr. Brown, it was
22  she would meet the expectations and then not meet them. It
23  was an up-and-down kind of ride with her.
24     Q.   Was there a fact -- was there a faculty
25  determination whether remediation will be deemed to be

**96**

1  helpful?
2      A.   Well, that was really the time that I spoke with
3  Dr. Babins and Dr. Cermak, and asked them to work very
4  closely with her. It was my recollection of the same
5  probationary time we're talking about -- which is thinking
6  backwards in '03, it's June, May and April.
7      Q.   Well, correct me if I'm wrong on this. But it
8  seems like, if you read the first sentence the resident is
9  supposed to -- the resident gets the academic probation
10  letter, and that this provision applies if the resident
11  fails to improve on the deficiencies identified in the
12  letter. It seems like then there's a faculty determination,
13  but I could be wrong. I'm asking, what is your
14  interpretation of that.
15     A.   Yeah, I don't think she necessarily failed. So
16  from that perspective, it doesn't apply, but she was closely
17  scrutinized by the faculty.
18     Q.   And this was after the probation was over, or
19  during?
20     A.   I view that statement as kind of a continuum. I
21  guess if you view it as if the -- if she would have gone
22  through the probation, and failed to meet the requirements
23  of the probation, then the faculty decides what do we do
24  next. That really didn't apply here.
25     Q.   Why not?

Ferguson & Holdnack Reporting, Inc.
814-452-4556