**Page 145**

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
   LISA BROWN, M.D.                  :
 3       Plaintiff                   :
                                     :
 4           v.                      : Civil Action No. 05-32 E
                                     :
 5 HAMOT MEDICAL CENTER,             :
         Defendant                   :
 6
 7
 8         Continued Deposition of LISA BROWN, M. D., taken
 9     before and by Sonya Hoffman, Notary Public in and for
10     the Commonwealth of Pennsylvania on Saturday, December
11     17, 2005, commencing at 9:24 a.m., at the offices of
12     Knox McLaughlin Gornall & Sennett, P.C., 120 West
13     Tenth Street, Erie, PA 16501.
14
15
16 For the Plaintiff:
17     Patrick Sorek, Esquire
       Leech Tishman Fuscaldo & Lampl
18     Citizens Bank Building, 30th Floor
       525 William Penn Place
19     Pittsburgh, PA 15219
20 For the Defendant:
21     Kerry H. Richard, Esquire, P.C.
       Tobin O'Connor Ewing & Richard
22     5335 Wisconsin Avenue, NW
       Suite 700
23     Washington, DC 20015
24
25            Reported by Sonya Hoffman
              Ferguson & Holdnack Reporting, Inc.
```

**Page 146**

```
 1                      I N D E X
 2
 3
 4 LISA BROWN, M. D.
 5    Direct Examination by Ms. Richard . . . . . . . . 3
 6
 7
 8
 9                   E X H I B I T S
10
11
12 Brown Deposition Exhibit No. 1. . . . . . . . . .151
13 Brown Deposition Exhibit No. 2. . . . . . . . . .164
14 Brown Deposition Exhibit No. 3. . . . . . . . . .169
15 Brown Deposition Exhibit No. 4. . . . . . . . . .172
16 Brown Deposition Exhibit Nos. 5 - 7 . . . . . . .179
17 Brown Deposition Exhibit No. 8. . . . . . . . . .181
18 Brown Deposition Exhibit No. 9. . . . . . . . . .183
19 Brown Deposition Exhibit No. 10 . . . . . . . . .197
20 Brown Deposition Exhibit No. 11 . . . . . . . . .213
21 Brown Deposition Exhibit No. 12 . . . . . . . . .214
22 Brown Deposition Exhibit No. 14 . . . . . . . . .224
23
24
25
```

**EXHIBIT 9**

**Page 147**

L I S A  B R O W N, M. D., first having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. RICHARD:

Q. I'll just remind you that you're still under oath from Thursday and we'll continue from there. All the same rules from Thursday still apply, if you need a break, tell me, if you don't understand the question, tell me all of that.

I am going to go back over just a couple of questions to cover where we left off two days ago. You mentioned that you had enlisted in the Reserves in, I think, it was February of '02.

A. Yes.

Q. What caused you to do that?

A. I had always had a desire to do something with my career that would be beneficial to the community or to society as a whole. And after the events of 9/11 instead of deciding to do mission work in a different county, I decided that it would probably be best to start out with doing things for our country.

And two of the other residents were reservists, and one of them had stated to me that one of the benefits of

**Page 148**

being an orthopedic surgeon in the Reserves is that you get to work with other people eventually. It's always good to see what other surgeons are doing from different parts of the country because sometimes you can get in a rut when you train in the same part of the country and then you end up practicing. And so we talked about that benefit.

Q. Who were the other residents who were reservists?

A. Jamie DiLulo and Karl Seeam.

Q. And which one was it that told you there was a benefit to working with others?

A. Jamie DiLulo.

Q. You also said that you had considered doing mission work in another country.

A. Uh-huh.

Q. How seriously had you considered that?

A. Not that seriously. Practically, it's -- I have never taken any steps to look into that and practically I knew I couldn't, I have two kids to support. I have medical school loans and I knew that wasn't anything that I could actively pursue whereas this is something -- the Reserves was something that I could actively pursue and do and not disrupt my training and not disrupt my ability to support my kids, and make a living, and to pay back my loans.

Q. Okay. When you were in medical school, did you do

1 that we're all talking about the same thing.
2        During your semi-annual evaluation with Dr.
3 Lubahn, did you discuss with him plans to study Dr. Rogers
4 hydroxyapatite coated hips?
