Case 1:05-cv-00032-MBC    Document 56-13    Filed 09/15/2006    Page 1 of 3

Page 1

1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3     LISA BROWN, M.D.,                 :
                Plaintiff               :
4                                       :
          v.                            :     Civil Action No. 05-32-E
5                                       :
      HAMOT MEDICAL CENTER,             :
6               Defendant               :

7

8

9             Deposition of J. DAVID ALBERT, II, M.D., taken

10      before and by Janis L. Ferguson, Notary Public in

11      and for the Commonwealth of Pennsylvania, on Friday,

12      December 16, 2005, commencing at 2:28 p.m., at the

13      offices of Knox McLaughlin Gornall & Sennett, PC,

14      120 West 10th Street, Erie, Pennsylvania 16501.

15

16    For the Plaintiff:
          Patrick Sorek, Esquire
17        Leech Tishman Fuscaldo & Lampl, LLC
          525 William Penn Place
18        30th Floor
          Pittsburgh, PA 15219
19
      For the Defendant:
20        Kerry M. Richard, Esquire
          Tobin O'Connor Ewing & Richard
21        5335 Wisconsin Avenue NW
          Suite 700
22        Washington, DC 20015

23

24                  Reported by Janis L. Ferguson, RPR
25                  Ferguson & Holdnack Reporting, Inc.

**EXHIBIT**

12

**Page 22**

1  Q.  And the -- it looks like they are all physicians
2  underneath. But --
3  A.  Um-hum.
4  Q.  -- could you match the name with the office so
5  that we can understand --
6  A.  I believe so.
7  Q.  -- who is who in terms of which person holds which
8  office.
9  A.  I'm going to start from the bottom up, because
10  that's probably the easiest. Dr. Craig Lippe was the
11  resident that Dr. Brown chose to have on the committee.
12  Q.  All right.
13  A.  And let's see where we are here. The osteopathic
14  DME would be Dr. Kruszewski. The person from the medical
15  education committee was Dr. Dulabon. The vice president for
16  medical education was probably Dr. Long. I'm trying to find
17  out where the general -- the resident -- probably the
18  representative of the residency program must have been Dr.
19  Stefanovski.
20  Q.  Was that person supposed to be a resident or not?
21  A.  No, I believe that was a physician that's in
22  the -- probably the faculty member of the residency program.
23  The resident would be the resident selected.
24  Q.  By the aggrieved.
25  A.  Right.

**Page 23**

1  Q.  I take it that the committee followed certain
2  procedures in carrying out its duties. Is that correct?
3  A.  Yes.
4  Q.  How did the committee decide what procedures to
5  follow?
6  A.  We first looked at any suggestion from any
7  documentation from the medical center as to what the
8  committee was supposed to do.
9  Q.  Let me stop you there.
10  A.  Um-hum.
11  Q.  Do you remember what you looked at?
12  A.  If it's anything more than this document, I'm not
13  certain.
14  Q.  Okay. When you say "this," you mean Pepicello No.
15  4?
16  A.  Pepicello No. 4. We looked at that. If there
17  were any other appropriate documents -- and, again, I don't
18  know that there were. But if there were, we would have
19  reviewed those. And then we generally discussed the
20  appropriate way to conduct that review within the confines
21  of those requirements.
22  Q.  Did the committee keep any records?
23  A.  We kept minutes of the meetings.
24  Q.  Who kept the minutes?
25  A.  Mr. Inderlied did them.

**Page 24**

1  Q.  Was he directed to do that?
2  A.  Yes.
3  Q.  By whom?
4  A.  By me.
5  Q.  Apart from the grievance resolution and due
6  process procedure, can you state what procedures the
7  committee followed.
8  A.  Can you clarify. You mean --
9  Q.  Sure.
10  A.  -- written procedures?
11  Q.  I'd like to find out the scope of all of the rules
12  or process that the committee followed. For example, there
13  may have been a process on who they would talk to. There
14  may have been a process on what documents they would look
15  at. There may have been a process about, you know, which
16  witnesses or what representatives would be able to talk.
17  There may have been a process about how long people would be
18  able to talk.
19  A.  Okay.
20  Q.  Can you tell me, did the committee discuss any
21  issues like that?
22  A.  Yes, we did.
23  Q.  And what was -- what did the committee discuss?
24  A.  We talked about how to get the most information so
25  that we could make an appropriate decision. We initially

**Page 25**

1  talked to the two prime parties, which would be Dr. Lubahn,
2  who made the initial decision, and Dr. Brown, who filed the
3  grievance.
4  Q.  And that was the March 30th meeting, correct?
5  A.  Yes. In the process of conducting this, I think
6  there was a very strong feeling within the committee that we
7  wanted to do everything to make sure that we came up with
8  the appropriate decision. This, after all, would likely
9  significantly affect Dr. Brown's ability to continue in an
10  orthopedic residency. And for that reason, we probably went
11  beyond what was prescribed in the normal review process.
12  And, in fact, we agreed that we wanted to bring everybody in
13  that had information. We wanted to talk to all of the
14  orthopedic faculty, to the residents, see all the
15  documentation that we could regarding performance by the
16  resident, what accommodations had been made, how that was,
17  you know, followed, if there were recommendations given to
18  her. And, really, from the ground up, document everything
19  that had happened to her during her training to that point.
20  Because we felt that without doing that, we might feel
21  uncomfortable later on, and we wanted to be able to look at
22  this and feel comfortable.
23       And even though it was going to be a
24  majority vote, we all felt strongly that it really needed to
25  be a unanimous vote. Unless we all felt that that was the

7 (Pages 22 to 25)

Ferguson & Holdnack Reporting, Inc.

