IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LISA BROWN, M.D., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 05-32 E |
| ) | |
| HAMOT MEDICAL CENTER, ) | |
| ) | |

SUPPLEMENTAL APPENDIX TO
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# Appendix - Exhibit L

Brown v. Hamot Medical Center                                    John Lubahn, M.D.

1

```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LISA BROWN, M.D.,            :
         Plaintiff           :
                             :
     v.                      :  Civil Action No. 05-32E
                             :
HAMOT MEDICAL CENTER,        :
         Defendant           :

         Deposition of JOHN LUBAHN, M.D., taken before
and by Carol A. Holdnack, RPR, Notary Public in and
for the Commonwealth of Pennsylvania, on Thursday
March 16, 2006, commencing at 9:41 a.m., at the
offices of Scarpitti & Mead, Renaissance Center,
1001 State Street, Suite 800, Erie, PA 16501.

For the Plaintiff:
     Patrick Sorek, Esq.
     Leech Tishman Fuscaldo & Lampl, LLC
     525 William Penn Place, 30th Floor
     Pittsburgh, PA 15219

For the Defendant:
     Kerry M. Richard, Esq.
     Tobin O'Connor Ewing & Richard
     5335 Wisconsin Avenue NW, Suite 700
     Washington, DC 20015

           Reported by Carol A. Holdnack, RPR
           Ferguson & Holdnack Reporting, Inc.
```

2

1              I N D E X
2
3  JOHN LUBAHN, M.D.
4      Direct Examination by Mr. Sorek . . . . .  3
5
6
7
8  EXHIBITS:
9      Lubahn Deposition Exhibit 1 . . . . . . .114
10
11
12
...
25

3

1        J O H N  L U B A H N, M.D., first having
2  been duly sworn testified as follows:
3
4              DIRECT EXAMINATION
5  BY MR. SOREK:
6
7     Q.  State your name for the record, please.
8     A.  John Lubahn.
9     Q.  And, Dr. Lubahn, have you had your deposition
10 taken before?
11    A.  Yes.
12    Q.  And what kind of case was it?
13    A.  Primarily Workers' Comp. cases, medical/legal
14 cases.
15    Q.  So about how many times have you had your
16 deposition taken?
17    A.  In 25 years?
18    Q.  Yes.
19    A.  50.
20    Q.  Okay.
21    A.  That's a guess, by the way.
22    Q.  All right.  So you're familiar with the deposition
23 process in terms of how it goes.  I represent the Plaintiff,
24 Dr. Brown.  You have counsel here.  It's a
25 question-and-answer process.  The information that you give

4

1  is similar to what you would be providing if you were
2  testifying at court.  And that your answers have to be out
3  loud.  You've heard all of that many times before, I take
4  it.
5     A.  Yes.
6     Q.  Who did you talk to besides your lawyer to prepare
7  for the deposition today?
8     A.  Dana.
9     Q.  Ms. Ashley.
10    A.  Yes.
11    Q.  And that's it.
12    A.  Yes.
13    Q.  What documents did you review to prepare for your
14 deposition today?
15    A.  Folders that they brought with them.
16    Q.  "They" meaning who?
17    A.  Dana and Attorney Richard.
18    Q.  What were in the folders?
19    A.  For the most part, documents related to
20 Dr. Brown's performance evaluations, in-training scores, her
21 file.
22    Q.  Okay.
23    A.  That's all I can remember.  It's kind of like this
24 stack of papers we have here.
25    Q.  And you're indicating just maybe 3 or 4 inches of

