**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LISA BROWN, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 05-32 E** |
| | ) | |
| **HAMOT MEDICAL CENTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT HAMOT MEDICAL CENTER'S REPLY TO PLAINTIFF'S
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff's opposition memorandum fails to mask the glaring and fundamental failure of her discrimination claims: she simply cannot fulfill the relatively modest standard required for her to avoid summary judgment under the mandates of *Fuentes v. Perskie,* 32 F.3d 759 (3d Cir. 1994). Indeed, her rambling opposition largely ignores the *Fuentes* test as it applies to her particular case, in favor of vague, unsupported and irrelevant complaints that Hamot's orthopedic residency program (the "Program") is not a good one, and that orthopedic programs generally don't attract enough female candidates.

But this case is not about the overall quality of Hamot's residency program. Nor is this case a stalking horse for criticisms about orthopedic residency programs nationally. This is a case in which plaintiff claims that discriminatory animus motivated Dr. Lubahn to dismiss her from Hamot's program, notwithstanding the following undisputed facts:

- alleged discriminatory animus <u>did not</u> prevent Hamot from selecting plaintiff for admission to its program in the first place;
- alleged discriminatory animus <u>did not</u> prevent Hamot from permitting plaintiff to advance through three years of the program notwithstanding ongoing academic problems;

- alleged discriminatory animus <u>did not</u> prevent Hamot from allowing plaintiff to emerge from probationary status during her third year;
- alleged discriminatory animus <u>did not</u> prevent Hamot from giving plaintiff positive feedback when she had earned it, including on January 30, 2004; and most importantly,
- Dr. John Lubahn, the program director at all relevant times, made each of the above decisions and took each of the above actions with regard to plaintiff.

Despite these undisputed facts, plaintiff would have us believe that Dr. Lubahn suddenly and paradoxically <u>did</u> demonstrate discriminatory animus when he decided not to advance her to the fourth year of the residency program on March 1, 2004.

Plaintiff's summary judgment evidence is wholly insufficient to overcome the actual and inferential conclusions compelled by the foregoing facts. She cannot proceed to a jury, because even assuming the truth of all her evidence, she fails to do what *Fuentes* requires: present: evidence which 1) could <u>reasonably</u> permit a jury to conclude that the reasons for Hamot's decision were a fabrication, or 2) would allow the inference that discrimination <u>was more likely than not</u> a determinative cause of Hamot's actions.

At the end of the day, this case is not about whether Hamot made the wisest or even best decision regarding plaintiff's residency. Nor is this case about whether plaintiff, this court or jurors might disagree with Hamot's decision. It is simply about whether Hamot's decision was motivated by discrimination, or secondarily whether the decision constituted a breach of contract. Plaintiff's opposition demonstrates that she can establish neither of her claims. Taken together, in the words of *Fuentes*, her "criticisms amount to little more than the schoolground retort "Not so", an approach which . . . does not create a material issue of fact." 32 F.3d 759, at 766. Accordingly, her complaint must be dismissed.

# ARGUMENT

I.    **TITLE VII AND PHRA CLAIMS**

    A.    **Plaintiff Ignores the Standard of Review**

The principal shortcoming of plaintiff's Opposition is its failure to link its alleged facts to the legal standards governing this motion. It is not just any factual dispute that will prevent summary judgment, but "only disputes over facts that might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).

In this Title VII case, the governing law is clear: plaintiff must first make out a prima facie case of discrimination under *McDonnell Douglas* and its progeny, such as *Hugh v. Butler County Family YMCA,* 418 F.3d 265 (3d Cir. 2005). Assuming she does, and assuming the defendant fulfills its relatively light burden of articulating legitimate non-discriminatory reasons for its decision, plaintiff must then fulfill her burden of showing pretext as articulated by *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994).

As will be shown below, plaintiff's opposition fails to avoid summary judgment, both because much of her summary judgment evidence is irrelevant, and because she has failed to identify genuine <u>material</u> factual disputes under the relevant standards to permit her to go to trial.

    B.    **The Merits of Hamot's Program Are Irrelevant**

It is certainly telling that the lead argument in plaintiff's Opposition is that the Program is of poor quality. Even assuming the arguments were true, plaintiff certainly knows that they have

no relevance to the summary judgment analysis.  On this score, *Fuentes* leaves no room for doubt:

> The factual dispute at issue is whether discriminatory animus motivated the employer, <u>not</u> <u>whether</u> <u>the</u> <u>employer</u> <u>is</u> <u>wise</u>, <u>shrewd</u>, <u>prudent</u> <u>or</u> <u>competent.</u>

37 F. 3d at 765 (emphasis supplied and citations omitted).

Given this clear statement of the law, it is obvious that plaintiff's complaints about the Program are neither material nor probative.  Put another way, the relative merits of the Program have no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable…."  Fed.R.Evid.401.  That is because they shed no light on the factual dispute at issue: "whether discriminatory animus motivated the employer." *Fuentes* at 765.

### C.    Plaintiff's Criticism of the Role of Women in Orthopedic Residencies Generally Is Also Irrelevant

In an attempt to paint the Program as a male bastion, plaintiff insinuates via "statistical" data that orthopedic residency programs nationwide are discriminatory towards women.[1]  Again, such claims have nothing to do with this case.  Whether or not female physicians nationwide have trouble gaining admittance to orthopedic residency programs generally is of no consequence because of one indisputable fact: <u>this</u> plaintiff, who <u>is</u> female, <u>did</u> gain admittance to the Program.

In fact, as with much of plaintiff's evidence, the logical consequence of plaintiff's statistics is to disprove the discriminatory animus plaintiff seeks to create.  Thus, for example, plaintiff cites a statistic that only 2.6% of orthopedic residents nationally were women in 2002.

---

[1] To establish the relevance of such evidence, plaintiff cites case law applicable to class actions, where multiple employees brought suit against their employers for across-the-board discriminatory action adversely affecting numerous members of a protected class.  *Green v. USX Corp.*, 843 F.2d 1511 (3d Cir.1988); *Griffin v. Carlin*, 755 F.2d 1516 (11th Cir.1985).  Here, one plaintiff is suing Hamot; this is not a class action.

