**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LISA BROWN, M.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 05-32E |
| | ) |
| HAMOT MEDICAL CENTER, | ) |
| | ) |
| Defendant. | ) |

## **OPINION**

COHILL, Senior J.

Pending before the Court are the parties' cross-motions for Summary Judgment:

Plaintiff's Motion for Partial Summary Judgment on the Complaint filed by Plaintiff Lisa

Brown, M.D. ("Brown"), with respect to two of three breach of contract claims (Counts III

and IV), and Defendant's Motion for Summary Judgment on the Complaint filed by

Defendant Hamot Medical Center ("Hamot") with respect to all claims, gender

discrimination in employment claims (Count I and II), and all three breach of contract claims

(Counts III, IV, and V).

For the reasons set forth below, as to Count's I and II, Hamot's motion for summary

judgment on Brown's gender discrimination Title VII and the PHRA claims shall be granted

and judgment will be entered in favor of Hamot.  As to Counts III and IV, Brown's Motion

shall be denied and Hamot's motion shall be granted with judgment as a matter of law

entered in favor of Hamot as to Counts III and IV.  As to Count V, we shall grant Hamot's

motion and enter judgment as a matter of law.

1

## I. *STANDARD OF REVIEW*

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, fail to demonstrate a genuine issue of material fact and thus, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).

The moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry the burden of persuasion at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The nonmoving party must then go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, and admissions on file, designate facts showing that a genuine issue of material fact remains for trial. Id. at 324. In deciding a motion for summary judgment, the facts must be viewed in a light most favorable to the nonmoving party and all inferences must be drawn in that party's favor." Gray v. York Newspapers, 957 F.2d 1070, 1078 (3d Cir.1992).

## II. *FACTUAL BACKGROUND*

The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."). Here, both parties have moved for summary judgment with respect to two breach of contract counts, Count III

and Count IV. As to those counts, the vast majority of the material facts are undisputed,

however, where there is a material dispute about the facts between the parties as to these

counts, the Court will so note. With respect to Count I and Count II, gender discrimination

counts, and Count V, a breach of contract count concerning the grievance procedure, Hamot

alone has moved for summary judgment. Brown is thus the non-moving party as to those

three counts and pertinent facts will be viewed in the light most favorable to her.[1]

## A. The Contract

From July 2001 to June 30, 2004, Hamot employed Brown as an Orthopaedic resident

(Ex. G ¶1). Hamot operates a hospital with both in- and out-patient care and sponsors

graduate medical education. (Doc. 50, Ex. B). Hamot sponsors an accredited Orthopaedic

Surgery Residency Program, through which it provides clinical training to residents seeking

to become orthopaedic surgeons. (Doc. 54, Ex. 1 and Doc. 54, 6 ¶¶ 4). The Residency

Program is conducted in accordance with the Institutional and Program Requirements of the

national accrediting entity, the Accreditation Council for Graduate Medical Education

("ACGME"). The Residency Program is directed by John D. Lubahn, M.D. (Lubahn), and

educates and trains physicians in skills needed to provide proper orthopaedic care. (Doc.

50, Ex. B, Ex. G ¶6). The ACGME has established Institutional and Program requirements

for accredited hospitals. (Doc. 50, Ex. B).

Hamot's orthopaedic Residency Program comprises five years. The residents receive

a series of one year contracts as a resident in the Residency Program. Brown had completed

---

[1]The parties have submitted exhibits to support their motions for summary judgment, and in some cases, the exhibits are identical, but assigned different numbers or letters. For clarity, exhibits will be referred to by number assigned to the submission on the docket sheet followed by the exhibit number or letter assigned by the party.

three of the five years of the Residency Program as of June 30, 2004, when she separated from the Residency Program. (Doc. 50, Ex. A, Ex. B).

The terms and conditions of Hamot's employment and training of residents are governed by a series of one-year contracts. Brown notes that the contracts "are typically renewed during the course of the residency" while Hamot points out that renewal is subject to evaluations of residents and assessments of their competency. Brown's third year contract ran from July 1, 2003 to June 30, 2004 (the "Contract"). (Doc. 50, Ex. B). The terms of this appointment are reflected in the Resident Agreement of Appointment in the Graduate Program in Medical Education (the "Appointment"). (Doc. 54, Ex. 6). The Appointment requires the resident to "meet all requirements for participation in a graduate program of medical education conducted by HMC…" (Id. at 1). It requires the resident to maintain licensure by the Pennsylvania State Board of Medicine. (Id.) Per the Appointment, Hamot agrees to: 1. Provide the Resident with a program of graduate medical education that meets the Institutional and Program Requirements of the Essentials of Accredited Residencies as approved by the Accreditation of Graduate Medical Education (ACGME). (Id. at 2). The Contract provides that the resident "shall be promoted to the next level of resident training required for his/her specialty [and] continue through the Residency Program . . . Upon satisfactory completion of the resident training year as determined by the program director and faculty. . . ."(Id. at 7).

As an Orthopaedic resident, Brown was required to fulfill the educational requirements of the Residency Program, obtain a full Pennsylvania license to practice

4

medicine, and abide by Hamot's policies. (Doc. 50, Ex. B at 4). Further, the Contract
incorporates the policies and procedures of ACGME. (Doc. 50, Ex. B at 1)

On March 1, 2004, Lubahn informed Brown that her contract would not be renewed
at the end of the academic year because of her clinical performance and current knowledge
base. (Doc. 50, Ex. A) Brown characterizes this action by Lubahn as a "decision to
terminate [Brown's] contract" whereas Hamot denies that Lubahn "terminated" her contract.
Rather, Hamot claims that Lubahn's decision was one "not to renew [Brown's] contract for a
fourth academic year."