5    A.   I remember discussing the upcoming research
6 project, and that was the upcoming research project.
7    Q.   And it was your intent to do a review of a
8 previous study?
9    A.   Yes.
10   Q.   What about the next point where it says that you
11 remained somewhat frustrated that you don't have enough time
12 to read?
13   A.   Yes.
14   Q.   Did you have that discussion with him?
15   A.   I don't remember the discussion.
16   Q.   Were you frustrated at that time?
17   A.   Yes.
18   Q.   Tell me what you meant by being frustrated and not
19 having enough time to read?
20   A.   I was on schedule with reading for the services I
21 was on. And that reading and studying that I did in the
22 mornings was not just because I was on those services, but
23 it was also to study for taking Step 3 of the boards. It's
24 one reason why your first year is set up the way it is.
25        But it always frustrated me that I had this large

205

1    Q.   Were there any other reasons after that that it
2 continued to be frustrating?
3    A.   Again, it was just -- it's the idea that you are
4 reading for the rotations that you're on and to be able to
5 have intelligent conversations with the attending that
6 you're rotating with and understand your patient's disease
7 state and treatment, as well as reading for orthopedics,
8 which was what I was going to be eventually going to be
9 doing every month, not just -- or not the other rotations.
10   Q.   And Dr. Lubahn says that he stressed the
11 importance of good time management and reading for specific
12 cases.
13   A.   Yes.
14   Q.   Is that accurate?
15   A.   I don't remember what the discussion exactly
16 was -- or what his response was.
17   Q.   Do you remember a different response?
18   A.   I don't remember what his response was.
19   Q.   Do you remember anything else about your
20 semi-annual evaluation that's not recorded here?
21   A.   No.
22   Q.   And do you believe it's an accurate reflection of
23 your performance during your PGY-1 year?
24   A.   Yes.
25        MR. SOREK:   Kerry, I have about 11:32 and would

207

1 topic to now start reading for -- or I should say to
2 continue reading for, and it just seemed like there was
3 never enough time to read for orthopedics as well as for the
4 individual rotations that I was on and preparing to take
5 Step 3, which again is the same. When you're reading for
6 the rotations that you're on, it's essentially trying to
7 allow you to take Step 3.
8    Q.   When did you take Step 3?
9    A.   Sometime during -- it must have been sometime
10 during the first year.
11   Q.   I'll save you the brain strength and you can refer
12 back to the exhibits. Is that your Step 3 result, Exhibit
13 No. 5 -- no, I'm sorry, that isn't it either. Exhibit No.
14 7, is that your Step 3 result?
15   A.   Yes.
16   Q.   And does that have a test date on it?
17   A.   March of 2002.
18   Q.   Do you believe that that's when you actually took
19 the exam?
20   A.   Yes.
21   Q.   So at the time of this July evaluation, you had
22 already taken Step 2; is that correct?
23   A.   Correct.
24   Q.   But you had continued to be frustrated after that?
25   A.   Yes.

206

1 ask how much you have to get through?
2        MS. RICHARD:   I have a ways to go.
3        MR. SOREK:   I think we're really bumping up
4 against the allowed time limit under the rules, so
5 I'd ask for something a little more specific than
6 a ways to go because I don't think we're going
7 to --
8        MS. RICHARD:   Initially, I thought that the
9 seven-hour rule applied per day, not for a total
10 deposition time.
11       MR. SOREK:   I don't believe that's true.
12       MS. RICHARD:   And secondarily, I'd say I have at
13 least two hours to go.
14       MR. SOREK:   I would be willing to go -- I'll talk
15 to my client, but I wouldn't be willing to stay
16 that long. Let's take a quick break and I'll talk
17 to my client.
18       MS. RICHARD:   Take a break. If we have to
19 reschedule, I can always get the Court's
20 permission to come back and continue this.
21       MR. SOREK:   Sure, you can try. I'm not sure
22 because we have a position on that. But that's --
23 let me talk to my client.
24       (Brief recess taken.)
25       MR. SOREK:   I've talked with my client and I'll

208

Case 1:05-cv-00032-MBC    Document 56-10    Filed 09/15/2006    Page 3 of 3