Page 26

1  appropriate decision, we would feel uncomfortable holding
2  it. And that's really why we went through a very long
3  process and interviewed as many people as we did and
4  reviewed as much information as we were aware existed.
5      Q.  When you said -- I think you said a moment ago you
6  wanted to document. Did you say -- you wanted to document
7  everything. Were you referring to the committee's work, you
8  were documenting?
9      A.  I'm not exactly sure if I meant document that.
10  But we wanted to see the documentation. We weren't going to
11  document. We wanted to see all the documentation, so that
12  we could consider that, when we deliberated.
13      Q.  What standard of decision did the committee use to
14  reach its conclusion? And by that, I mean in our business
15  we have -- we have terms like substantial evidence or
16  preponderance of the evidence. Is there a description of
17  the -- the standard or rule that the committee was
18  considering when it took its vote?
19      A.  As I said, I -- we felt that it had to be a
20  unanimous decision, and I think that meant that each and
21  every one of us had no doubts left after the review process;
22  that that was the appropriate decision. I guess that would
23  lend itself toward your description of preponderance of
24  evidence. There is no higher standard.
25      Q.  Was that standard discussed, or was that just kind

Page 27

1  of a feeling?
2      A.  I think that was discussed.
3      Q.  And agreed on?
4      A.  Yes.
5      Q.  So is it fair to say that the committee agreed
6  that any decision it would make -- or let me rephrase that.
7  Unless the committee unanimously agreed that it had no
8  doubts about the propriety of Dr. Lubahn's decision, his
9  decision would not be upheld? Is that fair?
10      A.  That's fair.
11      Q.  What documentation did you review as the chair of
12  the committee?
13      A.  I really reviewed exactly the same documentation
14  as everybody else on the committee. What we asked for were
15  any evaluations that had been given to Dr. Brown. We asked
16  for any scores of any exams that she may have taken as part
17  of the program. I think that's probably everything that I
18  can clearly remember in documentation, because I think
19  that's all they had from the program. They don't actually
20  take, you know, normal exams day to day in the orthopedic
21  program, as they would in my program, so we really didn't
22  have that to look at.
23      Q.  Who -- who did you ask to provide this
24  information?
25      A.  I don't know that I -- I mean, I knew -- I made

Page 28

1  that wish to the committee as a whole. We said we want to
2  see that. Exactly who was responsible for getting the
3  information together for us, I don't recall. Probably
4  whoever was acting as our secretary at the time.
5      Q.  Who was that?
6      A.  Probably Mr. Inderlied. And he was our recording
7  secretary, and I suspect that we just asked him to make sure
8  that we had that documentation.
9      Q.  Do you, in fact, know that the other members of
10  the committee reviewed that documentation, or is that just
11  something you believe?
12      A.  My recollection is that we had it at the meeting
13  and that everyone looked at it.
14      Q.  Did you have multiple copies or one copy, one set?
15      A.  I'm not sure, but I believe everybody had copies.
16      Q.  Do you know what happened to those copies?
17      A.  No one took them with them, because of the
18  confidential nature of it. And I think they were returned
19  to whoever provided them for us initially for the meeting.
20      Q.  Was there a time when everybody was in one room
21  with the copies of these --
22      A.  Yes.
23      Q.  -- brown documents? Was that at the March 30th
24  meeting, or some other time?
25      A.  I believe that was at the first meeting, yes.

Page 29

1      Q.  Now, you talked about Dr. Lubahn and Dr. Brown
2  coming in and -- I'll use the word testifying. But talking
3  to the committee.
4      A.  Yes.
5      Q.  Did the committee review the records before they
6  talked to Lubahn and Brown or while they were talking to
7  them or afterward, or how did that work?
8      A.  I believe we looked at the records before we
9  talked to either one of them for a few minutes, just to get
10  a feel for what we would hear from them and what questions
11  we would like to ask.
12      Q.  Did you have any of the documents at the
13  subsequent meetings; at the April 6th or April 8th meetings?
14      A.  I believe they were available for the second
15  meeting, but I do not believe we had them for the third
16  meeting.
17      Q.  And when you say "available", were they sitting in
18  a corner somewhere? Were they passed -- did committee
19  members have them in front of them?
20      A.  I believe they were laying on the table between
21  us, but they were not handed out in individual packets.
22      Q.  You testified a few minutes earlier about a desire
23  to go beyond the ascribed normal review process. Do you
24  remember saying something like that?
25      A.  Something like that, yes.

Ferguson & Holdnack Reporting, Inc.

8 (Pages 26 to 29)