## Page 9

1  Q. Okay. I'm not sure that answered the question.
2  Did the hospital meet all the requirements, to your
3  knowledge?
4  A. Yes.
5  Q. If you take a look at Page 7, Section 3, Paragraph
6  1.
7  A. Page 7?
8  Q. That's right.
9     MS. RICHARD: For the sake of clarity, I'm going
10    to note that that is HMC-03381, which is part of
11    the original document you identified.
12 Q. All right. Section 3, Paragraph 1 says, "Either
13 party may terminate this agreement at any time upon notice
14 thereof for proper cause." Do you see that?
15 A. Yes.
16 Q. What does proper cause mean?
17 A. Proper cause, to me, is the department chairman
18 and program director. It means that if, in my opinion,
19 experience, a resident isn't qualified to move on to the
20 next year based on their core knowledge or their performance
21 in other areas; attitude, behavior, affective domain, that
22 they shouldn't move on to the next year.
23 Q. The standards that you just mentioned, are those
24 written down anywhere?
25 A. Well, there's a curriculum that any residency

## Page 10

1  program has to have to be accredited. And so they are
2  written down in the hospital. And those are the guidelines
3  that I would follow to determine whether a resident could
4  perform at a given level.
5  Q. Okay. Be specific and tell me what guidelines
6  you're talking about that you just mentioned in your answer.
7  A. The guidelines that I would use are based on a
8  book that I helped write. They were published by the
9  Academic Orthopaedic Society in conjunction with, I think,
10 the American Orthopaedic Association and the American Board
11 of Orthopaedic Surgery.
12 Q. And what's the name of the book?
13 A. Curriculum for an Orthopaedic Residency.
14 Q. Is there anywhere that you or anybody else has
15 made known that definition of proper cause to anybody else
16 in the hospital?
17 A. I think the entire faculty that I work with
18 understands in this case, Lisa Brown case, Dr. Brown, what
19 the proper cause was.
20 Q. How do you know that?
21 A. I spoke to them and I told them.
22 Q. How do you know it was their understanding about
23 what proper cause means? Do you know that they have the
24 same understanding of proper cause that you do?
25 A. I believe they do, yes.

## Page 11

1  Q. How do you know that?
2  A. Because we met, we discussed it, we agreed with
3  it.
4  Q. Let me stop you there. When you met with the
5  faculty and discussed with the faculty, did you or anyone
6  else bring up the phrase "proper cause"?
7  A. I don't remember.
8  Q. Had you or anybody else looked at the contract at
9  the time you talked about it to the faculty?
10 A. We did look at the contract.
11 Q. Okay. But you don't recall whether the phrase
12 "proper cause," what proper cause was discussed.
13 A. That particular phrase, I don't remember.
14 Q. All right. And the discussions that you had, when
15 did those occur, that you just referred to a moment ago?
16 A. Well, they're really ongoing discussions. And the
17 first discussion I ever had with anybody about her quality
18 was her performance, I believe was with Dr. Williams. And
19 that was in her second year.
20    And Dr. Williams felt that she wasn't seeing her
21 patients in a timely fashion on morning rounds. And he
22 further stated that when he asked her why she hadn't seen
23 the patients, she said that he had already seen them, so it
24 would be a duplication of service for her to see them as
25 well.

## Page 12

1  Q. And Dr. Williams objected to that. I mean,
2  describe what the problem was, because we're all layman here
3  and you described some facts.
4  A. Well, the residents' duties and responsibilities
5  are to see their patients first thing in the morning, prior
6  to a 7:00 teaching conference, to interview the patient,
7  examine the patient, and write a note. And to not do that
8  is a problem.
9  Q. In your experience, had there ever been a time
10 when other residents had not seen patients in the morning
11 and write a note?
12 A. If it happens, I'm usually notified, and I have to
13 deal with it.
14 Q. Well, I guess the question was, in your experience
15 has it happened before?
16 A. Yes.
17 Q. Do you remember who it involved?
18 A. I remember one instance.
19 Q. Can you describe it for us.
20 A. There was a resident by the name of Ted Green who
21 was called to go to the emergency room about 4:30. He
22 didn't go to the emergency room. I was notified -- I later
23 talked to Dr. Green about it, and he didn't see a problem.
24 So I put him on probation. I put him on probation for three
25 months. And he corrected the problem and it never happened