See Pl. Opposition at 9.  Even assuming the relevance and accuracy of this statistic, it proves only that statistically, Hamot far out-performed the national average.  First, plaintiff was one of only two residents to enroll in the Program in July 2001 -- thus, that year Hamot admitted 50% women.  Second, the Program comprises five years with two residents in each class.  Thus, throughout plaintiff's participation in the program, one of ten residents in the Program, or 10%, was female.  It is significant that in the five years prior to plaintiff's admission in the Program, Hamot's Program enrollment was also 10% female.  Again, this far exceeds the national statistics cited by plaintiff.

Moreover, as plaintiff admits, Hamot's policy has been and is to reach out to female applicants to the Program.  Hamot cannot, however, control how many female medical school graduates are interested in orthopedics or how many of those interested apply to the Program.  Finally, because Hamot's residency admission process is governed by the National Residency Matching Program (NRMP), Hamot has no power to select specific residents.[2]  See Exhibit 1 (Deposition Transcript of Dr. John Lubahn) at 139:5-7.  Hamot receives roughly 200 applicants to the Program annually, interviews 30, and if the Program had "two applicants who were comparable who [the Program] thought [it] would like to interview, and one was a woman and one was a man, [it] would grant the interview to the woman."  Id. at 13-16.  In 2005, seven of Hamot's 30 interviewees were women, and its top choice was a woman, but she matched with a different residency program.  Id. at 143:22-25.

_____

[2] Under the rules of the NRMP, Hospitals rank order their preferred candidates, and medical students rank order the programs in which they wish to enroll.  Both hospitals and medical students submit their rank lists to the NRMP, who uses a computer to generate "matches."  Both student and hospital are obligated to accept the match, even when, as happened in this case, the student matches with their "last choice."  See www.nrmp.org for rules governing the match process.

D.      **Plaintiff Was Not Qualified for the Position of Fourth Year Resident**

1.      <u>Plaintiff's occasionally acceptable performance does not establish that she was qualified as a fourth year resident.</u>

Plaintiff's first task under the *McDonnell Douglas* analysis is to demonstrate that she was qualified to be promoted to the level of 4th year resident in Orthopaedic Surgery. *Hugh* at 267 (citing *McDonnell Douglas Corp.* at 802-03, 93 S. Ct. 1817).   Plaintiff suggests that evidence from her evaluations showing she received positive feedback and acceptable ratings, demonstrates that she was qualified to advance to her fourth year of training.   This evidence establishes nothing.  Hamot fully concedes that Plaintiff performed acceptably <u>at various points</u>, and sometimes even for extended periods of time.  Unfortunately, however, she could not sustain her acceptable performance.  Unless plaintiff establishes admissible evidence sufficient to permit a reasonable factfinder to conclude that she had no significant academic deficiencies, she cannot demonstrate she was qualified to be promoted.  *See e.g., Stoller v. College of Medicine*, 562 F.Supp. 403, 412 (M.D.PA. 1983) (dismissal from medical school upheld even though no member of the faculty had recommended medical student receive a failing grade where there was a rational basis in the record to support the decision).[3]

2.      <u>Plaintiff cannot create material factual disputes by contradicting herself.</u>

Despite plaintiff's bald assertions to the contrary, she cannot change history.   She admitted her deficiencies throughout her training, recognizing at various points that she needed to read more, that she could not find time to read enough, and that she was academically behind. <u>See</u> Exhibit 10, Hamot's Motion for Summary Judgment, at 206:24-207:9. 243:18-23, 250:24-

---

[3] Plaintiff implies that the fact that she was allowed to complete her third academic year constitutes evidence in and of itself that she was qualified for the position of fourth year resident.  This assertion is meritless.  Hamot's decision was intended to fulfill its contractual obligation under Section 5 of the Agreement.  See Section II.A., *infra*.  More significantly, Plaintiff did not complete her third academic year.  After numerous absences in April and May, she requested and was granted a medical leave of absence from early June until the end of her contract.  Although plaintiff was paid under the contract for this leave, she did not earn academic credit for the time missed.

251:2 and 252:12-14.  She also admitted in her meeting with Dr. Lubahn that "she understood that the decision [not to advance her to the next year of training] based on her academic performance, but not her clinical performance."  See Exhibit 27, Hamot's Motion for Summary Judgment.  Now, many months later, Plaintiff's mere insistence that she was qualified – even in the form of a Declaration -- cannot undo her steady and contemporaneous admissions.[4]

Likewise, plaintiff's Declaration claims – for the first time – that the incident in which she disregarded Dr. Lubahn's specific instructions and closed tightly a contaminated leg wound – was not in fact a mistake.  She now claims that she handled the case correctly, under the supervision of a different physician. Thus, she implies, she knew better than Dr. Lubahn did about handling this case.

This eleventh hour assertion is again inconsistent with the record evidence:  At the time of the incident, when Dr. Lubahn raised concerns that she had not followed his instructions, plaintiff simply offered to remove the staples.  Seven days later, she claimed that she could not hear Dr. Lubahn's instructions due to the noise in the ER, and that the ER physicians encouraged her to take the patient to the OR for treatment.  See Exhibit 16, Hamot's Motion for Summary Judgment.  In either event, plaintiff's third explanation of that event establishes only two things: 1) she did not follow Dr. Lubahn's (her direct supervisor's) express directions in caring for the patient; and 2) when asked about it, she was less than honest.

Plaintiff acknowledged that she had seen Dr. Lubahn's memo in her file regarding the incident, and she had discussed it with him.  See Exhibit 2 (Plaintiff's Deposition) at 215-222, and Exhibit J to Plaintiff's Opposition.  She offered no objection to the memo at the time.  It is simply inconceivable that plaintiff would have accepted the written reprimand in her file without

---

[4] There is no doubt that plaintiff considers her deficiencies less serious than Dr. Lubahn did, but as a trainee, her opinion of her own competence is far from probative evidence.

contesting it, if she thought it was false.  There is ample evidence that plaintiff knew how to disagree with Dr. Lubahn and record her opinions in her academic record.  See Exhibit J, Pl. Opposition.