## B. Brown's Residency at Hamot

Although residents are employed by Hamot during their training, the ACGME has
declared that, "Residents are first and foremost students, rather than employees, and all
accreditation standards and activities reflect this distinction." (Doc. 54, Ex. 3). ACGME
obligates every accredited residency program "to require its residents to obtain competence
in the six [ACGME competencies] to the level expected of a new practitioner." The "Core
Competencies" are: Patient Care, Medical Knowledge, Practice-based Learning and
Improvement, Interpersonal and Communication Skills, Professionalism, and Systems-based
Practice. (Doc. 54, Ex. 5 pp. 11-14).

Brown enrolled in Hamot's Program and received her first one-year appointment in
July 2001. In her first year of residency, Brown was among several residents in the
Residency Program who performed poorly on the Orthopaedic In-Training Examination
("OITE"), a national examination given annually and designed to be a tool for residents.
(Doc. 54, Ex. 8). In February 2002, Lubahn, the Residency Program's Director, advised

5

Brown that her scores needed improvement and that she needed to increase her reading to

improve them. (Doc. 54, Ex. 9). During Brown's second year, she continued to have

difficulty keeping up with her required reading, likely due to severe personal problems.

(Doc. 54, Ex. 10 at 206:24-207:9). Lubahn again stressed to Brown the importance of

reading as well as time management to accomplish that reading. (Doc. 54, Ex. 11). Again,

Brown received a low percentile ranking, as did some other residents, on the November 2002

OITE. (Doc. 54, Ex. 12).

In her regular semi-annual evaluation in February 2003, Lubahn explained that

Brown's OITE scores were in need of improvement; he discussed various study approaches

and a reading list for her, and he suggested that Brown read a specific article on fracture

dislocations. (Doc. 54, Ex. 13, 14).

In March 2003 Patrick Williams, a partner in Lubahn's practice group, reported that:

Over the past several months Dr. Brown, unfortunately, has been
struggling in regards to her duties as a resident. She has not progressed
academically and has failed to accept a higher level of responsibility
needed at her level of residency.

(Doc. 54, Ex. 15).

Williams further observed that Brown had failed to complete rounds and reported as follows:

Specifically, she has neglected rounds and subsequently has been
untruthful when asked about whether these duties have been performed.
Also, Dr. Brown has had difficulty following the responsibilities of the
hand service resident. When the scheduled attending has been absent, her
presence has not been accounted for on that particular day.

Id. Williams's memo concluded as follows:

On many occasions academic questions of a lower level have been proposed to
Dr. Brown and her level of comprehension has been severely lacking. When

6

confronted she has stated that she cannot find the time to read due to her resident responsibilities. Obviously, this is very concerning.

At this time, I hope the orthopaedic faculty can help Dr. Brown, but her progress is of great concern.

Id. Brown admits that the memo from Williams is part of her personnel file, but disputes the substance of the memo. Brown notes that she complained to Lubahn that the supervision and direction she received within the Residency Program was inadequate. (Doc. 59, Ex. J).

On March 26, 2003, Brown called Lubahn about a patient who had a contaminated laceration on his leg. Lubahn claims to have informed Brown that the wound should be thoroughly irrigated and loosely closed; however, Brown denies that Lubahn adequately communicated these instructions. (Doc. 54, Ex. 13 at 65:17-66:2; Doc. 54, Ex. 16; Doc. 59, Ex I; Doc. 59, Ex. E.¶¶ 1- 3). The day after the phone call, Brown informed Lubahn that she closed the wound tightly stitched and in layers. (Doc. 54, Ex. 13 at 65:9-12; Doc. 54, Ex. 16). When questioned about her failure to follow his instructions Brown told Lubahn the noise level in the Emergency Room prevented her from hearing his instruction. (Id. at 21:4-13 and 22:11-19). Brown states that she followed the instructions of the emergency room physician on site, which she believed to be the proper procedure. (Doc. 59, Ex. E ¶6).

On April 2, 2003, Lubahn met with Brown and advised her she would be placed on academic and clinical probation. See Exhibit 10 at 216:25-217:12. Lubahn hoped that Brown would use this time "to improve [her] core knowledge base in orthopaedics and improve [her] clinical skills. Lubahn also suggested a weekly schedule to Brown that would accommodate her need for increased time to study, which included significant work with Mary Beth Cermak and David Babins. (Doc. 54, Ex. 17) In a post-operative report Brown

7

dictated on June 30, 2003, she omitted a significant portion of the procedure from her report. In July, Lubahn provided her with written feedback and asked her to correct the report. (Doc. 54, Ex. 18) In August 2003, Brown acknowledged the inaccuracies, corrected the report and thanked Lubahn for his help. (Doc. 54, Ex. 19). In July 2003, Brown began the third year of the Residency Program assigned to "basic science." Brown received relatively positive evaluations for her research, and in October 2003, Lubahn removed her from probation. (Doc. 54, Ex. 20). Indeed, during her time in the Residency Program, Brown received several positive evaluations; several physicians noted that her clinical performance was acceptable and improving, though her in-training performance was generally thought poor. (Doc. 59, Ex. N).

Brown performed poorly on the November 2003 OITE – the results were worse than her previous year's OITE results, as Brown finished in the bottom 2%. (Doc. 54, Ex. 21) Brown asserts that other residents also performed poorly, that she had undergone severe personal hardships which interfered with her ability to improve her performance, and that her performance is evidence of Hamot's deficiencies in teaching residents. (Doc. 59, Ex. E ¶14). In a January 2004 evaluation, Lubahn observed that Brown's in-training performance was poor. (Doc. 54, Ex. 22). He suggested that she attend the Sylvan Learning Center in Erie for an evaluation of her problems with standardized tests. (Id.) Lubahn also observed that Brown was at risk of not completing the Residency Program on time and told her that "if her performance did not improve over the course of the next two years on the order of 20% to 40% each year he would not allow her to take Part I of the American Board of Orthopaedic Surgeons Exam." (Id.) In a letter to Lubahn dated February 20, 2004, Cermak reported an

8

incident where Brown had refused to go to the ER to treat a patient sent there by Cermak.
(Doc. 54, Ex. 10 at 258:3-14; Doc. 54, Ex. 13 at 230:2-16, and Doc. 54, Ex. 23).  Brown
denied that she had refused to go to the emergency room. (Doc. 54, Ex. 23).  Cermak
reported that she followed up with the emergency room nurse, who confirmed what had
transpired, through Brown continues to deny the substance of the report. (Id.)