```
 1   a patient with a certain condition, you will read about that
 2   condition prior to the day beginning.  So it wasn't -- it
 3   wasn't, you know, a set time that I would do questions.
 4        Q.   Within the framework of your sort of hours you set
 5   aside to study, what percentage of that did you devote to
 6   doing questions?
 7        A.   I'd have to estimate maybe 20 percent of the time.
 8        Q.   And during what period of time were you doing
 9   that?
10        A.   Various times.
11        Q.   If your PGY-2 year started July 1, when would you
12   have started reviewing questions for the OITE?
13        A.   Shortly after July 1.
14        Q.   And from that time forward did you dedicate 20 --
15   approximately 20 percent to it, or did that time go up or
16   down over time?
17        A.   I don't remember if it went up or down.
18        Q.   Okay.  And the exam is in November; is that
19   correct?
20        A.   Yes.
21        Q.   And do you remember what rotations you were doing
22   between July 1 and November 1 of your PGY-2 year?
23        A.   I believe I was doing my hand rotation.
24        Q.   What's the call schedule like for the hand
25   rotation?
```
240

```
 1   leave.
 2        Q.   Was it granted?
 3        A.   Yes.
 4        Q.   Do you know if it counted against you as vacation
 5   time?
 6        A.   I don't remember.
 7        Q.   Was there any other time between July 1 and
 8   November that you were not on your regular rotation or
 9   service?
10        A.   No.
11        Q.   Was there any particular rotation that you found
12   difficult during your PGY-2 year?
13        A.   The hand rotation was likely the most challenging.
14        Q.   In what way?
15        A.   To begin with, I had already sensed a disconnect
16   from Dr. Lubahn, and he is, of course, a hand surgeon and
17   the person you do the most work with during the hand
18   rotation.  And so that was challenging to feel as if I had
19   to not only perform as an orthopedic surgeon, but had to
20   make him aware that I more or less, let's say, existed.
21        He did not take a great interest in me, and so
22   that was very stressful and very challenging every day to,
23   you know, try and let him know that I was dedicated and
24   committed, as well as trying to perform in the operating
25   room.
```
242

```
 1        A.   The call schedule does not change for the various
 2   rotations.  So --
 3        Q.   What was your call schedule during your PGY-2 year
 4   then?
 5        A.   Well, I'll start with telling you about the
 6   weekends.  Once a month you were on Friday -- let's say you
 7   started with the first weekend and you were on Friday, then
 8   the second weekend you'd be on Saturday, and the third
 9   weekend you'd be on Sunday, and the fourth weekend you would
10   be off for the weekend.  So that would be the weekend.
11        And then from there, the call schedule would
12   rotate just through the residents who were on service and
13   available to take call.  And I believe it was probably every
14   fourth night.
15        Q.   When you say "from there", you mean from the
16   nights Monday through Thursday night was the rotation?
17        A.   If you were on Friday, then you were on Friday
18   night, then you'd be on Tuesday night.  Then you'd be on
19   Saturday, and then you'd be on Wednesday.  And then you'd be
20   on Sunday.  It was approximately no fewer than every four.
21   Sometimes, you'd go for a stretch and be on every other
22   night or every third night.
23        Q.   Okay.  Did you take any time off in that period
24   July 1 to November 1 of 2002?
25        A.   I requested a week off in September as a -- as a
```
241

```
 1        Hand surgery -- in addition, hand surgery tends to
 2   be a complicated skill to learn.  The anatomy is very
 3   complicated, the procedures are complicated, and it's just
 4   a -- it's just a challenging topic.  And so those two things
 5   together would make that probably the most challenging.
 6        Q.   Let's talk about your PGY-3 year.  Did your
 7   personal program of self-study change at all during that
 8   PGY-3 year from your PGY-2 year?
 9        A.   It changed in that in my PGY-2 year there was a
10   period of time in which I had a family tragedy and I was
11   commuting to Cleveland quite a bit.  And at that time I was
12   on rotation with Mark Suprock and John Kastrup.  And I would
13   basically, you know, end my day with having to drive to
14   Cleveland to take care of my kids and begin my day with
15   driving back to Erie in time to round on patients and be
16   available, and at no time miss any days of work or leave any
17   work for my fellow residents.
18        So during that time period, I did not spend time
19   reading in the mornings or in the evenings.
20        Q.   When was that time period?
21        A.   That time period was from about the middle of
22   September probably through sometime in January.  I don't
23   remember exactly if it was all the way through January.  And
24   at that time I would talk with Mark Suprock about it.  And I
25   basically let him know what was going on and told him that I
```
243