Plaintiff's last-ditch efforts to avoid summary judgment by changing her story are unavailing.  It has long been the rule that a party's self-contradictory evidence cannot create a material factual dispute.  *See, e.g., Cleveland v. Policy Mgmt. Sys. Corp.,* 526 U.S. 795, 806-07 (1999)(gathering cases); *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir. 1991)

### E.    Similarly Situated Male Residents Were Not Treated More Favorably

Under *Hugh* and *McDonnell-Douglas*, plaintiff's *prima facie case* must also show that male residents in the Program were treated more favorably than she was.  Plaintiff fails to meet this showing for several reasons.

First, plaintiff makes no effort to establish that any other resident was similarly situated to her.  This is a real requirement and should not be taken for granted.  *See Hankin v. Temple University (Health Sciences Center) et al.*, 829 F.2s 437, 442 (Cir.3d 1987)(rejecting claims of sex and race discrimination where medical fellow failed to produce any evidence that she and a male fellow were similarly situated).  Plaintiff refers to three residents, Ted Green, MD, Craig Lippe, MD and Jeff Nechleba, MD.  None of these individuals was similarly situated to plaintiff.  Dr. Green graduated from the Program in 1998, 3 years before plaintiff matriculated.  Dr. Lippe and Dr. Nechleba were enrolled in the Program at the same time as plaintiff, but they were her seniors:  Dr. Lippe was one year ahead of plaintiff, and Dr. Nechleba was four years ahead of plaintiff.  Notably, the *Hankin* court declined to assume that two fellows were similarly situated where they were just a year apart.  *Id.*

Second, it is preposterous for plaintiff to assert that "many other residents had performance problems worse than" she had, and erroneous for her to state no other residents were "disciplined, put on probation, or discharged from the Program."  Plaintiff was unique among residents of the Program because her deficiencies and shortcomings were not limited to one or two areas, topics or incidents.  They included a persistent and wide array of academic incompetence and weakness; clinical errors and misjudgment; spotty attendance and unreliability in the ER; failure to abide by the instructions and meet the specific expectations of attending faculty; inability or unwillingness to improve her performance despite ample time to correct it; and dramatically poor OITE results.  While any one of plaintiff's deficiencies alone might not have resulted in her dismissal from the Program, taken as a whole, they eroded Dr. Lubahn's confidence in her ability to sustain the level of performance necessary to succeed in her fourth or fifth year of training.  This combination presented a series of challenges to Dr. Lubahn that no other resident had ever presented in all of his 25 years on the Hamot faculty and as Program Director.  See Exhibit 1 at 30:18-31:7.  Indeed, Dr. Lubahn has never accommodated or helped any other orthopedic surgery resident more than he assisted plaintiff.  Id. at 19:3-15.

Turning to plaintiff's supposed incidents of misconduct by other residents, even assuming that plaintiff's allegations are true,[5] the incidents do not advance her case.  For example, she states that two residents – Dr. Lippe and Dr. Nechleba – were sued for malpractice.  As plaintiff well knows, anyone can sue for anything, and the fact that one gets sued is absolutely no evidence of wrong-doing, misconduct or academic deficiencies of any kind.  Indeed, such

---

[5]In fact, plaintiff's assertions about Dr. Thomas are patently false.  Although Dr. Thomas and Dr. Suprock were investigated by the Institutional Review Committee for some research irregularities, Dr. Thomas was cleared of any wrong-doing.  See Exhibit 3 (IRC Resolution of Eric Thomas).  Dr. Suprock is a private attending, with no knowledge as to what happened with Dr. Thomas.  Thus, his deposition testimony constitutes nothing more than his personal opinion and cannot serve to create a disputed issue of material fact on this point.  See Exhibit P, Pl. Opposition.

malpractice claims could only be relevant to plaintiff's case if the claims were meritorious. Plaintiff offers no evidence that any of the claims had merit. Yet, plaintiff would apparently have this court proceed to try the merits of these past malpractice cases in the context of her lawsuit. Needless to say, such a suggestion is entirely unworkable.

Plaintiff also recounts a litany of incidents she allegedly experienced during her residency. She fails to identify any of these incidents with sufficient specificity to allow anyone, much less a reasonable factfinder, to conclude that the incidents are material in anyway. Importantly, although there have been male residents in the Program who have had trouble in one or two areas or committed errors, there has never been a resident in the Program other than plaintiff who has persistently done so poorly across the gamut of performance measurements.

Moreover, to the extent a male resident has struggled in one or two of the areas mentioned or has committed a specific surgical error, he has been admonished, reprimanded, or disciplined depending on the severity of the problem, whether that action entailed probation or verbal and written criticisms from Dr. Lubahn. Exhibit 1 at 194:13-16.

For example, Dr. Lubahn placed Dr. Green on probation for three months because of his failure to go to the ER when called, and Dr. Green subsequently corrected the problem so it never recurred. Id. at 12:14-13:1 and 229:1-4. On another occasion, Dr. Lubahn criticized Dr. Carl Seon for his persistently poor handwriting when writing notes after seeing patients.[6] Id. at 66:8-11. Dr. Lubahn brought the matter to Dr. Seon's attention in evaluations. Id. Additionally, Dr. Lubahn told Dr. Vivek Sharma, a contemporary of plaintiff who was the other resident mentioned specifically in Dr. Benes' email, that Dr. Lubahn would not tolerate Dr. Sharma's going to the ER in an untimely fashion. Dr. Sharma apologized and said "it wouldn't happen

---

[6] Unlike plaintiff, Dr. Seon was never criticized or reprimanded for not having rounded on patients, a far more serious offense than having to correct penmanship.

again." The matter was noted in Dr. Sharma's academic file. Id. at 63:23-64:5. Finally, only one other orthopedic surgery resident has not completed the Program due to a decision made by Hamot, and that individual was a male who was terminated from the Program in 1987, before Dr. Lubahn became the Program Director. Id. at 134:4-20 and Exhibit 4 (Deposition Transcripts of Dr. Vincent Rogers) at 42:8-12.

In sum, Hamot has disciplined male residents in the past for various errors and performance issues. The incidents plaintiff cites as evidence of Hamot's failure to address problems with the performance of male residents are not comparable to plaintiff's situation. Instead, each alleged incident involved one incident, and plaintiff does not cite specific evidence showing that the male resident had a similar record of persistent, broad underperformance that plaintiff exhibited.