On February 25, 2004, in an evaluation of a presentation given by Brown, Lubahn
concluded that Brown "had no immediate knowledge when questioned" more specifically
about the presentation's subject matter and that the presentation was unsatisfactory
considering Brown's level of training. (Doc. 54, Ex. 24).  Brown denies that this occurred.

Though Brown denies that she created any problem by recurrently delaying
responding to emergency room calls, Hamot claims that on February 27, 2004, Lubahn
spoke with Frank Benes, who advised that Brown had delayed on multiple occasions in
responding to calls from the emergency department. (Doc. 54, Ex. 13 at 60:9-15, 61:6-14
and 63:19-22 ; Doc. 54, Ex. 25).  Similarly, Hamot presents an email, in which Benes
indicated that he specifically mentioned Brown because of "recurrences" in her delays.
(Doc. 54, Ex. 25).

## C. Brown's Separation from Residency Program

On March 1, 2004, Lubahn informed Brown that her contract would not be renewed
beyond that current academic year, ending June 30, 2004. (Doc. 54, Ex. 13 at 62:6-19).  On
March 17, 2004, in accordance with Hamot's Grievance Resolution and Due Process
Procedure, Brown met with James Pepicello, Executive Vice President and Chief Medical
Officer, about her discharge from the Residency Program. (Doc. 54 at Ex. 28 at 39:21-40:11;

Doc. 54, Ex. 29). Pepicello concluded that Lubahn's decision was reasonable. (Doc. 54, Ex. 28 at 39:13-20 and 45:1-3; Doc. 54, Ex. 30). Pursuant to the Grievance Procedure, a Grievance Committee was formed. The Grievance Committee met on three different occasions – March 30, 2004, April 6, 2004 and April 8, 2004 – to review the decision not to renew Brown's contract. (Doc. 54, Ex. 31 at 60:8-18). Even though the Grievance Committee was authorized to act on a "majority vote," committee members decided that they would not uphold Lubahn's decision unless everyone agreed with the decision and was left with no doubts after the review process. (Doc. 54, Ex. 34 at 25:5-27:4). At the third meeting, after considering all of the testimony from witnesses and available options, the Grievance Committee unanimously concluded that the decision was appropriate and recommended that it be upheld. (Doc. 54, Ex. 31 at 80:15-21 and 88:19-20; Doc. 54, Ex. 28 at 81:16-18). Brown argues that other residents were permitted to testify, and could not be expected to oppose the Residency Program Director's decision, as that could be injurious to their careers. After the Grievance Committee's decision, the Medical Education Committee reviewed the Grievance Committee's recommendation. (Doc. 54, Ex. 28 at 81:19-22).  The Medical Staff Executive Committee reviewed the Medical Education Committee's recommendation.  (Id. at 81:23-25). The Board of Directors reviewed the Medical Staff Executive Committee's recommendation. (Id. at 82:1-2). After considering the decision not to renew Brown's contract and any feasible alternatives to that decision, the Board of Directors unanimously voted to uphold the decision and the Medical Staff Executive Committee's recommendation that the decision stand. (Id. at 82:7-84:14).

10

When Lubahn first informed Brown of his decision not to renew her contract, Brown did not claim discrimination. To the contrary, she told Lubahn that she "understood the decision based on her academic performance but not her clinical performance." (Doc. 54, Ex. 26; Doc. 54, Ex. 27). Brown has since stated that she withheld accusations of discrimination until this action because she did not believe discrimination claims would help her progress through the Residency Program. (Doc. 59, Ex. E).

Since Lubahn became Director in 1988, the Residency Program has had only two female participants, Brown and one other, who successfully completed the Residency Program. (Doc. 59, Ex. H at 136 -137). Although half of medical school graduates are women, only 2.6% of Orthopaedic residents nationally were women. (Doc. 59, Ex. L). Brown asserts that male residents in the Residency Program also suffered performance problems but were not discharged from the Residency Program, including one who falsified records on a research project and others against whom malpractice suits were brought. (Doc. 59, Exs. P, Q, R, S, T). In particular, during Brown's time in the Residency Program, Lubahn went to great lengths to provide medical training for a male physician who had lost his license in another state, lost admitting privileges, had interpersonal problems, and substance abuse problems. This male physician was remediated, completed the Residency Program, and recommended for an attending position. (Doc. 59, Ex. T). Lubahn offered personal attention and help with test-taking skills to male residents with low OITE rankings. He made no such offer to Brown, but recommended instead that she consult Sylvan Learning Center, a tutoring service primarily for children. (Doc. 59, Exs. W, X). Brown also asserts that during her time in the Residency Program she was subject to a range of unwanted and

11

embarrassing comments relating to her status as a woman from the staff, other residents and
faculty. (Doc. 59, Ex. Y).

## III.  *GENDER DISCRIMINATION IN EMPLOYMENT*

Brown asserts two discrimination claims in her Complaint: (1) Count I, a sex
discrimination claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.
§ 2000e-2 et seq. ("Title VII"): and (2) Count II, a sex discrimination claim under the
Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. §§ 951 et seq. ("PHRA").
Hamot moves for summary judgment with respect to both discrimination claims. The
undisputed material facts and the disputed facts viewed in the light favorable to Brown do
not provide a basis for a reasonable trier of fact to return a verdict in favor of Brown. We
find that Brown has failed to make a prima facie case of employment discrimination, that
Hamot has articulated a legitimate, non-discriminatory reason for discharge from the
Residency Program, and that Brown cannot show that this reason, her academic deficiency,
was a pretext for discrimination.   The Court will therefore grant summary judgment in favor
of Hamot as to both Counts I and II of the Complaint for the reasons stated below.