### F.    Plaintiff Cannot Satisfy Either Prong of *Fuentes*

Assuming without conceding that plaintiff could establish a *prima facie* case, in order to survive Hamot's Motion plaintiff must satisfy one of the two prongs of *Fuentes* by showing that Hamot's reasons for not advancing her to the next level of training – "her academic deficiencies and her clinical weaknesses, of the affective domain, her behavior, her attitude" –were pretextual. See Exhibit 1 at 90:8-11. The *Fuentes* test is well-settled and specific. Plaintiff has not submitted evidence sufficient to satisfy either prong of the *Fuentes* standard.

    1.    Plaintiff cannot cast sufficient doubt on defendant's reasons for not renewing Her Contract

"Plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* at 765 (quoting

*Ezold v. Wolf, Black, Schorr & Solis-Cohen*, 983 F.2d 509 (3d Cir.1992) and *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir.1993)) (emphasis in original).  Plaintiff must show that a reasonable factfinder could conclude that each of Hamot's proffered reasons for the non-renewal of her Agreement was a "*post hoc* fabrication."  *Id.* at 764.  Plaintiff "cannot simply show that [Hamot's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated [Hamot], not whether [Hamot] is wise, shrewd, prudent or competent."  *Id.*  Indeed, this is a stringent standard for plaintiff, because the "'question is not whether [Hamot] made the best, or even a sound, business decision; it is whether the real reason is [discrimination].'"  *Keller* at 1109 (quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157 (7th Cir.1996).  To satisfy Prong 1, "[plaintiff] must show, not merely that [Hamot's] proffered reason was wrong, but that it was so plainly wrong that it cannot have been [Hamot's] real reason" for not renewing the Agreement.  *Keller* at 1109.

### a.    Dr. Bambrick Is Not Relevant to Plaintiff's Argument

Plaintiff argues that the reasons for her dismissal must be doubted because Hamot offered one of its previous graduates, Dr. William S. Bambrick III, an opportunity to remediate professional difficulties he experienced in North Dakota.  The problem for plaintiff is that Dr. Bambrick's situation is totally inapposite to hers.

Dr. Bambrick graduated from Hamot's Orthopaedic Surgery Residency Program in 1986 – before Dr. Lubahn became the Program Director.  He passed his Boards and obtained licenses to practice in at least three states, Florida, North Dakota and Ohio.  After many years of private practice, he experienced difficulties in North Dakota that caused his license to be suspended.  In an effort to demonstrate his commitment to the practice of medicine in North Dakota, he offered to spend a year working under the close supervision of another Board Certified orthopaedist in

order to receive his license back.  He contacted Hamot, and in particular Dr. Lubahn, to attempt

to arrange this.  Despite many efforts, the idea of supervised practice did not pan out.  Dr.

Bambrick was unable to obtain a license in Pennsylvania, and was unable to obtain malpractice

insurance.

As a result, Dr. Lubahn offered Dr. Bambrick an opportunity to spend time as an unpaid

observer, "to try to learn and salvage his career."  See Exhibit 1 at 184:15-18.  Indeed, Dr.

Lubahn advised Dr. Bambrick that it "was okay if [Dr. Bambrick] came to conferences and

observed and interacted."  Id. 178:18-21.  Dr. Bambrick was not authorized to engage in patient

care.  See Pl. Opposition, Exhibit T.  This observer status is granted frequently and is common at

residency programs and in hospitals nationwide.  See Exhibit 1 at 169:16-18, 183:21-24 and

184:7-10.  Dr. Bambrick's observation privileges were terminated when he engaged in

misconduct – by representing himself as a resident physician with authority to care for a patient

in the Emergency Room.  Security confronted him, he was asked to wait outside, he left and did

not return.  See Pl. Opposition, Exhibit T.

In sum, Bambrick did not train under Dr. Lubahn in the 1980's, and thus the fact that he

successfully completed the residency training program is no indication of the program standards

in 2004.    Although Dr. Bambrick observed for a few months in 2004, he was neither employed

by, nor admitted to the residency training program, nor subject to faculty evaluation.  As soon as

Dr. Lubahn learned that Dr. Bambrick had engaged in misconduct, he terminated Dr. Bambrick's

relationship with Hamot.

**b.    Plaintiff's Performance Was Substandard before Non-Renewal of the
Agreement**

A plaintiff's task in casting sufficient doubt on a decisionmaker's action is difficult when

a supervisor has filed reports of unsatisfactory performance or has had conversations with an

individual against whom an adverse employment action is taken <u>before</u> that action is taken. "[T]hat evidence would support a non-discriminatory finding." *Hugh* at 269.

Plaintiff's record of deficient knowledge and performance was established for more than a year before Hamot decided not to advance plaintiff to the next level of training. Her unacceptable performance landed her on probation in April 2003. She was regularly behind in her reading assignments and her performance manifested a resulting lack of academic knowledge. Reports about and evaluations of plaintiff's knowledge base and performance were abundant, before, during and after her probationary status. Dr. Lubahn often counseled her about the need for her to read and study more frequently and thoroughly, as did other evaluating physicians. <u>See</u> Exhibit 5 (Evaluations of Attending Physicians). Perhaps most importantly, although plaintiff disagreed with some of the details of faculty concerns, she was aware of, and in fact in agreement with, her need to improve, through her second and third year of training. See Exhibit J to Plaintiff's Opposition.

Accordingly, Hamot's proffered reasons for not renewing plaintiff's Agreement cannot be seen as a *post hoc* fabrication or so plainly wrong that they cannot have been genuine, and therefore, in order to withstand Hamot's Motion, plaintiff must submit evidence sufficient to satisfy Prong 2 of *Fuentes*.

2.    Plaintiff cannot demonstrate that discrimination motivated or determined Hamot's decision

In order to demonstrate that an "invidious discriminatory reason" or an "illegitimate factor" was "more likely than not a motivating or determinative cause of [Hamot's] action," *Fuentes* at 764-65, plaintiff "must point to evidence that proves . . . discrimination in the same way that critical facts are generally proved – based solely on the natural probative force of the evidence." *Keller* at 1111. To make such a showing, plaintiff can produce evidence "that

[Hamot] in the past had subjected [plaintiff] to unlawful discriminatory treatment, that [Hamot] treated other, similarly situated persons not of [plaintiff's] protected class more favorably, or that [Hamot] has discriminated against other members of [plaintiff's] protected class or other protected categories of persons." *Fuentes* at 765.