Inasmuch as Brown asserts claims of gender discrimination based upon both Title VII
and the PHRA and the analysis required for adjudicating plaintiff's claim under the PHRA
being identical to a Title VII inquiry, Goosby v. Johnson & Johnson Medical, 228 F. 3d 313
(3d Cir. 2000), this Court will not separately address her claim under the PHRA.  Hamot
asserts that Brown cannot assert a gender discrimination claim because she cannot (1)
establish a prima facie case of gender discrimination , or (2) rebut Hamot's purportedly
legitimate reasons for removing her from the Residency Program.

12

Title VII prohibits discrimination in employment based upon gender. See 42 U.S.C. §
2000e-2 (2004). A plaintiff may establish a claim of gender discrimination based upon
indirect evidence of discrimination, pursuant to the three-tiered, burden shifting framework
set forth in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1987). See Stanziale v.
Jargowsky, 200 F.3d 101, 105 (3d Cir. 2000) (applying the McDonnell Douglas burden-
shifting framework to Title VII claims).

McDonnell Douglas sets forth a three-step process in examining claims of
discrimination. Id. First, the plaintiff must establish a prima facie case of discrimination. If
the plaintiff can establish a prima facie case of discrimination, the burden shifts to the
defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment
action. Upon the defendant's satisfaction of this burden, the burden shifts back to the plaintiff
to show, by a preponderance of the evidence, that the articulated reason is a pretext for a
discriminatory motive. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133
(2000). To defeat a motion for summary judgment on the basis that the employer's proffered
explanation is a pretext for actual discrimination, "the plaintiff must point to some evidence,
direct or circumstantial, from which a fact finder could reasonably either: (1) disbelieve the
employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory
reason was more likely than not a motivating or determinative cause of the employer's
action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir.1994).

## A. Prima Facie Case

To establish a prima facie case of gender discrimination under Title VII, a plaintiff
must show that she: (1) belonged to a protected class; (2) was qualified for the position in

13

question; (3) was terminated; and (4) persons not in the protected class were retained. See In re Carnegie Assoc., 129 F.3d 290, 294-95 (3d Cir.1997); see also Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir.2002). "[T]here is a low bar for establishing a prima facie case of employment discrimination." Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 (3d Cir.2006). A plaintiff who fails to show how she meets these elements, in particular who fails to show how she was qualified for retention or that similarly situated man were retained, will not meet the bar. Despite this low threshold, Brown has not made such a showing and has failed to plead a prima facie case of gender discrimination.

The parties do not dispute that Brown is a member of a protected class or that her discharge from the Residency Program was an adverse employment action. Hamot, however, argues that Brown cannot show that her performance was satisfactory to move on to the fourth year of the Residency Program or that persons not in the protected class were retained. Hamot relies on Brown's poor academic performance and failure to demonstrate competence in the six core areas identified by the ACGME: Patient Care, Medical Knowledge, Practice-based Learning, Interpersonal and Communication Skills, Professionalism and Systems-Based Practice. (Doc. 54, Ex. 5). To be qualified for advancement, the resident must demonstrate increased competence each year so the resident may safely assume greater responsibilities and clinical independence over the course of the Residency Program. (Id.)

In her brief in opposition, Brown does not address the qualifications necessary to advance to the Residency Program's fourth year nor does she show how she met them. Rather, Brown provides evidence from her performance evaluations that demonstrate that

14

she received positive feedback and acceptable ratings. Hamot has conceded that Brown performed acceptably at various points and sometimes even for extended periods of time. Brown has herself conceded that she needed to read more, could not find time to read enough and that she was academically behind. She admitted in her meeting with Lubahn upon learning that she would have to leave the Residency Program that "she understood that the decision [not to advance her to the next year of training was] based upon her academic performance, but not her clinical performance." (Doc. 54, Ex. 27). Also, rather than demonstrate her qualifications to advance to the fourth year of the Residency Program, Brown argues instead that Hamot's Residency Program is of poor quality and that women are underrepresented in Orthopaedic residency programs in general. Even if these facts were true, and from the evidence the parties have provided they may well be, neither sheds light on Brown's qualifications for this Residency Program's fourth year or on whether Hamot discriminated against Brown here. Fuentes v. Perskie, 32 F.3d at 765 (factual dispute at issue is whether discriminatory animus motivated employer, not whether employer is wise, shrewd, prudent or competent.)

Though the burden is upon Brown to demonstrate her qualifications for fourth year advancement, Hamot notes that Brown's chronic failure to keep up with required reading, or even to read articles specifically suggested to her for her edification, translated directly to deficiencies in Brown's medical knowledge and her ability to apply the knowledge to assess patients, the Practice Based Learning and Improvement core area. The record is full of comments from evaluators about Brown's substantive knowledge and her need to improve in this area in particular. While Brown claims that Hamot was improperly fixated upon the

OITE examinations, Hamot notes that Brown's poor showing on these examinations simply

corroborated the faculty's observations that she had not acquired the fund of medical

knowledge required for a resident at her level, for the Medical Knowledge core area.