### a.   Plaintiff was not subject to past discriminatory treatment

Plaintiff argues that a series of sexually based comments and incidents demonstrate that Hamot -- specifically Dr. Lubahn – discriminated against her in the past. This argument fails because there is not one scintilla of evidence that any of the alleged comments or incidents involved Dr. Lubahn in any way. It is well-settled that "stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were temporally remote from the date of decision." *Ezold* at 545.

Plaintiff admits that she never reported any of the incidents she alleges in her interrogatories to anyone at Hamot, much less Dr. Lubahn. <u>See</u> Pl. Supplemental Answers to Interrogatories, Exhibit E, Pl. Opposition. Nor has plaintiff presented any evidence that Dr. Lubahn knew about any of these alleged matters – from any source – at any point in time, whether at the time the comments and treatment were allegedly directed towards plaintiff or contemporaneous with the decision not to advance her to the next level of training.

Most outrageous is plaintiff's effort to impugn Dr. Lubahnn by reference to Dr. Lippe, a Hamot resident who allegedly purchased a sexually explicit doll as a gift for plaintiff while Lippe attended a conference in Hawaii. It is unfair, unsupportable and patently false for plaintiff to insinuate that Dr. Lubahn was complicit in or knowledgeable of the doll's purchase or Dr. Lippe's gift of the doll to plaintiff. In fact, Dr. Lubahn traveled to Hawaii with his family and not with the Hamot residents, only saw them at professional presentations and possibly a

reception, and had no knowledge of the souvenir Dr. Lippe allegedly bought for and gave to plaintiff.  See Exhibit 1 at 216:9-217:8.  Plaintiff offers no evidence of any kind to dispute these facts.

**b.    Other Similarly Situated Male Residents Were Not Treated More Favorably[7]**

Plaintiff suggests that Hamot treated male residents more favorably than it treated her with regard to OITE scores.[8]  Plaintiff's reliance on the OITE scores of the residents is misplaced.  In fact, plaintiff concedes that Dr. Lubahn reviewed OITE scores with all residents, and that he encouraged all residents to improve their scores.  Pl. Opposition at 18-19.  The fact remains, however, that plaintiff's scores were not comparable to her peers.

In her opposition, plaintiff recounts various low scores received by other residents, and suggests that because these residents were not discharged, she was treated differently.  The fallacy in plaintiff's argument can best be seen in the following chart:[9]

| Resident Name | Exam year 2001 | Exam year 2002 | Exam year 2003 |
|---|---|---|---|
| Dr. Brown | 6th Percentile | 10th Percentile | 2d Percentile |
| Dr. Poole | 11th Percentile | 23rd Percentile | 17th Percentile |
| Dr. Seeds | 7th Percentile | 25th Percentile | 61st Percentile |
| Dr. Lippe | 28th Percentile | 77th Percentile | 61st Percentile |

Based on the chart, which compares performance on the exact same test, administered on the same dates, it is plain that none of the other residents performed as badly as plaintiff.  In

---

[7] To the extent that Hamot has already addressed plaintiff's arguments above, Hamot refers the court to its Section I.E., above.  As set forth in text, the remainder of plaintiff's arguments are equally flawed.

[8] Plaintiff contends that Hamot used her test scores inappropriately as a qualifying factor.  If this were true, Hamot most certainly would have used them to dismiss plaintiff after her first year in the program, or possibly her second.  Instead, the uncontroverted evidence is that the OITE scores were one factor that -- in plaintiff's case -- corroborated the faculties' concerns about plaintiff's lack of specific medical knowledge.  They were not determinative of anything.

[9] To the extent plaintiff failed to attach comparable OITE scores to her Exhibit V, the missing test results corresponding to the data set forth in the chart are attached at Exhibit 6.  The chart compares only those residents that plaintiff argued were treated more favorably than she.  Other residents had even better test results.

truth, Dr. Poole is the only resident similarly situated to plaintiff for this purpose, as he was her classmate. Dr. Lippe and Dr. Seeds were more senior than plaintiff, and were expected to have acquired more knowledge at that time. Even limiting the comparison to Dr. Poole, however, his scores were demonstrably higher than plaintiff's. Interestingly, Dr. Lippe was only one year ahead of Dr. Brown. Thus his 2002 scores (in the 77th percentile) reflected his PGY-3 level of knowledge. This compares to plaintiff's 2003 test score – in the 2d percentile. Once again, plaintiff simply cannot establish that she was similarly situated to these residents.

Plaintiff further argues that Dr. Lubahn treated her differently from male residents because he referred her to Sylvan Learning Center, rather than offering to personally assist her with her studying. There is a simple explanation for this difference. Other residents needed to read more and study harder. Plaintiff, in contrast, insisted that she knew far more than her test results suggested. She explained her low scores as the result of problems with test-taking, not a problem with knowledge. See Exhibit 2 (Deposition Transcript of Lisa Brown) at 96:6-16 and 101:18-24. Dr. Lubahn recognized in her January 30, 2004 review that her issues may be the result of both a test-taking problem, and a lack of knowledge, but as any good physician would, he referred her to a study center to be evaluated for test-taking problems, and told her to report back with their recommendations and a plan. See Exhibit W, Pl. Opposition. He did not write her off, or refuse to assist her further. Rather he tried in good faith to respond to her concerns and find a way help her. Dr. Lubahn directed her to the Sylvan Learning Center because he had known students who have honed their study and test-taking skills there in the past. See Exhibit 1 at 52:10-23.[10]

---

[10] It is significant that plaintiff never followed-up with Dr. Lubahn's suggestion, and never reported back to him. Exhibit 2 (Plaintiff's Deposition).

Thus, plaintiff has placed an emphasis on the OITE scores that they do not warrant.  The OITE did not play any significant role in the decision not to advance plaintiff to a fourth academic year.  Moreover, indisputable evidence shows that plaintiff's scores were significantly lower than her male counterparts', confirming that they were not similarly situated to her.