Hamot provides (Doc. 65, p. 16) a helpful chart showing Brown's performance on the OITE

exams. In 2001, Brown was in the 6th percentile nationally, in 2002, in the 10th percentile

nationally, and in 2003, in the 2nd percentile nationally, compared with all Orthopaedic

surgery residents of her year. Hamot evaluated Brown's performance as deficient in other

areas as well, including Patient Care, Interpersonal and Communication Skills, and

Professionalism. Several incidents in Brown's third year, combined with existing

deficiencies, led the faculty to conclude that Brown was not qualified to advance to the

fourth year. As the United States Court of Appeals for the Fifth Circuit has explained in

another context, a medical residency is primarily an academic enterprise:

> [a] residency program is distinct from other types of employment in that the
> resident's "work" is what is academically supervised and evaluated. [T]he
> primary purpose of a residency program is not employment or a stipend, but
> the academic training and the academic certification for successful completion
> of the program. The certificate . . . tells the world that the resident has
> successfully completed a course of training and is qualified to pursue further
> specialized training or to practice in specified areas.... Successful completion
> of the residency program depends upon subjective evaluations by trained
> faculty members into areas of expertise that courts are poorly equipped to
> undertake in the first instance or to review . . . .

Davis v. Mann, 882 F.2d 967, 968 - 969 (5th Cir.1989).

Brown has not demonstrated that she was qualified to advance to the fourth year of

the Residency Program. Neither has she demonstrated that persons not in the protected

class were retained, under the required fourth prong for the prima facie case. To satisfy this

prong, Brown would need to show that a male resident with similar or inferior academic and

16

clinical evaluations was promoted within the Residency Program. Though Brown relates misdeeds, some quite serious, of male residents in the program, she fails to establish that any of these individuals were similarly situated to her, as she must. Hankin v. Temple University, 829 F.2d 437, 442 (3d Cir. 1987). Hamot notes that none of three residents Brown refers to, Green, Lippe or Nechleba, were in her year, that male residents have been taken to task and otherwise disciplined, and that there has never been a resident in the Residency Program who has persistently done so poorly across the gamut of performance assessments as has Brown. According to Hamot, Brown's deficiencies encompassed five of the six core competencies defined by the ACGME, persisted over more than two years despite verbal and written counseling and a period of probation. Lubahn noted that this presented a series of challenges that no other resident had ever presented in his twenty-five years on the Hamot faculty. (Doc. 54, Ex. 13 at 30:18 – 31:7).

## B. Legitimate, Nondiscriminatory Reason for Discharge

Though Brown has failed to plead a prima facie case of gender discrimination, for the purpose of this motion, the Court will assume that Brown has met the minimal requirement of a prima facie case of discrimination. The second prong of the McDonnell Douglas analysis then requires that the defendant articulate a legitimate, nondiscriminatory reason for its employment action against the plaintiff. In order to satisfy its burden of production, a defendant need only introduce evidence that, if taken to be true, would permit the conclusion that the reason for the adverse employment action was nondiscriminatory. Fuentes, 32 F.3d at 763. Hamot has done so by producing evidence, such as test scores, correspondence, testimony and evaluations, showing that Brown's deficiencies were serious

17

enough that the medical faculty precluded her on that basis from continuing to the fourth

year of the Residency Program. Brown was afforded ample opportunity to participate in

discussions about her performance, and by her own admissions, appreciated the seriousness

of her situation. Her medical supervisors decided, however, that she did not meet the

standards Hamot set for continuation in its Residency Program.

The court is satisfied that no reasonable jury could find that Brown was asked to

leave the Residency Program other than as a result of academic decisions made by medical

faculty at Hamot over the course of several years of interaction and observation, after it was

determined that she was deficient in medical knowledge, which manifested in poor patient

care, and unable to keep up with the academic demands of the Residency Program among

other deficiencies.

## C. Pretext for Gender Discrimination

Although Hamot has articulated a legitimate, non-discriminatory reason for

preventing Brown to advance to the fourth year of the Residency Program, the Court will

briefly note the third and final prong of the McDonnell Douglas analysis. To defeat Hamot's

motion for summary judgment with respect to her gender discrimination claim, Brown must

adduce sufficient evidence for a reasonable fact finder to conclude that Hamot's articulated

reason was a pretext, masking a discriminatory motive. See Fuentes, 32 F.3d at 764. Brown

must show "such weaknesses, implausibilities, inconsistencies ... or contradictions in [the

defendant's] proffered legitimate reason [such] that a reasonable factfinder could rationally

find them unworthy of credence." Id. at 765.

A plaintiff may satisfy this prong by pointing to some evidence "that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. at 764. With respect to this approach, the United States Court of Appeals for the Third Circuit stated: "To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with sufficient probative force that a fact finder could conclude by a preponderance of the evidence that [a protected characteristic] was a motivating or determinative factor in the employment decision." Simpson v. Kay Jewelers, 142 F.3d 639, 644-45 (3d Cir.1998).

Not only does Brown neglect to demonstrate in legal terms how she can meet the prongs of the McDonnell-Douglas test, but she never alleges explicitly that her discharge from the Residency Program was actually based upon gender discrimination and that her academic deficiencies were merely a pretext. At this stage, Brown utterly fails to link the discharge to gender. Brown bears the burden to "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir.2005). This Court concludes that plaintiff has not satisfied the burden of demonstrating that there is a genuine issue as to a material fact regarding whether defendant's proffered explanation for plaintiff's termination should be disbelieved, or with respect to whether unlawful gender discrimination motivated defendant's decision to terminate plaintiff. Accordingly, Hamot's motion for summary judgment on Brown's gender discrimination Title VII and the PHRA claims is granted. This Court will grant Judgment in favor of Hamot as to Counts I and II.

19

## IV. *BREACH OF CONTRACT*

Brown has asked this Court to enter partial summary judgment in her favor on the basis that Hamot terminated Brown without proper cause (Count III) and failed to comply with its Advancement and Dismissal Policy (Count IV) in breach of the parties' April 8, 2003 employment contract. Hamot has asked this Court to enter summary judgment in its favor on the basis that Hamot's termination of Brown fully complied with the terms of the Contract (Count III), Hamot complied with Advancement and Dismissal Policy (Count IV), and Hamot adhered to the Grievance Resolution and Due Process procedure (Count V). As to Count III, on the basis of our finding that "proper cause" was not required under the Contract to remove Brown from the Residency Program, Brown's Motion shall be denied and Hamot's motion shall be granted with Judgment as a matter of law entered in favor of Hamot as to Count III. As to Count IV we will deny plaintiff's motion and grant Hamot's motion, and at Count V, we will grant Hamot's motion. Judgment as a matter of law will be entered in favor of Hamot as to Counts IV and V.