    **c.**    **Hamot Has Not Discriminated Against Other Female Orthopedic Surgery Residents or Any Other Protected Class of Persons**

                    i.    <u>Other Female Orthopedic Surgery Residents</u>

There is no dispute that plaintiff was one of two women who has been a resident in the Program.  The other woman, Dr. Stephanie Galey, performed an internship at Hamot from 1996-97, entered the Program in July 1997 and successfully completed her residency in June 2001.  <u>See</u> Exhibit 4 (Deposition Transcript of Dr. Stephanie Galey) at 6:17-23.  In contrast to plaintiff's assertions, Dr. Galey stated that she "was very well-trained" in the Program.  <u>Id.</u> at 14:1-3.  After completing a fellowship at the Cleveland Clinic, she returned to Hamot, and she is currently an orthopedic surgeon in private practice who teaches a foot and ankle rotation at Hamot.  <u>Id.</u> at 22:5-6.  Dr. Galey testified that she considered Dr. Lubahn to be responsive when she had questions about cases and to have satisfactorily instructed residents and administered the Program.  <u>Id.</u> at 20:3-14 and 21-24.  Notably – and in stark contrast to plaintiff – Dr. Galey demonstrated personal initiative as a resident in the Program when she was informed that she needed to improve.  For example, she used her scores on the annual Orthopedic In-Training Examination ("OITE") as a tool to identify areas where she should focus her attention when studying.  <u>Id.</u> at 18:25-19:4.  Likewise, Dr. Galey recalled that when she was advised by faculty of areas where she needed to improve, she sought out applicable materials to read so she could "learn a little bit more about each individual topic."  <u>Id.</u>  Unlike much of plaintiff's evidence, Dr.

Galey's account of her time in the Program is material and contradicts plaintiff's assertions about the Program's alleged poor quality and residents' opportunities for sound training.

Moreover, Dr. Galey did not experience any discrimination, nor did she feel that she was treated less favorably than her male counterparts. Indeed, Dr. Galey, a deponent selected by plaintiff whose statements are conspicuously absent from plaintiff's brief, confirmed that when Dr. Galey was a resident, she never felt that she was treated differently than male residents in the Program either by Dr. Lubahn, faculty or by the male residents themselves. Id. at 14:7-12. Additionally, Dr. Galey confirmed that she never witnessed any unprofessional conduct or conduct outside of the workplace by her fellow residents that caused her any concern. Id. at 14:20-25.

     ii.    <u>Orthopedic Surgery Residents of Other Protected Classes</u>

Likewise, Plaintiff offers no evidence that Hamot discriminates against residents who are members of other protected classes. Residents of varied racial and national origin backgrounds have participated in the Program, and the only other orthopedic surgery resident who did not finish the Program as a result of a decision by Hamot was a white, male terminated before Dr. Lubahn's tenure as Program Director. <u>See</u> Exhibit 1 at 134:4-20 and Exhibit 4 (Deposition Transcript of Dr. Rogers). Additionally, Hamot "preferentially select[s] minority people to interview" for positions in the Program. <u>See</u> Exhibit 1 at 139:1-23.

Thus, plaintiff has not pointed to evidence sufficient to allow a reasonable factfinder to conclude that discrimination was more likely than not a motivating factor in Hamot's decision not to renew her Agreement for a fourth academic year. Because she cannot satisfy Prong 1 or Prong 2 of *Fuentes*, summary judgment in Hamot's favor as to plaintiff's discrimination claims must be granted. *Fuentes*; *Keller*.

## II.    BREACH OF CONTRACT CLAIMS

As Hamot filed its Motion for Summary Judgment, Plaintiff filed a Motion for Partial Summary Judgment with respect to Counts 3 and 4 of her Complaint relating to breach of contract.    Hamot has since filed an Opposition to plaintiff's Motion for Partial Summary Judgment.    In order to minimize redundancy and as support for this Reply to plaintiff's Opposition, Hamot respectfully incorporates by reference its arguments and evidence set forth in its Opposition to plaintiff's Motion for Partial Summary Judgment.    In addition, Hamot replies to plaintiff's Opposition as follows:

The parties agree that "when contractual language is clear and unequivocal, its meaning must be determined by its contents alone."  *Steuert v. McChesney*, 444 A.2d 659,661 (PA. 1982). Hamot's Resident Agreement of Appointment ("Agreement") is clear and unequivocal, and based on its plain meaning, Hamot is entitled to judgment as a matter of law.

### A.    Hamot Fully Complied with the Terms of the Agreement

Plaintiff's characterization of Hamot's use of five Agreements of Appointment for its residents as a "pretense" and Hamot's expectations with respect to residents' completion of the Program is inaccurate.    The Agreement means what it says: that is, it is a one year contract. Consistent with this fact, the parties actually entered into new Agreements each year.    More importantly, each year's contract is different, as each year sets forth a specific list of academic obligations and achievements that the resident is expected to achieve.    Also, each year the Agreement permits either party to terminate the Agreement effective immediately for proper cause (Section 3) or upon 120 days notice that it intends to not renew the agreement (Section 5). See Exhibit CC, Pl. Opposition.    Plaintiff's obligations under the Agreement required her to meet the educational requirements of the Program, as provided by the ACGME.    Admission to the

Program is not an automatic ticket to graduation. Although Hamot expects its residents to complete the Program, each resident must live up to his or her end of the bargain, and failure to do so may preclude the next reappointment.

What is more, the evidence uniformly indicates, Hamot did not "terminate" plaintiff under Section 3 of the Agreement, so the "proper cause" issue is irrelevant.[11] See Exhibit O, Pl. Opposition. Hamot elected to terminate the Agreement on 120 days notice pursuant to Section 5, after Dr. Lubahn had discussed that possibility with various members of the administration and faculty before reaching his decision. See Exhibit 7, Hamot Opposition to Motion for Partial Summary Judgment, at 69:13-24 and 71:24-72:21. Plaintiff was notified on March 1, 2004 of Hamot's decision, and the Agreement was to expire on June 30, 2004, a period of more than 120 days, which is all the Agreement required. See Exhibit CC, Pl. Opposition. Additionally, before upholding Dr. Lubahn's decision, Hamot's Grievance Committee (GC) invited all orthopaedic faculty members to share their opinions on Dr. Lubahn's decision. Only after considering all of their opinions did Hamot uphold the decision. There is nothing unclear or ambiguous about the Agreement and Hamot's actions are undisputed. Thus, summary judgment in Hamot's favor as to plaintiff's Count 3 "proper cause" breach of contract claim is appropriate.