To make out a cause of action for breach of contract, a plaintiff must prove: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. Ruthrauff v. Ravin, 914 A.2d 880 (Pa. Super. 2006), Ware v. Rodale Press, 322 F.3d 218 (3d Cir. 2003).

Brown claims that Hamot breached the employment contract in terminating her without proper cause (Count III) and in failing to comply with Hamot's Advancement and Dismissal Policy (Count IV). The parties agree as to the existence of a contract and they agree that it is entitled "Hamot Medical Center Resident Agreement of Appointment in the

20

Graduate Program of Medical Education" (Doc. 50, Ex. B).    The Contract was signed on

April 8, 2003 and covers "a period of one (1) year commencing on July 1, 2003 and ending

on June 30, 2004. . . ." There is disagreement as to provisions regarding the manner of

termination and the necessity for proper cause.

## A. Termination without "Proper Cause" (Count III)

Brown's Contract provides, in relevant part (emphasis added):

### Section 3. Termination and Suspension

1.    Either party may terminate this Agreement at any time upon
notice thereof for proper cause.

2.    The Chairman of the Medical Staff Executive Committee . . . the
Program Director. . . [and various other Hamot officials] shall each have the
right to summarily suspend all or any portion of the activities of the Resident
whenever such action must be taken immediately in the best interest of patient
care. Such summary suspension shall become effective immediately. Upon
imposition of a summary suspension, the Program Director shall provide
written notice of the matter to the Vice President . . . and the matter shall be
processed in accordance with the procedures as outlined in the "Grievance
Resolution and Due Process for Resident Physicians" Policy.

\* \* \*

### Section 5. Continuation of Training

Upon satisfactory completion of the resident training year as determined
by the program director and the faculty, the Resident shall be promoted to the
next level of resident training required and approved for his/her specialty
unless either HMC or the Resident shall give written notice to the other of
termination upon completion of the current contract year. Such notice must be
provided at least one hundred twenty (120) days before completion of the
contract year.

These two sections outline the manner in which a resident may be separated from the

program. The proper starting point for interpretation of the Contract is the plain meaning of

the Contract. Steigerwalt v. Terminix Intern., 2007 WL 1780054 (3d Cir. 2007) ("Not all

21

principles of interpretation are created equal; the plain meaning rule should always come first."); see Watt v. Alaska, 451 U.S. 259, 266 (1981) (noting that, although the plain-meaning rule is not absolute, "the words used, even in their literal sense, are the primary, and ordinarily most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else"). We only employ other interpretive devices if the Contract's plain meaning cannot be determined. Steigerwalt at 2007 WL 1780054 (3d Cir. 2007).

In this case, any misunderstanding as to the manner of a Resident's separation from the Residency Program is dispelled by reading paragraphs 3 and 5. The plain language of these paragraphs reveals that they describe two dissimilar situations. Paragraph 3 describes the case where the Contract is terminated "at any time," "upon notice, and "for proper cause." The action is taken "immediately" in the "best interest of patient care." The "summary suspension" is "effective immediately." After the fact of suspension, the paragraph provides that the Residency Program director provide written notice to the Vice President and that Hamot's grievance and due process procedures are activated. This section describes an urgent situation in which Hamot suspends a Resident immediately with a fuller evaluation to follow later. Finally, "Termination" in the title of this paragraph plainly means termination during the course of the existing year-long Contract.

By contrast, paragraph 5 describes the general promotion process, while providing for a way for either party to separate from the Resident/Hospital relationship. The paragraph preserves for the Resident the opportunity to leave the Residency Program and for Hamot the opportunity to prevent a Resident from proceeding to the next training level. Either party must give "written notice to the other of termination upon completion of the current contract

22

year." The notice must be given "at least one hundred twenty (120) days before completion of the contract year." This section describes a non-urgent situation in which either party gives written notice well in advance. Further, this paragraph contemplates a situation in which one of the parties does not wish to proceed to the next contract in the series that makes up the typical five-year Residency Program. The paragraph does not, in its plain language or in a reasonable interpretation thereof, encompass terminating the existing Contract during the contract year.

The record in this case is replete with evidence that Brown was not terminated from her Contract with Hamot as contemplated by paragraph 3. Lubahn's letter of March 1, 2004 does not discuss a summary suspension in the best interests of patient care. Rather, Brown was permitted to serve as a Resident at Hamot until the final day of the Contract, June 30, 2004. Lubahn cited Brown's deficiencies in clinical performance and current knowledge base as a basis for the decision that he "decided not to renew your contract at the end of this academic year, June 30, 2004." (Exhibit A) Brown was not permitted to continue in the Residency Program for a fourth year. Paragraph 5 describes this scenario precisely and it was under this Contract paragraph that Hamot acted against Brown. Finally, "termination" in the fourth line of this paragraph plainly means termination of participation in the Residency Program, "upon completion of the current contract year" and not during the contract year.

This part of the Contract is not ambiguous, and thus may be interpreted on its face without reference to extrinsic evidence, Duquesne Light, 66 F.3d at 614 (quoting Meridian Bank, 657 A.2d at 21-22) ("if the court can determine its meaning without any guide other

than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends"). Brown's interpretation of the facts – that she was fired during her contract and yet continued to serve until the contract's end – and her interpretation of the Contract itself are blatantly contradicted by the evidence. While required for summary termination under paragraph three, this Court finds that this Contract does not require "proper cause" in a decision made under paragraph 5 to decline to offer a Resident a contract for an additional year. To resolve Count III, we need not therefore evaluate the underlying basis for Hamot's decision not to offer Brown an additional year in the Residency Program, though the reason in the notice letter may well serve. Hamot failure to demonstrate "proper cause" cannot serve as a basis to show that the Contract was breached. Judgment as a matter of law shall therefore be entered in favor Hamot on this Claim and Brown's Motion for Summary Judgment on this claim shall be denied.