### B. Hamot Was Not Contractually Bound by the Advancement and Dismissal Policy, but Followed it Nonetheless

Plaintiff continues to argue that the Advancement and Dismissal Policy ("A&D Policy") was contractually binding on Hamot. By the express language of the Agreement, it is not. The Agreement is silent as to the A&D Policy. In contrast, when Hamot intended to bind itself to a policy, such as the "Grievance Resolution and Due Process for Resident Physicians" policy, it

---

[11] Because plaintiff has complained of a breach of Section 3 of the Agreement and has moved for summary judgment on that Count, Hamot refers the Court to its Opposition to Plaintiff's Motion, in which it refutes this argument.

expressly incorporated that policy by reference.  See Exhibit 6, Hamot's Motion for Summary Judgment, at Section 4.  For this reason alone, any objective reading of the Agreement compels the conclusion that the A&D Policy is not part of any binding Agreement.   Further, the only other reference to policies in the Agreement is explicit:  ONLY plaintiff agreed to be bound by Hamot policies.  The Agreement reads: "Whereas, [Hamot] and the Resident intend to be legally bound by the terms of this Agreement, <u>and the Resident also agrees to be bound</u> by all terms of the [Hamot] rules and regulations and <u>other policies approved by the Medical Staff Executive Committee or the HMC Board of Trustees;</u>".  <u>Id.</u> at 1.

Plaintiff offers no contrary evidence.  Nor would any be admissible under basic rules of contract interpretation. *Steuert*, at 661.  Thus, whether or not Hamot followed the A&D Policy cannot be the subject of a trial, as there is no contractual issue to resolve, and Hamot is entitled to Summary Judgment in its favor on Count 4 of the Complaint.

### C. Hamot Followed Its Grievance Resolution and Due Process Policy

Plaintiff cursorily argues that Hamot breached its contractual obligations to plaintiff by failing to follow the Grievance Resolution and Due Process Policy.  In this regard, she asserts three arguments: 1) that Hamot failed to "provide a resolution at step two of the grievance procedure;" 2) that the Grievance committee heard evidence and acted in the absence of one of its members, Dr. George Dulabon; and 3) that Hamot improperly relied on Brown's OITE scores.  Pl. Opposition, p. 29.   None of these arguments is persuasive.  Hamot substantially complied with the policy, and even if plaintiff had adduced probative evidence of noncompliance, the undisputed facts reveal, at worst, harmless error.

Plaintiff claims that Dr. James Pepicello failed to resolve Step 2 of plaintiff's grievance before moving to Step 3.  This is simply false.  Dr. Pepicello met with plaintiff and determined

that he would uphold Dr. Lubahn's decision.    Recognizing that this outcome would be unacceptable to plaintiff, he immediately initiated Step 3 of the policy.  The language of the policy expressly authorizes him to do this.  "If Step #2 is still unsatisfactory to the resident/intern or the VP for Medical Education, the resident/intern and/or the VP for Medical Education may direct the matter immediately, in writing, within 7 days, to the Medical Education Committee." See Exhibit 29, Motion for Summary Judgment.   Moreover, plaintiff in fact fully participated in Step 3, and never claimed any error at the Step 2 stage, despite the fact that she was then represented by counsel.  Accordingly, she waived any error that might have occurred at the Step #2 level.

Plaintiff next argues that the absence of Dr. George Dulabon from part of the "GC's" proceedings and from the vote rendered the decision invalid.  To the contrary, Dr. Dulabon's absence had no effect whatsoever on the GC.  First, the quorum requirements for the GC are defined by the Medical Staff Bylaws, Section 10.06.C, which provides as follows:  "A committee quorum, other than the Executive Committee, is constituted when a majority of the members present and entitled to vote are current Active Medical Staff."   See Exhibit 7 (Medical Staff Bylaws). The Medical Staff Bylaws further provide, at Section 10.07.A, that . . . "the action of a majority of members present and entitled to vote at a meeting in which a quorum is present shall constitute the acts of the members."    Id.  Likewise, the Grievance Resolution policy itself confirms that the GC's action is effective upon a "majority vote."   See Exhibit 29, Hamot's Motion for Summary Judgment.

At all times, at least five of the six duly appointed members of the GC were present, and all were Active Medical Staff entitled to vote.   See Exhibit 8 (Deposition of Dr. Albert).   Even though a simple majority vote would have been legally sufficient, the GC's vote was in fact

unanimous.  Thus, all five members voted to uphold the decision not to advance plaintiff to the next year of training. Id. Under these circumstances, the absence of Dr. Dulabon was neither procedurally incorrect, nor harmful.  It is undisputed that had he been present, even assuming he would have voted to reject Dr. Lubahn's decision, his vote would have been inconsequential. Accordingly, plaintiff cannot avoid summary judgment on this theory.

Finally, plaintiff asserts that Hamot "improperly focused" on her OITE scores, for which she cites only the American Academy of Orthopedic Surgeons (AAOS) Program Directors Report.  See Exhibit U, Pl. Opposition.  Plaintiff never establishes, however, how this allegation, even if true, rises to the level of a breach of contract.

Moreover, while it is true that the AAOS provides that OITE performances should not be used to decide whether or not to advance a resident, Hamot complied with those guidelines, and plaintiff has not submitted evidence to the contrary.  In fact, Dr. Pepicello responded to plaintiff's inquiry that an OITE performance would only be relevant to a resident's participation in the Program if it was "combined with issues of substandard performance, in terms of the resident's clinical duties," but "it would not be an indicator in and of itself."  See Exhibit 28, Hamot's Motion for Summary Judgment.[12]

Accordingly, Count 5 of plaintiff's Complaint also must fail, as there are no genuine issues for trial, and plaintiff has failed to demonstrate that she is entitled to recover on the existing facts.

---

[12] In plaintiff's declaration, she asserts that the GC improperly heard testimony from other residents.  Her opposition is silent on this point, however, and she offers no explanation as to how this could have violated the Grievance Policy.  Absent far more, plaintiff cannot save her claim from summary judgment on these grounds.