### B. Failure to adhere to Advancement and Dismissal Policy (Count IV)

In cross-motions, the parties each seek summary judgment with respect to this count which concerns Hamot's "Advancement and Dismissal Policy," a two and a half page, unsigned document issued by Lubahn with its stated purpose as follows: "To define the advancement from year to year of all residents." Brown argues that (1) the Advancement and Dismissal Policy was made a part of the Contract and is binding upon Hamot and that (2) Hamot failed to comply with the Advancement and Dismissal policy in its decision not to permit Brown to continue in the Residency Program. Hamot disagrees asserting that (1) the Advancement and Dismissal Policy is not part of the Contract which only requires that Brown follow Hamot's policies while Hamot is free to disregard them vis á vis Brown, and

24

that (2) if this Court finds that adherence to the Advancement and Dismissal policy was

Hamot's duty, then Hamot complied with it in its decision not to permit Brown to continue

in the Residency Program.

The first question boils down to whether Hamot's adherence to the Advancement and

Dismissal policy was part of the contract such that a failure to follow it constitutes a breach.

Both parties agree that through the Contract, Hamot bound Brown to following Hamot's

policies, and Brown accepted that obligation. At Section 2 (B) 4, a clause specifically

requires the resident to adhere to all Hamot policies. ("The Resident Agrees to: . . . 4.

Abide by and adhere to all HMC policies, procedures, rules and regulations. . . . ") This

is also outlined in the fourth paragraph of the Contract:

> . . . HMC and the Resident intend to be legally bound by the terms of this
> Agreement, and the Resident also agrees to be bound by all terms of the
> MHMC rules and regulations and other policies approved by the Medical Staff
> Committee or the HMC Board of Trustees.

Contract ¶4.

In contrast, Hamot, for its part, agrees to:

> Provide the Resident with a program of graduate medical education that meets
> the Institutional and Program Requirements of the Essentials of Accredited
> Residencies as approved by the Accreditation Council for Graduate Medical
> Education (ACGME).

Contract Section 2. A. 1.

Nothing on the face of the Contract expressly obligates Hamot to follow its own

policies in general or its Advancement and Dismissal Policy in particular. Neither does the

Contract contain any express reference to its Advancement and Dismissal Policy; it does not

25

incorporate the policy by reference. In contrast, when Hamot intended to bind itself to a policy, such as the "Grievance Resolution and Due Process for Resident physicians" policy discussed infra, it expressly incorporated that policy by reference. Exhibit 6 to Hamot's M. for Summ. J. at Section 4. The Advancement and Dismissal Policy itself does not contain the requisites for the formation of a contract. The policy was neither dated nor signed by either party. The policy is more in the nature of a unilateral expression of policy by the orthopedic residency program director, and does not represent a meeting on the minds. We therefore find that an objective reading of the Contract compels the conclusion that the A&D Policy was not part of a binding agreement such that Hamot would be liable for damages for breach of a contractual duty to follow such policies.[2] Judgment as a matter of law shall therefore be entered in Hamot's favor on this Count.

## C. Failure to adhere to Grievance Resolution and Due Process Procedure (Count V)

In its Summary Judgment motion, Hamot asks for judgment on Count V of the Complaint, in which Brown alleges that Hamot breached the Contract by failing to follow its own Grievance Resolution and Due Process policy.

The parties agree that this policy is expressly made part of the Contract, at Section 4. Due Process:

Any problem, grievance, misunderstanding, or alleged violation(s) arising under this Agreement and any pertinent matters relating thereto and to the resident's status in his/her residency, shall be resolved in accordance with the

---

[2]Even if the A&D Policy was legally binding on Hamot, Hamot clearly followed the policy when it placed her on probation initially, and provided her with appropriate levels of feedback and guidance. It also had reason to treat her situation as "more serious" and not to renew her contract given her overall substandard record, discussedsupra, including the events of early 2004 after her probation ended. See Lubahn Dep. at 57-76; 95 ("she would meet the expectations and then not meet them. It was an up-and-down kind of ride with her.")

policy for "Grievance Resolution and Due Process for Resident Physicians" contained within the resident handbook.

(Doc. 50, Ex. B).

In turn, the "Grievance Resolution and Due Process for Resident Physicians," which, among

other things, may be utilized for complaints related to "non-renewal of Agreement of

Appointment," reads as follows:

Hamot Medical Center Resident/Intern Due Process Procedure

Any problem . . . will be resolved as follows:

Step #1    The resident/intern must attempt to resolve the grievance. . . via the usual chain of command beginning with the individual, then that persons' advisor or supervisor, and then the program director.

Step #2    Should the resident/intern feel that the issue has not been adequately resolved . . . he/she may file a written complaint within fourteen (14) days with the Sr. VP of Medical Education.

Step #3    If Step #2 resolution is still unsatisfactory [to either party, either party] may direct the matter immediately, in writing, within seven days, to the Medical Education Committee. A committee appointed by the Chair of the MEC, comprising of [5 hospital officials and a resident selected by the aggrieved resident] shall receive and evaluate all pertinent information, including, if necessary, direct testimonies from the affected parties within thirty (30) days of having been appointed. The resident/intern shall have the right to meet with the committee and to call witnesses in his/her behalf. The committee shall make its decision and resolve the matter, in writing, by majority vote, within fourteen (14 days) of concluding its review."

Said decision shall be final and binding on the parties, subject to approval of the Medical Education Committee, Medical Staff Executive Committee and the Board of Directors.

(Doc. 59, Ex. EE).