III.    **PUBLIC POLICY FAVORS GRANTING SUMMARY JUDGMENT IN THIS CASE.**

Plaintiff attempts to impose an employment-based analysis onto what is fundamentally an academic relationship. While there may be cases in which a resident suffers an employment-based wrong (e.g., denial of health benefits, denial of FMLA Leave, failure to pay wages, etc.), this is not such a case. In fact, plaintiff's principal complaint is that she believes her academic performance was unfairly evaluated. This is true in both her discrimination claims and her "breach of contract" claims. It has been long settled that academic institutions are entitled to "the widest discretion in making decisions as to the academic performance of their students." *Hankins v. Temple Univ. (Health Sciences Center) et al.*, 829 F.2d 437 (Cir.3d 1987), *citing, Bd. Of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948 (1978), and *Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 106 S.Ct. 507 (1985).

In *Hankins* an African-American woman physician was dismissed from a fellowship training program in rheumatology for academic reasons including a lack of medical knowledge, poor clinical judgment, interpersonal communications, poor attendance and timeliness and inappropriate dress and demeanor. *Hankins* at 439. She contested the veracity of these reasons, and alleged she was treated differently than another (male) fellow in terms of access to vacation time, holiday schedules, and rotational schedules based on sex. The Third Circuit upheld the trial courts grant of summary judgment on plaintiff's Title VII claim, noting that at most plaintiff had raised an issue of fact as to whether "the faculty and staff at the hospital were mistaken in their appraisal of her medical skills, and in their decision to terminate her fellowship. Relying on *Horowitz*, the court declined to look behind the medical judgment of the faculty. *Id.* 443. The court further noted that the plaintiff had adduced no cognizable evidence to tie the decision to dismiss her from the fellowship training program to any alleged discriminatory animus.

The *Hankins* decision is on all fours with the instant case. The undisputed reason for plaintiff's dismissal from the residency training program was her chronic and recurring academic deficiencies. Plaintiff has adduced no evidence to suggest that Dr. Lubahn actually acted for any other reason. As an academic decision, Dr. Lubahn's decision is entitled to the widest discretion. That is, unless plaintiff can show that Dr. Lubahn's decision was so attenuated as to not constitute an actual exercise of his professional discretion, it is entitled to deference. *Ewing* at 225. *See also, Stoller v. College of Medicine*, 562 F.Supp. 403, 412-413 (M.D.PA. 1983)(finding a rational basis to dismiss medical student for overall poor performance existed, even where none of the faculty evaluations recommended the student receive a failing grade). Plaintiff cannot even begin to make the necessary showing. Dr. Lubahn's decisions are supported by negative evaluations and criticisms from no fewer than five different faculty members, his own observations, and plaintiff's own admissions. See Exhibit 5. (Faculty Evaluations). Also, as in *Hankins*, plaintiff alleges a litany of things she claims were discriminatory; yet she fails utterly to tie any of those supposedly discriminatory acts to the decisionmaker, or even to the decisionmaking process. Accordingly, in reliance on *Hankins* alone, this court should grant Summary Judgment.

The *Ewing* case is also instructive. In *Ewing* a medical student with a long history of poor academic performance was dismissed from medical school after he failed the first part of a national licensing board examination. In that case, the plaintiff argued that the school's decision was unfair because all 32 other people in the history of the university who had failed the test had been permitted to stay in school and retake the test, some as many as three or four times. The Court upheld the lower court's decision dismissing the plaintiff's case, finding that based on plaintiff's unique record, the decision to dismiss him from school was reasonable. The Court

stated that when judges are asked to "review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate the person or committee responsible did not actually exercise professional judgment." *Ewing* at 225. In fact, the Court expressly declined to even hear evidence concerning the 32 other allegedly similarly situated students who were treated differently than Mr. Ewing. The Court deemed it immaterial, so long as the decision with regard to Mr. Ewing was reasonable on its face. *Ewing* at 228.

The reasons for courts' unusual deference to academic institutions, and in particular medical educators are explained nicely in *Hernandez v. Overlook Hospital*, 692 A.2d 971, 976-77 (NJ 1997). There, the court upheld a Program Director's decision to dismiss a resident from an internal medicine residency program for academic reasons, and in the process noted: "Residents unlike [fully trained] physicians, are generally considered students subject to the academic requirements of a residency program. (citations omitted)." *Id.* at 974. The court found:

> Assessing a student's academic performance must be left to the sound judgment of the individual academic institution. (citations omitted) The process of rendering an academic decision frequently involves a subjective assessment of a student's ability to meed curriculum standards. Those evaluations should be conducted in an academic, rather than a legal environment because such decisions do not lend themselves to the traditional fact-finding process of civil litigation. *Id.* at 975.

The court noted that "we must avoid at all costs . . . the pursuit of mediocrity that can result from judicially supervised academic decisions." *Id.* at 976. It then overturned the lower court's decision, expressly finding that:

Because of plaintiff's unique status as a doctor-in-training and considering the strong public policy of ensuring that only qualified physicians serve the public, we find that Overlook is qualified, both substantively and procedurally, to pass judgment on whether plaintiff is fit to practice medicine in its programs. To hold otherwise and not afford great deference to a Program's expertise in this area would, in effect, threaten the autonomy of such a programs (sic) to determine the academic standards by which residents are to be educated, trained and judged.

*Id.* at 977.

The courts' decisions in *Hankins* and *Overlook* provide strong, independent reasons to deny plaintiff's claims and grant summary judgment in favor of Hamot.

## CONCLUSION

For all of the foregoing reasons, as well as the reasons set forth in Hamot's principal memorandum supporting its Motion, and its Opposition to Plaintiff's Motion for Partial Summary Judgment, any and all claims asserted by plaintiff against Hamot should be dismissed, and summary judgment in favor of Hamot should be granted with respect to all Counts in plaintiff's Complaint.

Respectfully submitted,

**Tobin O'Connor Ewing & Richard**

/s/_____ _____
Kerry M. Richard
Ziad Haddad
Forrest G. Read
Tobin O'Connor Ewing & Richard
5335 Wisconsin Avenue, NW, Suite 700
Washington, DC 20015
202-362-5900
Counsel for defendant