In her Brief in Opposition to Hamot's Motion for Summary Judgment, Brown

maintains that "Hamot did not follow its grievance policy after terminating Brown's

27

employment. Contrary to Hamot's representations, the process was replete with irregularities and lack of compliance with published procedures." (Doc. 58, p. 28). Brown addresses this allegation in but one paragraph, providing three pieces of evidence which she asserts demonstrate deviation from the policy and consequently provide a genuine dispute of material fact: (1) the failure of Hamot to provide a resolution at Step 2 of the policy, (2) the improper reliance upon Brown's test scores in determining retention, and (3) the failure of one physician to attend the Step 3 committee meeting and the inclusion of resident testimony in committee deliberations. The Court will address the second two first, reserving the first issue, the Step 2 failure, last.

Brown contends that Hamot "improperly focused on Brown's performance on the OITE [Orthopaedic In-Training Examination] as a condition for retention in the Program, when the OITE exams were not administered for that purpose." (Doc. 59, Ex. U) Exhibit U consists of several pages from the American Academy of Orthopaedic Surgeons ("Academy") in which the Academy stresses its opinion that the use of OITE exam scores to determine resident retention of promotion is "inappropriate." This demonstrates that the testing body did not administer the exams for this purpose and that the testing body finds use of the exam results for this purpose improper. Brown, however, does not provide evidence that her low 2003 OITE ranking was made by Hamot a "focus" or reason for non- retention or that if Hamot did so, it was prohibited from so doing. Though Hamot may be so prohibited, Brown neither states nor demonstrates that Hamot was bound by the Academy's statement that this use was "inappropriate." Hamot is quite correct in its assertion that

Brown fails to show how this allegation, viewed in the light most favorable to Brown,

indeed, if viewed as true, rises to the level of breach of contract.

Similarly, Brown fails to show that the fact that "voting members were absent when

Brown's grievance was addressed" in committee at Step 3, even if true, rises to the level of

breach of contract. Brown points to ¶15 of her September 15, 2006 Statement (Doc. 59, Ex.

E) for the proposition that "One of the members of the Grievance Committee, George

Dulabon, did not vote and residents were allowed to testify," but does not show how this

rises to breach of her Contract. Brown does not show how Dulabon's absence or resident

testimony in any way controverts Step 3 of the policy.

Lastly, we come to Brown's first allegation as to the grievance procedure. That is

Brown's allegation that "Hamot failed to provide a resolution at step two of the grievance

procedure," with a citation to Exhibit E, September 15, 2006 Declaration of Lisa Brown ¶16.

After taking the time to read the cited paragraph, the Court sees that ¶16 simply mimics the

opaque sentence "Hamot failed to provide a resolution at step 2 of the grievance procedure."

We assume that this means that when Brown filed a written complaint within fourteen days

with the proper individual, there was no "response or resolution" as she defines those terms.

Hamot's brief in support of its motion for summary judgment provides the

background that pursuant to step 2 of the grievance procedure, Brown met with James

Pepicello, M.D., the Senior Vice President for Surgical Services, who to no party's

objection, stood in the shoes of the "Sr. VP of Medical Education" referenced in the policy.

At that meeting on March 17, 2004, Pepicello listened to Brown's version of events

surrounding the decision not to renew Brown's contract for year four of the Residency

Program. (Doc. 54, Ex. 29 at 39:21 – 40:11). Pepicello admits at deposition that he was asked by Hamot not to make a statement to Brown about a decision/resolution at the time he met with her, and that he did not make any such statement. (Id. at 41:23 – 42:6). When specifically asked at deposition whether rather than resolving anything in Step 2 he just sent the matter to step 3, "And you did not yourself make any decision about her grievance. Is that fair?" Pepicello answered "That's fair." (Id. at 44: 9 – 16). Nevertheless, Pepicello concluded that Lubahn's decision "was a reasonable one" and he tacitly agreed with the decision not to renew, (Id. at 45: 2- 3); he decided, however, that since his decision "was negative to Brown, then it would go to the next step," that is, the committee. Id. at 45: 4 – 5. When asked, "Q. . . . Step 2 seems to call for a resolution by you, and your letter to Brown doesn't seem to contain a resolution. Is that accurate or not? A. I – yeah, I guess that's accurate." (Id. at 45:11 – 15).

Implicit in Steps 2 and 3 is the communication of a resolution of Step 2 to the intern, though pursuant to Step 3, as Hamot urges in its brief, Pepicello was within his rights to unilaterally initiate Step 3 of the policy: "If Step #2 is still unsatisfactory to the resident/intern or the VP for Medical Education, the resident/intern and/or the VP for Medical Education may direct the matter immediately, in writing, within 7 days, to the Medical Education Committee." In the alternative, Hamot asserts that in failing to object contemporaneously to the alleged Step 2 error, Brown has waived the right to complain now. Hamot also asserts that its error at Step 2, if it existed, was harmless.

It is obvious that both Hamot and Brown knew that step two was resolved against Brown, otherwise, continuation onto Step 3 would never have happened. Hamot wasted no

time in going to the Medical Educational Committee because Brown herself had made it clear that she would proceed to do so. It is difficult to ascertain how Brown has been damaged by this alleged failure to give feedback before the next step in the process was initiated. Brown has provided no evidence of such alleged damages. We therefore find that there is no genuine issue of material fact that there was no damage resulting from this alleged breach of contract and as such, Brown has no cause of action.

Accordingly, Judgment as a matter of law shall therefore be entered in favor of Hamot and Hamot's Motion for Summary Judgment on Count V is granted.

## V. CONCLUSION

Accordingly, for the reasons previously stated, plaintiff's Motion for Partial Summary Judgment is denied, and defendant's Motion for Summary Judgment is granted. An appropriate order will be entered contemporaneously herewith.

Dated: January 2, 2008

Maurice B. Cohill, Jr.
Senior United States District Court Judge

31